UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-16-1012-PHX-SRB(BSB) |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | June 26, 2017 |
| Joseph M. Arpaio, | ) | 1:18 p.m. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL — DAY 1 — P.M. SESSION

(Pages 123 through 264, inclusive.)


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        A P P E A R A N C E S

2


3    For the Government:

4                U.S. Dept of Justice – Public Integrity Section
                 By: JOHN D. KELLER, ESQ.
5                10th & Constitution Avenue
                 Washington, DC  20530

6
                 U.S. Dept of Justice – Public Integrity Section
7                By: VICTOR R. SALGADO, ESQ.
                     SIMON J. CATALDO, ESQ.
8                1400 New York Avenue NW, 12th Floor
                 Washington, DC  20005

9
     For the Defendant Joseph M. Arpaio:
10
                 Wilenchik & Bartness
11               By: DENNIS I. WILENCHIK, ESQ.
                     JOHN D. WILENCHIK, ESQ.
12               2810 North Third Street
                 Phoenix, AZ  85004

13
                 Goldman & Zwillinger
14               By: MARK D. GOLDMAN, ESQ.
                     JEFF S. SURDAKOWSKI, ESQ.
15                   VINCENT R. MAYR, ESQ.
                 17851 North 85th Street, Suite 175
16               Scottsdale, AZ  85255

17   Also Appearing:

18               MS. KAREN CLARK, ESQ.
                 Ethics Counsel for Timothy Casey
19

20

21

22

23

24

25

1                              INDEX OF WITNESSES

2    WITNESSES FOR THE          Direct      Cross     Redirect
     GOVERNMENT:
3
     CASEY, Timothy               126        172
4

5

6

7                              INDEX OF EXHIBITS

8    EXHIBIT NO.:          DESCRIPTION                      RECEIVED:

9         6    December 23, 2011, email from Casey to Sands,
                  et al., DOJ-009854-DOJ-009855              248
10       24    September 25, 2012, email from Casey to
                  MacIntyre, Sands, Lake, et al.,
11                DOJ-011828-DOJ-011830                      140
         25    October 12,2012, email chain and attachments
12                from Casey to Allen, et al.,
                  DOJ-011832-DOJ-011842                      142
13       26    October 18, 2012, email and attached letter
                  from Casey to Sands, MacIntyre, et al.,
14                DOJ-011844-DOJ-011849                      189
         36J   March 14, 2013, MCSO press release,
15                DOJ-009681-DOJ-009682                      156
         36K   April 17, 2013, MCSO press release,
16                DOJ-009688-DOJ-009689                      157
         36L   May 18, 2013, MCSO press release,
17                DOJ-009843-DOJ-009844                      158
         46    May 28, 2013, Briefing Board Message,
18                DOJ-000713                                 164

19

20

21

22

23

24

25

                        UNITED STATES DISTRICT COURT

CASEY - DIRECT

1          THE COURT:  The record will show the presence of

2     counsel and the defendant.

3          Mr. Keller, you may continue with your questions of

4     Mr. Casey.

5          MR. KELLER:  Thank you, Your Honor.

6     TIMOTHY CASEY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

7                   DIRECT EXAMINATION CONTINUED

8     BY MR. KELLER:

9     Q.  Mr. Casey, earlier in your testimony you testified

10    regarding your billing records.  Do you remember that

11    testimony?

12    A.  I remember.

13    Q.  And you testified that over the time period following the

14    preliminary injunction, you explained to the defendant that

15    under the injunction, he was required to either arrest or

16    release?  Was that your testimony?

17    A.  That was my testimony.

18    Q.  Over all the different dates we saw in your billing

19    records, did that advice ever change?

20    A.  It never changed.

21    Q.  And was that the same advice that you gave to Mr. Sands?

22    A.  It is.

23    Q.  And the same advice you gave to Chief MacIntyre?

24    A.  It is.

25    Q.  And the same advice you gave to Mr. Sousa?

                          CASEY - DIRECT

1   A.  It is.

2   Q.  And Mr. Palmer?

3   A.  It is.

4   Q.  Now, with respect to Mr. Palmer, Ms. Miller, if we could

5   pull up what's been admitted as Government's Exhibit 8, I

6   believe before the break we were talking about some training

7   that was proposed at some point after the preliminary

8   injunction came out.  I believe you testified that you proposed

9   to Brian Sands at some point that training should go out?

10  A.  Yes.

11  Q.  And training specific to the preliminary injunction?

12  A.  Yes.

13          THE COURT:  Could you remind me who's Mr. Palmer?

14          THE WITNESS:  Mr. Palmer is a sergeant and a member of

15  the HSU.  There were two sergeants, one lieutenant.

16          THE COURT:  Thank you.

17  Q.  (BY MR. KELLER)  Mr. Casey, having seen Government's

18  Exhibit 8, do you recognize what it is?

19  A.  Yes.

20  Q.  And what is it?

21  A.  It's -- Originally it starts off with an e-mail from Joe

22  Sousa asking me to review some -- Well, it goes to Brett Palmer

23  asking him to draw up some training scenarios based on Judge

24  Snow's order and his conversations with me.

25          And then he asked to have me review what he writes up

CASEY - DIRECT

1    and then have Chief Sands sign off on it.  And then it was

2    going to go into eLearning, which is an electronic -- my

3    understanding, I think it was, but I can't swear to it -- is an

4    online system where people can go to it and get that training.

5    Q.  And did all of this take place in January of 2012?

6    A.  Well, this -- the first e-mail on the back, it started on

7    January 11th.

8    Q.  And the most recent e-mail in the front from Mr. Sousa to

9    you, was that also January of 2012?

10   A.  Yes, January 24th.

11   Q.  Did you eventually review the training scenarios listed in

12   Government's Exhibit 8?

13   A.  Yeah, I did.

14   Q.  And do you remember did it take you awhile after receiving

15   this e-mail from Mr. Sousa to actually sit down and review the

16   training scenarios?

17   A.  Yeah.  I usually try to do everything quickly, but I saw an

18   e-mail at the civil contempt hearing that they followed up with

19   me in -- sometime later.  And I said no, I hadn't read it yet,

20   but I'd follow up.

21   Q.  But did you in fact at some point review the training

22   scenarios?

23   A.  I did.  I do remember that.

24   Q.  What was your response to training scenario number three?

25          MS. CLARK:  Objection, Your Honor.  Confidentiality

CASEY - DIRECT

1   and privilege.

2           MR. DENNIS WILENCHIK:  And also --

3           THE COURT:  Could you be more specific in the

4   question.  What was his reaction is -- I don't see, you know --

5   He might say he laughed, he might say he cried, but it doesn't

6   really advance the case.

7   Q.  (BY MR. KELLER)  Yes, Your Honor.  Mr. Casey, did you

8   respond to Sergeant Palmer regarding the training scenarios?

9   A.  Yes.

10  Q.  And specifically did you address training scenario number

11  three with Mr. Palmer?

12          MR. DENNIS WILENCHIK:  Objection, Your Honor.  Lack of

13  foundation and best evidence how he responded and where he

14  responded.

15          THE COURT:  Okay.  The only -- This question just

16  calls for a yes or no answer, which is did you address training

17  scenario number three with Mr. Palmer?

18          THE WITNESS:  I did.

19          THE COURT:  Next question.

20  Q.  (BY MR. KELLER)  Was that shortly after you had actually

21  reviewed the training scenarios?

22  A.  Yes.

23  Q.  And what did you tell Mr. Palmer?

24          MS. CLARK:  Objection.  Confidentiality and privilege.

25          THE COURT:  The objection is overruled.  You are

UNITED STATES DISTRICT COURT

CASEY - DIRECT

1    directed to answer.

2              THE WITNESS:  I did not remember any of this until the

3    civil contempt hearing when I had to read this, and it jogged

4    my memory.  Three was -- Three was backwards from what we

5    talked about in our conversations.  And I was concerned because

6    he -- we had an issue with Brett Palmer in the case on a

7    previous occasion.  And now here it is he's writing this up.  I

8    talked to him plural, several times, at least twice, and the

9    response that he got on this was wrong.  And I told him that,

10   and he gave me his explanation, said he would correct it.

11   Q.  (BY MR. KELLER)  So just so it's clear, with respect to

12   training scenario number one, that was actually consistent with

13   the advice that you had given Mr. Palmer and the rest of the

14   sheriff's office?

15   A.  I'd have to read it again, but my memory is I had a problem

16   with the last two.

17   Q.  Okay.  What was the problem -- You said it was backwards.

18   What more specifically was the problem with training scenario

19   number three?

20             MS. CLARK:  Objection on confidentiality, privilege,

21   and also mental impressions.  Sorry, Judge.

22             THE COURT:  The objection is overruled.  Could you put

23   it up on the screen.  I don't have an -- Well, I guess I could

24   pull it out of one of these giant binders.  But since you have

25   it on the screen, I can follow along.  Thank you.

CASEY - DIRECT

1   Q.  (BY MR. KELLER)  Yes.  If we could go to the next page,

2   Ms. Miller.

3           Again, Mr. Casey, what specifically was the problem

4   with scenario number three?

5   A.  The holding of the person waiting for ICE to come.

6           MS. CLARK:  Judge, did I get a ruling on the

7   objection?

8           THE COURT:  You did.

9           MS. CLARK:  I'm sorry.

10          THE COURT:  I overruled, and that's why he's

11  answering.

12          MS. CLARK:  Thank you.

13  Q.  (BY MR. KELLER)  Mr. Casey, I don't believe I caught your

14  full answer there.  What was the problem with scenario number

15  three?

16  A.  It had that if they contacted ICE, which was perfectly

17  acceptable under the Judge's order, to come get them, but if

18  ICE somehow instructed them to come, I did not believe, in my

19  judgment, that that was permissible under the order.

20          You cannot hold them, you cannot detain them beyond

21  whatever it was.  You can arrest them under state charges, but

22  if the traffic stops, say, is 14 minutes and ICE is not there

23  in 14 minutes, you've got to release them in 14 minutes.  And

24  if ICE says bring them in, there's no authority for that under

25  the Judge's order.

CASEY - DIRECT

1              Now, I understand that's that might be a practice in

2      other jurisdictions, but out here we have an order, and we

3      can't do that.

4      Q.  And you told that specifically to Sergeant Palmer?

5      A.  Yes.

6      Q.  Ms. Miller, you can take that off the screen unless Your

7      Honor would like it to remain up there.

8              Mr. Casey, do you recall the bench trial in Melendres?

9      A.  I do.

10     Q.  And at some point during that bench trial, did you observe

11     testimony that led you to believe that the preliminary

12     injunction was being violated?

13     A.  I heard testimony that made me concerned.

14     Q.  Whose testimony was that?

15     A.  I believe it was Sergeant Palmer.  I believe it was Charley

16     Armendariz.  And then there was some discussion by the sheriff

17     about LEAR, but that wasn't about violating policy.  It was his

18     understanding of policy.

19     Q.  Based on that testimony, did you tell the sheriff again

20     that under the preliminary injunction, he could not hold people

21     for the federal authorities?

22     A.  There was something called a LEAR policy at the MCSO, so

23     the answer to your question is --

24              THE COURT:  I'm sorry.  LEAR?

25              THE WITNESS:  LEAR, L-E-A-R.

                              CASEY - DIRECT

 1              THE COURT:  Okay.  Do those four letters stand for

 2      something?

 3              THE WITNESS:  They are.  They're an acronym, but I

 4      don't remember what they're for.  But somehow they're -- It's

 5      an ICE term that MCSO adopted when they had 287(g) authority.

 6              THE COURT:  Okay.  I interrupted your question with

 7      mine.

 8      Q.  (BY MR. KELLER)  So did you tell the sheriff, based on that

 9      testimony, again, after hearing that testimony, that the office

10      could not hold people for the federal authorities in the

11      absence of state charges?

12              MR. DENNIS WILENCHIK:  Objection.  Leading.

13              THE COURT:  Overruled.  You may answer.

14              THE WITNESS:  Yes, we did at some point.

15      Q.  (BY MR. KELLER)  I'm sorry.  What was the end of --

16      A.  I said yes, at some point.  I can't tell you if it was the

17      day he mentioned LEAR was still in effect or if it was the day

18      after or some point, but at some point during the trial we did.

19      Q.  And so it was shortly after you heard that testimony?

20      A.  Yes.

21      Q.  Did you also tell Brian Sands that, again, the preliminary

22      injunction prohibited holding people for the federal

23      authorities without state charges based on hearing that

24      testimony?

25      A.  I can answer it this way:  Brian understood that that was

CASEY - DIRECT

1    what the preliminary injunction said.

2              MR. DENNIS WILENCHIK:  Objection.  Ask it be stricken.

3              THE COURT:  The motion to strike is denied.

4    Q.  (BY MR. KELLER)  And is your understanding based on

5    conversations that you had with Mr. Sands?

6              MS. CLARK:  Objection, confidentiality, privilege,

7    Judge.

8              MR. DENNIS WILENCHIK:  Same.

9              THE COURT:  Overruled.  You are directed to answer.

10             MS. CLARK:  Continuing objection for the record.

11             THE WITNESS:  Am I ordered, Your Honor?

12             THE COURT:  Yes.

13             THE WITNESS:  Yes.  It is based on my conversation

14   with Brian Sands.

15   Q.  (BY MR. KELLER)  And did Brian Sands tell you that he told

16   the sheriff the same thing?

17             MR. DENNIS WILENCHIK:  Objection.  Leading and calls

18   for hearsay.

19             MS. CLARK:  Same continuing objection.  I'm sorry.

20   Privilege and confidentiality.

21             THE COURT:  Thank you.  Sustained.

22             MR. KELLER:  Your Honor, if I could be heard on the

23   hearsay objection?

24             THE COURT:  No.  Please continue.

25   Q.  (BY MR. KELLER)  What did the defendant say to you in

CASEY - DIRECT

1  response to you telling him again that the office could not

2  hold people without state charges under the preliminary

3  injunction?

4          MR. DENNIS WILENCHIK:  Your Honor, excuse me, but can

5  we just have some kind of foundation for this alleged

6  conversation, when, where?

7          THE COURT:  This is a conversation that took place

8  shortly after the testimony that he heard and during the

9  Melendres trial.

10          MS. CLARK:  My objection is continuing on the record.

11          THE COURT:  The objection is overruled.  You may

12  answer.

13          MS. CLARK:  Is he ordered to answer, Your Honor?

14          THE COURT:  He is.

15          THE WITNESS:  He knew about the order.  He indicated

16  that he delegates to HSU and the details, so the details

17  weren't important for him because he wasn't actually enforcing

18  it.  So he delegates it.

19  Q.  (BY MR. KELLER)  And what did you say in response to that?

20  A.  I don't remember the details, but I wanted to make sure he

21  understood you cannot detain.  And he understood is what he

22  told me.

23          MR. DENNIS WILENCHIK:  Objection.  Ask that be

24  stricken.  He cannot know what the sheriff understood.

25          THE COURT:  The motion to strike is denied.

UNITED STATES DISTRICT COURT

CASEY - DIRECT

1   Q.  (BY MR. KELLER)  Did you also tell Jack MacIntyre, based on

2   your concerns about this testimony, again, that the preliminary

3   injunction prohibited holding people for the feds in the

4   absence of state charges?

5   A.  I don't know if I did at that time.

6   Q.  Ms. Miller, if we could pull up Government's Exhibit 35A.

7          Mr. Casey, does Exhibit 35A appear to be a transcript

8   of the proceedings held before Judge Murray Snow in September

9   of 2015 in the Melendres matter?

10  A.  Yes.

11  Q.  And did you testify in the contempt proceedings in the

12  Melendres matter?

13  A.  The same answers as before.  I did.

14  Q.  Ms. Miller, if we could go to Page 1854 of the transcript.

15          MR. DENNIS WILENCHIK:  Wait a minute, Judge.  I'm not

16  sure what he's doing here, so I would like a little guidance.

17  Is this impeachment of something, or what is this?

18          THE COURT:  I think he's going to show him some prior

19  testimony to see if it refreshes his recollection.

20          MR. KELLER:  Yes, Your Honor.

21  Q.  (BY MR. KELLER)  Mr. Casey, starting -- or, Ms. Miller,

22  could you --

23          Mr. Casey, does your name appear at the top of this

24  page of Government's Exhibit 3A?

25  A.  It does.

                            CASEY - DIRECT

1    Q.  And, Ms. Miller, could you tear out Lines 24 and 25 of the

2    transcript.

3           Do you see that question, Mr. Casey?

4    A.  I do.

5    Q.  Ms. Miller, if you could go to the next page of the

6    exhibit, please, and if you could highlight or if you could

7    tear out Lines 11 -- 11 through 19.

8           Mr. Casey, does that refresh your recollection as to

9    whether you told Mr. MacIntyre again after that testimony that

10   the MCSO could not hold people for the federal authorities?

11          MR. DENNIS WILENCHIK:  I'm going to object.  This

12   should not have been shown to the Court.  This absolutely is

13   blatant hearsay that we've already discussed about MacIntyre.

14   It has not been ruled on.  And this is not, in my opinion,

15   designed legitimately to refresh any recollection that I've

16   heard so far.  This is solely to get in a hearsay statement of

17   Mr. MacIntyre that should be stricken.  And I ask the Court to

18   remove it from the board.

19          MR. KELLER:  Your Honor, I'm not offering --

20          THE COURT:  The objection is overruled.  The question

21   is does that refresh your recollection as to whether you did or

22   did not have a conversation with Jack MacIntyre shortly after

23   you heard the testimony you earlier referenced during the

24   Melendres trial.

25          MR. DENNIS WILENCHIK:  Your Honor, I want to be clear

CASEY - DIRECT

1    on this.  This is to be shown to a witness, not spread

2    across -- If you look at the rule, if it's for the purpose of

3    refreshing recollection, it is to be shown, as counsel knows,

4    only to a witness to do that.  It is not to be published

5    throughout the courtroom at all.  And that's what the rule

6    provides, as you well know.  And this is improper.  I ask it be

7    taken off the board, stricken, and done the proper way under

8    the rules.

9              THE COURT:  Will you answer the question please yes or

10   no.

11             MR. DENNIS WILENCHIK:  Your Honor, I'd like you to

12   rule on that please.

13             THE COURT:  I already ruled on it.  You restated the

14   same thing.

15             MR. DENNIS WILENCHIK:  To allow this to be published

16   to refresh his recollection to the entire court.

17             THE COURT:  Please answer the question, Mr. Casey.

18             THE WITNESS:  It does not.

19             THE COURT:  Now take it down.

20             MR. DENNIS WILENCHIK:  And I'd ask honestly in the

21   future that they not do that again, Your Honor.  It's not

22   appropriate.

23             THE COURT:  Please continue, Mr. Keller.

24   Q.  (BY MR. KELLER)  Mr. Casey, specifically with regard to the

25   Ninth Circuit's decision in Melendres, I think you testified

UNITED STATES DISTRICT COURT

CASEY - DIRECT

1  previously that the Ninth Circuit -- Well, I think you

2  testified that you handled oral argument before the Ninth

3  Circuit based on the appeal of the preliminary injunction in

4  Melendres?

5  A.  The interlocutory appeal I did.

6  Q.  And did the Ninth Circuit rule on that appeal eventually?

7  A.  They did.

8  Q.  Did that ruling come down in September of 2012?

9  A.  I don't know.

10  Q.  Ms. Miller, if we could bring up Government's Exhibit 34.

11       MR. DENNIS WILENCHIK:  We'll stipulate to it, Your

12  Honor.

13       THE COURT:  If counsel both agree it was September of

14  2012, would you have any reason to doubt that?

15       THE WITNESS:  I just don't remember.  I don't doubt

16  it.  I mean, it sounds right, but I don't know.

17       THE COURT:  Thank you.  We'll assume that to be true.

18  Q.  (BY MR. KELLER)  Ms. Miller, then, could we pull up

19  Government's Exhibit 24 please.

20       Mr. Casey, do you recognize Government's Exhibit 24?

21       MR. DENNIS WILENCHIK:  Can we enlarge that?

22       THE WITNESS:  Yes.

23       MR. DENNIS WILENCHIK:  Can you enlarge it.

24       THE COURT:  They can only enlarge it by pieces.

25       MR. DENNIS WILENCHIK:  Okay.

CASEY - DIRECT

1      THE WITNESS:  I read it.  I remember it.  I mean, I

2  remember the substance.

3  Q.  (BY MR. KELLER)  What is this exhibit?

4  A.  It's basically forwarding to my client contacts at that

5  time copying on the CC to the defense team, two lawyers and my

6  paralegal, the Ninth Circuit's order on the interlocutory

7  appeal.

8  Q.  And do you describe in the e-mail the effect of the order

9  of the appellate decision?

10  A.  Yeah.  It -- Right.  It doesn't change the injunction.  It

11  doesn't do anything.

12  Q.  Mr. Casey, did you send this to, among other people, Amy

13  Lake?

14  A.  I did.

15  Q.  And who is Amy Lake?

16  A.  He was -- She was the -- the administrative assistant for

17  the sheriff.

18      MR. KELLER:  Your Honor, I'd offer Government's

19  Exhibit 24.

20      THE COURT:  Is there any objection to 24?

21      MR. KELLER:  Ms. Miller, if you could --

22      THE COURT:  I'm sorry.  Is there an objection?

23      MR. DENNIS WILENCHIK:  No, no objection.

24      THE COURT:  24 is admitted.

25  Q.  (BY MR. KELLER)  Ms. Miller, if you could tear out the

CASEY - DIRECT

1   portion of the e-mail beginning with "this ruling".

2           Mr. Casey, is this what you referenced before when I

3   asked you whether you explained the effect of the appellate

4   decision on the preliminary injunction?

5   A.  Yeah.  I don't know what I meant.  I think it's a typo when

6   I said a release or decision.  I don't -- Oh, I think -- I

7   think we were still waiting for Judge Snow's findings of facts

8   and conclusions of law.  I don't think that came out -- Yeah,

9   it didn't come out until the next year in May.

10  Q.  But as to the first part of your e-mail, "This ruling does

11  not change the status quo," what did you -- what did you mean

12  by that?

13  A.  It means everything -- We never asked for a stay.  There is

14  no stay.  The order's in place.  Nothing changes.

15  Q.  At some point after this in roughly October of 2012, did

16  the plaintiffs in Melendres allege violations of the

17  preliminary injunction?

18  A.  They did.

19  Q.  Ms. Miller, if we could pull up Government's Exhibit 25,

20  Mr. Casey, do you recognize what's previously been marked for

21  identification purposes as Government's Exhibit 25?

22  A.  Could I see the next page?

23          I do.  I do.  Yes, I see it.

24  Q.  And what is this exhibit?

25  A.  Can I go back to the first page?

CASEY - DIRECT

1    On that day I think the ACLU lawyer was Andre Segura

2    wrote us a letter -- wrote us -- sent me a letter complaining

3    and making the accusation that the MCSO had been violating or

4    violated the preliminary injunction.  They gave some press

5    releases that were issued by the sheriff and attached that.

6    And I got that, and then I wrote -- wrote what I wrote

7    there to say we need to get our arms around the facts of this

8    to see whether there's any merit to it.

9    MR. KELLER:  Move for the admission of Government's

10   Exhibit 25, Your Honor.

11   MR. DENNIS WILENCHIK:  No objection.

12   THE COURT:  25 is admitted.

13   Q.  (BY MR. KELLER)  If we could go to the next page of the

14   exhibit, Ms. Miller.

15   Mr. Casey, does the e-mail reflect that you again here

16   reminded everyone to whom you sent this e-mail of the specific

17   prohibition in the preliminary injunction?

18   MR. DENNIS WILENCHIK:  Objection.  Leading.  Document

19   speaks for itself.

20   THE COURT:  Overruled.  You may answer.

21   THE WITNESS:  It does.

22   Q.  (BY MR. KELLER)  And, Ms. Miller, if we could go back to

23   the previous page, who did you send this to, Mr. Casey?

24   A.  I sent it to the Chief of Staff, First Chief Deputy Jerry

25   Sheridan, Jack Mac, and Brian Sands with a copy to the defense

CASEY - DIRECT

1   team.  And I think my co-counsel Mr. Liddy at the MCAO was out,

2   so therefore I copied the secretary and his direct supervisor.

3   Q.  Again, I think you answered a similar question earlier, but

4   why is the sheriff not included on this e-mail?

5           MS. CLARK:  Objection.  Confidentiality.  Privilege.

6           THE COURT:  I think we all know it's because he didn't

7   have e-mail.

8           THE WITNESS:  That's -- Am I ordered to answer?

9           THE COURT:  Yes.

10          THE WITNESS:  Yeah.  He does not use e-mail.

11  Q.  (BY MR. KELLER)  Ms. Miller, if we could go to -- if we

12  could go to Page 6 of the exhibit please.

13          MR. DENNIS WILENCHIK:  Your Honor, I want to come back

14  to my earlier objection.  I'd like --

15          THE COURT:  Which?  There was no objection to this

16  exhibit.

17          MR. DENNIS WILENCHIK:  No, no.  I objected on the

18  basis that the document speaks for itself, and the question was

19  leading.  I'd like counsel to point out where in that document

20  Mr. Casey was advising of the same thing he allegedly claims he

21  advised from day one.  That was what the objection is based on,

22  is facts not in evidence.  There's nothing in that that says

23  anything of the kind, and I want him to point it out.

24          THE COURT:  Your request to me that I request

25  Mr. Keller to do that is denied.

CASEY - DIRECT

1    MR. DENNIS WILENCHIK:  Because I objected to the

2    question as leading.

3    THE COURT:  I understood -- Excuse me.  You objected.

4    I ruled.  It was answered.  If you want to clarify on

5    cross-examination, that is your prerogative.

6    You may continue, Mr. Keller.

7    Q.  (BY MR. KELLER)  Mr. Casey, looking at Page 6 of this

8    exhibit, is this a press release from the sheriff's office?

9    A.  That's what it looks like.

10   Q.  And what's the date of the press release?

11   A.  It says September 21, 2012.

12   Q.  And does it focus -- Is this one of the press releases that

13   the plaintiffs sent to you in their letter alleging violations

14   of the preliminary injunction?

15   A.  Is it attached to the other stuff you gave me?

16   Q.  Yes.

17   A.  Yes.

18   Q.  It's part of the same exhibit.

19   Does the press release concern generally ICE's refusal

20   to accept illegal aliens from the Maricopa County Sheriff's

21   Office?

22   MR. DENNIS WILENCHIK:  Again, leading.

23   THE COURT:  Sustained.

24   Q.  (BY MR. KELLER)  Is the sheriff quoted in this press

25   release, Mr. Casey?

CASEY - DIRECT

1      MR. DENNIS WILENCHIK:  Well, Your Honor, has he

2  established foundation -- objection -- to Mr. Casey having

3  reviewed this at the time?

4      THE COURT:  I'm sorry.  This is an admitted exhibit.

5  He can read from it.  This is part --

6      MR. DENNIS WILENCHIK:  Is this an admitted exhibit?

7      THE COURT:  Yes.  This is part of Exhibit 25.

8      MR. DENNIS WILENCHIK:  Oh, okay.  So he's just asking

9  him to read from an exhibit that's in evidence?  Okay.

10     THE COURT:  Correct.

11  Q.  (BY MR. KELLER)  Mr. Casey, is Mr. Arpaio quoted in this

12  press release?

13  A.  There are quotes, and then it says Arpaio says.  That's on

14  the first page.

15  Q.  Ms. Miller, if we could go to the next page of the exhibit

16  please, if you could tear out the second full paragraph

17  starting with "I expected," is the sheriff again quoted in the

18  paragraph that's torn out here, Mr. Casey?

19  A.  That's what it says.

20  Q.  And is the quote "I expected it would happen eventually, so

21  I had a back-up plan in place, which was to take these illegal

22  immigrants not accepted by ICE to the Border Patrol"?

23  A.  That's what the quote is.

24  Q.  And then does the press release reflect that "As directed

25  by the sheriff, last night deputies took the two suspects to

CASEY - DIRECT

1    the Border Patrol"?

2    A.   That's what it says.

3    Q.   The press release doesn't say anything about Border Patrol

4    directing the sheriff or directing MCSO to turn the people

5    over, does it?

6    A.   I didn't see anything like that.

7    Q.   During your entire involvement in the Melendres case, did

8    you ever see any paperwork or communications from Border Patrol

9    or from ICE directing the sheriff or directing the sheriff's

10   office to turn people over -- to turn suspected unlawful

11   immigrants over to those agencies?

12          MS. CLARK:  Objection.  Confidentiality.

13          THE COURT:  Sustained.

14          MR. KELLER:  Your Honor, Mr. Casey has already

15   testified to this in open court.

16          THE COURT:  Well, I can't tell from the scope of your

17   question whether it relates exclusively to the waiver that

18   attaches to issues concerning the preliminary injunction, and

19   that is why the objection was sustained.

20   Q.   (BY MR. KELLER)  The -- Mr. Casey, the injunction addressed

21   Maricopa County Sheriff's Office detaining people based solely

22   on suspicion or knowledge of unlawful status; is that right?

23          MR. DENNIS WILENCHIK:  Objection, Your Honor.  The

24   document speaks for itself, and it's leading.

25          THE COURT:  This is just a transitional question, so

CASEY - DIRECT

 1   you may answer.

 2            MR. DENNIS WILENCHIK:  It's false and leading.

 3            MS. CLARK:  Is he ordered to answer, Your Honor?

 4            THE COURT:  Yes.

 5            THE WITNESS:  More or less.

 6   Q.  (BY MR. KELLER)  And so were the two, based on your

 7   knowledge and representation of the sheriff's office, were the

 8   two primary federal agencies implicated by the

 9   preliminary injunction ICE and Border Patrol?

10            MS. CLARK:  Objection.  Mental impressions.

11            THE COURT:  Overruled.  You are directed to answer.

12            THE WITNESS:  No.  Border Patrol was never involved at

13   the time.  It was always ICE.  This was the first time we

14   learned about Border Patrol.

15   Q.  (BY MR. KELLER)  Okay.  Was ICE one of the -- Was ICE the

16   primary agency implicated in the preliminary injunction?

17   A.  I used to say they were the federal authority that largely,

18   I think, took people that were in the country unlawfully.

19   That's where he was taken.  So I think even if Border Patrol

20   got someone, they took them to ICE, but Border Patrol --

21   Q.  Mr. Casey, thank you.  I think that answers the question.

22   During your representation of MCSO over the time period at

23   issue here from the date the preliminary injunction was issued,

24   December 23rd, 2011, through May of 2013, did you see any

25   correspondence or records from ICE directing the sheriff or the

CASEY - DIRECT

1   sheriff's office to turn over suspected unlawful immigrants to

2   them?

3   A.  No.

4   Q.  Did you see any correspondence or documents from Border

5   Patrol directing the sheriff's office or the sheriff to turn

6   people over to them?

7   A.  In the same time period?

8   Q.  The same time period.

9   A.  No.

10  Q.  Did you tell the sheriff, in response to these allegations,

11  that the back-up plan referenced in this press release violated

12  the preliminary injunction?

13          MS. CLARK:  Objection.  Confidentiality and privilege.

14          THE COURT:  Overruled.  You're directed to answer.

15          MS. CLARK:  Continuing objection on this line of

16  questioning.

17          THE COURT:  Yes.

18          THE WITNESS:  I told the sheriff that in my judgment

19  it was likely, not definitively, but likely a violation.

20  Q.  (BY MR. KELLER)  Did you tell the sheriff that if you had

21  to go to court on this, in all likelihood you believed the

22  Court would find it to be a violation?

23          MR. DENNIS WILENCHIK:  Objection.  Leading.

24          MS. CLARK:  Objection.

25          MR. DENNIS WILENCHIK:  That's not how you ask a

CASEY - DIRECT

1    question on direct.

2              MS. CLARK:  Objection.  Also mental impressions,

3    Judge.

4              THE COURT:  On mental impressions, no.  The question

5    was did you tell the sheriff.  On leading, sustained.  You can

6    ask him an open-ended question as to what he told the sheriff

7    if you like.

8    Q.  (BY MR. KELLER)  What did you tell the sheriff with respect

9    to whether you believed, if this were litigated in court,

10   whether it would be found to be a violation?

11             MR. DENNIS WILENCHIK:  That is a leading question.

12   Objection.  He just needs to ask what he discussed with the

13   sheriff, period.

14             THE COURT:  Well, he doesn't have to be that limited.

15             MR. DENNIS WILENCHIK:  Well, if he gives a suggestion

16   as to the answer, it's a leading question.  That's exactly --

17             THE COURT:  I didn't say it wasn't a leading question.

18   I said he wasn't limited to the question you suggested.

19             MR. DENNIS WILENCHIK:  Thank you.

20             THE COURT:  Sustained.  Try again.

21   Q.  (BY MR. KELLER)  What did you tell the sheriff with respect

22   to whether or not --

23             THE COURT:  Did you tell the sheriff anything about

24   what would happen if you went to court on this?

25             THE WITNESS:  That's the question.  Am I directed to

UNITED STATES DISTRICT COURT

CASEY - DIRECT

1   answer?

2           THE COURT:  Yes, that is.

3           THE WITNESS:  I shared with the sheriff that we could

4   make a good faith argument that under Judge Snow's order, there

5   was some language about there needed to be something more, the

6   magic words something more, that perhaps this was the something

7   more, that we can make a good faith argument.  But I gave him

8   my advice that if in fact it went before that judge or most

9   judges, I predicted it was not going to be a winning argument,

10  which is sometimes laypeople don't understand, but lawyers

11  sometimes advance good faith arguments that don't win.  But

12  that was what I shared with him, and that's what we went with.

13  Q.  (BY MR. KELLER)  And again you conveyed to him, you told

14  the sheriff that in your estimation, you believed in all

15  likelihood transferring to Border Patrol was a violation?

16          MR. DENNIS WILENCHIK:  Objection.  Leading and asked

17  and answered.

18          THE COURT:  Sustained.

19  Q.  (BY MR. KELLER)  Did you tell Brian Sands the same thing?

20  A.  Am I instructed to answer?

21          THE COURT:  You are.

22          THE WITNESS:  Yes.

23  Q.  (BY MR. KELLER)  Had you ever heard of the back-up plan

24  before these allegations?

25  A.  I had not.

CASEY - DIRECT

1   Q.  Prior to these allegations, did you ever tell the defendant

2   that if ICE wouldn't accept people, he could turn them over to

3   Border Patrol under the injunction?

4           MR. DENNIS WILENCHIK:  Again, Your Honor, these are

5   not direct questions.

6           THE COURT:  The objection is overruled.

7           MS. CLARK:  Just the continuing objections on

8   confidentiality and privilege.

9           THE COURT:  As well as that one.  You're directed to

10  answer.

11          MR. DENNIS WILENCHIK:  And I'd like the record to

12  simply reflect that you can ask any witness millions of

13  questions about what they didn't discuss.  It is leading, it is

14  inappropriate, and not probative.

15          THE WITNESS:  What was the question?  I'm sorry.

16  Q.  (BY MR. KELLER)  Had you ever told the sheriff prior to

17  these allegations from the plaintiffs that he could turn people

18  over to Border Patrol and that that would not be a violation of

19  the injunction?

20  A.  Never.

21  Q.  So when you did have your discussion with the sheriff

22  regarding these allegations, what did the sheriff say?

23          MS. CLARK:  Continuing objection, Judge.

24          THE COURT:  Yes, and it's overruled.  You're directed

25  to answer what did the sheriff say after you talked to him

CASEY - DIRECT

1   about this press release?

2        THE WITNESS:  He's the sheriff.  He makes the

3   decisions.

4   Q.  (BY MR. KELLER)  Did you have additional or further

5   discussions with the defendant about this issue?

6   A.  It was a conversation that went on for some period.

7   Q.  How would you characterize that conversation in terms of

8   the tone?

9        THE WITNESS:  Objection.  Also mental impressions,

10  Judge.

11       THE COURT:  Sustained.  Tone.  You'll have to ask

12  him --

13  Q.  (BY MR. KELLER)  Was it a heated discussion, Mr. Casey?

14       MS. CLARK:  Objection.  Same objection, Judge.

15       THE COURT:  That one's overruled.

16       THE WITNESS:  It was heated.

17  Q.  (BY MR. KELLER)  During that meeting, did Brian Sands agree

18  with you that this conduct was likely a violation of the

19  preliminary injunction?

20       MR. DENNIS WILENCHIK:  Your Honor, excuse me.  Lack of

21  foundation.  There's no testimony yet that Brian Sands was at a

22  meeting with the sheriff.

23       THE COURT:  Sustained.

24  Q.  (BY MR. KELLER)  Was Brian Sands present for that

25  conversation?

CASEY - DIRECT

1   A.  He was present for part of the conversation.  When it got

2   heated, he was not.

3   Q.  For the part that he was present, did he agree with you

4   that this was likely a violation of the preliminary injunction?

5            MR. DENNIS WILENCHIK:  Objection, Your Honor.  If the

6   witness is asked what he said as opposed to whether he agreed,

7   I won't object.  But this is the problem.  He's asking for his

8   mental impression.

9            THE COURT:  Okay.  I understand the problem.  Did he

10  express his agreement with your position?

11           THE WITNESS:  He did.

12  Q.  (BY MR. KELLER)  While the sheriff was present?

13  A.  Yes, he did.

14  Q.  Did Chief Sands express to you that he was considering

15  resigning over this?

16           MS. CLARK:  Objection, Judge, the continuing

17  objection, confidentiality, privilege.

18           THE COURT:  Sustained.

19  Q.  (BY MR. KELLER)  Did you tell Brian Sands that you would

20  consider resigning if the sheriff did not follow your advice?

21           MS. CLARK:  Same objections, Judge.

22           THE COURT:  Sustained.

23  Q.  (BY MR. KELLER)  During this discussion with your sheriff,

24  did you remind him of your earlier conversations about the

25  preliminary injunction?

UNITED STATES DISTRICT COURT

CASEY - DIRECT

1          MS. CLARK:  Objection, Judge.  We're on a new topic,

2   so I must renew the objections, confidentiality and privilege.

3          THE COURT:  Overruled.  You're directed to answer.

4          THE WITNESS:  Yes.  I reminded him what we talked

5   about in December and what we talked about, I think, after the

6   trial too or during the trial.

7   Q.  (BY MR. KELLER)  And at the end of that conversation, what

8   did the sheriff tell you he was going to do?

9          MS. CLARK:  Is the witness ordered to answer on those?

10  Are you overruling my objection on that?

11         THE COURT:  I am, and he is directed to answer.

12         THE WITNESS:  The -- The sheriff said it wasn't going

13  to happen again.  He understood.  It was a one-time he

14  characterized it as a mistake, and it would not happen again.

15  And that's my memory, is that the resolution was it was not

16  going to happen again, that this was an exception, an

17  aberration, and not the rule, that he remembered what we talked

18  about particularly after the trial in July or August, and it

19  was not going to happen again.  And to my knowledge, it didn't

20  happen from that point until I withdrew in November of 2014.

21         MR. KELLER:  Ms. Miller.

22         THE COURT:  I'm sorry.  What didn't happen again?

23  Turning people over to Border Patrol instead of ICE?

24         THE WITNESS:  Either one is my understanding.

25         THE COURT:  Okay.  Thank you.

UNITED STATES DISTRICT COURT

                            CASEY - DIRECT

1    Q.  (BY MR. KELLER)  Ms. Miller, if we could pull

2    up Government's Exhibit 36J.

3            Mr. Casey, what does Government's Exhibit 36J appear

4    to be?

5    A.  A news release.

6    Q.  What's the date of that news release?

7    A.  March 14th, 2013.

8    Q.  And in general does the press release concern turning

9    people over to ICE?

10   A.  I'd have to read it.

11   Q.  Ms. Miller, if you could tear out the line starting with

12   "final arrest numbers" in the bolded section up at top.

13           Does the press release generally relate to turning

14   people over to ICE?

15   A.  It says, "Four were arrested for ID theft and forgery, and

16   seven were turned over to ICE."

17   Q.  Ms. Miller, if you could get rid of the tearout there.  Is

18   the sheriff quoted at the bottom of the press release?

19   A.  That's what it looks like.

20           MR. KELLER:  Your Honor, I'd move for the admission of

21   Government's Exhibit 36J.

22           THE COURT:  Is there any objection?

23           MR. DENNIS WILENCHIK:  Hearsay objection.

24           THE COURT:  Pardon?

25           MR. DENNIS WILENCHIK:  I'm sorry.  Hearsay objection.

CASEY - DIRECT

1    THE COURT:  The objection is overruled.  36J is

2   admitted.

3   Q.  (BY MR. KELLER)  Ms. Miller, if we could show the

4   witness --

5    Before we move on, so, Mr. Casey, would you agree with

6   me that based on this press release, the sheriff's office

7   actually did continue to turn people over to ICE even after

8   that conversation that you had with the sheriff?

9   A.  I don't believe I've ever seen this before today.

10  Q.  I understand, Mr. Casey, but would you agree with me that

11  the press release indicates that the sheriff's office did

12  continue to turn people over to ICE even after your

13  conversation with him?

14  A.  That's what it says.

15  Q.  Ms. Miller, if we could go to Government's Exhibit 36K,

16  Mr. Casey does this also appear to be a press release from the

17  sheriff's office?

18  A.  It does.

19  Q.  And is the -- Can you tell me the date of the press

20  release?

21  A.  It says April 17th, 2013.

22  Q.  Does it also reference turning people over to ICE?

23  A.  It says two suspects were turned over to ICE.

24    MR. KELLER:  Move for the admission of Government's

25  Exhibit 36K, Your Honor.

CASEY - DIRECT

1          MR. DENNIS WILENCHIK:  I'm going to object unless the

2    foundation -- ask the Court to reconsider a prior ruling on the

3    prior exhibit that the witness never even saw.  There's no

4    foundation, and it's hearsay.

5          MR. KELLER:  Your Honor, the defendant has stipulated

6    to the authenticity of this --

7          THE COURT:  I think the authenticity to this was

8    stipulated to.  Isn't this one of the documents that you

9    stipulated to the authenticity?

10         MR. DENNIS WILENCHIK:  We stipulated that counsel

11   would not have to call any custodians of records for any

12   documents.  But that has nothing to do with introducing a

13   document into evidence with a witness who's never seen it when

14   it's pure hearsay.  And that has nothing to do with our

15   stipulation.

16         THE COURT:  What's the number?

17         MR. KELLER:  This is 36K.

18         THE COURT:  The objection is overruled.  36K is

19   admitted.

20   Q.  (BY MR. KELLER)  Ms. Miller, if we could go to Government's

21   Exhibit 36L, Mr. Casey, does Government's Exhibit 36L appear to

22   be another press release from May 18th, 2013, from the Maricopa

23   County Sheriff's Office?

24   A.  It does.

25   Q.  Does this press release also reference turning over people

CASEY - DIRECT

 1  to ICE?

 2          MR. DENNIS WILENCHIK:  Again, Your Honor, unless this

 3  witness has any personal knowledge of an exhibit, it is

 4  inappropriate to introduce it through that witness and to ask

 5  for it to be admitted into evidence.  Totally improper.

 6  Hearsay.  Lack of foundation.

 7          THE COURT:  It's neither totally improper nor lacks

 8  foundation.  It is stipulated to be an authentic news release

 9  from the Maricopa County Sheriff's Office during the time that

10  Sheriff Arpaio was the sheriff.

11          MR. DENNIS WILENCHIK:  It was stipulated that there

12  would not be any need for any custodian of records on anything.

13          THE COURT:  Right.

14          MR. DENNIS WILENCHIK:  We did not stipulate to the

15  admission of the document itself.

16          THE COURT:  I understand that.

17          MR. DENNIS WILENCHIK:  Well, it is being introduced

18  through a witness who has no foundational basis for admission.

19  It is hearsay.

20          THE COURT:  The objection is overruled.  36L is

21  admitted.

22          MR. DENNIS WILENCHIK:  What is the basis?

23  Q.  (BY MR. KELLER)  Mr. Casey, for all three of these press

24  releases in April and May of 2013, was that while the

25  preliminary injunction was still pending?

CASEY - DIRECT

1   A.  I don't know when the Judge's order came out.  I thought it

2   was in May of '13.  So it's either permanent or preliminary,

3   but I've never seen these three to my knowledge.

4   Q.  Ms. Miller --

5           MR. DENNIS WILENCHIK:  May I renew my objection based

6   on that, Your Honor.

7   Q.  (BY MR. KELLER)  Ms. Miller, if we could go briefly to --

8           MR. DENNIS WILENCHIK:  Could the Court rule?

9           THE COURT:  I've already ruled on the objection.  I

10  don't need rule on it again, Mr. Wilenchik.

11          MR. DENNIS WILENCHIK:  Well, with all due respect, I

12  think you do.  There's no basis for it.

13          THE COURT:  Continue, Mr. Keller.

14  Q.  (BY MR. KELLER)  Thank you, Your Honor.

15          Ms. Miller if we could go back to Government's Exhibit

16  34 please, and if you could go to Page 71 of that exhibit.  And

17  if you could tear out the entry for May 24th, 2013, including

18  the portion next to the initials TJC.

19          Mr. Casey, does that refresh your recollection as to

20  when the permanent injunction was issued?

21  A.  In all candor, it refreshes my recollection that that's

22  when I read and reviewed and billed for looking at the 142-page

23  opinion and order.  I assume that's the day, but it could have

24  been the day before.  I mean, it's somewhere thereabouts.

25  Q.  Approximately May 24th, 2013?

                              CASEY - DIRECT

1   A.  Somewhere --

2            THE COURT:  You don't have to argue about this.  We

3   could all just look it up.  It's a matter of public record.

4   It's on or about this date.

5   Q.  (BY MR. KELLER)  Thank you, Your Honor.  Mr. -- Ms. Miller,

6   if we could go back to Government's Exhibit 36J.

7            THE COURT:  Are you going to -- If you're going to ask

8   him if March 14th, April 17th and May 18th 2013, were all

9   before May 24th, that would be a waste of time.

10  Q.  (BY MR. KELLER)  Your Honor, I was actually going to direct

11  the witness's attention to the quote at the bottom of 36J.

12  Ms. Miller, if you could tear that out please.

13            Is the sheriff quoted as saying, "Identity theft

14  continues to be a burdening problem in Arizona as evidenced by

15  the large number of arrests we've made in this area"?

16  A.  That's what it says.

17  Q.  And "Maybe our nation's leaders will iron out a

18  comprehensive immigration reform deal that will help alleviate

19  the problem of non-citizens working with false documents in our

20  neighborhood work sites"?

21  A.  That's what it says, yes.

22  Q.  Ms. Miller, if we could go back to -- If you could go back

23  to Government's Exhibit 25, please, Ms. Miller.

24            Mr. Casey, at the time that you received this

25  allegation from the plaintiffs in October of 2012, the

CASEY - DIRECT

1  defendant was campaigning for reelection, right?

2  A.  I know that that's the -- there was a general election in

3  November, and I assume he was.

4  Q.  Ms. Miller, if we could go to the next page of the exhibit

5  please, and if you could tear out the second-to-last paragraph.

6          Mr. Casey, why did you reference the upcoming election

7  in this e-mail about plaintiffs' allegations?

8          MS. CLARK:  Objection.  Confidentiality.  Privilege.

9  And perhaps mental impressions also, Judge.  I should add

10  generally work product.

11          THE COURT:  The objection is sustained.

12  Q.  (BY MR. KELLER)  So that I can try and reframe my question,

13  Your Honor, as to work product?

14          THE COURT:  Yes.

15  Q.  (BY MR. KELLER)  I believe work product is included in the

16  scope of the waiver that --

17          THE COURT:  I know, but I'm sustaining this one, so

18  move on please.

19  Q.  (BY MR. KELLER)  Did Chief Sands respond directly to you

20  regarding these allegations?

21  A.  Yes, he did.

22  Q.  Did he tell you that the back-up plan and those press

23  releases that you were just reviewing, the ones that the

24  plaintiffs alleged violated the preliminary injunction, were

25  issued solely for political purposes for the election?

CASEY - DIRECT

1              MR. DENNIS WILENCHIK:  Objection.  Leading and

2      hearsay.

3              MS. CLARK:  Just to be sure, Judge, that it's on the

4      record, I'm objecting on attorney-client privilege and

5      confidentiality.

6              THE COURT:  Overruled.  You may answer.  You are

7      directed to answer.

8              THE WITNESS:  Is he -- I'm sorry, Judge.

9              Yes, he did tell me it was issued for the election.

10     Q.  (BY MR. KELLER)  We were talking about the permanent

11     injunction that came down in May of 2013.  Are you aware of an

12     office-wide announcement or a briefing board that went out in

13     the sheriff's office after that order came down?

14             MS. CLARK:  Objection.  Confidentiality.  Privilege.

15             THE COURT:  Overruled.  You are directed to answer yes

16     or no.

17             THE WITNESS:  I don't remember.  You're going to have

18     to -- Maybe I remembered last time.

19     Q.  (BY MR. KELLER)  Ms. Miller, if we could bring up

20     Government's Exhibit 35 please.

21             Mr. Casey, I'm going to show you a portion of your

22     previous testimony in the Melendres civil contempt hearing.

23             Ms. Miller, if you could go to Page 1701 of the

24     exhibit.

25             And, Your Honor, I should note for the record that the

CASEY - DIRECT

1    page numbers I'm using are always in reference to the page

2    number in the upper right-hand corner of the transcript.  There

3    are also ECF page numbers on here.  And this exhibit,

4    Government's Exhibit 35, is not actually 1700 pages long, just

5    so the record's clear.

6            Mr. Casey, have you had a chance to review that?

7    A.  I did, yeah.

8    Q.  Does that refresh your recollection as to whether a

9    briefing board was issued in the days following the permanent

10   injunction?

11   A.  It does.

12   Q.  And was a briefing board issued -- sent out to the

13   sheriff's office in the days following the issuance of the

14   permanent injunction?

15   A.  There was.

16   Q.  Ms. Miller, if we could show the witness Government's

17   Exhibit 46.

18            Mr. Casey, does this appear to be the briefing board

19   that was sent out on May 28th, 2013, that you just referenced?

20   A.  I think that is.  Yeah, I think that's it.

21   Q.  And does it reference an order of the defendant, Sheriff

22   Arpaio?

23   A.  Yes.  It's by order of Sheriff Arpaio.

24            MR. KELLER:  Your Honor, I would move for the

25   admission of Government's Exhibit 46.

CR16-01012-01-PHX-SRB  BENCH TRIAL - DAY 1  6/26/17    164
CASEY - DIRECT

1          THE COURT:  Is there any objection?

2          MR. DENNIS WILENCHIK:  Same objection.  Hearsay.

3          THE COURT:  The objection is overruled.  46 is

4    admitted.

5    Q.   (BY MR. KELLER)  Mr. Casey, does the first sentence of this

6    two-sentence order state "By order of Sheriff Arpaio, effective

7    immediately no MCSO personnel shall detain any person for

8    turnover to ICE unless probable cause to arrest or detain

9    exists under Arizona criminal law"?

10   A.   That's what it says.

11   Q.   Is that consistent with your description of the

12   preliminary injunction to the defendant?

13          MS. CLARK:  Excuse me, Judge.

14          MR. DENNIS WILENCHIK:  Your Honor, excuse me.  I've

15   just been advised, unless counsel can tell me otherwise, I

16   don't even think this document has been listed as an exhibit.

17          THE COURT:  It's 46.

18          MR. KELLER:  We sent this to counsel last week, Your

19   Honor.

20          MR. DENNIS WILENCHIK:  Yes.  46 is not listed as an

21   exhibit.

22          THE COURT:  Okay.  We can address this in a few

23   minutes.  I have it as Exhibit 46 on my exhibit list.

24          MR. DENNIS WILENCHIK:  On what?

25          THE COURT:  That's all I know about it.

CASEY – DIRECT

1    MR. DENNIS WILENCHIK:  Apparently we have a different

2    exhibit list then.

3    MR. KELLER:  Your Honor, this was sent --

4    THE COURT:  It says 46.  May 28, 2013, briefing board

5    message, on the court exhibit list.

6    MR. KELLER:  This was just sent to defense counsel

7    last week, Your Honor, this exhibit, with a request.  They've

8    had it in discovery, but as an exhibit, as a marked exhibit,

9    this was sent to defense counsel last week with -- and they

10   were asked whether they objected to the exhibit, and we

11   received no response.

12   THE COURT:  Thank you.

13   MR. DENNIS WILENCHIK:  I'm looking at the document

14   that I think counsel is looking at, and I don't see that.

15   THE COURT:  Well, it's the document that's on the

16   screen, is Exhibit 46.

17   MR. DENNIS WILENCHIK:  I'm saying I don't have that.

18   THE COURT:  Okay.  You're going to have to -- You can

19   sort this out with each other on the break.  And if you haven't

20   figured it out, I'm not going to sit here and take all this

21   court time with you and Mr. Keller saying what -- who sent what

22   to whom when.  You talk about it on the break, and if there's

23   still an issue, we can come back to it after the break.

24   Mr. Keller, your question, it's off my screen, so I

25   don't know what it was.

CASEY - DIRECT

1  Q.  (BY MR. KELLER)  Mr. Casey, is the first line that we just

2  read, that I just read of the briefing board in Government's

3  Exhibit 46, is that consistent with your description of

4  the preliminary injunction to the defendant?

5          MR. DENNIS WILENCHIK:  Objection, Your Honor.  This is

6  dealing with the permanent injunction, which is --

7          THE COURT:  That objection is overruled.  It's not an

8  evidentiary objection.

9          MS. CLARK:  Objecting on confidentiality, privilege,

10  work product, and mental impressions.

11          THE COURT:  Also overruled.  You are directed to

12  answer.

13          MR. DENNIS WILENCHIK:  Objection.  Relevance.

14  Irrelevant.

15          THE WITNESS:  Yes.

16  Q.  (BY MR. KELLER)  And that's the same advice you have been

17  giving the defendant since December 23rd, 2011, roughly?

18          MS. CLARK:  Just a continuing objection on those

19  reasons I stated.

20          THE COURT:  Still overruled.

21          MR. DENNIS WILENCHIK:  Objection, irrelevant, based on

22  the final order, which is completely different than the

23  preliminary injunction.

24          THE COURT:  Overruled.

25          THE WITNESS:  That is exactly what I told him on those

UNITED STATES DISTRICT COURT

CASEY - DIRECT

1   occasions.

2   Q.  (BY MR. KELLER)  That's what you told him in July of 2012

3   as we discussed?

4   A.  Yes.

5   Q.  And again in the fall of 2012 in response to the

6   plaintiffs' allegations?

7   A.  Yes.

8   Q.  Mr. Casey, did you withdraw as counsel -- I think you

9   referenced earlier you did withdraw as counsel in the Melendres

10  case in 2014 or 2015?

11  A.  2014.

12  Q.  What was that withdrawal based on?

13      MS. CLARK:  Objection, Judge.  Privilege.

14  Confidentiality.  Mental impressions.

15      MR. DENNIS WILENCHIK:  And also --

16      THE COURT:  Did you have to testify about this before

17  Judge Snow, Mr. Casey?

18      THE WITNESS:  On a very narrow area.

19      THE COURT:  Okay.  The objection is sustained.

20  Q.  (BY MR. KELLER)  Mr. Casey, did you testify specifically as

21  to the reason for your withdrawal in front of Judge Snow in the

22  criminal -- in the civil contempt hearing?

23  A.  I did not.

24  Q.  Ms. Miller, if we could bring up Government's Exhibit 35

25  please.

CASEY - DIRECT

1          MR. DENNIS WILENCHIK:  Wait a minute, Your Honor.

2  Before he brings up anything, again --

3          THE COURT:  I already sustained the objection.  I'm

4  not going to hear his testimony on why he withdrew.

5  Q.  (BY MR. KELLER)  Did your reason to withdraw have to do

6  with the preliminary injunction in some sense?

7          MS. CLARK:  Same objections, Judge.

8          THE COURT:  Sustained.  I'm not going to hear why he

9  withdrew.

10  Q.  (BY MR. KELLER)  Did the defendant, Mr. Arpaio, resist

11  implementation of the preliminary injunction?

12          MS. CLARK:  Objection.  Confidentiality.  Privilege.

13          THE COURT:  That is overruled, and you are directed to

14  answer.

15          MR. DENNIS WILENCHIK:  And also, Your Honor, I'm

16  objecting on the basis it calls for a conclusion, not facts.

17          THE COURT:  Overruled.  You may -- are still directed

18  to answer.

19          THE WITNESS:  What was the question.

20  Q.  (BY MR. KELLER)  Did the defendant, Mr. Arpaio, resist

21  implementation of the preliminary injunction?

22          MS. CLARK:  I must add to my objection mental

23  impressions, Judge.

24          MR. DENNIS WILENCHIK:  Objection.  Calls for

25  inadmissible opinion.

CASEY - DIRECT

1          THE COURT:  All of them are still overruled, and

2     you're still directed to answer.

3          THE WITNESS:  I'll put it this way.  We had

4     difficulties having him seem to understand it.  We had

5     difficulties in responding to Segura's letter in the fall of

6     2011.  So you can draw or the Court can draw its own

7     conclusions, but I don't feel qualified to tell you that.

8     Q.  (BY MR. KELLER)  From December 23rd, 2011, through May

9     28th, 2013, when that briefing board came out, how many times

10    did the defendant assure you that there would no longer be

11    detentions based solely on unlawful status?

12          MS. CLARK:  Objection.  Confidentiality.  Privilege.

13          THE COURT:  Overruled.  You're directed to answer if

14    you can give us a number.

15          THE WITNESS:  No.  I remember, because it's three

16    times.  The first, it's not happening.  That was in December of

17    '11.  Then we have the issue at trial, which was not that it

18    was happening but his understanding of LEAR.  So we corrected

19    that.  Then we have the Segura letter in October of '11 that

20    there was a mistake, as he expressed it.  And that was a

21    one-time mistake, wasn't going to happen again.  That's what I

22    was told.

23    Q.  (BY MR. KELLER)  And yet you know now that the assurances

24    on all three of those occasions were lies?

25          MR. DENNIS WILENCHIK:  Objection, Your Honor.

UNITED STATES DISTRICT COURT

1    Improper question on direct.  Leading.

2           THE COURT:  Sustained.

3    Q.  (BY MR. KELLER)  Mr. Casey, Exhibits -- the press releases

4    we reviewed, Exhibits 36J, 36K, and 36L, those all indicate

5    that, despite those assurances, the office continued to detain

6    people and turn them over to ICE; is that right?

7           MR. DENNIS WILENCHIK:  Objection.  Leading.

8           THE COURT:  Sustained.

9    Q.  (BY MR. KELLER)  Mr. Casey, do you know whether the

10   defendant's statements to you on those three occasions that

11   they would no longer be holding people for ICE were true?

12          MR. DENNIS WILENCHIK:  Objection, Your Honor.  First

13   of all, it's a mischaracterization of testimony, and, second of

14   all, how could he know when it's true and when?

15          THE COURT:  Sustained.

16          MR. DENNIS WILENCHIK:  Call for foundation.

17   Q.  (BY MR. KELLER)  Mr. Casey, after December 23rd, 2011, did

18   you learn that the Maricopa County Sheriff's Office continued

19   to turn people over to ICE?

20   A.  We have the issue that came up at trial and that I wasn't

21   sure about the timing.  But we had some misunderstandings by a

22   couple of deputies.  But I wasn't sure if it was pre- or

23   post-preliminary injunction, is my memory as I sit here today.

24   Then we had the Segura letter.  And then I think there was some

25   issues that came up in May of '14.

CASEY - DIRECT

1  Q.  Well, did you learn, based on the Segura letter, that after

2  December 23rd, 2011, the Maricopa County Sheriff's Office

3  continued to turn people over to ICE?

4  A.  I'm not going to answer it the way that you phrased it.  I

5  was told there were less than two, three, less than a handful

6  of a mistake that happened, that it wasn't systemic.  It wasn't

7  HSU.  It wasn't -- It wasn't the whole agency or department.

8  So I -- That's my quibble with it, in fairness, if we're about

9  fairness.

10 Q.  All right.  So you can't -- you can't say to what extent

11 the sheriff's office continued to turn people over to ICE?  Is

12 that what your testimony is today?

13 A.  What I'm telling you is before I came here today, I'd never

14 seen those three, and I -- what I testified to, I thought to

15 his credit from the moment I talked to him in the fall of '12

16 after the Segura letter until I withdrew, I did not believe

17 there was a problem turning people over to the federal

18 authorities, whatever they were.

19 Q.  But do those press releases suggest otherwise?

20 A.  They do suggest otherwise.

21         MR. DENNIS WILENCHIK:  Objection, Your Honor.  This is

22 leading and obvious.

23         THE COURT:  The answer stands.

24         MR. KELLER:  Thank you, Your Honor.  No further

25 questions.

CASEY - CROSS

1          THE COURT:  I think we'll take our break.  We'll

2     reconvene at 2:35.  Court is in recess.

3          (Proceedings recessed from 2:20 p.m. until 2:36 p.m.)

4          THE COURT:  Thank you.  The record will show the

5     presence of counsel and the defendant.

6          Mr. Wilenchik, you may cross-examine Mr. Casey.

7          MR. DENNIS WILENCHIK:  Thank you, Your Honor.  First,

8     Your Honor, I promised opposing counsel that I would indicate

9     to the Court that I have no objection to 46.

10          THE COURT:  Thank you.

11                       CROSS-EXAMINATION

12     BY MR. DENNIS WILENCHIK:

13     Q.  Mr. Casey, listening to your testimony, I want to start

14     with one thing I thought was important you said about the --

15     your discussion with the sheriff or one of your discussions

16     with the sheriff.  You said that it was in your judgment -- and

17     I want to highlight that, in your judgment -- that it was --

18     and I want to highlight likely -- you felt a violation to be

19     cooperating with Border Patrol.  Would that be fair?

20     A.  Yeah, yeah.

21     Q.  Okay.  When you said that, I took note of that, because my

22     question to you is notwithstanding your interpretations, in

23     fairness to you, or your beliefs or what you thought might be

24     likely of what a judge might do, you would at least agree with

25     me that it's not directly in the preliminary injunction order

UNITED STATES DISTRICT COURT

1   language itself as to what to do in terms of Border Patrol or

2   ICE for that matter, correct?

3           MS. CLARK:  Objection.  Attorney-client privilege,

4   confidentiality, and mental impressions.  Despite the fact that

5   it's defense counsel asking these questions, I still need to

6   make the same record, because the holders of the privilege are

7   not here.

8           THE COURT:  Overruled.  You are directed to answer.

9           THE WITNESS:  You're correct.

10  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Thank you.  And as I

11  think I want to highlight you were saying to the Court, lawyers

12  make these kind of judgment calls all the time in what they do

13  obviously, correct?

14  A.  And we're often wrong.

15  Q.  And we're often wrong.  We don't like to talk about that

16  part obviously.

17          But you were trying to counsel -- give counsel in

18  doing that, correct?

19  A.  Yes.  That's what I -- That's what I was doing, and the

20  record reflects the plaintiffs never filed an OSC.

21  Q.  Right.  I'm going to get to that.  I appreciate that.

22          And the reason you were trying to counsel was you were

23  trying to give the sheriff your best interpretation of what

24  might happen?  Fair enough?

25  A.  That's fair.

CASEY - CROSS

1    Q.  But the sheriff, if I understood your testimony, said to

2    you something to the effect of -- and I didn't mark it down

3    verbatim -- but something to the effect, if I heard you right,

4    that, well, that's fine; I am the sheriff; I make that call;

5    and basically if you can make a good faith argument, then you

6    should do so or something like that.  Correct?

7              MS. CLARK:  Continuing objection on attorney-client

8    privilege and confidentiality.  The holders are not here.

9              THE COURT:  Overruled.

10             MR. KELLER:  Objection, Your Honor.

11             THE COURT:  You're directed to answer.  What?  Another

12   objection.

13             MR. KELLER:  Hearsay.  This is not offered by an

14   opposing party, Your Honor.

15             MR. DENNIS WILENCHIK:  I'm just cross-examining him on

16   what he already said.

17             THE COURT:  Just a moment.  I'm trying to read the

18   question.

19             The objection is overruled.  You are directed to

20   answer.

21             THE WITNESS:  Yes.

22   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  You wouldn't do anything

23   as an experienced, seasoned attorney, I believe, you wouldn't

24   do anything that you felt was unethical or in violation of the

25   rules in that regard, would you?

CASEY - CROSS

1   A.  I would hope not.

2   Q.  And you didn't think that at the time, did you?

3   A.  I did not, and I do not.

4   Q.  And you told us, if I understood you correctly, that you

5   felt, based on what that discussion was, that there was

6   discussion that the without more or only on language, if I got

7   it right, would provide that good faith argument?  Isn't that

8   what you testified?

9   A.  That's what I testified.

10          MS. CLARK:  Objection on mental impressions, Judge.

11          THE COURT:  Overruled.  The answer will stand.

12  Q.  (BY MR. DENNIS WILENCHIK)  And that's what you said you

13  told the sheriff, correct?

14  A.  Yes.

15  Q.  And that's what you said you told everyone else?

16  A.  That's what I actually wrote in a letter responsive to the

17  plaintiffs' letter.

18  Q.  You didn't write the plaintiffs and say, gee, it was a

19  mistake, it's only happened a few times, and it won't happen

20  again?  Fair?

21  A.  That is fair.

22  Q.  I'm going to pull that letter up, if you like.  Do we have

23  that exhibit?  Can you find that, the letter of October -- what

24  is it? -- 11th, 2012.

25          But did you admit that letter?

CASEY - CROSS

1          MR. KELLER:  No.

2          MR. DENNIS WILENCHIK:  I'll do so.  Can you find it?

3    What exhibit number?

4          MS. DE LOS ANGELES:  25.

5          MR. DENNIS WILENCHIK:  I think you referenced it, but

6    I'm not sure it was admitted or not.

7          MR. KELLER:  Exhibit 25 was admitted.  I thought you

8    were talking about a different exhibit.

9    Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Fair enough.  All right.

10   Well, what I'm talking about is actually the response letter.

11   Is that part of Exhibit 25?  I know it had a lot of pages.  It

12   was hard for me to follow along.  Do we have the response

13   letter of Mr. Casey in October?  Do you recall responding?

14   A.  I do, yes.

15   Q.  And in that do you remember highlighting certain things,

16   underlining certain things?

17         THE COURT:  This one, we should get the letter and

18   have him look at it and not have to remember if he used a

19   highlighter or used an underscore.

20   Q.  (BY MR. DENNIS WILENCHIK)  Absolutely.  Can you find that?

21         This 25 attaches the letter, but I'm not sure it's

22   part of 25.

23         THE COURT:  I want to remind the audience once again

24   if your phones are not off, and they're just -- and they're

25   receiving or transmitting texts or phone calls or you're

CASEY - CROSS

 1    getting alerts, turn them off.  We just heard a signal that

 2    someone got a message.

 3    Q.   (BY MR. DENNIS WILENCHIK)  Can you find it?

 4           THE COURT:  So this would be a letter from you,

 5    Mr. Casey, to one of the attorneys in Melendres?

 6           THE WITNESS:  Yeah.  It was about a week later, Your

 7    Honor.

 8    Q.   (BY MR. DENNIS WILENCHIK)  Now, let me set that up --

 9    excuse me -- while they're looking for it.  I don't know why I

10    can't find it either in my note right now.

11           Basically what happened, just to recap, was that you

12    went to the Court of Appeals in September, as I recall,

13    mid-September, and in that argument, which I think also we have

14    here, if you like -- there's a transcript of it that the

15    government provided -- and that -- in that argument to the

16    Court of Appeals on the PIO, you had made some kind of a

17    comment in general to the effect that the office was not

18    detaining illegal aliens, I guess, and sending to Border Patrol

19    or ICE or something like that, right?

20    A.   Yes.

21    Q.   And then when you got back, one of the lawyers from the

22    ACLU wrote you and basically complained basically attaching

23    these three actually, I believe, news releases and saying,

24    well, gee, what you said at the Court of Appeals was wrong, you

25    need to correct it, or something to that effect in general,

CASEY - CROSS

1    correct?

2    A.  I -- Yes.  I think in effect that is exactly what they did.

3    Q.  Okay.  And so at that point it's my understanding that you

4    then set out to do what in your words you called a thorough

5    investigation.  Is that fair?

6    A.  I think that's how I represented it to the plaintiffs.

7    Q.  Right.  And in that thorough investigation -- And then

8    resulting from that thorough investigation was the letter.  Do

9    you not have it?

10            I'll find it.

11            And basically you were -- you were doing a thorough

12   investigation, and you even were communicating with Mr. Liddy

13   about it; is that right?

14   A.  Yes.

15   Q.  And you saw an exhibit on direct examination where

16   basically you were seeking to look into the facts yourself to

17   determine what happened?

18   A.  Yes.

19   Q.  Would that be fair?

20            You didn't then speak, I think you said on direct,

21   with the sheriff about that directly at that time, correct?

22   A.  I don't think on the first day I got it, no.  It was later.

23   Q.  Okay.  You sent some e-mail to the rest of the folks there

24   at MCSO trying to find out about what's going on because of

25   this investigation you were doing, right?

UNITED STATES DISTRICT COURT

CASEY - CROSS

1    A.  Yes.  And I spoke Brian Sands.

2    Q.  Okay.  Let me ask it this way.  Nobody at MCSO was stopping

3    you from doing that thorough investigation, correct?

4    A.  That is correct.

5    Q.  And in particular the sheriff never ordered that you not do

6    a thorough investigation or stand in your way in any way in

7    doing that?

8    A.  No, not at all.

9    Q.  Okay.  And no one else at MCSO again stood in your way and

10   said, hey, we're not giving you information, don't do this, we

11   don't want to cooperate, right?

12   A.  That never happened.

13   Q.  In fact, is it true that at no time did the sheriff

14   actually ever tell you, Tim, no way, no how, or whatever words

15   you want, I'm not following that order, and I'm directing my

16   troops not to?

17          MS. CLARK:  Objection.  Privilege and confidentiality.

18          THE COURT:  Overruled.  You're directed to answer.

19          THE WITNESS:  He never said that.

20   Q.  (BY MR. DENNIS WILENCHIK)  All right.  And he never said

21   that even in the testimony you gave to the government that you

22   have already given in this, quote, heated conversation, did he?

23   Never actually said that?

24   A.  He never said that.  His comments were what I mentioned

25   earlier.

CASEY - CROSS

1  Q.  And you said, if I got you right, that you thought that

2  there could have been a, quote, misunderstanding of some kind,

3  right?

4  A.  Yes.

5  Q.  Okay.  Now, to be clear, you didn't, in your response, tell

6  the plaintiffs at any time verbally or otherwise about any

7  misunderstanding or mistakes or anything like that, right?

8  A.  That would violate and privilege and confidentiality, so I

9  did not do that.  That's correct.

10  Q.  Did you send anything, if I understand your answer, did you

11  send anything internally --

12  A.  No.

13  Q.  -- to --

14  A.  I'm sorry.  I didn't --

15  Q.  You know as a lawyer --

16  A.  I know.  I'm sorry.

17  Q.  -- I've got to finish my question.

18  A.  Yes, you do.

19  Q.  Did you send anything internally to the office and

20  the people you just mentioned you were doing this investigation

21  with saying anything like that?

22  A.  About what?

23  Q.  Well, that, for example, I've been advised this is a

24  mistake, it won't happen again, anything like that?

25  A.  Yes.

UNITED STATES DISTRICT COURT

CASEY - CROSS

1   Q.  Where is that, sir?  Because I haven't seen it.

2   A.  No, I haven't seen anything in writing.  It was all done

3   orally with some of the chiefs.

4   Q.  Like who?

5   A.  MacIntyre and Sands.

6   Q.  You didn't follow up, though, in any way, shape, or form,

7   just so we're clear on that -- I want to be clear on what you

8   just said -- with a memo to the file, a memo to them just

9   saying, listen, based on this investigation, here's what I've

10  looked at and determined, or here's what the sheriff told me,

11  anything like that?

12  A.  I did not.

13  Q.  Okay.  Now, at the time that you were communicating with

14  them, you would have known that this information was

15  confidential, correct?

16  A.  What information was confidential?

17  Q.  Well, you just told me.  You felt that the information

18  learned in the course of this investigation would have been

19  confidential to the extent you would have communicated with

20  them and privileged?

21  A.  No.  I said my communications with the sheriff were

22  confidential and privileged.

23  Q.  Okay.

24  A.  I don't know what you're referring to.

25  Q.  Sure.  Were your communications, is what I'm asking, with

CASEY - CROSS

1    the other people intended by you to be privileged?

2    A.  Did I intend -- Are you asking me did I intend what I said

3    to Mac and to Sands to be privileged?

4    Q.  Yes.

5    A.  Absolutely, yes.

6    Q.  And so I'm just getting clear that nothing at least would

7    have prevented you, at least we can agree, to have sent them a

8    memo instructing them on what you had learned and what they

9    shouldn't do in the future?

10   A.  I didn't think I needed a CYA.

11   Q.  And I appreciate that, Tim, but that wasn't my question.

12   A.  I think -- Well, that's my answer.  I didn't think I needed

13   to do anything but orally at that time.

14   Q.  Okay.  Let me see if I can rephrase it, okay, because I

15   don't think, with all due respect, that was my question.

16          My question was at the time nothing would have

17   prevented you believing that it would be privileged and

18   protected of at least advising the people that you were dealing

19   with, i.e., Sands, MacIntyre, and whomever, on this

20   investigation, of your findings and your recommendations for

21   the future, correct?

22   A.  Nothing prevented me from doing that.

23   Q.  And to be clear, there's no record at all, whether it's

24   in your files or their files that you've seen, in which you did

25   that, correct?

CASEY - CROSS

1   A.  I don't know about the files, but I can tell you I don't

2   remember authoring one, and I wouldn't have authored any one.

3   Q.  Well, let me understand that.  And I'm not trying to

4   quibble with you.  But if you believed that advice to your

5   clients, at least at the time you believed, would have been

6   protected and privileged and confidential, nothing would have

7   prevented you to make it clear to these law enforcement

8   officers as to what your beliefs were as to the investigation

9   and how they should proceed going forward?

10  A.  I cannot answer that without violating the attorney-client

11  privilege and confidentiality on a host of other things that

12  leads to my answer.

13  Q.  You can't answer the simple question of whether or not you

14  could have simply, believing there was a privilege and that it

15  would be protected, sending your clients something to guide

16  them on how they should proceed?  Isn't that --

17  A.  No, because it's not so simple in context matters.  And I

18  cannot truthfully answer your question without getting into a

19  host of other things about why I didn't put it in writing that,

20  and that's privileged and not been waived by anyone, so I'm

21  sorry.

22  Q.  Okay.  Well, let me just go over change -- I may jump

23  around a little bit, but the original part -- Excuse me.

24  Strike that.

25          The first conversation that you had with the sheriff I

CASEY - CROSS

1   believe you said was on December twenty -- sixth?

2   A.   Third.

3   Q.   Well, do you know you talked to the sheriff on the 23rd?

4   A.   Yes.

5   Q.   How do you know that?

6   A.   I didn't -- Regrettably, I did not bill my time.  And I

7   didn't remember talking to anyone other than Sands.  But in the

8   civil contempt, Mr. Wilenchik, I received several subpoenas by

9   I assume it was the ACLU.  And in the process, even though my

10  file had gone over to successor defense counsel, I searched for

11  it, and I found an e-mail going from me at 9:00, 9:30 at night

12  on the 23rd to my then associate, now partner, James Williams

13  giving an overview about speaking with Sands, speaking with

14  Jack Mac, what they thought about the preliminary injunction,

15  and speaking with the sheriff.

16  Q.   And that was on the 23rd?

17  A.   It was at 9:30 at night, so I, sometime between 4:30 when I

18  received it and 9:30 at night -- I remember because I didn't

19  appreciate getting any order at 4:30 on December 23rd, because

20  I was out there until 9:30 taking care of things.  But I did

21  speak with the sheriff so -- on the telephone.  It wasn't in

22  person.

23  Q.   Okay.  Let's just take that for a minute then and assume

24  that to be correct.

25  A.   It is correct.

CASEY - CROSS

1  Q.  When you say it is correct, sir, you didn't remember it

2  before, and now you're telling me you looked at an e-mail that

3  refreshed your recollection.  And I'm assuming that for the

4  purposes of our conversation that that is correct.  All right?

5          Okay?

6          All right?

7          THE COURT:  He believes it's correct.  We don't have

8  to quibble about whether you're assuming it and he's not

9  assuming it.  You can just ask your next question.

10 Q.  (BY MR. DENNIS WILENCHIK)  Okay.  You said that

11 Mr. Williams and you were discussing whether you were

12 disappointed in the order.  Is that the e-mail you're referring

13 to?

14 A.  I think I mentioned what I thought about the order and what

15 the others thought about it, because I think -- He's from

16 Texas, and he was back at Baylor with his in-laws.

17 Q.  And basically you were saying, if I recall what you're

18 talking about, that, hey, it could have been worse, right?

19 A.  Yes.

20 Q.  Why?

21 A.  We could have lost on all the motions.  There would be no

22 trial.

23 Q.  Well, let's talk about the PIO, if we can.

24 A.  PIO?

25 Q.  What?

UNITED STATES DISTRICT COURT

CASEY - CROSS

1    A.  You said PIO.

2    Q.  Yeah.  I refer to it as the PIO, preliminary injunction

3    order.  I'm sorry.  If you want to refer to it as something

4    else?

5    A.  I think of the MCSO's public information office when I hear

6    PIO.

7    Q.  So we can refer to it as PIO, right?

8    A.  Sure.  I'd prefer injunction if you could use that.

9    Q.  I'll try to do it.  If I don't, correct me.

10           So basically you were referring to the injunction when

11   you were saying, hey, it could have been worse?

12   A.  Yes.

13   Q.  Okay.  What could have been worse about the injunction than

14   what it already said?

15           MS. CLARK:  Objection.  Attorney-client privilege,

16   confidentiality, and mental impressions, Judge.

17           THE COURT:  Overruled.  You're directed to answer.

18           THE WITNESS:  The comment about being -- it could have

19   been worse was about being able to go to trial on the merits of

20   the Fourth Amendment claim and the Fourteenth Amendment claim.

21           My understanding on December 23rd was the same thing

22   that was confirmed by the sheriff that night.  They're not

23   detaining people unlawfully in the country anymore, that that

24   stopped because of President Obama's policy.  They won't take

25   them at ICE.  So guess what?  You're ordered -- and I used the

CASEY - CROSS

1   expression with him, when he started telling me that -- if

2   you're ordered not to wear a dress, and you don't wear a dress,

3   the order doesn't have much effect, does it?

4   Q.  (BY MR. DENNIS WILENCHIK)  Those were his exact words?

5   A.  No.  Those were my things to him, because he was telling me

6   we're not doing it, so it doesn't have any bearing.

7   Q.  Let me ask you about that since you've mentioned it now

8   twice, I think, both on direct and now.  When you say "it" --

9              THE COURT:  You're wandering from the mike.  Thank

10  you.

11  Q.  (BY MR. DENNIS WILENCHIK)  What is "it"?  Because I don't

12  see anything, as we both agreed earlier, in the order that

13  deals with this issue of ICE.  In fact, I don't see the word

14  ICE at all, do you, in the order?

15  A.  No.  But it's about turning over people to the federal

16  authorities.

17  Q.  Can you just stick with me for my questions?

18  A.  Yes, I will do that.

19  Q.  Nothing in the order deals with ICE, right?

20  A.  No.

21  Q.  Or necessarily talks about taking people to ICE, correct?

22  A.  Not in the order but elsewhere throughout the opinion.

23  Q.  Well, we'll come to that, but the order -- the opinion

24  you're referring to is the summary judgment opinion?

25  A.  It's also the -- the same thing, I think, that came out

                              CASEY - CROSS

1    with the preliminary injunction.  I don't remember now.  It's

2    been almost six years.

3    Q.  Do you remember that the rest of that order on the summary

4    judgment motion and on this class certification, that 40-page

5    order, do you remember anything in there talking about

6    detaining people and taking them to ICE?

7    A.  I'd have to look at the order.  As I sit here --

8    Q.  Do you recall anything?

9    A.  -- today, Mr. Wilenchik, I do not.

10   Q.  Thank you.

11          Let's take a look at Exhibit 26 now.

12          Okay.  Now let's just go through this carefully.

13   This, again, was after you return -- Hold on.  This is after

14   you returned from the Court of Appeals, just putting this in

15   perspective, and the plaintiffs send you this letter, which I

16   believe was Exhibit 25 perhaps that you referenced earlier.

17   And now you're looking into this issue.

18          And here you say on October 28th "Please find attached

19   my letter," blah-blah-blah-blah, "relating to the accusation

20   that the MCSO is violating the Court's injunction," right?  "I

21   will keep you posted on all developments regarding this issue."

22          THE COURT:  Excuse me.  Do you remember when you were

23   objecting that Mr. Keller was reading from a document that

24   hadn't yet been admitted?

25          MR. DENNIS WILENCHIK:  Oh, I apologize, Your Honor.

CASEY - CROSS

1   You're correct.

2           I move for the admission of Exhibit 26.

3           THE COURT:  Is there any objection?

4           MR. KELLER:  Objection, Your Honor.  Hearsay.

5           THE COURT:  The objection is overruled.  26 is

6   admitted.

7   Q.  (BY MR. DENNIS WILENCHIK)  You say here "I anticipate they

8   will cry foul in a very public court filing and issue a new

9   release right before the election."  Do you see that?

10  A.  I do.

11  Q.  Would it be accurate then to say that the only at least

12  written evidence that you've seen about anyone talking about

13  political motives would be this e-mail of yours accusing the

14  plaintiffs of that?

15          MS. CLARK:  Objection.  Mental impressions.

16          THE COURT:  Overruled.  You're directed to answer.

17          THE WITNESS:  I'm sorry.  I don't understand your

18  question.

19  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Fair enough.

20          I thought you testified on direct examination -- I

21  could be wrong.  If I am, correct me -- that you were told by

22  Chief Sands that there's some political motive behind "it", and

23  I assumed you meant by "it" taking people to Border Patrol.  Is

24  that right?

25  A.  Right.  That's what he told me.

UNITED STATES DISTRICT COURT

CASEY - CROSS

1    Q.  Good.  Okay.  And when did he supposedly tell you that?

2    Was it before or after or in the context of this time frame?

3    A.  Supposedly.  I'm telling you what my memory is is Brian

4    Sands, your former client in the civil contempt case, told me

5    about that when I talked to him and we started finding out

6    about why this mistake happened.

7    Q.  You seem to be kind of defensive there, Mr. Casey.  All I

8    asked you was --

9    A.  I think you know why I'm defensive, Mr. Wilenchik.

10   Q.  I have no idea why you're defensive, but let me just ask

11   the questions to see if you can answer them.  Okay?

12        The question was do you recall putting in writing that

13   statement that you allegedly told the Court under oath about

14   what Chief Sands said to you?

15        THE COURT:  He didn't allegedly tell the Court

16   anything.  He either told the Court or he didn't tell the

17   Court.

18        MR. DENNIS WILENCHIK:  You're absolutely correct as

19   usual.  I apologize.

20   Q.  (BY MR. DENNIS WILENCHIK)  That you actually did tell the

21   Court.  Is that in writing anywhere where you made a note of

22   that somewhere?

23   A.  I don't know.

24   Q.  Well, I hadn't seen it, so have you seen it?

25   A.  I didn't read it when -- If there is one, I don't know

CASEY - CROSS

1    about it.

2    Q.  Okay.

3    A.  I don't have my file.

4    Q.  Who has your file?

5    A.  I don't know who's current counsel for the sheriff.  I know

6    it was Iafrate.  It went from me to Iafrate.  Then it went to

7    Jones Skelton Hochuli.  I don't know who has it.

8    Q.  Did you retain any portion of your file?

9    A.  Only e-mails.  Only e-mails that may have been kept by my

10   paralegal.

11   Q.  What about your notes to the file?  Did you not keep any of

12   that?

13   A.  No.  Everything went over there.

14   Q.  To Iafrate?

15   A.  Every one to successor counsel.

16   Q.  So you don't keep on your system or anything else notes

17   that you make?

18   A.  I'm not a big note taker, but anything I took would have

19   been in the note file.

20   Q.  Do you know if they were asked to produce all of your

21   records in these proceedings, both the civil and criminal

22   proceeding?

23   A.  I don't know.

24   Q.  All right.  In any event, you don't have any recall of

25   making any note of that statement?

CASEY - CROSS

1    A.  I don't have a recall one way or the other.

2    Q.  Okay.

3    A.  It may have been in my personal notes, but I can tell you,

4    if you're asking me did I send it to him in writing to the

5    client?  No.  But may -- would I have documented it?  Maybe.

6    Q.  Well, I haven't seen it, so that's why I'm asking you if

7    you --

8    A.  I don't know what you've seen.

9    Q.  I just told you I didn't, okay, so I'm asking if you have.

10           Have you?

11   A.  I think I shared with you I haven't seen it.  Sorry,

12   counselor.

13   Q.  Now, getting back to the point, what Sands told you, as you

14   understood it, was his opinion as to what was going on, because

15   he, like you, you told us, disagreed with the sheriff's

16   position, right?

17           MS. CLARK:  Continuing --

18           MR. KELLER:  Objection.

19           MS. CLARK:  -- objection on confidentiality and

20   privilege and perhaps mental impressions, depending --

21           MR. KELLER:  Objection as to the foundation for Sands'

22   opinion.

23           THE COURT:  Overruled.  You're directed to answer.

24           THE WITNESS:  I have no idea where Brian Sands got the

25   information.  I have no idea.

CASEY - CROSS

1   Q.   (BY MR. DENNIS WILENCHIK)   Or if he got the information,

2   correct?

3   A.   I just know what he told me and what I've shared, but I

4   don't know where he got it, if he got it, if he made it out of

5   thin blue air.   I have no idea.

6   Q.   Could have been his opinion too?

7   A.   I have no idea.

8   Q.   All right.   Fair enough.

9        And did I get that right that part where I said it was

10   my understanding from listening to you that both he and you

11   shared a contrary view of what the Snow order said from Sheriff

12   Arpaio?

13   A.   Yes.

14   Q.   Okay.   And that's when Sheriff Arpaio, again, getting back

15   to it, was saying, you know, make an argument for it or

16   something like that, and you said you could, right?

17   A.   Eventually, yes.

18   Q.   All right.   Did you send the sheriff personally anything

19   about this heated conversation that was just between you and

20   him and not with Chief Sands in the room?

21   A.   In writing?

22   Q.   Yes.

23   A.   No.

24   Q.   Are you free to tell us, since you didn't on direct, what

25   the nature of the heated conversation specifically centered

CASEY - CROSS

1    about?

2    A.  I think that's attorney-client privileged.

3    Q.  Okay.  Did it center around the injunction or about your

4    performance?

5    A.  No.  The performance issue -- I can't answer the question

6    without getting into attorney-client.

7    Q.  Well, let's go on.  In Exhibit 26, let's go on to the next

8    page and get to the letter that you attached.  Okay.  This

9    appears at least to me to be the letter that you sent to the

10   plaintiffs' counsel that we were talking about earlier,

11   correct?

12   A.  Yes.

13           MR. DENNIS WILENCHIK:  I'd move for the admission,

14   Your Honor.

15           THE COURT:  It's already been admitted.

16   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  And I want to go through

17   this with you in relevant part, Mr. Casey, in light of this

18   conversation where you say this was around the second time

19   where you had the conversation with Sheriff Arpaio that you

20   related to the Court, correct?

21   A.  Third time.

22   Q.  Third time?

23   A.  Yes.

24   Q.  Okay.  Let me get that straight in my mind then.  The first

25   time was on December 23rd.  We'll come back to that.  The

CASEY - CROSS

1  second time is when?

2  A.  After the trial, during the -- After his trial testimony at

3  some point.

4  Q.  Okay.  I'll come back to that too?

5        THE COURT:  That was around May of 2012?

6        THE WITNESS:  No.  It was July and August of 2012.

7        THE COURT:  Thank you.  July and August of 2012.

8  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  I'll come back to that.

9  And then this is the third time, just so we're clear?

10  A.  Yes.

11  Q.  I want to walk you through this.  This says "Your letter

12  raises questions concerning three Maricopa County Sheriff's

13  Office news releases pertaining to three events."

14        THE COURT:  Do you have the ability on your computer

15  to pull out a par -- Because it's really hard to read.

16  Q.  (BY MR DENNIS WILENCHIK)  Sure.  Let me start with asking

17  you a question about this.  I take it then from this statement

18  that you actually did review the news releases at that time?

19  A.  Before I wrote this.  I got them with Segura's letter.

20  Q.  Had you ever been asked in fact by Lisa Allen, who was in

21  the office, to review, along with Liddy, press releases before

22  they went out?

23  A.  We actually recommended after the trial that that take

24  place, but it didn't.  Sometimes it did but not always.

25  Q.  You're saying Lisa Allen did not ask you to comment on news

UNITED STATES DISTRICT COURT

CASEY - CROSS

1    releases while something was in litigation?

2    A.   I do not -- The ones that Segura sent to me, I believe the

3    first time I ever saw them was when Segura's letter came in.

4    Q.   Let me ask it this way.  When you saw those news releases

5    and you say you hadn't reviewed or approved them, were you

6    pretty heated about that?

7    A.   I was not happy.

8    Q.   Would that be heated?

9    A.   Yes.

10   Q.   Okay.  And at that point did you express that anger, if you

11   will -- you can use whatever word you want -- to anyone at the

12   office?

13         MS. CLARK:  Objection.  Continuing objection on

14   confidentiality and privilege.

15         THE COURT:  What office?

16         MR. DENNIS WILENCHIK:  MCSO.

17         THE COURT:  Okay.  The objection is overruled.  You're

18   directed to answer.

19         THE WITNESS:  Yes, I did.  Brian Sands.

20   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  And did you discuss in

21   that regard that in the future you'd like to see news releases?

22   A.   No, because it was -- it was beating a dead horse.  We'd

23   gone through that so many times, particularly Mr. Liddy, and it

24   didn't seem to happen.

25   Q.   Have you seen, again, any document, whether in this case or

CASEY - CROSS

1   in the civil case, or even in the trial portion, that reflects

2   that you raised that issue and said anything to the effect of

3   what you just told the Court?

4   A.  About what?

5   Q.  That you're not getting news releases to review.  You're

6   upset about it.  In the future, they should not be issuing such

7   releases without a lawyer reviewing it?

8   A.  I didn't send anything like that to my knowledge.

9   Q.  Now, the sheriff's office did not have what I'd call a

10  general counsel.  Is that fair?

11  A.  Not officially they did not.

12  Q.  When you say not officially, what does that mean?

13          MS. CLARK:  Objection.  Confidentiality.  Privilege.

14          THE COURT:  Overruled.  You're directed to answer.

15          THE WITNESS:  The sheriff treated Jack MacIntyre, who

16  was a former County Attorney, as, I thought, in-house counsel,

17  although he had specific assignments.  That was my impression.

18  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Your impression, but in

19  fact you knew that he was a chief having nothing to do with

20  legal matters, correct?

21  A.  That's not what I understood.  I knew he was a Chief.  I

22  knew he had something to do on the detention side.  But he had

23  a lot to do with legal matters.

24  Q.  Like what?

25  A.  Handling requests from counsel, handling schedulings with

CASEY - CROSS

1   various people, running interference with counsel who is

2   outside and the sheriff.  If you needed something done, you

3   usually went to him immediately.

4   Q.  Okay.  And is that what you have testified in the past is

5   the reason why you were sending him copies of things?

6           MS. CLARK:  Objection.  Confidentiality.  Privilege.

7   I'm not sure what else because I don't know what the question's

8   calling for.

9           THE COURT:  I don't know what the question's calling

10  for either.  I mean, the privilege waiver is only as to things

11  related to the preliminary injunction order.  And I believe

12  that Mr. Casey's representation of the sheriff's office and

13  perhaps his practices with respect to Mr. MacIntyre surpass

14  just the preliminary injunction.  Would that be accurate?

15          THE WITNESS:  I'm sorry.  I was literally daydreaming.

16  I'm sorry.  I apologize.

17          THE COURT:  You're kidding?

18          THE WITNESS:  I'm so sorry.  I was looking at the

19  clock hoping Mr. Wilenchik would be done.

20          MR. DENNIS WILENCHIK:  This was something that was

21  actually gone into on direct, so all I was trying to do --

22          THE WITNESS:  I'm sorry.  I apologize to you and the

23  Court.

24          THE COURT:  That's okay.

25  Q.  (BY MR. DENNIS WILENCHIK)  Let me ask it this way.  Do you

CASEY - CROSS

1  remember testifying here about why you sent, in this courtroom,

2  why you sent things to Jack MacIntyre?

3  A.  I do.

4  Q.  Okay.  What did you tell us?

5  A.  Well, that's privileged unless I'm ordered.

6  Q.  Well, were you ordered to answer it earlier?

7  A.  I don't remember.  Sorry.

8  Q.  You don't remember?

9  A.  I do not remember.

10  Q.  All right.  Let me get on to the point, because we're kind

11  of off the point.

12          So getting back to my question, you -- we can at least

13  agree that you didn't send anything when you found out that

14  there were news releases being issued that you didn't know

15  about, advising the office not to do it in the future.  Would

16  that be accurate?

17  A.  I don't remember that.  Whether Mr. Liddy did, I don't

18  know.

19  Q.  Well, talking about Mr. Liddy now, who did Mr. Liddy

20  actually represent?  Why was he being copied on everything?

21  A.  Mr. Liddy and I were co-counsel.

22  Q.  Okay.  So Mr. Liddy and you worked together to advise the

23  office and the sheriff on these matters; correct?

24  A.  That is right.

25  Q.  Did you ever see anything or recall anything that Mr. Liddy

                              CASEY - CROSS

1     sent saying, hey, you know, I understand that you're looking

2     into this; I never saw anything about these news releases,

3     anything like that?

4     A.  You know, I don't remember.  I mean, I know Tom --

5     Q.  I'm asking if you do remember.

6     A.  I'm sorry?

7     Q.  I'm asking if you do remember.  So if you don't, say you

8     don't.

9     A.  No, I don't.

10    Q.  Okay.  And it says here it also accuses my clients of

11    apparent violations of the Court's December 23rd injunction.

12    Who were your clients that you're referring to?

13    A.  My clients that I considered were the sheriff as the duly

14    elected sheriff, whatever capacities, and the MCSO, the office.

15    Whether it was a jural entity or not, they were my clients.

16    Q.  The sheriff in his duly elected capacity?  Is that what you

17    said?

18    A.  Yeah.  I mean, I considered -- I know what the Judge has

19    ordered here, but I always considered Joe Arpaio to be my

20    contact.  The same way as if an insurance company hired me to

21    represent an insured, the insured was the client.  The county

22    hired me.  I considered him the client.

23    Q.  And you never told him that any communications with you

24    weren't under the attorney-client privilege, right?

25    A.  I've told -- I told him that my understanding is that all

                      UNITED STATES DISTRICT COURT

CASEY – CROSS

1   communications between us would be privileged.

2   Q.  Okay.  And you would think, based on that, that he would

3   have a reasonable expectation to believe that?

4   A.  That who would?

5   Q.  The sheriff.

6           MR. KELLER:  Objection, Your Honor.  Foundation.

7   Q.  (BY MR. DENNIS WILENCHIK)  That's who he was just talking

8   about, wasn't it?

9           THE COURT:  He said what he said.  He doesn't have to

10  tell us what the sheriff thought in response to what he's told

11  him.

12  Q.  (BY MR. DENNIS WILENCHIK)  I didn't ask him what the

13  sheriff thought.  I said was there in his mind a reasonable

14  expectation that the sheriff would have therefore --

15          THE COURT:  Okay.  The objection is sustained.

16  Q.  (BY MR. DENNIS WILENCHIK)  Did you ever disabuse the

17  sheriff of that notion that you were acting as his counsel for

18  purposes of what you told us, i.e., providing confidential

19  communications with him?

20  A.  No.  He was the office holder.  Therefore, he was what I

21  considered my primary contact, my client.

22  Q.  I come back to my question.  Therefore, you believe that he

23  had a reasonable expectation, based on that, that what he would

24  be communicating with you about would be privileged, right?

25          MR. SALGADO:

CASEY - CROSS

1          MR. KELLER:  Objection as to relevance at this point,

2   Your Honor.

3          MR. DENNIS WILENCHIK:  I'll get to the relevance.

4          THE COURT:  Overruled as to relevance.

5          THE WITNESS:  I agree with you.

6   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  The reason I ask that,

7   Mr. Casey, while we're on it, is because knowing what you've

8   just said to be the case, have you seen anything or testified

9   to anything that maybe I missed wherein the sheriff wrote you

10  under confidence or told you in confidence that it was his plan

11  to violate the order?

12  A.  No, absolutely not.

13  Q.  Now, the accusation you say here lacks merit, right?

14  A.  What are you talking about now?

15  Q.  I'm sorry.  The letter.  I'm reading from the pullout.

16  A.  Yes.  That was the argument I made to the plaintiffs.

17  Q.  And that was the conclusion basically, correct?

18  A.  That was what the position I was advancing.

19  Q.  When you say you were advancing, I want to be clear on

20  that.  You could have said to the plaintiffs, look, I've

21  learned some information that I believe to be troublesome, but

22  I don't believe there's any systemic, to use your terms, or

23  endemic situation going on; this was in exception to the rule;

24  or any of that kind of thing that you testified about, right?

25  A.  I don't agree with you.

UNITED STATES DISTRICT COURT

CASEY - CROSS

1    Q.  Really?  Can you point out then in this letter that's in

2    front of you where you said that?

3    A.  I said I don't agree with you.  I didn't say that.  But I

4    don't believe I have an obligation to tell them my mental

5    impressions.

6    Q.  And you didn't put those same alleged mental impressions

7    down anywhere that we can see at least, right?

8    A.  I can't tell you.  I don't have my file.

9    Q.  Well, don't you think there's a duty to be fair and candid

10   and honest with the opposing counsel?

11   A.  If you -- If you're driving at whether it met Rule 11, I

12   satisfied myself that it met Rule 11, and I satisfied myself

13   with the assistance of predecessor counsel other than ethics

14   counsel who's here today.

15   Q.  Predecessor counsel?

16   A.  Yes.  My firm has what we consider to be a lawyer who

17   provides ethics at the time, ethics counsel, on any issues that

18   we have.  We have her on retainer.

19   Q.  Have you provided to anyone any information about this

20   alleged conference with an ethics counsel?

21   A.  I don't know if I have or not.

22   Q.  Well, I haven't seen it.  I'll avow that.  Unless counsel

23   has, he can tell us in open court, but I haven't seen it.

24         Who was that?

25   A.  I don't even remember her name because my partners picked

CASEY - CROSS

1    her.

2    Q.   In any event, let's talk about not only the duty of candor

3    to the opposing attorney, but let's talk about the duty of

4    candor to the Court.  All right.

5           You understand the ethics rules provide also -- and I

6    can cite the specific one, if you like -- but I'm sure you're

7    familiar with a duty of candor to the Court, right?

8    A.   Yes.

9    Q.   And if you had learned during this investigation that you

10   told us the sheriff didn't direct and didn't tell you what to

11   do, if you had learned that in fact the plaintiffs were correct

12   that the news releases and the other information they provided

13   indicated that they felt that there was a violation of the

14   order and you, based on what you've told us today, felt there

15   was a violation, you would have a duty, wouldn't you, of some

16   kind to advise both the Court of Appeals that you just

17   testified in or -- excuse me -- just argued in and told them

18   there was no violations, and also Judge Snow that there may be

19   in fact violations going on?

20         MS. CLARK:  Objection.  Attorney-client privilege.

21   Confidentiality.  Mental impressions.  Work product.

22         THE COURT:  Overruled.  You're directed to answer.

23   This is asking him for his opinion as an attorney if he had

24   that ethical obligation if he were to have concluded that there

25   were violations of the preliminary injunction.

CASEY - CROSS

1          MS. CLARK:  Just a continuing objection on this line.

2          THE COURT:  So noted.

3          THE WITNESS:  No.  It didn't -- It did not apply

4     because of the statements that Joe Arpaio said and the

5     exception issue.  What we did is we disclosed obviously the

6     reports to the Segura letter, gave them that.  If they thought

7     that there was a continuing violation, they should bring it.

8          The second response to your question is I thought my

9     judgment was wrong, because the people on the other side at the

10    ACLU in Covington & Burling are very talented, bright people,

11    and they never brought an OSC.  So just as you and I hope we're

12    always right, we're not.  So I -- Actually there's part of me

13    at one point that thought perhaps I was being hypercritical of

14    the sheriff.

15    Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Fair enough.  And I

16    appreciate answer, because you at least would agree with my

17    premise that if you had discovered something that you believe

18    was clearly in violation of the Court order, you would have

19    some duty to correct yourself with the Court of Appeals and/or

20    Judge Snow to report that, right?

21    A.  I can't compare the two, because at the time I went to the

22    Court of Appeals, I did not have this knowledge.  But in front

23    of Judge Snow I agree with you.

24    Q.  But you understand that the rule provides even if you

25    didn't have the knowledge at the time, but you later come by

CASEY - CROSS

1   that knowledge, you have a duty to correct a misstatement to a

2   court, right?

3   A.  Yes.

4   Q.  And you didn't do that, right?

5   A.  No, I did not.

6   Q.  And I'm hearing you say, if I understand you correctly now,

7   I'm hearing you say you didn't do it because ultimately

8   notwithstanding what this letter actually says, that you

9   believe that in fact there probably wasn't any violations based

10  on the fact that the position you took and the fact that they

11  didn't do anything about it, right?  Do I get you right?

12  A.  You do in part.

13  Q.  Okay.  Where did I go wrong?

14  A.  Well, it was a long question.

15  Q.  Let me break it down for you.

16  A.  Please.

17  Q.  This letter goes on to explain in great detail, would you

18  agree with me, the circumstances around each of the violations

19  that they brought to your attention, right, or alleged

20  violations?

21  A.  I've only seen the front page, but I think you're right.

22  Q.  Well, let's go through it.

23          You go on here --

24          THE COURT:  Excuse me.  Maureen, would you give

25  Mr. Casey Exhibit 26.

CASEY - CROSS

1         MR. DENNIS WILENCHIK:  I'm sorry, Judge?

2         THE COURT:  We're giving Mr. Casey Exhibit 26 so he

3    doesn't have to see it just based on the little bits that are

4    on the screen.

5         MR. DENNIS WILENCHIK:  Okay.

6         THE WITNESS:  Thank you very much.  Do you want me to

7    read it?

8    Q.  (BY MR. DENNIS WILENCHIK)  Yeah.  Take that off, and let's

9    go through it.

10        THE COURT:  Give him a minute to read the letter that

11   he sent to the ACLU.

12   Q.  (BY MR. DENNIS WILENCHIK)  Just let me know when you're

13   done.

14   A.  Okay.  Okay.  I'm done.

15   Q.  Again, if you want to refer to it, that's fine.

16        First of all, who specifically assisted you with both

17   your research as well as your investigation?

18   A.  I don't remember now.

19   Q.  It wasn't the sheriff, however.  Would we agree on that?

20   A.  I'm sorry?

21   Q.  It wasn't the sheriff.  Can we agree on that?

22   A.  Yes.

23   Q.  Look at Page 2, if you would, the second paragraph, okay,

24   where it says, "Three of these individuals were booked on state

25   criminal charges."  Do you see that?

 1   A.  I do.

 2   Q.  What does that mean to you?  I don't want to get ahead of

 3   ourselves.  What does that mean to you?

 4   A.  There were no state criminal charges that you could arrest

 5   them on.  That's my understanding.

 6   Q.  There were no state criminal charges you could arrest them

 7   on?

 8   A.  Three of these issues -- I'm sorry.  "Three of these

 9   individuals were booked on state charges, but there was

10   insufficient evidence --"

11   Q.  State criminal charges?

12   A.  State criminal charges, yeah.  And then the other two,

13   insufficient evidence to arrest on state criminal charges.

14   Q.  Okay.  Let me stop.  I want to walk through this very

15   carefully with you.

16        You don't disagree that the people that are stopped

17   based on the Melendres case even at the time of the

18   preliminary injunction order should have been stopped on some

19   kind of criminal suspicion, right, as opposed to just stopping

20   them on the basis that they're here illegally, right?

21   A.  Yeah.  I think I articulated what appeared to me to be the

22   probable cause earlier.

23   Q.  And, again, I appreciate this, but as a lawyer please just

24   stick with my question.

25   A.  Context matters, Mr. Wilenchik, and you're not providing

CASEY - CROSS

1    context, if you want the truth.

2    Q.  I beg to differ, sir.  I'm providing exactly a question

3    that I --

4           THE COURT:  Okay.  Let's not disagree with one

5    another.  Let's just ask the question again please.

6    Q.  (BY MR. DENNIS WILENCHIK)  Okay.  I'll ask the question

7    again.

8           You understood, as a result of being a lawyer in

9    Melendres, that what Judge Snow is saying even in the PIO, the

10   injunction, was that it was no longer okay for MCSO to be

11   stopping illegal aliens simply on the basis that they were here

12   illegally, which is a civil violation.  Is that fair?

13          MR. KELLER:  Objection, Your Honor.  Calls for a legal

14   conclusion.

15          THE COURT:  Overruled.  You may answer.

16          THE WITNESS:  That is correct.

17   Q.  (BY MR. DENNIS WILENCHIK)  Yeah.  And in fact he went on in

18   that order, as you know, to discuss the loss of the 287(g)

19   certification, right?

20   A.  That's correct.

21   Q.  Which gave him that authority, right?

22   A.  To serve as federal agents, yes.

23   Q.  That's gone now, right?

24   A.  It was gone in 2009.

25   Q.  So Snow is basically saying -- Judge Snow is basically

CASEY - CROSS

1   saying, look, you've got to stop them on some reasonable

2   suspicion of a crime, not just because they're here illegal.

3   I'm being simple, but can we agree on that?

4   A.  Yeah.  He was doing it on a Terry stop basis, yes.

5   Q.  Sure.  Terry stop basis meaning you have to have some

6   reasonable suspicion of some criminal activity afoot, fair?

7   A.  Correct.

8   Q.  And then when you're in the course of that investigation,

9   which let's assume it's on human smuggling, something you and I

10  both know about, because I think we were both in the Ninth

11  Circuit arguing that, right?

12  A.  Yes, sir.

13  Q.  But at this time human smuggling was legal, right?

14  A.  It was.

15  Q.  And if you're stopping them, for example, on human

16  smuggling, that was a state crime, right?

17  A.  It was.

18  Q.  And assuming that you were lawfully stopping them on a

19  Terry stop on that basis, then what Judge Snow was saying or --

20  let me stop -- what you were telling the sheriff, if I

21  understood you correctly, was -- and his people was that you

22  felt that you could only stop them for a reasonable period of

23  time?  Fair?

24  A.  If you had probable cause or a reasonable suspicion.

25  Q.  Right.  What we just talked about.  Right?

CASEY - CROSS

1   A.  Yes.

2   Q.  Okay.  Do you agree with me at least that there's nothing

3   in the preliminary injunction order that deals with that

4   specific issue that we just talked about in terms of a time

5   frame to reasonably stop them to contact Border Patrol or ICE?

6   Would that be fair, sir?

7   A.  I don't understand your question.

8   Q.  What are you having a problem?  And I'll do my best.

9   A.  About contacting ICE about whether or not Judge Snow said

10  anything about contacting ICE at the time?

11  Q.  No, no.  Let me back up.  I apologize.

12          Is it my understanding from listening to your direct

13  testimony correct that you were telling MCSO people that they

14  could contact ICE, and I think you said, if I go back to my

15  notes here, within a 14-minute period of time or something like

16  that?

17  A.  No.  I said there was no prohibition whatsoever about

18  calling ICE, none whatsoever.  But when the traffic stop

19  reached its natural end, if ICE wasn't there to pick anyone up,

20  it would violate the order to hold them, in my judgment, after

21  that.

22  Q.  Okay.  And you said something about 14 minutes?

23  A.  Yeah, because at the trial we had evidence that the average

24  traffic stop was 14 minutes, so that's what I'm remembering.

25  Q.  And that's what I want to get to first.  A couple of

CASEY - CROSS

1    issues.

2              Are you conflating, sir, what you learned at the trial

3    where there was expert testimony on that issue with what the

4    actual PIO actually stated --

5    A.  The injunction?

6    Q.  -- in that regard?

7    A.  No, I don't think so.  I mean --

8    Q.  Okay.  There was testimony actually at the trial about how

9    long -- a lot of testimony by experts about how long a typical

10   stop should last.  Would that be a generalized fair statement?

11   A.  That's a generalized fair statement.

12   Q.  That testimony was not prior to the preliminary injunction

13   order, correct?

14   A.  That's true.

15   Q.  And if I were to hand you that 40-page order and avow to

16   you that there's nothing in it because there was no such

17   evidence presented at the time of the preliminary injunction

18   about any kind of discussion about the length of time to stop

19   somebody, to make the call, or anything like that, would you

20   generally agree with that?

21   A.  Yeah, I would agree there would be no time set forth by a

22   judge.

23   Q.  Okay.  So my question is twofold really.  One, do you think

24   maybe you're conflating, if you understand my question, what

25   you learned later on at the permanent injunction hearing

                        CASEY - CROSS

1    perhaps with what you actually knew at the time of the

2    preliminary injunction, which is the issue here in this case?

3    A.  I think I understand your question, and the answer is no.

4    Q.  So can you then tell me where this 14 minutes came from

5    that you were telling people at the time of the

6    preliminary injunction they have to make a call and hope that

7    ICE shows up and picks somebody up?

8           MR. KELLER:  Your Honor, objection.  That

9    mischaracterizes the testimony.

10          THE COURT:  Sustained.

11   Q.  (BY MR. DENNIS WILENCHIK)  Well, I certainly don't mean to

12   mischaracterize your testimony.  Did I misunderstand you?

13   A.  Yes.

14   Q.  Okay.  Let's go through it again.  You told deputies at the

15   time of the preliminary injunction that they could contact ICE?

16   A.  Yes.

17   Q.  Was there any time frame on that contact?

18   A.  Yes.

19   Q.  What was that contact time?

20   A.  The natural duration of whatever the traffic stop entailed.

21   And each traffic stop for any number of circumstances, the

22   natural length depends.  So that is what I shared with them.  I

23   didn't say 14 minutes.

24   Q.  Did you testify on direct about 14 months, or did I

25   misunderstand?

                 UNITED STATES DISTRICT COURT

CASEY - CROSS

 1   A.  No.  I mentioned 14 minutes, but it was in the context of

 2   what I understood the evidence to be as an average traffic

 3   stop.

 4   Q.  Oh.

 5   A.  Sometimes it's much longer.

 6   Q.  Okay.  Fair enough.  But that evidence, again, wasn't at

 7   the time of the preliminary injunction, just to be clear?

 8   A.  Just so it's clear for you, what I shared with them is that

 9   whatever the length of the traffic stop is, the detentions end

10   under the order, Judge Snow's order.  It's not that

11   complicated.  It's not rocket science.

12   Q.  Okay.  So there was no specific time?

13   A.  No specific time.

14   Q.  For example, human smuggling detention such as something

15   we're talking about now in this letter could take hours to

16   investigate, right?

17        MR. KELLER:  Objection, Your Honor.  Foundation.

18        THE COURT:  Sustained.

19        THE WITNESS:  I'm sorry.

20   Q.  (BY MR. DENNIS WILENCHIK)  Well, you were the one who were

21   advising them on the order and that the time frames could be

22   different.  Did you not have in your mind that they could have

23   been substantially longer than, say, 14 minutes?

24   A.  Yes, they can be substantially longer than 14 minutes.  I

25   did have that in my mind at the time.

CASEY - CROSS

1   Q.   Thank you.  And so here, to go on -- By the way, you

2   described that to the sheriff or to Sands and the others?

3   A.   When?

4   Q.   At any time.  Did you describe what you just told us about

5   how long a period of time, whether it would be reasonable or

6   whatever your words were, did you describe that to the sheriff,

7   or was that something you described to the other deputies?

8   A.   I don't remember that level of detail.  I do remember

9   telling Palmer.  I remember telling Sousa.  And I think it's

10  probable I certainly told Sands.

11  Q.   Okay.  But you're not sure on the sheriff?

12  A.   I don't remember.

13  Q.   Fair enough.  Now, you say here "HSU contacted ICE

14  concerning these two individuals."  So far I'm correct that you

15  aren't saying that they couldn't do that, right?

16  A.   Correct.

17  Q.   You never said that?  Am I right on that?

18  A.   Well, I'm -- I'm agreeing with what you're reading from.

19  Q.   I'm sorry?

20  A.   I'm sorry.  You're losing me, Dennis.  Mr. Wilenchik.

21  Q.   That's okay.  You can call me Dennis.

22         You say, "HSU contacted ICE."  My question was weren't

23  you telling the deputies it was okay that they did do that?

24  A.   Yes.

25  Q.   Okay.  So far so good.  Nothing wrong with that?

CASEY - CROSS

1    A.  Nothing wrong with that.

2    Q.  "Concerning these two individuals reasonably believed to

3    have illegally entered the United States," which, again, if

4    they learn during a lawful stop that the -- and they had

5    reasonable suspicion during that lawful stop that the

6    individuals were illegal, whether they admitted it or they

7    asked for ID, they didn't have any, or they sent them from

8    Mexico, whatever, came over legally, however, they would have a

9    right to advise ICE of that when they contacted ICE, right?

10   A.  Yes.

11   Q.  ICE advised that it would not take custody of the

12   individuals.  And that was consistent with what you were

13   understanding from day one when you said you had the initial

14   conversation with the sheriff where he said no big deal, I

15   don't really care about the order much, because we're not doing

16   it anyway, because Obama isn't taking them.  Right?

17   A.  That's correct.

18   Q.  ICE would not take custody of individuals, and then you

19   underlined -- So you must have thought this was important, I

20   would assume?  Would that be a fair assumption?

21   A.  That is a fair assumption.

22   Q.  "But directed HSU to contact U.S. Border Patrol regarding

23   federal handling and custody of the two individuals."  Do you

24   see that, sir?

25   A.  Yes.

CASEY - CROSS

1   Q.  So in your own investigation, you obviously did learn that

2   this is what happened, right?  You weren't just making this up?

3   A.  No.  This is what my clients told me either -- whoever it

4   was that I talked to.

5   Q.  Right.  And did you determine in fact that that was pretty

6   typical of what ICE was saying, that we're not taking them, but

7   contact Border Patrol, and the guys would be contacting Border

8   Patrol, who would direct them to take them in?

9   A.  The former, not the latter.

10  Q.  What?

11  A.  The former, not the latter.  I understood that ICE wouldn't

12  take them, but I had no idea that they were directing or

13  anything like that until we had this conversation.

14  Q.  I'm saying at this time you learned that, right?

15  A.  At this time I learned that, right.

16  Q.  That's all I'm saying?

17  A.  Yeah.

18  Q.  "HSU immediately contacted U.S. Border Patrol."  It doesn't

19  sound like they waited on it for the fun of it, right?

20  A.  That's why I probably used that word.

21  Q.  "U.S. Border Patrol Agent Hernandez in Ajo, Arizona,"

22  right?

23  A.  Yes.

24  Q.  Did you speak with Agency Hernandez in Ajo, Arizona?

25  A.  I did not.

CASEY - CROSS

1    Q.  Who directed the MCSO to deliver these suspects to U.S.

2    Border Patrol at a specified meeting point, period, underlined.

3    Right?

4    A.  Yes.

5    Q.  All that's underlined?

6    A.  It is.

7    Q.  So here, regardless of what you're telling us you say you

8    spoke to the sheriff about and others earlier about your

9    opinion -- I'm not trying to be critical; I'm just restating

10   the facts -- regarding your opinion of what the order said or

11   would have said -- or would say if Judge Snow were more direct

12   or clear, right?

13   A.  I'm sorry.  Can you rephrase that?

14   Q.  Sure.

15          As we said earlier, Judge Snow did not discuss this

16   issue that's underlined in his order anywhere?  Fair?

17   A.  That is fair.

18   Q.  And you were trying to interpret, based on -- I don't want

19   to go over it again much -- but the without more --

20   A.  Right.

21   Q.  -- and all that language that was unclear.  Right?

22   A.  Yes.  I did think that was unclear.

23   Q.  Sure.  And what you were trying to say here was, if I read

24   this right underlined, is that not only could they contact the

25   federal authorities, but they essentially could cooperate with

                              CASEY - CROSS

 1   them and take their lead once they have a legitimate stop and

 2   make the contact through a legitimate stop and seek direction

 3   from the federal authorities and then cooperate with them at

 4   their direction?  Isn't that what that basically says?

 5   A.  That is the argument that I assert right there.

 6   Q.  That is the argument you assert.  That's the facts you

 7   found --

 8   A.  Yeah.

 9   Q.  -- and advised the plaintiffs of, right?

10   A.  The --

11   Q.  Is that right?

12   A.  Yes and no.  The citation to the order docket 494 is the

13   citation to that part of Judge Snow's order where he says you

14   won't detain anyone here that's unlawfully unless there's

15   something more.  You can't just hold them because they're

16   unlawfully in the country.  This was the position that we are

17   taking that this is the something more.

18   Q.  I thought you said that, and I appreciate that.

19   A.  So I --

20   Q.  Thank you for highlighting that.

21   A.  Okay.

22   Q.  And in fact you actually referenced, which is going to be

23   my very next question, Judge Snow's order in that regard that

24   you just told us?

25   A.  Yes.

CASEY - CROSS

1    Q.  Not like you were ignorant of it, right?

2    A.  No.  I don't believe I was ignorant of it.

3    Q.  I don't mean that disparagingly.  You were actually trying

4    to comply with it, I assume?

5    A.  I don't comply with orders.  You don't comply with orders

6    that are issued to the client.  They're the client's.

7    Q.  Well, thanks for telling me that, but, sir, the fact is

8    that you knew that you could be complicit with a client not

9    following an order if it was clear and direct and you told them

10   in any way anything other than what it said to do, right?

11   That's obvious?

12   A.  I think that's what every lawyer understands when there's

13   an injunction.  If you don't tell them, you're complicit.  You

14   give them the wrong advice.  You're complicit.

15   Q.  Can you show me where -- You already testified it's not in

16   the order, but can you show me where in writing you made that

17   clear to all of these different individuals at MCSO in any way?

18   A.  Made what clear?

19   Q.  What you just said as to what your interpretation of the

20   order actually meant.

21   A.  I can't answer that without divulging attorney-client

22   communications with your client and some of the people in the

23   executive branch there.

24   Q.  Hmm.  Well, let's start with this and see if you have any

25   problem with this.  Again, I haven't seen any correspondence of

CASEY - CROSS

1   any kind.  Do you know without reviewing the content at the

2   moment that there was any kind of correspondence that would

3   have revealed that this very activity you underlined, which is

4   at the core of the complaint by ACLU here, was in fact illegal?

5   At any time did you advise your clients of that in writing?

6   A.  No.  It was all oral.

7   Q.  All right.  Anyway, without belaboring it, again, the fact

8   of the matter is it's pretty obvious here that you're clearly

9   aware, at least as of October of '12, that this is going on,

10  fair?

11  A.  That I'm aware that this -- what's going on?  The Segura

12  allegations?

13  Q.  No, no.  What was just read and underlined by you that's at

14  the core of this case, you knew it was going on as of October

15  of '12; isn't that accurate?

16  A.  Yes.

17  Q.  Thank you.  And again I'm going to repeat is there

18  anyplace, if we go through this letter now that you have in

19  front of you, where you said anything other than you felt that

20  everything they had done was legal and that there was no merit

21  to the allegations of any kind that were being made by

22  plaintiffs?

23  A.  No.

24          THE COURT:  I want to go back to something you said

25  earlier.  With respect to this incident where the two people

CASEY - CROSS

1  were taken to Border Patrol, is this the incident that you

2  testified earlier they said that that was a one-time thing --

3          THE WITNESS:  Yes.

4          THE COURT:  -- and they weren't going to do it again?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  So to your knowledge, this was the

7  only time that Border Patrol received people that were not

8  being arrested for any criminal charges from the MCSO?

9          THE WITNESS:  That's what I was told, and that was my

10  understanding.

11  Q.  (BY MR. DENNIS WILENCHIK)  Let's get into that.  Thank you,

12  Judge.

13          Is there anyplace in this letter where it says what

14  you just told the Judge?  These are the only incidents in my

15  investigation that I've come up with that I found that this

16  activity is going on where they're following the direction of

17  Border Patrol?

18  A.  No.

19  Q.  Did you ask the question of anyone specifically during this

20  thorough investigation of yours, factually and legally, I might

21  add, you said, wherein you asked the question of how many times

22  has this gone on?  And who did you ask it of?

23          MS. CLARK:  Objection.  Calls for attorney-client

24  privilege, confidential information, and maybe more, but I

25  don't know.

                              CASEY - CROSS

 1            THE COURT:  Objection is overruled, and Mr. Casey is

 2    directed to answer.

 3            THE WITNESS:  Yes.  I asked the sheriff, and we had

 4    our discussion, and I asked it of Brian Sands.

 5    Q.  (BY MR. DENNIS WILENCHIK)  Anyone else?

 6    A.  Those are the two that I remember.

 7    Q.  Now, you testified that the sheriff delegated things.  Is

 8    that an accurate statement still?

 9    A.  That's what he told me.

10    Q.  Did you inquire as to what detail the sheriff had about any

11    of these incidents?

12    A.  I can't -- I cannot answer that without waiving the

13    attorney-client privilege and confidentiality.

14    Q.  Uh-hmm.  Well, let's put it this way.  Maybe we can make it

15    easy on you.  You didn't correspond with the sheriff, you

16    didn't hand deliver anything to his office at any time about

17    the PIO, correct?

18    A.  No, that's not correct.

19    Q.  Okay.  Did you hand deliver the copy of the order on the

20    23rd to him?

21    A.  No.  I sent it over to the others that I saw the exhibit.

22    Q.  My question was did you hand deliver it to the sheriff?

23    A.  No.  No.

24    Q.  Did you hand deliver anything else confidentially to the

25    sheriff directly in regard to the PIO?

CASEY - CROSS

1    A.  I don't remember.

2    Q.  Do you remember doing it at all?

3    A.  I don't know one way or the other.  I think the only thing

4    is the e-mail on the 23rd.

5    Q.  But you didn't hand deliver that?

6    A.  I sent it to who I was supposed to send it to.  He doesn't

7    do e-mail.  So --

8    Q.  My question simply was, sir -- I don't want to get in an

9    argument -- you didn't hand deliver the December 23rd e-mail to

10   the sheriff; is that fair?

11   A.  No, I did not.

12   Q.  And you don't recall, when you e-mailed all the others to

13   get the information about this letter and the response, you

14   don't remember sending an e-mail to the sheriff about that, and

15   you don't remember, as you sit here, hand delivering anything

16   to him about it, correct?

17   A.  Yeah.  He doesn't do an e-mail, so I'd have to hand deliver

18   it.

19   Q.  It's a yes or no.

20   A.  No, it wasn't.  You had a false premise in your question.

21   You said I didn't send an e-mail to the sheriff, and he doesn't

22   do e-mails so, I couldn't do that.

23   Q.  I didn't ask if you could do it.  I asked if --

24            THE COURT:  No.  You said you -- We know that he

25   didn't have e-mail, so asking him a question about sending him

CASEY - CROSS

1   an e-mail has a false premise.

2           MR. DENNIS WILENCHIK:  Really?

3           THE COURT:  Yeah, because everybody knows he didn't

4   have e-mail.

5   Q.  (BY MR. DENNIS WILENCHIK)  What does it have to do with

6   sending it to others and asking them.

7           THE COURT:  Ask a new question please.

8   Q.  (BY MR. DENNIS WILENCHIK)  Sure.  Did you send that e-mail

9   to others, and in that e-mail can we find anywhere where you

10  said please make sure the sheriff is aware of this, anything

11  like that?

12  A.  No.

13  Q.  Okay.  Because the reason I ask that is you testified --

14  and I notice you said this very carefully -- that when you

15  talked to Chief Sands, you believed or something -- I'm not

16  quoting you exactly, so don't hold me to it -- that he would

17  get the word or something to the sheriff or something to that

18  effect.  Do you remember that?

19  A.  Yeah.  I'm sure it was the same one in your cases when you

20  defended him.

21  Q.  Let's put aside my cases.

22  A.  I'm sure it was the same process.

23  Q.  I didn't defend him, so let's stick to your case.  Okay?

24  Is that okay?

25  A.  Well, I mean fair is fair.  I mean --

CASEY - CROSS

1   Q.   No.   Fair is what's right, and I'm asking you a question.

2   A.   Ask your question please.

3   Q.   The question was did you testify in this court under oath

4   that you talked to Sands and asked him to talk or that he told

5   you he had talked to the sheriff about something?   That's all

6   I'm asking.

7   A.   That's usually the way it went.   I talked to Sands first.

8   Q.   Okay.   Did you write Sands, given the fact that your

9   testimony is you didn't hand deliver anything to the sheriff

10  that you're aware of and you didn't e-mail him for reasons

11  stated, did you ask anyone to actually make sure the sheriff

12  was aware of things that were going on that you thought were

13  important as a part of your investigation?

14  A.   I personally made sure the sheriff was aware of that when I

15  met with him.

16  Q.   I understand you saying that.   I appreciate you saying

17  that.   I'll get back to that.   But, please, if you can answer

18  my question, I very much appreciate it.   You didn't ask anybody

19  in writing in any of these e-mails to make sure they

20  communicated this to the sheriff or got him a copy of your

21  e-mail, fair?

22  A.   In writing, no.   You're correct.

23  Q.   And as far as the events that you just told me about a

24  minute ago that occurred in this alleged conversation with the

25  sheriff -- and I use the word alleged -- you don't have any

CASEY - CROSS

1   kind of record of it not only in the file, not only to the

2   sheriff in any way --

3          THE COURT:  Are we back on December 23rd, 2011, that

4   conversation, or are you talking --

5          MR. DENNIS WILENCHIK:  December 23rd?  No.

6          THE COURT:  Or are you -- Then I'm not sure when you

7   said this conversation --

8   Q.  (BY MR. DENNIS WILENCHIK)  The conversation that was the,

9   quote, heated conversation that surrounded the timing of this

10  letter?

11         THE COURT:  Okay.

12  Q.  (BY MR. DENNIS WILENCHIK)  And his investigation where he

13  said --

14         THE COURT:  So no, no, no.  It's the time frame that

15  we're talking about, because there have been several

16  conversations --

17         MR. DENNIS WILENCHIK:  Fair enough.

18         THE COURT:  -- that Mr. Casey --

19         You're talking about a conversation that occurred in

20  October of 2012 after he received the information alleging by

21  the ACLU that there was a violation of the

22  preliminary injunction.

23  Q.  (BY MR. DENNIS WILENCHIK)  And he wrote this e-mail that I

24  think is part of Exhibit 26 to all those individuals about the

25  letter, enclosing the letter, and about his investigation.

CASEY - CROSS

1      At that time you said -- you didn't reference the

2    sheriff in that communication with the others, but you had some

3    kind of heated conversation, right?

4    A.   When I forwarded the Segura letter, we ended up at the --

5    towards -- I thought it was towards the end of what I was

6    investigating when I finally had the meeting with Sands and

7    him.

8                THE COURT:  Was that before you sent this response --

9                THE WITNESS:  Yes.

10               THE COURT:  -- to the ACLU?

11               THE WITNESS:  Yes.

12               THE COURT:  Okay.  So sometime between October 12th

13   and October 18th?

14               THE WITNESS:  Yes.

15   Q.   (BY MR DENNIS WILENCHIK)  Was that conversation before you

16   sent a copy of this letter to all the people -- other people at

17   MCSO advising them this basically was the letter you were going

18   to send?

19               THE COURT:  Okay.  So now you're referring to the

20   October 18th letter?

21               MR. DENNIS WILENCHIK:  Yes.  Exhibit 26.

22               THE COURT:  Okay.  Because this letter could also be a

23   different letter, so --

24               MR. DENNIS WILENCHIK:  I'm sorry, Judge?

25               THE COURT:  There's two letters involved in Exhibits

CASEY - CROSS

1  25 and 26.

2      MR. DENNIS WILENCHIK: Right. The one letter is from

3  the plaintiffs to him.

4      THE COURT: Right.

5      MR. DENNIS WILENCHIK: And this is his response and

6  e-mails to the MCSO folks --

7      THE COURT: Right.

8      MR. DENNIS WILENCHIK: -- basically saying, if I

9  understand it correctly, that you're going to be sending this,

10  right?

11      THE COURT: But his conversation with the sheriff that

12  has been described occurred sometime between the 12th and

13  before the letter of the 18th was sent.

14      MR. DENNIS WILENCHIK: Right. That's my

15  understanding. And so my question was did it occur before you

16  sent this draft letter to the other people at MCSO?

17      THE COURT: Well, did you send a draft letter to the

18  people at the MCSO?

19      THE WITNESS: I never sent a draft letter to the MCSO.

20  This is the final letter that I actually signed and sent out to

21  the ACLU.

22  Q.  (BY MR. DENNIS WILENCHIK) So you didn't send a draft to

23  any of the people that you talked to at MCSO saying, "This is

24  the letter I'm going to send. Is it correct so I can send it?"

25  A.  I have to insert a privilege, attorney-client privilege and

CASEY - CROSS

1    confidentiality.

2    Q.  On what basis?

3    A.  What I just said there, attorney-client.  I cannot unless

4    I'm ordered to.

5                MR. DENNIS WILENCHIK:  Well, I ask that you order him,

6    Your Honor, to answer that simple question of whether he sent a

7    draft so he can make sure that what he was sending was correct

8    and who did he send it to.

9                THE COURT:  You're directed to answer, Mr. Casey.

10               THE WITNESS:  The conversation I had with the sheriff

11   was get it out.  This is the position we're going to take.  I

12   said I would take it essentially.  I would do that.  I thought

13   we could make a good faith argument.  I've always asked the

14   sheriff if he wanted a review.  No.  I always asked Brian Sands

15   do you want a review?  No.  They didn't want anyone else.  They

16   didn't want Brian J, who replaced Joe Sousa at HSU, to review

17   it.  So they did not want to see a review.

18   Q.  (BY MR. DENNIS WILENCHIK)  So now you've got me more

19   confused.  So why are you even sending this letter to all those

20   individuals if you're telling me that the sheriff told you that

21   they told you that they didn't even want to review the letter?

22               MS. CLARK:  Continuing objection on confidentiality

23   and privilege.

24               THE COURT:  Overruled.  You may answer or you shall

25   answer.

UNITED STATES DISTRICT COURT

CASEY - CROSS

1        THE WITNESS:  It was my practice whenever I sent

2   something major to the plaintiffs to copy the client on it so

3   they had it.  So it wasn't requested of me.

4   Q.  (BY MR. DENNIS WILENCHIK)  So you just sent this for their

5   files?

6   A.  For their files.

7   Q.  And what good, as far as you were concerned, would it do in

8   their files after the fact if there was something in it that

9   was wrong?

10  A.  I have no idea, but I don't believe there was anything

11  wrong.

12  Q.  Okay.  Well, let me get to that.  So none of them got back

13  to you, any of these people, Sands, Sheridan, MacIntyre, Liddy,

14  James Williams, Eileen Murray from your office, none of them

15  got back to you saying, hey, this is contrary to what we really

16  think is going on, right?

17  A.  The main folks were -- I'm sorry -- MacIntyre, Sands,

18  Sheridan, and I think -- this writing is bad -- but I think

19  it's the replacement, Jakowinicz, Brian, or whatever.  I don't

20  remember his name, but he's Joe Sousa's replacement at HSU,

21  because I know I got information to create my response to the

22  Segura letter from the new HSU head.

23  Q.  Well, okay.  Mr. -- Lieutenant Sousa was actually

24  transferred out in April earlier, correct?

25  A.  I think right after the trial he was -- I thought he was

CASEY - CROSS

1   transferred after the trial but maybe.

2   Q.  Are you sure when that was?

3   A.  No.  I know it was sometime in '12.

4   Q.  All right.  Let's get on with it.  My question to you was

5   you copied all of these people, right?

6   A.  Yeah, right.

7   Q.  And for their files you said, right?

8   A.  For the MCSO people for their files, right.

9   Q.  None of these people who received this got back to you

10  after reviewing this letter and said, well, wait a minute,

11  there's something wrong in here; this isn't what we're doing;

12  or why are you writing this since this is contrary to our

13  policy; or anything like that.  Right?

14  A.  That's right.

15  Q.  Now, let's go on briefly in Paragraph 2 of Page 2.  And

16  there too on the second incident, again this talks about a

17  criminal employment investigation.  So again I want to repeat

18  that we're talking not just about a stop that Judge Snow was

19  concerned about in Melendres where you just stop somebody based

20  on the suspicion they're here illegally, right?  So far so

21  good?

22  A.  So far so good.

23  Q.  And that was okay to do that, right, under his order?

24  A.  Yes.

25  Q.  Did you see anywhere, while we're on it, at any time

CASEY - CROSS

1    anywhere where the MCSO was continuing to exercise their 287(g)

2    authority and stop people on anything other than criminal --

3    what appear to be criminal investigations?

4    A.   They had no 287(g) after I think it was October and

5    November of 2009.  They did not exercise it because they didn't

6    have it.

7    Q.   So as far as you were concerned, the stops that they were

8    making that you were learning about were legitimate criminal

9    suspicion stops or Terry?

10   A.   My memory is I had no concerns about the probable cause

11   reasonable suspicion for the initial contact.

12   Q.   My question actually was you haven't seen anything where

13   they didn't stop people on lawful criminal type investigations,

14   right?

15   A.   I didn't see anything like that, yeah.

16   Q.   And you still haven't, right?

17           MS. CLARK:  Objection.  Confidentiality.  Privilege.

18   And I'm not sure what else the question might call for that's

19   objectionable.

20   Q.   (BY MR. DENNIS WILENCHIK)  Let me make it clear, Judge.

21           The three press releases that we saw in direct

22   examination, for example -- okay -- do you have those in front

23   of you?

24           THE COURT:  I'm sorry.

25           THE WITNESS:  No, but I remember them.

1        THE COURT:  Are you talking about the new press

2   releases that Mr. Casey said he never saw before?

3        MR. DENNIS WILENCHIK:  Yes.

4        THE COURT:  What about them?

5        MR. DENNIS WILENCHIK:  Well, I haven't gotten there.

6        THE COURT:  Because, I was going to say, because we

7   have press releases attached to Exhibit 25 and 12.

8   Q.  (BY MR. DENNIS WILENCHIK)  Yes, you're right.  And I

9   apologize there was confusion.  What I'm trying to do,

10  Mr. Casey, so it's clear is when I ask you the question have

11  you seen, similar to what the government asked you, have you

12  seen anything since then, you had testified on direct

13  examination, if I recall correctly, that before you saw those

14  releases, that you hadn't seen those, and you hadn't seen or

15  were aware of anything where the sheriff was doing anything

16  wrongful since this period of time of '12, right?

17  A.  That's my best memory.

18  Q.  Okay.  And I appreciate that.  So now, to be clear on it,

19  you were then shown these three press releases, correct?

20  A.  Yes.

21  Q.  And I know we're getting off of the October '12 document,

22  and I'm veering off, but while I'm doing it -- that will happen

23  from time to time -- again, these releases, have you actually

24  read these releases that were shown to you?

25  A.  No, other than skimming them.

CASEY - CROSS

1      THE COURT:  Can I just for the record say Exhibit 46.

2      MR. DENNIS WILENCHIK:  Yes.  Thank you very much.  I

3  think 46 is all of them, right, Judge?

4      THE COURT:  Correct.

5  Q.  (BY MR. DENNIS WILENCHIK)  Exhibit 46, you were shown --

6      MR. KELLER:  Sorry.  Just to clarify the record,

7  Exhibit 46 was the briefing board.

8      THE COURT:  You're right.

9  Q.  (BY MR. DENNIS WILENCHIK)  Exhibit -- Well, what is the

10  exhibit?

11      MR. KELLER:  36.

12      MR. DENNIS WILENCHIK:  36J or something?

13      THE COURT:  There are three different exhibits.  There

14  are 36J, 36K, and 36L.

15  Q.  (BY MR. DENNIS WILENCHIK)  And I had that, and I apologize.

16      Okay.  Let's start -- Do you have those in front of

17  you, by the way?

18  A.  I don't.

19      THE COURT:  Unless somebody handed them to him.

20      THE WITNESS:  No.

21  Q.  (BY MR. DENNIS WILENCHIK)  No?  Okay.  It's on the screen

22  if you want to take a look.  The first one would be Exhibit

23  36J.  And this was shown for the first time in court to you,

24  right?

25  A.  It was.

CASEY - CROSS

1   Q.  So is it fair to say that this shows, if you look at the

2   very first paragraph of it, that the remaining seven suspects

3   arrested were turned over to officials from ICE for border

4   violation issues?

5   A.  That's what it says.

6   Q.  That's what it says?

7   A.  Yeah.

8   Q.  Again, you don't have any personal knowledge of any of

9   this, right?

10  A.  I have no personal knowledge.

11  Q.  I understand.  But you testified about them at the

12  government's request, so let me just ask you:  This at least

13  reads and shows on its face that these individuals were

14  actually arrested, correct?

15  A.  If that's what it says.  I don't have any reason to dis --

16  Q.  That's what it says, right?

17  A.  You want me to read it?  I mean, I don't have any -- I

18  don't know.

19  Q.  Well, I understand.

20          THE COURT:  We can't say what it says because it's in

21  miniature.  Do you want him to have the exhibit in front of

22  him?

23          MR. DENNIS WILENCHIK:  Sure.  Absolutely.

24          THE COURT:  Would you please hand Mr. Casey 36J, K,

25  and L, so that he can read it and answer your questions.

UNITED STATES DISTRICT COURT

CASEY - CROSS

1   Q.  (BY MR. DENNIS WILENCHIK)  Very good.

2   A.  I did see it on the screen.  They were arrested.

3   Q.  Okay.  Now, if I understand what we've been talking

4   about -- and I've been going through this pretty slowly -- if

5   somebody is arrested, there's no problem with taking them down

6   to ICE or Border Patrol, right?

7   A.  They're arrested on state charges?  Yes, you're right.

8   Q.  Right.

9   A.  Yeah.

10  Q.  So this wouldn't mean anything was going on illegally, to

11  use that term, right, on its face?

12  A.  Yeah.  Right.  I agree with you that you'd need to know why

13  they were turned over to ICE, what's the background.

14  Q.  Well, it says they were arrested.  Do you see that?

15  A.  I'm with you.  I'm with you.

16  Q.  Fair enough.  Thank you.

17          Exhibit 36K.  Okay.  This was a felony human smuggling

18  arrest/release from what it appears, correct?  Seven booked --

19  A.  Right.

20  Q.  -- on human smuggling charges by HSU.

21          And, again, same question:  There wouldn't be anything

22  on the face of this that would implicate anything that was

23  necessarily illegally done, even, according to your opinion,

24  whether it's in the order or not, right?

25  A.  Absolutely.  You're correct.

UNITED STATES DISTRICT COURT

CASEY - CROSS

1    Q.   Thank you.  And then let's take a look at the final one,

2    Exhibit 36L.  That was put in front of you today.

3            This document too, if I'm reading it correctly, same

4    thing, arrested on human smuggling operation, right?

5    A.   Yes.

6    Q.   Turned over to -- what? -- the Border Patrol or ICE?

7    A.   Says turned over to ICE.

8    Q.   Okay.  So, again, same thing.  Nothing on its face wrong

9    with that either, right?

10   A.   Yeah, you're right.  You'd have to get the CAD reports.

11   Q.   So, in sum, in regard to all three of these news releases

12   that were put in front of you that I objected to but that were

13   admitted, there's nothing you see, now that you actually read

14   them, that would indicate that this was anything going on other

15   than what you would have -- whether you were right or wrong is

16   irrelevant -- whatever you told them that you said, this would

17   be consistent at least with what you told him?

18   A.   Yes.

19   Q.   Now, did the sheriff you believe have a right to disagree

20   with your interpretation in good faith with what -- You're

21   smiling.

22   A.   Yes.  Clients do.

23   Q.   Okay.  And --

24           THE COURT:  Really.  Clients --

25   Q.   (BY MR. DENNIS WILENCHIK)  Yes, they do.

CASEY - CROSS

1          And would he be correct or is it something wrongful

2     for him to say but I make that decision because I'm the

3     sheriff, I mean, basically?  He's the client?

4     A.  He is the client.

5     Q.  And unless you said, sheriff, there's no way I can make

6     that argument to these plaintiffs' lawyers with, you know, a

7     good faith basis, he's free to make that determination, isn't

8     he?

9     A.  He's absolutely, and if I couldn't live and abide by that,

10    I couldn't follow it, I would have tried to withdraw then, but

11    I didn't.

12    Q.  Exactly.

13          Now, getting back to it -- and I won't belabor it --

14    but in the second paragraph --

15          THE COURT:  You keep saying that, Mr. Wilenchik,

16    but --

17          MR. DENNIS WILENCHIK:  You know how lawyers say that

18    kind of stuff.

19          THE COURT:  You say that, and it seems like you still

20    belabor it anyway.

21    Q.  (BY MR. DENNIS WILENCHIK)  All right.  Well, I'll belabor

22    it a few minutes.  All right?  How's that?

23    A.  What are we going back to?

24    Q.  We're belaboring Exhibit 26 for one more minute hopefully.

25          And in the actual letter, if you could, the letter?

CASEY - CROSS

1   A.  Yes, sir.

2   Q.  I'm actually talking to my people.

3        In the letter itself, in the second page, we went

4   through the second paragraph of the second page.  And now what

5   I'd like to do with you is go through the second paragraph,

6   okay, in relevant part the underlined portion again.  All

7   right?

8   A.  Where it's talking about about Supervisor Bonilla?

9   Q.  No.  The underlying portion where it says September 27th,

10  which is a great day in history, my birthday, 2012 event -- I

11  won't say how old I was -- it's underlined, and it says, "The

12  U.S. Border Patrol --"  Oh, I'm sorry.  You're correct.  I

13  missed that.  "Supervisor Bonilla advised that it would take

14  custody of these two individuals, directed MCSO deputies to

15  deliver these individuals to it, Ajo, Arizona, and in fact took

16  custody of these individuals."  Right?

17  A.  Yes.

18  Q.  And as far as you knew from your investigation, that's what

19  happened, and you underlined this as being an important point,

20  right?

21  A.  Yes.  With, like -- With the addition, citing Judge Snow's

22  specific part of that order, something more.  That's the

23  something more we thought.

24  Q.  Thank you, sir.

25       Now, and that was in good faith, right?

CASEY - CROSS

1    A.  I wouldn't have done it if I didn't think it was in

2    good faith, so yes.

3    Q.  Okay.  Now, let me move on.

4          See, I told you I would be brief.

5          The plaintiffs never responded to your letter, you

6    said, and never said, no, you're wrong, and that underlined

7    portion in particular is really nagging and annoying to us

8    because it's clearly a violation of Judge Snow's order?  They

9    never did that, did they?

10   A.  They never did that.

11   Q.  Now, you also testified that you never discussed the Border

12   Patrol issue with the sheriff at all in of any these

13   conversations; is that correct?

14   A.  Yeah.  I don't remember other than the -- in response to

15   Segura ever talking about Border Patrol.

16   Q.  So at least we can be sure that in December of 2011, that

17   never came up?

18   A.  No.  It was always ICE.

19   Q.  Okay.  And that's why the sheriff later was telling you,

20   according to your testimony, that he had this what counsel has

21   referred to as the back-up plan, right?

22   A.  You're asking me why he told me that?  I don't know why.

23   Q.  No.  Okay.  And if I did, I apologize.  It's not my

24   intention.

25          What I'm saying is that's what you understood that he

CASEY - CROSS

1   was now telling you, if I understood your testimony correctly,

2   that he had this back-up plan, i.e., BP, Border Patrol?

3   A.  Border Patrol, correct.

4   Q.  Not back-up plan.  That would be BU.

5   A.  I got it.

6   Q.  And, again, didn't he say to you, well, you never said

7   anything about Border Patrol, right?

8   A.  You know, if he did, I'm not going to deny it.  I don't

9   remember that level of detail.

10  Q.  Okay.  Let me move on.  Again, I told you I'd be jumping

11  around a little bit.

12          So let's get back to the first conversation.  Okay?

13  A.  Right.

14  Q.  That you recalled when you looked at that e-mail to James

15  Williams.  You knew that you weren't going to work over the

16  holidays, right?

17  A.  No.  Yeah.  I wasn't going to try to work on the 25th,

18  that's for sure, or Christmas Eve.

19  Q.  But -- And you'd assume, I take it, that not a lot of other

20  people would be working on Christmas, right?

21  A.  Yeah.

22  Q.  So having said that, you did want to get the word out, if I

23  understood you correctly, to HSU so that over the holidays,

24  which might include New Year's?

25  A.  Yes, sir.

CASEY - CROSS

1   Q.  That they would be aware of the order?

2   A.  Yes.

3   Q.  When you spoke to the sheriff on the 23rd and, I believe,

4   on the 26th, you said, correct?

5   A.  I don't remember.  I remember looking at some time sheets.

6   Whatever day it was, it was before the beginning of the year.

7   Q.  Let me ask this as a prefatory question.  I'll come back.

8   I've looked at all those time sheets as best I could, and

9   obviously a lot of them are blacked out as to what you talked

10  about, right?

11  A.  Right.

12  Q.  Who blacked that out?

13  A.  I have no idea.  I never produce time sheets.

14  Q.  You don't know that the sheriff did that?

15  A.  I don't think the time sheets ever went to the MCSO.  They

16  always went to the county, wherever it went to the county.

17  Q.  So I just want to make clear, as far as you know, the

18  sheriff wasn't blacking or redacting anything because he didn't

19  want it out in the open?

20  A.  I don't.  I don't know why they were redacted.

21  Q.  And you didn't have your own time sheets in the system to

22  look at in preparation for your testimony in the civil case?

23  A.  You know, we have a record retention policy, and I don't

24  believe we had those, because after a certain period of time,

25  they're electronically purged, and I didn't keep hard copies,

CASEY - CROSS

1   but we're trying to be electronic in our firm now.

2   Q.  Fair enough.  And would I be able to safely assume from

3   that that you don't have an exact recall of every conversation

4   on those time billing sheets and what occurred in 2011?

5   A.  No.  You would be correct.  I don't remember everything,

6   no.

7   Q.  Okay.  You don't even know whether all of that time is

8   about the preliminary injunction order for that matter, I would

9   take it, right?

10  A.  I mean, I have some memory of what he and I talked about,

11  you know, but whether it was the night of the 23rd, if it was

12  after Christmas, I can't really tell you.

13  Q.  The order came out late in the day, you said, on the 23rd?

14  A.  Yes.

15  Q.  Almost toward the end of the day?

16  A.  Like 4:30.

17  Q.  And you didn't have a full chance, I take to it, to read

18  all 40 pages and digest it before you wrote at 5:23 or whatever

19  your e-mail to all those folks copying them with the order and

20  then sort of summarizing it, right?

21  A.  I think that's somewhat of a fair summary, because -- Yeah.

22  Q.  Would it also be in the same vein fair that it's possible

23  that Eileen Henry helped you with that e-mail or compiling

24  information for the e-mail?

25  A.  No, no.

                              CASEY - CROSS

1    Q.  Are you sure of that?

2    A.  You know what?  No, I'm not sure of anything, you know, six

3    years later.  But I would think, you know, Eileen is pretty

4    much, because of some family issues, she's pretty much out at

5    5:00.  So I would be surprised if she was there after 5:00 on

6    the 23rd.

7    Q.  But you don't know?

8    A.  I don't know.

9    Q.  And, in any event, when you sent it out, if you do recall,

10   at the after business hours on the 23rd, you basically chose

11   two portions of the order to highlight, correct?

12   A.  I did.

13   Q.  Can we pull up I think it's Exhibit 6, if I'm not mistaken.

14   And this is the e-mail, correct?  Is this in evidence?  Did you

15   introduce this?

16           MR. KELLER:  I believe so.

17           MR. DENNIS WILENCHIK:  Okay.  I'll assume it's in

18   evidence then, Your Honor.

19           THE COURT:  Well, this isn't Exhibit 6.

20           MR. DENNIS WILENCHIK:  If it's not, I'll move for it

21   to be admitted?

22           THE COURT:  But I don't know what number it is.

23           MR. DENNIS WILENCHIK:  Number 6.

24           THE COURT:  Well, my list says 6 is an audio

25   recording.

CASEY - CROSS

1        MR. DENNIS WILENCHIK:  Really?  Is it 6?  I thought it

2   was.  That's what we have it down.  I think we should get this

3   all corrected later in the day, Judge, because I think we're

4   operating on different lists.  I know they mentioned Exhibit 8

5   in their direct examination, didn't you?  I know that?

6        MR. KELLER:  Exhibit 8, yes.

7        MR. DENNIS WILENCHIK:  But I don't know if you

8   mentioned this.  You're saying you did, right?

9        MR. KELLER:  I believe so.

10        MR. DENNIS WILENCHIK:  Well, not a big deal either

11   way.

12        THE COURT:  Well, Exhibit 8 says it's a January 24,

13   2012, e-mail chain from Sousa to Casey, Sands, et al.

14        MR. DENNIS WILENCHIK:  No, that's not what this is.

15   It's a Friday, December 23rd --

16        THE COURT:  I have no idea what exhibit this is.  But

17   I can tell you it's not 6.

18        MR. DENNIS WILENCHIK:  I can tell you it's 6 on our

19   list, but I don't know what it is on your list I agree.  So can

20   we clean that up later perhaps?

21        THE COURT:  Yes.

22        MR. DENNIS WILENCHIK:  Because it may be a lot of the

23   exhibits are not the same for whatever reason I'm not clear on

24   as I wasn't on 46.

25   Q.  (BY MR. DENNIS WILENCHIK)  In any event, can we show this,

CASEY - CROSS

1   Your Honor --

2          THE COURT:  Yes.

3          MR. DENNIS WILENCHIK:  -- and move its admission at

4   least for the time being?

5          THE COURT:  Well, I can't admit it until I know the

6   number, but you can go ahead and show it to Mr. Casey and ask

7   him questions about it.

8          MR. DENNIS WILENCHIK:  Okay.  I assume you have no

9   objection?

10          MR. KELLER:  No objection, Your Honor.

11   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Mr. Casey, do you have

12   that up on the screen?

13          THE COURT:  Oh, is it 5E?  December 23, 2011, e-mail

14   from Casey to Sands, et al.

15          MR. DENNIS WILENCHIK:  That's what it is.  I don't

16   know why it's 5E on your list and 6 on ours, but you're right.

17   That's what it is.

18          THE WITNESS:  May I see a hard copy?

19          THE COURT:  I'm sorry?

20          THE WITNESS:  May I see a hard copy?

21          MR. DENNIS WILENCHIK:  Yeah, sure.

22          THE COURT:  We couldn't show it to you until we found

23   out what number it was, but now you can open 5E and see

24   if that's really what it is.

25          THE WITNESS:  E or B?

CASEY - CROSS

1      THE COURT:  E as in Edward.

2      So what's 5?

3      5 is a transcript.  We don't have 5E.  I don't know

4  why.  Let me see if I have it in this binder.

5      MR. DENNIS WILENCHIK:  Judge, are you looking at the

6  government's exhibit list?

7      THE COURT:  Yes.

8      MR. DENNIS WILENCHIK:  Okay.  Because I show 6 as

9  being a December 23rd, 2011, e-mail.  Do you want me to show

10  you this or give it to you?  May I?

11      THE COURT:  Okay.  Would you give him Exhibit 6,

12  Maureen.

13      MR. KELLER:  Your Honor, I believe there's a typo on

14  the Court's exhibit list.  I think that's the reason for the

15  confusion as we're looking at the two exhibit lists.

16      THE COURT:  So we're going to look at -- we're going

17  to take Exhibit 6 out of the box and see if it is what we're --

18  Okay.  So apparently Exhibit 6 on my list is not an audio

19  recording of an interview.  It is in fact what we've been

20  talking about.

21      THE WITNESS:  Thank you, Your Honor.

22      THE COURT:  So I will leave it to the government to

23  correct their list.  Meanwhile, marked Exhibit 6 is admitted.

24      Would you give this back.

25      MR. DENNIS WILENCHIK:  Thank you.

CASEY - CROSS

1          Do we all have that document, Your Honor?

2          THE COURT:  I hope so.

3    Q.  (BY MR. DENNIS WILENCHIK)  Me too.

4          Okay.  I have it on the screen anyway, if that helps

5    any.  And this is an important document in that, as far as I

6    can see, Mr. Casey, it's the only document -- and, again, I

7    don't say this to pejorative -- it's the only document that

8    I've seen that actually describes anything about the order

9    itself from you to your clients.  Would you disagree with that?

10   A.  I think the letter I sent to him after Segura also

11   contained a quote from Judge Snow's order.  I think it might be

12   the same quote that I have at Paragraph 5 of Exhibit 6.  Other

13   than those two, I don't -- I can't remember.

14   Q.  Let me be clear on what you just said.

15          The letter you sent to who?

16   A.  You had it up here.

17          THE COURT:  The ACLU letter.

18          THE WITNESS:  No.  It was actually -- Yeah, the ACLU

19   letter to me from Andre Segura of October 11th, 2012.

20   Q.  (BY MR. DENNIS WILENCHIK)  Right.  But my question was --

21   Yes.  And you sent that to the other individuals at MCSO but

22   not the sheriff, right?

23   A.  That one I sent, yes, but I did send it to Amy.  I think

24   that's the one I sent to Amy Lake.

25   Q.  Actually I think you have it backwards?

CASEY - CROSS

1            THE COURT:  Okay.  Let's not go back right now.  Let's

2   look at Exhibit 6.

3   Q.  (BY MR. DENNIS WILENCHIK)  All right.  In any event, my

4   point was an important one, so I want to come back to it, which

5   is other than just citing from a particular paragraph of the 40

6   pages, even with respect to the letter you just referenced of

7   October 18th --

8            THE COURT:  No.  Let's stick with Exhibit 6.

9   Q.  (BY MR. DENNIS WILENCHIK)  I'm getting there, Judge.

10            This is the only document I have seen anywhere in all

11   these files wherein you in any way said anything about the

12   order in writing.  Is that fair?

13   A.  I'll take your word for it.  I don't remember anything

14   other than those two.

15   Q.  I'll avow that.  Is that okay?

16   A.  I will trust you.

17   Q.  You don't know anything differently?

18   A.  I don't know anything differently.

19   Q.  All right.  And you write here, if I can find it, that this

20   is a quick summary, right, because you just received the order,

21   and I take it you had not had a full opportunity to digest it?

22   A.  That's right.

23   Q.  When did you take the opportunity to fully digest the

24   order?

25   A.  I think probably after I got it out.  That's why I was

CASEY - CROSS

1    there so late, would be my best guess, before the holidays.

2    Q.  Do you know that other than guessing at it?

3           THE COURT:  He said it was his best guess.  That's as

4    good as you're going to get.

5    Q.  (BY MR. DENNIS WILENCHIK)  And the quick summary, is this

6    in order of importance as to what you viewed in the order?

7    A.  No.  It's -- No.  I think it's just an order of whatever it

8    is there.  So the bold indicates importance, but no.

9    Q.  And I guess that was one of my questions, is why is this

10   number five about the injunction?  Because that's the main

11   thing that they were being asked to do as a result of this.

12   Would that be fair?

13   A.  I think that would be fair, uh-hmm.

14   Q.  Do you think, before I get into it, that this necessarily

15   called out to your clients, one, the importance of this order?

16           MR. KELLER:  Objection, relevance, Your Honor.

17           THE COURT:  Sustained.

18           MS. CLARK:  Objection also on mental impressions,

19   Judge.

20   Q.  (BY MR. DENNIS WILENCHIK)  Was it your intention to call

21   out to your clients the importance of the order?

22   A.  Yes.

23   Q.  Because you understood the consequences and ramifications

24   to individuals such as them and possibly even yourself if there

25   was an order of the Court that was clear and definite that was

1   not properly followed, right?

2   A.  Yes.

3   Q.  And here was your opportunity to explain to them what

4   exactly they were to do or not do.  Would that be accurate

5   also?

6   A.  That usually occurred orally.

7   Q.  I'm sorry?

8   A.  I said that usually occurred orally.  This was getting it

9   out at 5:22 so they were aware of it.

10  Q.  You said orally is what you said?

11  A.  Yeah.  Most of our conversations, most of the things that

12  we did of any substance were orally.

13  Q.  Okay.  Is that true of, as a general practice, that you

14  make that something important would be oral and not written

15  down?

16  A.  I cannot tell you what the general practice is for anyone

17  other than what I did on the Melendres case with this client.

18  Q.  Well, specifically we have something on the 23rd, and so

19  what I want to ask you is:  Where we're looking at number five

20  here -- can you please scroll up -- where we're looking at

21  number five, as I read this, what you're doing is simply

22  quoting from the order itself, right?

23  A.  That's what it looks like.

24  Q.  Is this the actual injunction language, or is this

25  elsewhere from the actual injunction language itself?

CASEY - CROSS

1    A.   You know, I don't remember, but I thought the injunction

2    language was not as specific as this.  So I think this might

3    have been elsewhere in the text, because I cite the pages.

4    Q.   And here, if I'm reading this right -- and correct me

5    because my eyes aren't that great at this stage of my life --

6    but is "solely on" and "without more", is that in italics on

7    this or not?

8    A.   That's "without more", yeah.

9    Q.   What about "solely"?  Is that italicized?

10   A.   It looks like "solely on knowledge without more".

11   Q.   Is that all italicized?

12   A.   Yeah, right.

13   Q.   So you must have thought, again, given what we talked about

14   underlining things, that italicizing would lend some importance

15   to it?

16   A.   Yes.

17   Q.   Did you simply put -- describe for your clients at any time

18   what that meant?

19   A.   In writing, no, because we weren't sure what it meant.

20   Q.   You weren't sure?

21   A.   No.

22   Q.   And you weren't sure because the order wasn't clear on it,

23   correct?

24        MR. KELLER:  Objection, Your Honor.  Calls for a legal

25   opinion.

CASEY - CROSS

1          THE COURT:  Overruled.  You may answer.

2          THE WITNESS:  I agree with you that's one of the

3    reasons we took the matter up on an interlocutory appeal, is

4    because we had some real questions about what precisely was the

5    extent of the order's application as to the human smuggling

6    statute.

7    Q.  (BY MR. DENNIS WILENCHIK)  So when you said that the

8    sheriff wanted it appealed, I believe you said on direct, you

9    then added "and I agreed"?

10   A.  Yes.

11   Q.  Did I get that right?

12   A.  You did.

13   Q.  So it wasn't just the sheriff saying that.  It was you too?

14   A.  I think everyone was in agreement, including my co-counsel,

15   that we should take it up on appeal and make sure.

16   Q.  Right.  Let me ask you this:  Did you ever consider at the

17   time taking it back to Judge Snow and just simply saying,

18   "Judge, I'm not clear on what you mean by 'solely on', 'without

19   more'.  What is that"?

20          MS. CLARK:  Objection.  Calls for attorney-client

21   privilege, confidential, mental impressions, work product.

22          THE COURT:  Overruled.  You're directed to answer.

23          THE WITNESS:  I talked to the sheriff.  The sheriff

24   wanted an appeal.  He did not want to go back to Judge Snow.

25   Q.  (BY MR. DENNIS WILENCHIK)  My question was:  Did you want

CASEY - CROSS

1   to do -- go back to Judge Snow and clarify that?

2   A.  I don't remember now, but I do remember the context of his

3   response was in response to my questions about a clarification

4   motion.  And he wanted to take it up on appeal.

5   Q.  Because he thought it was wrong or unclear, fair?

6   A.  There was another reason.

7   Q.  Was that one of the reasons?

8   A.  One -- The ones you articulated was one of the reasons,

9   yes.

10  Q.  And he didn't say that in the meantime he was going to

11  violate the order notwithstanding what he thought it meant?

12  A.  No.  Make sure it's clear.  He never said he was going to

13  violate the order.

14  Q.  Now, let me go on here.

15          You then, if you can take that off the screen, the --

16  that portion -- Actually, you know what?  I apologize.  I'm

17  just getting a little tired.  Can you put that back up, 5.

18          I apologize, sir.

19          I wanted to ask you where it says, "to be clear".  Do

20  you see that?

21  A.  Where is this at?

22  Q.  Well, it's in the portion you actually quote from Judge

23  Snow.

24          THE COURT:  Well, to be clear, that's not clear.  I'm

25  not sure he ever ended the quote.

UNITED STATES DISTRICT COURT

                          CASEY - CROSS

1          THE WITNESS:  No.  I mean, I will tell you that --

2          MR. DENNIS WILENCHIK:  Wait.  I'm sorry, Your Honor?

3          THE COURT:  I'm not sure there were closing quotation

4    marks.

5          THE WITNESS:  No, there isn't.

6          MR. DENNIS WILENCHIK:  You're not sure there were

7    quotation marks?

8          THE COURT:  Closing.  There's quotation, you know how

9    you put them at the beginning where there's a start but no end.

10         MR. DENNIS WILENCHIK:  Got it.

11         THE COURT:  I assume by reading it -- and I haven't

12   checked it -- but it ends with the word authority and that the

13   rest is you.  Is that wrong?

14         MR. DENNIS WILENCHIK:  Actually I think it is wrong,

15   but go ahead.

16         THE WITNESS:  It is wrong.  My memory, Your Honor,

17   respectfully, is that it looks like I put a semicolon before I

18   put P37-38, and there should be a closed quotation.

19         THE COURT:  So this is an actual quote of Page 37 and

20   38 beginning from the word "from"?

21         THE WITNESS:  Yes, ma'am.

22         THE COURT:  Okay.  Thank you.

23   Q.  (BY MR. DENNIS WILENCHIK)  That's what I thought

24         So it was the Court, just to be clear on the record,

25   that was saying, "To be clear, the Court is not enjoining MCSO

CASEY - CROSS

1   from enforcing valid state laws."  Right?

2   A.  That, yes.

3   Q.  That he was clear on, right?

4   A.  Yes.

5   Q.  And on that point, that is what we were just going over

6   earlier in my examination, right?

7   A.  Yes, human smuggling and the other one, employment.

8   Q.  So if you had -- were enforcing valid state laws or

9   detaining individuals, could be even a traffic stop, right?

10  Didn't have to be human smuggling?

11  A.  Could be any of it.

12  Q.  When the officer has reasonable suspicion that individuals

13  are violating a state criminal law.

14          "Instead, it," being the Court, "is enjoining MCSO

15  from --" would this be the operative important words -- "from

16  violating federal rights protected by the United States

17  Constitution in the process of enforcing valid state law based

18  on an incorrect understanding of the law"?

19  A.  I interpret the operative statement as, at the beginning,

20  "from detaining any person based solely on knowledge without

21  more."

22  Q.  Again, but that wasn't my question.  My only question right

23  now is that is from Judge Snow's order?

24  A.  It is, yeah.

25  Q.  And that you chose to quote, right?

CASEY - CROSS

1    A.  Yes.

2    Q.  And that's what you were communicating to your client was

3    important, I take it, because you chose to take this right out

4    of the order and tell them, right?

5    A.  Yes.

6    Q.  First of all, I have a couple of questions on this.

7           Do you think this language is very clear to a

8    layperson reading this as to what these federal rights are

9    protected by the United States Constitution and what an

10   incorrect understanding of the law even means?  Do you think

11   those concepts were clear or would be clear to a layperson --

12          MS. CLARK:  Objection.  Calls for mental impressions.

13          MR. KELLER:  Objection, relevance, Your Honor.

14          THE COURT:  Sustained.

15   Q.  (BY MR. DENNIS WILENCHIK)  Which one did you sustain and

16   why?  And then I can go on.

17          THE COURT:  I don't have to tell you why.

18   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  All right.  I'll assume

19   it was both.

20          Let me ask it this way.  Did you believe when you read

21   that that it was clear to you?

22   A.  I thought that there was ambiguity.

23   Q.  Now let me ask you this:  Let's get off of that, if you

24   don't mind, and let's move on in this document.

25          It says -- And of course then you discuss all the

CASEY - CROSS

 1    other things that the order contained.  It wasn't just this

 2    order, right?

 3    A.  That's right.

 4    Q.  And, again, no discussion in here, we can agree, on ICE or

 5    Border Patrol or any of that stuff, right?

 6    A.  Yes.

 7    Q.  And how long they can detain people or anything, right?

 8    A.  Yes, sir.

 9    Q.  Whether they can call up either the federal authorities

10    either, right?

11    A.  Yeah.

12    Q.  Okay.  Now, then you say -- and I want to focus on this --

13    "Where do we go from here?"

14            And you say, "Declare victory on plaintiffs' failure

15    to prove racial profiling so far."  It says, "They themselves

16    said they would win as a matter of law and did not want a

17    trial."

18            That was the first thing you stated, declare victory,

19    right?

20    A.  Yes.

21    Q.  The second thing, "Plaintiffs were granted only a very

22    narrow victory on detention issues."  Is that your word, sir?

23    A.  Yes.

24    Q.  Can I safely assume, unless you tell me otherwise, that

25    what that meant was that you believed that that related to this

CASEY - CROSS

1    preliminary injunction order?

2    A.   It related to the Court's rulings on the summary judgment

3    motion, so I'm supposed to answer only your question, so --

4    Q.   Well, I'll ask it a different way then.  Was part of the

5    preliminary injunction order on detention issues or not?

6    A.   On the detention issues?

7    Q.   Yeah.

8    A.   The detention issue, as I was thinking about it, was Lewis,

9    DPHO.  There was an issue about him making a Fourth Amendment

10   violation during a stop.

11   Q.   Okay.  Well, let me ask it a better way perhaps.

12        Would you, looking at this now, think that maybe your

13   clients thought that that could have related to detention

14   issues --

15        THE COURT:  He's not going to tell us what he thinks

16   his clients might have thought.

17        MR. DENNIS WILENCHIK:  I beg to differ on this one,

18   because he is relating --

19        THE COURT:  He's not going to tell us what he thinks

20   his clients may have thought.

21        MR. DENNIS WILENCHIK:  Can I finish?  I believe, Your

22   Honor, with all respect, that he can, because he's writing this

23   to his clients interpreting the court order and telling them

24   what's important or not important.  I would think he would at

25   least believe that when he's writing this, what his clients

CASEY - CROSS

1   would take this to be relating to.

2          THE COURT:  Okay.  We're going to break for the day.

3          MR. DENNIS WILENCHIK:  No.  Please, can I just go on

4   for a minute?

5          THE COURT:  No, no, no, no.  I'm going to let

6   Mr. Casey step down, because we have a couple of things that we

7   have to talk about before we break for the rest of the day.

8          MR. DENNIS WILENCHIK:  All right.  I'm at your

9   service.

10         THE COURT:  Sorry, Mr. Casey.  We'll see you tomorrow

11  at 9:00.

12         THE WITNESS:  9:00.  Okay.  Thank you.

13         THE COURT:  So -- You can go.

14         THE WITNESS:  Thank you.

15         THE COURT:  I only have one -- I don't know if you

16  have some things you want to talk about, but I have one thing

17  that I want to ask you about before we recess, and that has to

18  do with the pending motion to quash the subpoena to the

19  Attorney General.

20         And my question is this:  I haven't seen an issued

21  subpoena, nor have I seen a return of service on a served

22  subpoena.  And before we spend a lot of time and effort on the

23  motion to quash, I wanted to find out if it's, one, been issued

24  and, two, been served.

25         MR. DENNIS WILENCHIK:  May I defer to one of my folks

CASEY - CROSS

1    who --

2            THE COURT:  You may.

3            Do you want to handle it?

4            MR. DENNIS WILENCHIK:  I refer to the smarter half of

5    my name.

6            MR. JOHN WILENCHIK:  Thank you, Your Honor.

7            THE COURT:  Okay.  So this is the smarter

8    Mr. Wilenchik?

9            MR. DENNIS WILENCHIK:  That doesn't say a lot, but

10   yes.

11           MR. JOHN WILENCHIK:  Your Honor, it has been issued

12   and served.

13           THE COURT:  And could you tell me are you going to be

14   filing a proof of service?

15           MR. JOHN WILENCHIK:  We will do that, Your Honor, yes.

16           THE COURT:  And how was it served?

17           MR. JOHN WILENCHIK:  It was served on the Office of

18   the General Counsel in Washington, D.C.

19           THE COURT:  And is that an acceptance of service of

20   the subpoena?

21           MR. JOHN WILENCHIK:  I have to review our files, Your

22   Honor, but we will file the paperwork that we have on that,

23   yes.

24           THE COURT:  Okay.  Can I ask Mr. Keller do you agree

25   that the subpoena's been properly served, again, deferring to

CASEY - CROSS

1    someone else?

2            MR. CATALDO:  Your Honor, I'll just wait for the

3    microphone.

4            We do, Your Honor.

5            THE COURT:  Okay.  Good.  That clears up that

6    question, because I didn't want to be quashing a subpoena that

7    it was a moot point if it hadn't been served.  And there was

8    nothing on the record that showed service.

9            Is there anything that plaintiffs wish to discuss

10   before we adjourn for the day?

11           MR. KELLER:  No, Your Honor.

12           THE COURT:  How about from the defense?

13           MR. DENNIS WILENCHIK:  Nothing, Your Honor.  Thank

14   you.

15           THE COURT:  Okay.  Then we'll see you tomorrow morning

16   at 9:00 a.m.

17           MR. DENNIS WILENCHIK:  One thing.  Can we leave some

18   of this stuff here, or do you have something before us?

19           THE COURT:  Yes.  We will lock the courtroom as soon

20   as everybody leaves, and we will unlock it again at 8:30

21   tomorrow morning.

22           MR. DENNIS WILENCHIK:  Thank you.  Appreciate it.

23           THE COURT:  Court is adjourned.

24       (Proceedings recessed at 4:25 p.m.)

25

264

1                          **C E R T I F I C A T E**

2

3              I, LINDA SCHROEDER, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages constitute

7      a full, true, and accurate transcript of all of that portion of

8      the proceedings contained herein, had in the above-entitled

9      cause on the date specified therein, and that said transcript

10     was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 27th day of June,

12     2017.

13

14

15                                    s/Linda Schroeder
                                _____
16                                Linda Schroeder, RDR, CRR

17

18

19

20

21

22

23

24

25

**UNITED  STATES  DISTRICT  COURT**