UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| United States of America, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | CR-16-1012-PHX-SRB(BSB) |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | June 28, 2017 |
| Joseph M. Arpaio, | ) | 1:16 p.m. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL – DAY 3 – P.M. SESSION

(Pages 660 through 791, inclusive.)

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          A P P E A R A N C E S

2


3     For the Government:

4              U.S. Dept of Justice – Public Integrity Section
                 By: JOHN D. KELLER, ESQ.
5              10th & Constitution Avenue
                 Washington, DC  20530
6
                 U.S. Dept of Justice – Public Integrity Section
7              By: VICTOR R. SALGADO, ESQ.
                     SIMON J. CATALDO, ESQ.
8              1400 New York Avenue NW, 12th Floor
                 Washington, DC  20005
9
      For the Defendant Joseph M. Arpaio:
10
                 Wilenchik & Bartness
11             By: DENNIS I. WILENCHIK, ESQ.
                     JOHN D. WILENCHIK, ESQ.
12             2810 North Third Street
                 Phoenix, AZ  85004
13
                 Goldman & Zwillinger
14             By: MARK D. GOLDMAN, ESQ.
                     JEFF S. SURDAKOWSKI, ESQ.
15                   VINCENT R. MAYR, ESQ.
               17851 North 85th Street, Suite 175
16             Scottsdale, AZ  85255

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                    INDEX OF WITNESSES

2  WITNESSES FOR THE          Direct     Cross    Redirect
   GOVERNMENT:

3
   JAKOWINICZ, Brian                      663       686
4  TROWBRIDGE, Michael        700        716       765

5  WITNESSES FOR THE          Direct     Cross    Redirect
   DEFENDANT:

6
   CLEM, Chris                769

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1    THE COURT:  The record will show the presence of

2  counsel and the defendant.

3    Mr. Wilenchik, you may continue your

4  cross-examination.

5    MR. DENNIS WILENCHIK:  Thank you, Your Honor.

6    BRIAN JAKOWINICZ, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

7    CROSS-EXAMINATION CONTINUED

8  BY MR. DENNIS WILENCHIK:

9  Q.  Lieutenant, when we broke, I think we were dealing with

10  Exhibit 14, which we put up on the screen again for you.  Okay?

11    Do you have that up there, sir?

12  A.  Yes, sir.

13  Q.  Okay.  Can you read it?  Because sometimes we compress

14  these things.

15    THE COURT:  He's got the paper copy.

16  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Thank you.

17    And the second part of that e-mail after the part

18  about the Reader's Digest version talks about "Although the

19  order is ordering us not to do something we don't do --"

20    Do you see that?

21  A.  Yes, sir.

22  Q.  "-- Chief Sands wants it put out as a proactive measure."

23    Can you tell us today what again, as far as you were

24  concerned, that meant?  What is it that wasn't being done that,

25  as far as you were concerned, he's referring to?

JAKOWINICZ - CROSS

1          MR. SALGADO:  Objection.  Foundation.

2          THE COURT:  Overruled.  Did you know when you read

3    this what the order was ordering them -- "ordering us not to do

4    that we don't do"?

5          THE WITNESS:  I didn't understand it, no.  That was

6    exactly why I made the phone call to Joe and then -- excuse

7    me -- Chief Sands.

8    Q.  (BY MR. DENNIS WILENCHIK)  Well, did you come to learn

9    either by the fact that the document that we showed -- that we

10   were looking at showed that the order was attached to it or by

11   talking to Chief Sands or Lieutenant Sousa that what that was

12   referring to was basically stopping people simply on the basis

13   that they were here illegally as the order points out?

14   A.  No.  The conversation never got like that.  I spoke with

15   Lieutenant Sousa, and he basically told me --

16          MR. SALGADO:  The question calls for hearsay, Your

17   Honor.

18          THE COURT:  Well, the question didn't, but the witness

19   appears to want to offer it.  Did you ever come to learn what

20   it referred to?

21          THE WITNESS:  Sitting here today, yes, I know what it

22   means.

23          THE COURT:  But not then?

24          THE WITNESS:  Not at that time, no, I didn't know.

25   Q.  (BY MR. DENNIS WILENCHIK)  Well, let me ask that again a

JAKOWINICZ - CROSS

1   different way maybe.  I'm confused honestly.

2        When you're reading something like that that's

3   ordering you to do something we don't do, isn't it fair to say

4   that what that's referring to is stopping people on the basis

5   of race, which is what Melendres was about?

6        MR. SALGADO:  Objection, narrative, Your Honor.

7        THE COURT:  Overruled.  Did you know at any time that

8   that was what that was referring to?

9        THE WITNESS:  No.  At the time it was -- either in

10  conversation with one of the two -- it was my understanding is

11  we cannot stop people based on race.

12  Q.  (BY MR. DENNIS WILENCHIK)  Isn't that what I just asked?

13  A.  Yeah.  Okay.  If I'm understanding.

14  Q.  Okay.  That's fine.  I understand you may be a little

15  nervous, whatever.  Okay.

16        But as far as you were concerned, that's what the

17  understanding at least of the order was at that point in time,

18  not today, but at that point in time, what you just said,

19  right?

20  A.  Yes, sir.

21  Q.  And as you again read the order even in court, that is

22  still your understanding as to the preliminary injunction

23  language, right?

24  A.  Yes.

25        (Cell phone chirping.)

JAKOWINICZ - CROSS

1      THE COURT:  Excuse me.  What was that noise that I

2   just heard that sounded like a chirp?

3      UNIDENTIFIED MALE SPECTATOR:  I'm sorry, Your Honor.

4   My text message hadn't been completely silenced.  I apologize

5   for that.

6      THE COURT:  Not silenced. Off.  Off.  No

7   transmission.

8      UNIDENTIFIED MALE SPECTATOR:  Please accept my

9   apologies.

10      THE COURT:  Your apologies are accepted, but this

11   morning, if there's any misunderstandings, let's clear it up

12   right now.  Your phones cannot be transmitting even silently.

13   They must be off.

14      UNIDENTIFIED MALE SPEAKER:  If I may, Honorable

15   Bolton, I just came for the second session after lunch, so I

16   wasn't aware of that.

17      THE COURT:  Okay.  Then you weren't one of the ones

18   that was violating the rule this morning.  So off is what they

19   must be.  I don't want -- It doesn't matter whether I -- You

20   can -- It shouldn't be vibrating in your pocket either.  Off.

21      I'm sorry for the interruption.

22   Q.  (BY MR. DENNIS WILENCHIK)  Thank you.  It is true that

23   whenever you did read the order, you thought you understood it,

24   correct?

25   A.  Which order are we talking about?

JAKOWINICZ - CROSS

1  Q.  Again, we're here on the preliminary injunction order.  I

2  apologize.

3  A.  The 2011 one?

4  Q.  Yes, sir.

5  A.  The first time I read it, no, I didn't understand it.

6  Q.  Okay.  Did you think you understood it?

7  A.  I probably thought I did.

8  Q.  Okay.  But what you're saying now is later on after the

9  preliminary injunction, reading that --

10       THE COURT:  You mean permanent injunction?

11       MR. DENNIS WILENCHIK:  I apologize.  I'm getting

12  tired.

13       MR. SALGADO:  Your Honor, objection.  This is plowed

14  ground.  Asked and answered.  We covered this earlier in the

15  morning.

16       THE COURT:  Once again, you can make that objection

17  but not until the question's asked.

18       Go ahead, Mr. Wilenchik.

19  Q.  (BY MR. DENNIS WILENCHIK)  Thank you.  Let me just move on.

20       Is it correct, Lieutenant, that as far as you were

21  concerned, HSU or the field agents were not detaining anyone

22  without state charges of some kind, correct, meaning without an

23  investigation of state charges or federal criminal charges?

24  A.  Correct.  The way I understood it is you had to have a

25  state -- you had to have a state crime to be able to come in

JAKOWINICZ - CROSS

1    contact with these people.

2    Q.  And then when you did, it was your understanding at least

3    at the time and the practice that you believed was occurring

4    was that then and only then if they're not then formally

5    charged with the state crime, the deputies would be calling

6    again Border Patrol and taking direction from them as to what

7    to do?  Would that be an accurate summary of what you

8    thought --

9    A.  Or ICE, yes.

10              MR. DENNIS WILENCHIK:  Or ICE.

11              THE COURT:  I want to clarify this difference between

12   ICE and Border Patrol.  You testified this morning that when

13   you were leading -- were the head of HSU, that when -- if

14   individuals had been stopped and there were no state charges,

15   they were sometimes turned over to ICE.

16              THE WITNESS:  Yes, ma'am.

17              THE COURT:  Was there a point in time when you stopped

18   having them turned over to ICE and instead turned them over to

19   Border Patrol, or were you sending them to either one at any

20   time?

21              THE WITNESS:  There was a point in time where ICE

22   would not take them, and that's when the decision was made by

23   the sheriff we're going to give them to Border Patrol.

24              THE COURT:  Okay.  So prior to -- And I think you told

25   us about that conversation with the sheriff.

JAKOWINICZ - CROSS

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  Prior to that time, was it always ICE that

3    you turned people over to while you were the head of HSU?

4          THE WITNESS:  To the best of my recollection, yes.

5          THE COURT:  Thank you.

6    Q.  (BY MR. DENNIS WILENCHIK)  And I just want to clarify a

7    point that the Judge just went into, okay, just so there's no

8    misunderstanding.

9          What I was asking a few minutes ago before the Judge

10   started questioning you was, to clarify, that it is true that,

11   again, people, as far as you know, weren't just being stopped

12   after the preliminary injunction order simply because they

13   looked illegal or something like that, right?

14   A.  Correct.

15   Q.  They had to be stopped on some legitimate criminal pretext

16   basis for investigation, right?

17   A.  Yes.  For a traffic stop it would have to be an Arizona

18   Title 28 violation.

19   Q.  Okay.  And that, if I'm understanding you correctly, was

20   really the distinction after this preliminary injunction order

21   that there had to be some reasonable basis to believe there was

22   a criminal activity afoot before you just stopped somebody, not

23   just stopping them on the basis you think they look illegal,

24   right?

25          THE COURT:  Well, a Title 28 violation isn't

JAKOWINICZ - CROSS

1   necessarily criminal.

2   Q.  (BY MR. DENNIS WILENCHIK)  Yes.  It's true that it isn't --

3          THE COURT:  Traffic stops don't have to be criminal.

4          MR. DENNIS WILENCHIK:  That's true.

5          THE COURT:  In fact, I don't think they are on the

6   vast majority.

7          THE WITNESS:  You're right.

8   Q.  (BY MR. DENNIS WILENCHIK)  Let me clarify that.  That's a

9   good point.

10          It had to be on some reasonable basis, including

11  something like a Title 28 violation, not just on the basis that

12  they're looking like they're here illegally.  Is that fair?

13  A.  Yes, sir.

14  Q.  And once they're legitimately stopped -- and I appreciate

15  that clarification -- once they're legitimately stopped, the

16  idea was after the order that, as you understand it, what the

17  practice was was deputies would contact during that

18  investigatory stop Border Patrol or ICE and then would take

19  direction from them as to how to proceed in terms of bringing

20  them down there and then picking them up.  Is that about right?

21          MR. SALGADO:  Objection, time frame, Your Honor.

22          THE COURT:  Overruled.  You may answer.

23          THE WITNESS:  Yes.  They would handle their own

24  investigation, and then they would reach out to ICE or Border

25  Patrol later on as part of that investigation.

JAKOWINICZ - CROSS

1    Q.  (BY MR. DENNIS WILENCHIK)  Right.  But it was usually

2    during that investigatory process.  In other words, they

3    wouldn't -- they wouldn't just detain people for however long

4    they felt like.  You knew that wasn't appropriate?

5    A.  Right, yes.

6    Q.  So it was during the process of -- And no one knew how long

7    that process could be in any given situation, right?  It could

8    change?

9    A.  Yes, sir.

10   Q.  For example -- and I'll keep this brief -- but a human

11   smuggling investigation might be longer than, as the Judge

12   pointed out, a Title 28 type violation, right?

13   A.  Yes, sir.

14   Q.  And thank you for that clarification.  I was trying to

15   oversimplify, and I appreciate your clarification.

16          Okay.  Did you think that that kind of activity, when

17   you were head of HSU and you took over, was cooperating with

18   the federal government and appropriate?

19   A.  Yes.

20   Q.  And did anybody advise you that that kind of cooperation

21   was in any way illegal or against a court order?

22   A.  No, sir.

23   Q.  Did you believe it was against a court order?

24          THE COURT:  He didn't know about the court order then

25   he said.

1    MR. DENNIS WILENCHIK:  Okay.  I'll accept that

2    notwithstanding what I've shown on the board, but that's fine.

3        THE COURT:  I know what you've shown, but we know what

4    his testimony is, is that he didn't know about the -- what the

5    preliminary injunction order said while he was the head of --

6    Q.  (BY MR. DENNIS WILENCHIK)  I'll accept it at this time that

7    he doesn't recall that.  I appreciate that.  Is that about

8    right, what we just said?

9    A.  I'm sorry.  I'm lost now.

10        THE COURT:  Before May of 2013, did you know there was

11    a preliminary injunction in effect that had something to do

12    with whether people were detained or -- for being illegal?

13        THE WITNESS:  No, I didn't understand anything about

14    that.

15    Q.  (BY MR. WILENCHIK)  You may have known about it, but you

16    may not have understood it?

17    A.  It may have been referenced, but I didn't know what it was

18    or what it meant or anything like that.

19    Q.  Let me ask it this way:  No one certainly for the record

20    stopped you from understanding then, inquiring further, asking

21    any questions when you either had it attached or it was

22    referenced or when you see this e-mail on the board now?

23    A.  Stopped me from asking questions?

24    Q.  Yeah.  It's important.  In other words, did any directive

25    come from the sheriff himself saying, "I don't want you to know

1    what's going on.  I don't want you to learn about the order.

2    Don't read that thing"?  Anything like that?

3    A.  No, no, sir.

4    Q.  So basically it was just you maybe not following up and

5    checking into things as we look back?

6    A.  No.  I did ask questions, a couple questions.  That's what

7    the follow -- the phone call with Lieutenant Sousa and then the

8    phone call to Chief Sands when I got this e-mail, because I

9    didn't understand it.  I'm, like, how am I supposed to write up

10   training for something I don't understand?  What are you

11   talking about?

12   Q.  Sure.  And, again, because I may not be permitted to get

13   into those conversations in detail, but as a result of those

14   conversations, you did learn something about at least their

15   interpretation of the order.  Would that be accurate?

16   A.  Not much more than "We're not doing it.  We're not doing

17   anything wrong.  Don't worry about it" essentially.

18   Q.  Okay.  Fair enough.

19        And would it be fair to say it was your understanding

20   at that point that what they're referring to is an

21   interpretation that the order was saying basically you can't

22   just stop people because they're illegal?

23        MR. SALGADO:  Objection.  Foundation.

24        THE COURT:  Overruled.  Did you have that

25   understanding at this time or not?

JAKOWINICZ - CROSS

1      THE WITNESS:  Yes.

2    Q.  (BY MR. DENNIS WILENCHIK)  Thank you.

3           And then just not to belabor it, but -- I keep saying

4    that -- but looking at this exhibit on the screen, which I

5    believe is 14, it goes on to say, "Listed below Tim Casey

6    breaks the order down for us."  Do you see that?

7    A.  Yes, sir.

8    Q.  Before anything goes out office-wide, Chief Sands and Tim

9    Casey need to sign off on it.  Right?

10   A.  Yes, sir.

11   Q.  Taking the latter point, this -- about Mr. Casey signing

12   off at least would be consistent with the earlier e-mails we

13   saw before the lunch break that I showed you dealing with

14   Mr. Casey essentially being sent the training scenarios to sign

15   off on or to revise, correct?

16   A.  Yes, sir.

17   Q.  So that's nothing new to you at this point when you're

18   reading this in October of 2012, right?

19   A.  Correct.

20   Q.  And then it says, "Listed below Tim Casey breaks the order

21   down for us."  So let's go below, if we can, if you can scroll

22   down.  Oops.  Too far.

23          And this appears attached to that to be what it's just

24   referring to, which is allegedly how -- I'll make it clearer --

25   which is how Tim Casey did summarize the order on December

UNITED STATES DISTRICT COURT

1    23rd, right?

2    A.  Yes, sir.

3    Q.  So you did have that at the time, whether you remember it

4    now or not, available to you to review, right?

5    A.  I wouldn't have had it on the original, the 23rd.  I ended

6    up getting it when --

7    Q.  No, no, no.  I'm not saying you had it on the 23rd, sir.

8    What I'm saying is at least now in October --

9    A.  October, yes.

10   Q.  -- if you didn't know about the order by just pulling it up

11   on the document itself where it shows it's attached, you at

12   least had Casey's summary laid out for you right under the

13   e-mail, right?

14   A.  Yes, sir.

15   Q.  And it refers to his summary, right?

16   A.  Yes, sir.

17   Q.  And as far as I know, that's the only place where he ever

18   puts in writing anything about the order.  Do you know of any

19   other place?

20   A.  I don't remember anything else right now.

21   Q.  And it would appear that that's why, at least would you

22   agree with me, he's attaching that e-mail in fact to the

23   documents we've just been going through?

24   A.  Yes.

25   Q.  Okay.  So assuming this to be the only place where Casey

JAKOWINICZ - CROSS

1   describes the order, did you read this at the time?

2   A.  I don't recall specifically if I did or not.

3   Q.  If you had read it, looking at it today, would you agree,

4   just looking at it now, that it only begins an item five on his

5   quick summary where it's bolded that he discusses the

6   injunction at all?

7   A.  Yes, sir.

8   Q.  Okay.  And there he quotes.  You see that, right?

9   A.  Yes, sir.

10  Q.  Okay.  And did you -- Does this help you to recall whether

11  you actually read that language then as you see this now at the

12  time so that you could follow through on the e-mail above it

13  about doing something to follow up with Mr. Casey about sending

14  something out that was being requested to the troops?

15  A.  No, sir.

16  Q.  Is there any reason you wouldn't have?

17  A.  I may have read the beginning part of it, and it's talking

18  about some stuff.  And I made the phone call right away saying,

19  "Hey, I don't even know what you're talking about here.  What

20  is this?"  And from there it never got to that point.

21  Q.  All right.  And would it also be accurate for me to say

22  that since this had been, what we're looking at, Exhibit 14,

23  had been copied to Mr. Casey, that you never heard from him

24  either about whether he was getting something to review or not

25  review on this date?

JAKOWINICZ - CROSS

1   A.  I'm sorry.  I don't understand.

2        THE COURT:  So in October, the e-mail of October

3   2012 --

4        THE WITNESS:  Okay.

5        THE COURT:  -- a copy was sent to Mr. Casey.  Did you

6   ever hear back from Mr. Casey responsive to that e-mail?

7        MR. DENNIS WILENCHIK:  Thank you.

8        THE WITNESS:  Not that I recall.

9        THE COURT:  So was a briefing board ever prepared as

10  was originally directed in the October e-mail?

11       THE WITNESS:  Not to my knowledge, no.

12  Q.  (BY MR. DENNIS WILENCHIK)  No.

13       You wouldn't blame the sheriff for that, would you?

14  A.  I don't know who -- When I called Chief Sands to get

15  further direction, he told me to do nothing.  Unless I hear

16  something different from him, we're not doing anything.  Where

17  that was decided, whether he made that decision or above him or

18  whoever, I don't know.

19  Q.  Well, let me ask you that, because I never heard that

20  before.

21       So you're saying now the reason you did nothing on

22  this to follow up is because you called Chief Sands, or is

23  there some written communication with him following up on this

24  in which he told you don't do anything?

25  A.  I believe it was a phone call.

UNITED STATES DISTRICT COURT

JAKOWINICZ - CROSS

1  Q.  I guess I'm confused, if you'll bear with me, because this

2  e-mail, if we go look at it again above the fold, so-to-speak,

3  where we are that we just went through this morning, shows that

4  I thought it was Chief Sands that was doing the requesting for

5  this.  Am I missing that?

6  A.  Correct.

7  Q.  It even says, "I told Chief Sands I'd forward this to you

8  so you can write up a Reader's Digest.  Chief Sands wants it

9  put out as a proactive measure."  Do you see that language?

10  A.  Yes.

11  Q.  Are you sure then when you testify under oath that Chief

12  Sands, after reading that, told you "Disregard it.  No, I don't

13  want it put out"?

14  A.  Yes, sir.

15  Q.  Did you make a note of that anywhere, sir, if that's true?

16  A.  No, sir.

17  Q.  Did Chief Sands send you anything saying forget all of

18  these e-mails that were sent to you to put something out?

19  A.  No, sir.

20  Q.  He certainly never told you that the sheriff directed

21  anyone to do that, correct?

22  A.  I don't remember him telling me anything specific like

23  that.

24  Q.  You never heard him say the sheriff ordered that forget all

25  this stuff; he doesn't want training out.  Right?

JAKOWINICZ - CROSS

1        MR. SALGADO:  Objection.  Hearsay.

2        THE COURT:  Overruled.  You may answer yes or no.

3        THE WITNESS:  I don't remember exactly the way the

4    conversation went.  I remember him telling me we're not --

5    we're not going to put anything out at this time, if something

6    changes, I'll let you know, or something to that effect.

7    Q.  (BY MR. DENNIS WILENCHIK)  And this was right after this

8    e-mail was sent where he says he wants something out?

9    A.  It was right around that time, yeah, because after I talked

10   to Joe and he couldn't give me any direction, I called Sands

11   because Sands is the one that's asking for it to go out.

12   Q.  And you, given what we just read, didn't think of maybe

13   putting an e-mail at least or something out saying I'm not

14   doing anything on this because notwithstanding what it said,

15   I've been ordered otherwise?

16   A.  No.  I called the executive chief, who's mentioned in here,

17   and spoke to him personally, and he said not to.

18   Q.  Did you understand my question?

19   A.  Yes.  I didn't put out an e-mail.

20   Q.  Saying that notwithstanding this, I've been told, so I'm

21   standing down doing nothing?

22   A.  Correct.

23   Q.  So was it still true at that period of time, as you

24   previously testified, that you couldn't understand the

25   injunction, preliminary injunction, and would have wanted

1    clarification from an attorney?

2    A.  At that time in October of '12?

3    Q.  Yes.

4    A.  Correct.  I did not understand it.

5    Q.  When you took over at HSU, did you quickly find out that

6    the deputies and sergeants had built up relationships with

7    various people at ICE and Border Patrol that they were working

8    with?

9    A.  Yes, sir.

10   Q.  Did you think there was anything wrong with that?

11   A.  No, sir.

12   Q.  Did you think that was a good thing?

13   A.  Yes, sir.

14   Q.  Forgive me, but did you say earlier that you didn't know

15   around when that conversation that we clarified in the

16   deposition with Sheriff Arpaio occurred in which you asked him

17   what to do, and he said call Border Patrol?

18   A.  It was the latter part of 2012.  And I didn't ask him.  He

19   asked me what I will do.

20   Q.  Did you make a note of that anywhere?

21   A.  No, sir.

22   Q.  And that would have been then, if I've got my timing right,

23   pretty much at or around or shortly after this e-mail chain

24   that we just looked at as Exhibit 14?

25   A.  Possibly.  It coincided with the time that ICE had made

JAKOWINICZ - CROSS

1    some sort of decision that they weren't going to take people

2    from us.  If it was around the same time as this, then that

3    would be right.

4    Q.  Let me ask you something.  You told us you didn't

5    understand the order.  And I think on direct examination you

6    testified that -- let me get this clear in my head -- that you

7    had a bachelor's degree from Michigan State University, one of

8    the top -- Big 10?

9    A.  Yes, sir.

10   Q.  And it was in psychology and what?

11   A.  Criminal justice.

12   Q.  Criminal justice.  Did you do well in school?

13   A.  I graduated.

14   Q.  Well, I guess I could say the same thing.

15          But -- And you had then a master's degree beyond that?

16   A.  Yes, sir.

17   Q.  In what?

18   A.  Business administration.

19   Q.  Any other degrees?

20   A.  No, sir.

21   Q.  So you had a master's in business administration and a

22   college degree, and you couldn't understand the order?

23   A.  Correct.

24   Q.  Did you think your deputies then out in the field could

25   understand it better than you without any further explanation

JAKOWINICZ - CROSS

1   from a lawyer?

2   A.  No.

3   Q.  So the process when you took over and throughout your stay

4   at HSU, to be perfectly clear on it, was you understood that a

5   deputy would call ICE or Border Patrol, put the suspect on the

6   phone with ICE or Border Patrol.  Am I right so far?

7   A.  Yes, sir.

8   Q.  So the deputy wouldn't do that.  They would actually have

9   Border Patrol or ICE talk with the person in custody at that

10  time, correct?

11  A.  Yes, sir.

12  Q.  They, ICE or Border Patrol, would conduct the telephonic

13  interview with the suspect, correct?

14  A.  Correct.

15  Q.  And at the conclusion of the interview, the phone would be

16  turned back to the deputy, and the ICE or Border Patrol agent

17  would let the deputy know if they wanted the deputy to hold the

18  suspect for their disposition, correct?

19  A.  Yes, sir.

20  Q.  That's pretty much how it went?

21  A.  Yes, sir.

22  Q.  And, again, at that -- all that time you never believed

23  there was anything wrongful, unlawful about that?

24  A.  Correct, sir.

25  Q.  And you understood that the sheriff's office per se after

JAKOWINICZ - CROSS

1    '09 did not have the authority to simply enforce immigration

2    laws by itself, correct?

3    A.  I understood the 287(g) program had been rescinded.

4    Q.  Right.  And so is what I said correct then that by itself

5    it could not civilly enforce the immigration laws?

6    A.  Correct, as I understood it, yes.

7    Q.  Because that had nothing to do with the scenario we just

8    talked about, correct?  That civil enforcement had nothing to

9    do with the scenario we just talked about?

10   A.  Two separate scenarios, yes, sir.

11   Q.  Okay.  And so the authority that you believed your office

12   had to turn people over to Border Patrol was if Border Patrol

13   asked you to do so, is that true?

14   A.  Yes, sir.

15   Q.  Meaning if they directed you to do so?

16   A.  Yes, sir.

17   Q.  And in fact Border Patrol on other occasions would actually

18   ask for your cooperation in other kinds of cases, would it not,

19   where, for example, they would catch people in the desert

20   transporting drugs that were illegal and call for assistance.

21   Would that be fair?

22   A.  Yes, sir.

23   Q.  Did you think there was anything wrongful about that kind

24   of cooperation either?

25   A.  No, sir.

1    Q.  And finally what is a shift summary?

2    A.  A shift summary is written generally by the sergeant of the

3    squad describing an event of what happened, a notable event,

4    something that, you know, the chiefs and the PIOs would want to

5    know about.  It would have specifics of when, where, who, you

6    know, specifics.

7          THE COURT:  Wait.  Can you give me an example of the

8    kind of incident that would result in a shift summary being

9    prepared?

10          THE WITNESS:  In HSU?

11          THE COURT:  Yes.

12          THE WITNESS:  Okay.  If a deputy made a stop on a

13   minivan with 20 people inside, and they ran through the desert,

14   and we got the helicopter out to try and find people.  It's the

15   middle of summer or somebody had to get an IV, you know.

16   Something like that would be a shift summary to let everyone

17   know, hey, this is what happened; these are the people we

18   apprehended; maybe a couple people got away, you know; be on

19   the lookout for them; they're going to be dehydrated as all

20   get-out, you know, that kind of thing.

21          THE COURT:  Thank you.

22   Q.  (BY MR. DENNIS WILENCHIK)  And did HSU try to include in

23   those shift summaries what it had learned about stops from

24   field deputies that had contacted it for assistance in those

25   kind of scenarios, or was that just the HSU officers initiating

JAKOWINICZ - CROSS

1    something themselves?

2    A.  I can't think of a specific instance where we did a shift

3    summary that included patrol deputies, but I can't say it

4    didn't happen either.

5    Q.  Were you made aware that patrol deputies were contacting

6    ICE or Border Patrol under the same program, if you will, or

7    protocol that we just discussed a few minutes ago?

8    A.  Not unless they went through my guys, unless they called

9    our guys.  And my -- you know, if they asked for our assistance

10   or something, we'd go out and help them, but if they did stuff

11   on their own, that was on their own.

12   Q.  But it was your understanding as head of HSU, that was not

13   the preferred method of how field deputies should operate,

14   meaning that -- meaning that they should contact HSU for its

15   guidance in dealing with Border Patrol and so forth?

16   A.  We would have preferred that, because if we can build a

17   case off of it, that would have been the better way to do it.

18   But I don't know that it was ever directed that they had to do

19   that.  Deputies that worked in Gila Bend worked alongside

20   Border Patrol.  Border Patrol showed up right there.  They -- I

21   would guess they didn't call us.

22   Q.  In those kind of circumstances?

23   A.  Correct.

24   Q.  And would these shift summaries typically be sent out to

25   multiple federal agencies at the time?

JAKOWINICZ - REDIRECT

1   A.  The list of who it went out to changed.  It evolved

2   constantly.  It went out to a lot of people.

3   Q.  So it wasn't something that was being hidden or covert --

4   A.  No.

5   Q.  -- or surreptitious in any way?

6   A.  No, sir.

7   Q.  And why would those shift summaries be sent out to these

8   various federal agencies?

9   A.  Intelligence sharing, mostly for that.  It was intelligence

10  sharing so they would know what we had going on, and they could

11  play it against the intelligence they have.

12  Q.  It wasn't just for publicity to the federal agencies?

13  A.  No.

14          MR. DENNIS WILENCHIK:  Thank you, Your Honor.

15          THE COURT:  Mr. Salgado, redirect.

16          You may proceed.

17          MR. SALGADO:  Thank you, Your Honor.

18                      REDIRECT EXAMINATION

19  BY MR. SALGADO:

20  Q.  Lieutenant, I just want to recap part of your testimony on

21  cross-examination.  You said that you found out about the PI in

22  May of 2013; is that right?

23  A.  That's when I came to understand what it meant and

24  understand the full power of what it was, yes.

25  Q.  And you came to understand it because somebody explained it

JAKOWINICZ - REDIRECT

1   to you?

2   A.  Yes, sir.

3   Q.  And do you know who that somebody is?

4   A.  It was Tim Casey and Tom Liddy.

5   Q.  Okay.  And --

6           THE COURT:  Are you referring back to the meeting that

7   you had after the May 2013 order was issued?

8           THE WITNESS:  Yes, yes, ma'am.  I believe that's when

9   the whole thing was explained and the light bulb went on of

10  what actually everything means now.

11  Q.  (BY MR. SALGADO)  And for you the light bulb went on for

12  you?

13  A.  Yes, sir.

14  Q.  And the defendant was at that meeting; is that right?

15  A.  Yes, sir.

16  Q.  And based on that meeting, MCSO-wide action was taken,

17  right, through the briefing board?

18  A.  Yes, sir.

19  Q.  Based on the explanation that you received from Casey,

20  Liddy, et al.?

21  A.  Yes, sir.

22  Q.  Did anybody explain to you what the order meant in December

23  of 2011?

24  A.  No, sir.

25  Q.  Did you have any meetings with the defendant when the

JAKOWINICZ - REDIRECT

1    preliminary injunction was issued in December of 2011?

2    A.  No.

3    Q.  How about when you took over HSU?

4    A.  No, sir.

5    Q.  Nobody explained it to you?

6    A.  No, sir.

7    Q.  You didn't go to any meetings with the defendant?

8    A.  No.

9    Q.  With the lawyers?

10   A.  No, sir.

11   Q.  No.  Okay.

12          Anyone in your chain of command explain to you what

13   the PI meant?

14   A.  No, sir.

15   Q.  From December of 2011 all the way up through May, 2013,

16   nobody ever explained to you what the order meant?

17   A.  Correct.

18   Q.  And you also mentioned on cross-examination that

19   dissemination of the order was, I believe the term you used,

20   was at a higher level?  The responsibility fell at a higher

21   level?  Is that right?  Am I remembering your testimony

22   accurately?

23   A.  Yeah.  I think, if I recall what you're taking about, yes.

24   Q.  You said that you don't have the authority as a

25   lieutenant --

JAKOWINICZ - REDIRECT

1   A.  Correct.

2   Q.  -- to implement MCSO-wide training?

3   A.  Correct.

4   Q.  Ms. Miller, can you please publish Exhibit 46.  It's

5   already in evidence, Your Honor.

6           Would you highlight that please.

7           This is a briefing board that went out in May, 2013,

8   correct?

9   A.  Yes, sir.

10  Q.  Do see where it says by order of Sheriff Arpaio?

11  A.  Yes, sir.

12  Q.  That's the defendant?

13  A.  Yes, sir.

14  Q.  So who has the authority to issue MCSO-wide policy and

15  training?

16  A.  Sheriff.

17  Q.  The sheriff?

18  A.  The sheriff.

19  Q.  Okay.  And you didn't go to any meetings with the sheriff

20  in December of 2011, did you?

21  A.  No, sir.

22  Q.  Not when you took over HSU?

23  A.  No, sir.

24  Q.  Not in October when you got that e-mail from Casey?

25  A.  No, sir.

JAKOWINICZ - REDIRECT

1   Q.  On direct examination and subsequently on cross you talked

2   about this meeting that you had with the sheriff in the latter

3   half of 2012; is that right?

4           Well, Strike that.

5           THE COURT:  The one about Border Patrol.

6           THE WITNESS:  Yes, sir.

7   Q.  (BY MR. SALGADO)  Where defense counsel showed your

8   testimony where you said that the sheriff told you call Border

9   Patrol.  Do you recall that.

10  A.  Yes, sir.

11  Q.  Okay.  And I'd like to -- You said that you had involvement

12  in the drafting of press releases from time to time?

13  A.  From time to time.

14  Q.  Press releases that dealt with immigration enforcement or

15  HSU activities?

16  A.  HSU related, yes.

17  Q.  And transfers to ICE and CBP?

18  A.  Correct.  The latter part of my time there.

19          MR. SALGADO:  Correct.  Your Honor --

20          Ms. Miller, can you please project Paragraph 2 of Page

21  2 of Exhibit 36E already in evidence and tear out that

22  paragraph.

23          The second full paragraph.

24          THE COURT:  So is this Page 2 of a press release?

25          MR. SALGADO:  That's already in evidence, correct.

JAKOWINICZ - REDIRECT

1          THE COURT:  For the witness, all we're seeing is Page

2    2.  So if he saw Page 1, it would show that it was a press

3    release from the Maricopa County Sheriff's Office?

4    Q.  (BY MR. SALGADO)  Yes.  So let's start there.

5          Page 1, do you identify this as a press release

6    from MCSO?

7    A.  Yes, sir.

8    Q.  And do you see the title, it says, "ICE refuses to accept

9    illegal aliens."  Do you see that?

10   A.  Yes, sir.

11   Q.  Is this the type of press release that you would have seen

12   or been involved?

13   A.  I can't say for sure, not -- This kind of stuff, I dealt

14   with the stuff that was number specific.  If it said six people

15   and it was really five, I would have been, like, how do you

16   know it was actually five?  It was more that kind of thing.

17   This kind of stuff I wasn't involved in.

18   Q.  I'd like to show you -- see if this jogs your memory as to

19   whether you were.  The second full paragraph.

20          Second paragraph.

21          Quote -- Does this, reading this paragraph, does it

22   jog your memory whether you were involved in this press

23   release?

24   A.  I'm sorry it doesn't.  I don't recall.

25   Q.  All right.  Well, let me ask you:  You see the text where

JAKOWINICZ - REDIRECT

1    it says, "So I had a back-up plan in place, which was to take

2    these illegal immigrants not accepted by ICE to the Border

3    Patrol," Sheriff Arpaio said.  Do you see the word call

4    anywhere there.

5    A.  No, sir.

6    Q.  And that's exactly what you did, right, after the sheriff

7    ordered you to, quote-unquote, call Border Patrol if ICE

8    refused to accept?

9    A.  Correct.

10   Q.  There was no ambiguity --

11           THE COURT:  So how did that work?  How -- How did

12   you -- What was the actual process of taking people to Border

13   Patrol?  Did you call them first?  Did you just show up at

14   their office?  Did you meet halfway?

15           THE WITNESS:  We would -- Our supervisors, the

16   sergeants, would have their contact numbers on cell phones and

17   explain what we had.  And then they would put the phone up to

18   each individual.  The individual would speak to them.  They'd

19   say yes, we want that person, please hold onto them.

20           And instead of calling ICE agents, it just changed to

21   calling Border Patrol agents.

22           THE COURT:  So please hold onto them --

23           THE WITNESS:  That's my term.  It's them saying, yes,

24   we want custody of that person; please don't release them.

25           THE COURT:  So would the deputy just stay there by the

JAKOWINICZ - REDIRECT

1    side of the road until Border Patrol showed up?  Would the

2    deputy transport them to a Border Patrol office?  How did the

3    actual transfer take place?

4        THE WITNESS:  It varied.  It varied.  It depended on

5    how many people we had, where were the resources, that kind of

6    thing.  Sometimes they would come directly -- and I can't say

7    Border Patrol specific or ICE.  I can't remember the

8    differences.

9        Sometimes they would come to the scene and take

10   people from us.  Sometimes we would go back to our, like, our

11   headquarters where we had air conditioning and everything, and

12   everybody could wait there, and they'd come meet us.  Sometimes

13   we would take them all the way to them.  It depended on how

14   everybody was stretched.

15       THE COURT:  Thank you.  Please continue.

16   Q.  (BY MR. SALGADO)  Thank you, Your Honor.

17       And you also recall testimony about the Title 28 stops

18   and the detentions, and over the course of that detention the

19   deputy would call ICE or CBP.  Do you remember that line of

20   questioning?

21   A.  Yes, sir.

22   Q.  Now, was a call placed to ICE or CBP after the state

23   investigation had concluded or before it was concluded?

24   A.  You'd have to -- I don't know.  I can't say it was the same

25   every time.

JAKOWINICZ - REDIRECT

1  Q.  Okay.

2  A.  The sergeant would be able to better answer that who was on

3  scene.

4  Q.  Because you had limited involvement, right, in the street?

5  A.  Correct.

6  Q.  Let me show you the preceding paragraph of this starting

7  with sheriff's detectives.  Can you tear that out, Ms. Miller,

8  please.  Does this jog your memory as to when during the stop

9  the call was placed?

10  A.  In this particular case, yes, it would have been after we

11  talked to them about state crimes.

12  Q.  Okay.  So once your deputies determined in this instance

13  that there were no state charges, only then did they call ICE

14  or in this case ICE and then CBP; is that right?

15  A.  Yes, sir.

16  Q.  Why wouldn't they have released him as soon as no PC was

17  determined on state charges?

18  A.  Because the person -- it would be the indicia of human

19  smuggling that we were looking for.  If they self-admitted, you

20  know, I just came across or if they looked like they had been

21  going through the desert for ten days with the same clothes, or

22  if you have 12 people in a car with no luggage, nobody knows

23  each other's name, they're all giving you a different answer of

24  where they're going, nobody knows the driver's name, those

25  would be the kind of things we would be, okay, something's up

JAKOWINICZ - REDIRECT

1    here, the totality of the circumstances.  We probably have what

2    we think we have, and that's when we put them on.

3    Q.  Completely based on presumed violations of federal

4    immigration law, correct?

5    A.  Yeah, the totality of all of that.

6    Q.  Not on presumed violations or probable cause of state laws;

7    is that right?

8    A.  Correct, correct, sir.

9    Q.  The state law has ended effectively at that point; is that

10   right?

11   A.  Yes, sir.

12   Q.  So this is a completely new detention?

13   A.  Yes, sir.

14   Q.  And is that what you understood to be the violation, a

15   violation of the PI?

16   A.  Yes.  That's where we violated it.

17   Q.  A detention based on civil federal immigration violations?

18   A.  Correct.

19   Q.  During your cross-examination, Mr. Wilenchik asked you

20   several times about conversations that happened around the

21   March 2012 and the October 2012 e-mail.  Do you remember that?

22   A.  Yes, sir.

23   Q.  And you said you called Sousa, and then you called Sands,

24   et cetera, et cetera.  Do you recall that testimony?

25   A.  Yes, sir.

1   Q.   Okay.  Did anyone ever tell you whether you could transfer

2   people to ICE or CBP under the PI in all of these

3   conversations?

4   A.   I don't remember anything like that coming up.

5   Q.   Okay.  Were you privy to the conversations that Casey may

6   have had with Brian Sands?

7   A.   No.

8   Q.   How about Casey with Palmer?

9   A.   No.

10  Q.   How about Casey with Sousa?

11  A.   Only the e-mail that I saw.

12  Q.   But you never heard a conversation between Casey and Sousa,

13  did you?

14  A.   No.

15  Q.   So you don't know whether Casey told any of them whether it

16  was okay or not to take people to ICE?

17  A.   Correct.

18  Q.   How about conversations between Casey and the sheriff?

19  Were you ever privy to those?

20  A.   No.

21  Q.   Do you know whether Casey told the sheriff that he couldn't

22  transfer people to ICE in December, 2011?

23  A.   No.

24  Q.   You have no idea?

25  A.   No.

JAKOWINICZ - REDIRECT

1        MR. SALGADO:  One moment, Your Honor.

2        That's it for now, Your Honor.  Thank you.

3        THE COURT:  May this witness be excused, Mr. Salgado?

4        MR. SALGADO:  Yes, he may.

5        THE COURT:  Is there any objection?

6        MR. DENNIS WILENCHIK:  Yes.  I'd like to examine on

7   the document he raised in redirect that I did not go into on

8   cross.

9        THE COURT:  We do not have recross.

10        MR. DENNIS WILENCHIK:  Even if he raised something new

11   in an exhibit that I hadn't had a chance to examine?

12        THE COURT:  That would be your objection, that he

13   exceeded the scope of cross.

14        MR. DENNIS WILENCHIK:  We're not talking about that.

15   We're talking about him raising something new in redirect in

16   questions asked that I've not had a chance to ask the

17   witness --

18        THE COURT:  That's right, and that is why --

19        MR. DENNIS WILENCHIK:  -- who is present and

20   available.

21        THE COURT:  That is why you have the objection that he

22   has exceeded the scope of cross-examination, which was not

23   made.

24        This rule will apply to both sides.  You may step

25   down, sir.

JAKOWINICZ – REDIRECT

1          MR. DENNIS WILENCHIK:  You said yesterday you're not

2   enforcing that rule.

3          THE COURT:  No.  I said I would not entertain it

4   beyond the scope of direct, but I would always entertain the

5   objection to beyond the scope of cross.

6          You have daily transcripts.  You can check.

7          MR. DENNIS WILENCHIK:  He's not excused.  Then I

8   intend to recall him.

9          THE COURT:  I did not excuse him.  I said he could

10  step down.

11         MR. DENNIS WILENCHIK:  I just want to say that before

12  he left.

13         THE WITNESS:  Do I wait?

14         THE COURT:  No, you don't have to wait.

15         MR. DENNIS WILENCHIK:  He can wait.

16         THE COURT:  If you're needed later, we will let you

17  know.

18         MR. DENNIS WILENCHIK:  Your Honor, I'd ask that he

19  wait, because our case will be going on.

20         THE COURT:  Oh, well, hold on a second.  Let me find

21  out what's left for the government.

22         MR. KELLER:  Your Honor, the government intends to

23  call Sergeant Michael Trowbridge at this point.

24         THE COURT:  And are there any other witnesses you're

25  going to call today?

JAKOWINICZ - REDIRECT

1      MR. KELLER:  Well, the only other issue we have are

2  the pending exhibits and whether there's going to need to be

3  any additional foundational testimony laid potentially by the

4  case agent on some of those exhibits.  But until we know --

5      THE COURT:  So your only substantive witness is

6  Sergeant Trowbridge?

7      MR. KELLER:  Yes, Your Honor.

8      THE COURT:  How long did you anticipate his testimony

9  to be?

10     MR. KELLER:  Well, on direct, Your Honor, 20 to 30

11 minutes likely.

12     THE COURT:  Do you have any anticipation of the timing

13 on your cross-examination of Trowbridge, Mr. Wilenchik?

14     MR. DENNIS WILENCHIK:  Yeah.  It will probably be at

15 least that long, perhaps a little bit longer, depending on what

16 he says.

17     THE COURT:  Okay.  Well, I'm going to let the sergeant

18 go for the day.  And if you want him back tomorrow or Friday,

19 make sure you have infor -- have contact information for him.

20     So, Sergeant, you're not released from your subpoena,

21 and you still abide by the rule not to discuss your testimony

22 with any other witnesses.  Thank you.

23     MR. DENNIS WILENCHIK:  Thank you, Your Honor.

24     MR. KELLER:  Your Honor, the government calls Sergeant

25 Michael Trowbridge.

                          TROWBRIDGE - DIRECT

1            MICHAEL TROWBRIDGE, GOVERNMENT'S WITNESS, SWORN

2               THE CLERK:  Please state your name for the record,

3       spelling your last name.

4               THE WITNESS:  Michael Trowbridge, T-r-o-w and then

5       bridge, b-r-i-d-g-e.

6               MR. DENNIS WILENCHIK:  Victoria, do you have

7       Trowbridge?

8               THE COURT:  You may proceed, Mr. Keller.

9               MR. KELLER:  Thank you, Your Honor.

10                          DIRECT EXAMINATION

11      BY MR. KELLER:

12      Q.  Sergeant Trowbridge, would you state your name for the

13      record.

14      A.  It's Michael Trowbridge, T-r-o-w and bridge, b-r-i-d-g-e.

15      Q.  Where do you currently work, sir?

16      A.  District Two patrol sergeant in the southwest valley of

17      Maricopa County.

18      Q.  That's with the Maricopa County Sheriff's Office?

19      A.  Correct.

20      Q.  When did you start with the sheriff's office?

21      A.  I graduated the academy in December of 2004.

22      Q.  And what was your first position upon graduating from the

23      academy?

24      A.  Deputy sheriff.

25      Q.  Were you promoted from that position at some point?

TROWBRIDGE - DIRECT

1   A.   I was, in February of 2008.

2   Q.   And what was -- What rank was that promotion to?

3   A.   Sergeant.

4   Q.   Were you still in patrol when you were promoted to

5   sergeant?

6   A.   Yes, I was.

7   Q.   And how long did you stay in patrol as a sergeant?

8   A.   Three years.

9   Q.   Which district was that in?

10  A.   In District Two, which is the southwest valley.

11  Q.   At some point did you join HSU?

12  A.   I did.

13  Q.   And when was that?

14  A.   In March of 2011.

15  Q.   How long were you in HSU?

16  A.   Two years.

17  Q.   So you would have left roughly March of 2013?

18  A.   Correct.

19  Q.   What was your job in HSU as a sergeant?

20  A.   I was one of the interdiction sergeants.

21  Q.   And what does that mean?  What are interdiction activities?

22  A.   We would usually be on the highways and freeways throughout

23  Maricopa County looking to intercept human smuggling load

24  vehicles.

25  Q.   Are you familiar with the phrase 287(g) or 287(g)

TROWBRIDGE - DIRECT

1   certified?

2   A.  Yes.

3   Q.  What does that mean?

4   A.  It was a program set up by the federal government where

5   deputies would be cross-trained to basically talk about a

6   person's alienage and how they entered the country, how they

7   entered the United States.

8   Q.  Were you personally 287(g) certified at some point?

9   A.  Yes, I was.

10  Q.  Do you remember when that was?

11  A.  I do not.

12  Q.  When you were still a patrol sergeant in District Two, were

13  you 287(g) certified?

14  A.  No.

15  Q.  Did MCSO lose 287(g) authority at some point?

16  A.  Yes.

17  Q.  Do you remember when that was?

18  A.  I do not.

19  Q.  Do you know what the LEAR policy is?

20  A.  Yes.  It was a policy mostly for patrol that if they

21  encountered somebody who they thought or felt was in the

22  country illegally, that they would contact either ICE, Border

23  Patrol, or a 287(g) deputy.

24          THE COURT:  Do you know what LEAR means?

25          THE WITNESS:  I'm not sure what the acronym means, no.

TROWBRIDGE – DIRECT

1    Q.  (BY MR. KELLER)  Was the LEAR policy kept in force even

2    after MCSO lost 287(g) authority?

3    A.  I was in human smuggling when the authority was lost, so

4    I'm not sure if patrol was still doing it.

5    Q.  Well, did HSU continue to turn people over to ICE and

6    Border Patrol even after the loss of 287(g) authority?

7    A.  Yes.

8    Q.  During the interdiction activities that you described as

9    part of HSU's enforcement operations, did HSU encounter

10   individuals who they suspected to be in the country unlawfully?

11   A.  Yes.

12   Q.  And if HSU couldn't make a state case on one of those

13   people, what would you do?

14   A.  Typically we would contact ICE and either have them come to

15   the scene or we would transport them to their facility.

16   Q.  And was that contact made after the determination that

17   there was no state charge?

18   A.  Yes.  But it was typically still on the roadside, so during

19   the kind of preliminary investigation I guess you would say.

20   Q.  But there would be no reason to call ICE or Border Patrol

21   if you had the state charge?

22          MR. DENNIS WILENCHIK:  Objection.  Leading.

23          THE COURT:  Sustained.

24   Q.  (BY MR. KELLER)  Why would you -- Why would you generally

25   call ICE or Border Patrol after the determination was made that

TROWBRIDGE - DIRECT

1    there was no state charge?

2           MR. DENNIS WILENCHIK:  Objection.  Misstatement of

3    testimony.

4           THE COURT:  Overruled.  You may answer.

5           THE WITNESS:  I'm sorry.  Could you repeat it again.

6    Q.  (BY MR. KELLER)  Why would you generally call ICE or Border

7    Patrol after the determination had been made that there were no

8    state charges on the person?

9    A.  Because we knew we wouldn't be taking them back to process

10   them in enforcement support and that there was no state crime

11   involved, so -- But they would usually -- they would admit that

12   they're in the country illegally, so at that point that's when

13   ICE would get involved, and they'd usually do an interview over

14   the phone with them.

15   Q.  And is that essentially the same thing that patrol deputies

16   were doing as part of the LEAR policy?

17   A.  I believe so, yes.

18   Q.  Throughout your entire time at HSU from March of

19   2011 through March of 2013, did that practice that you just

20   described, HSU making a determination that there was no state

21   charge, then calling ICE or Border Patrol, did that practice

22   ever change?

23   A.  No.

24   Q.  Did anyone ever tell you to change that practice?

25   A.  No.

TROWBRIDGE - DIRECT

1   Q.  Did HSU generally transport these individuals to ICE or to

2   Border Patrol?

3   A.  Yes.

4   Q.  Did ICE ever stop accepting people from the Maricopa County

5   Sheriff's Office or from HSU during your time in the Human

6   Smuggling Unit?

7   A.  Yes.

8   Q.  And what did you do in response to that?

9   A.  Then we contacted Border Patrol out of Casa Grande and

10  asked if they would accept the individuals, and we'd to have

11  drive to Casa Grande.

12  Q.  How long a drive is that?

13  A.  From 35th and Durango, it's probably an hour and 15, hour

14  and 30 minutes.

15  Q.  Were you aware of the December 23rd, 2011,

16  preliminary injunction issued in the Melendres case when it

17  came out?

18  A.  Yes.

19  Q.  Was the order discussed within HSU?

20  A.  Not in detail but a little bit it was talked about.

21  Q.  Were there concerns within HSU about the order?

22  A.  There was, that the unit might be shut down, and that guys

23  might get sent back to patrol or to other functions within the

24  office.

25  Q.  Despite those concerns, did you ever get any direction from

TROWBRIDGE - DIRECT

1   your command staff about how the order affected HSU's

2   activities?

3   A.  Not that I can recall, no.

4   Q.  Any direction from the sheriff?

5   A.  No.

6   Q.  Were you surprised by that?

7   A.  I guess a little bit, yeah.

8   Q.  And in this time period, again, after this

9   preliminary injunction came down, I believe you testified HSU

10  continued to hold people and turn them over to ICE or CBP?

11  A.  Correct.

12  Q.  Was this a pretty common occurrence during your two years

13  in HSU?

14  A.  Yes.

15  Q.  Did that practice violate the preliminary injunction?

16  A.  It did.

17  Q.  Why didn't you raise any concerns about it?

18  A.  I didn't know that much about the injunction at the time in

19  detail, so it was never really brought up.

20  Q.  Did you feel like it was your responsibility to make sure

21  that the preliminary injunction was complied with?

22  A.  No.

23  Q.  Whose responsibility was it, in your opinion?

24  A.  I would think the command staff, if there was something

25  that we needed to know on the front line, that that would

TROWBRIDGE - DIRECT

1   trickle down to us eventually, hey, you need to start doing

2   this or stop doing that.

3           THE COURT:  So when you say that what you were doing

4   violated the preliminary injunction, are you saying that today

5   with hindsight?

6           THE WITNESS:  Yes, yes, definitely, yeah.  At the time

7   I had no idea.  But now in hindsight we definitely know it was

8   against what the judge wanted.

9   Q.  (BY MR. KELLER)  And on that issue at the time, no one

10  explained it to you; is that right?

11  A.  No, not in great detail at all.

12          THE COURT:  Well, what kind of detail is -- was it

13  explained?

14          THE WITNESS:  Not enough for me to remember at this

15  time.

16          THE COURT:  Do you know who gave you whatever

17  explanation there was?

18          THE WITNESS:  No.

19  Q.  (BY MR. KELLER)  Do you remember a couple of meetings at

20  the sheriff's office in the general time frame after the

21  preliminary injunction came down that you were present for?

22  A.  Yes.

23  Q.  Do you remember what was discussed at those meetings?

24  A.  Tim Casey was usually the one kind of leading the meetings,

25  and they did talk about the judge's order and stuff, but I'm

1    not sure in what detail it was discussed.

2    Q.  Did you provide any briefing from HSU to the people at that

3    meeting, to Mr. Casey and to the sheriff or the command staff?

4    A.  No.

5    Q.  Did anybody else that was there from HSU provide a briefing

6    on what HSU's activities were --

7    A.  They may have.

8    Q.  -- that you remember?

9    A.  They may have just discussed current events, or I think one

10   time they discussed a workplace detail that they were going to

11   be conducting.

12   Q.  In those meetings, did you get any direction from the

13   command staff or from Mr. Casey about how to comply with the

14   preliminary injunction?

15   A.  Not that I remember.

16   Q.  Did you have any one-on-one conversations with Mr. Casey

17   about the injunction?

18   A.  No.

19   Q.  Did you ever, in any setting, talk to Mr. Casey about the

20   fact that HSU was continuing to hold people and turn them over

21   to ICE and CBP?

22   A.  No.

23   Q.  Again, did you feel like it was your responsibility to do

24   that, to communicate that to the attorney?

25   A.  No, I did not.

TROWBRIDGE - DIRECT

1   Q.  When you were in HSU during load vehicle interdictions,

2   would you write up the details of those operations in some

3   capacity?

4   A.  I would.  I would do a shift summary.

5   Q.  And what kind of details would be included in the shift

6   summary?

7   A.  It would state basically the probable cause for the traffic

8   stop, the date, the time, the location.  And then part of the

9   interview process when the detectives talked to the subjects in

10  the vehicle would be where they were going to in the

11  United States and how much they were going to pay to get there.

12  So that would usually be broken down with each person's name

13  also and their date of birth.

14  Q.  Would it include whatever charges were eventually, if

15  charges were ever brought against the people, what the charges

16  were?

17  A.  Yeah.  We break it down where if it met the state

18  requirement for human smuggling, that would be in one section.

19  And then if anybody was turned over to ICE or Border Patrol,

20  then that would be in, like, a separate drop-down.

21  Q.  Is this something you would create, a shift summary,

22  basically for every shift you worked?

23  A.  For every load that was interdicted.

24  Q.  And who did you provide that shift summary to, if anyone?

25  A.  It was the command staff, the PIO's.  There was one or two

TROWBRIDGE – DIRECT

1    people, representatives from ICE, that were on there.  And

2    there was probably roughly 20, 20 people, recipients.

3    Q.  Was that standard practice?

4    A.  Yes.

5    Q.  Every shift summary went to the command staff?

6    A.  Yes.

7    Q.  And it included detailed information about who had state

8    charges and who was turned over to ICE?

9    A.  Yes.

10          THE COURT:  When you say it went to the command staff,

11   are you saying it went to specific people's e-mail?

12          THE WITNESS:  Yes, ma'am.

13          THE COURT:  Who were those people.

14          THE WITNESS:  It would have been the lieutenant,

15   whoever the lieutenant of HSU was at the time.  During my time

16   there was Lieutenant Brian Jakowinicz and Lieutenant Joe Sousa.

17   And then going up, it would have been Chief Trombi, Dave

18   Trombi, and then Chief Brian Sands, and then Lisa Allen, and

19   whoever the PIO's were at the time.

20   Q.  (BY MR. KELLER)  During your time in HSU, would the sheriff

21   often hold press conferences about HSU's activities?

22   A.  Yes.

23   Q.  And sometimes would these press conferences reference

24   operations that had just occurred the same day?

25   A.  Yeah.  It was more in the workplace enforcement type stuff

1  where it would occur the same day or while we're still doing

2  the investigation.

3  Q.  And from your observations during your time in HSU, was the

4  sheriff often in the media based on HSU's activities?

5  A.  In my opinion, yes, he was.

6  Q.  While you were in HSU, did you see press conferences and

7  press releases, media statements that either directly quoted or

8  very nearly quoted information that you would put in shift

9  summaries?

10  A.  Almost to a tee.

11  Q.  And these were press conferences in which the sheriff was

12  participating?

13  A.  I don't know if he was participating.  It would be press

14  releases that were sent out to the media, so then I would see

15  it in the media.

16  Q.  Did you have a lot of interaction with Chief Sands?

17  A.  Not a whole lot.

18  Q.  Would he ever contact you directly for questions about

19  HSU's activities or stats or things of that nature?

20  A.  No.  He was included on a text message, though.  So when we

21  would interdict a load vehicle, there would be a group

22  text message.  If my lieutenant was unavailable or out of town,

23  I would send it directly to Chief Sands, and he would be one of

24  the only ones that actually would reply pretty quickly.

25  Q.  And did Chief Sands ever show up at HSU operations?

1    A.  Him and Chief Trombi showed up at a workplace enforcement

2    one down at 19th and Buckeye.  I remember they pulled up in a

3    vehicle.

4    Q.  Do you remember an incident that you were present for

5    involving a phone conversation between Sergeant Brett Palmer

6    and Mr. Arpaio?

7    A.  Yes.

8    Q.  And do you remember what the context was for that phone

9    conversation?

10   A.  It was during the time when the sheriff's office wasn't

11   exactly seeing eye to eye with ICE, and ICE wouldn't accept

12   some unaccompanied minors that were intercepted in the load

13   vehicle.  So they were going to have to be taken to

14   Casa Grande.  The PIO and the sheriff had called Brett on

15   speaker phone.

16         MR. DENNIS WILENCHIK:  Objection, Your Honor.  I don't

17   want this getting into a narrative of hearsay.

18         THE COURT:  I think he's going to relate something he

19   heard the sheriff say.  Is that right?

20         THE WITNESS:  Yes, ma'am.

21         THE COURT:  So to the extent he's going to give us a

22   statement made by the defendant, the objection is overruled.

23         MR. DENNIS WILENCHIK:  Well, excuse me, but I thought

24   he was relating something also Palmer was saying, is why I

25   interrupted.

1          THE WITNESS:  May I continue?

2          THE COURT:  Please continue.

3          THE WITNESS:  Okay.  So we were in Brett's office on

4    speaker phone.  I could hear the sheriff and Brett kind of

5    going back and forth.  The sheriff wanted those kids held in

6    the building until the news media could get there to the

7    enforcement support building.  Brett did reference the order --

8          MR. DENNIS WILENCHIK:  Excuse me.  That's exactly my

9    point, Your Honor.

10         THE COURT:  Okay.  Just tell us what the sheriff said.

11         THE WITNESS:  I don't know exactly what he said, but

12   basically the sheriff wanted the kids held in the building.

13         MR. DENNIS WILENCHIK:  Excuse me, Your Honor.  If he

14   doesn't know exactly what the sheriff said, I would --

15         THE COURT:  To the best of your recollection, what did

16   the sheriff say?

17         THE WITNESS:  He wanted to wait until the media got

18   there with the kids still in the building, and Brett wanted to

19   get rid of the kids and take them to Casa Grande.

20         MR. DENNIS WILENCHIK:  Objection.  Ask that part be

21   stricken as hearsay.

22         THE COURT:  The motion to strike is denied.  Please

23   ask your next question.

24   Q.  (BY MR. KELLER)  Was the preliminary injunction

25   specifically referenced in that conversation?

TROWBRIDGE - DIRECT

1   A.  Yes.

2   Q.  Did that change the sheriff's position about holding the

3   kids at the office?

4   A.  No.

5           MR. DENNIS WILENCHIK:  What a liar.

6           THE COURT:  What was the outcome -- What was the final

7   outcome of that conversation?

8           THE WITNESS:  The kids were taken to Casa Grande as

9   soon as possible.

10  Q.  (BY MR. KELLER)  What was your general practice when you

11  were the sergeant on hand and an interdiction intercepted

12  children?

13  A.  I would usually have the detention officer that was on

14  scene contact ICE right away and try to get rid of them as

15  quick as we could.

16  Q.  Why did you do that?

17  A.  Because I didn't want it to turn into a kind of an event.

18  And it's easier, if they're kids, just get them to an ICE

19  facility so they could take care of them.

20  Q.  Why would it turn into an event?

21  A.  Once the command staff knew that there's kids involved, if

22  there's cameras and stuff like that.

23  Q.  Meaning media cameras?

24  A.  Yes.

25  Q.  That the command staff would want to be present?

TROWBRIDGE - DIRECT

1   A.  Present or at least have the media there to usually film

2   them as they're walking out the building.

3           MR. KELLER:  If I could have just a moment, Your

4   Honor?

5           THE COURT:  I'm curious if you were in a situation

6   where you pulled over a vehicle and arrested the driver, and

7   the passengers were minors who did not have any relatives that

8   they were able to identify close by, what options as a law

9   enforcement officer do you have for the care of those minors?

10          THE WITNESS:  In a usual situation, you'd contact CPS,

11  and they would take custody of the kids.

12          THE COURT:  So there's the possibility of CPS.  If

13  these minors you believed were from another country, you would

14  then attempt to turn them over to ICE or Border Patrol instead?

15          THE WITNESS:  Correct.

16          THE COURT:  Would you also have the option to turn

17  them over to CPS?

18          THE WITNESS:  It depends.  Usually in the interviews

19  with the adults in the vehicle, nobody would take -- I don't

20  want to say ownership, but nobody would say, yes, that's my

21  child.  And they would just say, hey, they're aunt lives in the

22  Indianapolis or something, and we're trying to get them there.

23          THE COURT:  So could you have turned them over to

24  Child Protective Services?

25          THE WITNESS:  I guess we could have, yes.

1          THE COURT:  But did you ever do that?  It was always

2     either to ICE or Border Patrol?

3          THE WITNESS:  Correct.

4          THE COURT:  Okay.  Thank you.

5     Q.  (BY MR. KELLER)  Just to be clear, there were not state

6     charges on these minors that we're discussing?

7     A.  No.

8     Q.  And in the incident where Sergeant Palmer was having the

9     disagreement with Mr. Arpaio, there were no state charges

10    pending against those minors?

11    A.  No.

12    Q.  This conversation occurred while you were sergeant in HSU?

13    A.  Yes.

14    Q.  And while Brett Palmer was a sergeant in HSU?

15    A.  Yes.

16          MR. KELLER:  No further questions, Your Honor.

17          THE COURT:  Mr. Wilenchik, you may cross-examine.

18                    CROSS-EXAMINATION

19    BY MR. DENNIS WILENCHIK:

20    Q.  Sergeant Trowbridge, are you still a sergeant at MCSO?

21    A.  Yes, sir.

22    Q.  And what unit?

23    A.  I'm in the District Two patrol.

24    Q.  Okay.  How long were you at HSU?

25    A.  Two years.

1    Q.  What years were those?

2    A.  From March of 2011 to March of 2013.

3    Q.  Okay.  So when the PI, as we've referred to it -- You know

4    what I mean by that?  The injunction, preliminary injunction

5    order, came out in December.  You were at HSU?

6    A.  Correct.

7    Q.  As a sergeant?

8    A.  Yes.

9    Q.  And if I understand how things worked from what I've read,

10   Sergeant Palmer would instruct his group on the meaning of that

11   order, and you would instruct yours?

12   A.  To the best that we knew what the order was at that time.

13   Q.  Okay.  We'll get into that.

14           So -- But basically that's how it would work, right?

15   He had his group?  You had yours?

16   A.  Correct.

17           THE COURT:  Which was which?  You have what group?

18           THE WITNESS:  Sergeant Palmer and I were both the

19   interdiction sergeants, and then separate was the enforcement

20   support -- or the employer sanctions.

21           THE COURT:  Workplace.  So both of you were on

22   interdiction, and there was somebody else that was in charge of

23   the workplace enforcement?

24           THE WITNESS:  Correct.

25           THE COURT:  Thanks.

1    Q.  (BY MR. DENNIS WILENCHIK)  But basically when I said

2    that -- and I used that loosely; it's getting late -- you had a

3    group of people, and he had a group of people split up, right?

4    A.  Correct.

5    Q.  And did you work cooperatively together on cases, or would

6    it be separated out, if you understand my question?

7    A.  Yeah.  It depended.  Sometimes we'd work the same day.

8    Sometimes we would work opposite days.

9    Q.  Okay.  So your group might work with Palmer's group on

10   cases?

11   A.  Yes.

12   Q.  Okay.  Let's start -- I'm going to be a little bit out of

13   order, and I apologize, but this conversation that you related

14   with the sheriff, first of all, when did you say this

15   conversation was?

16   A.  I don't remember the exact date.

17   Q.  Can you give us any kind of time frame?

18   A.  It was during my time in human smuggling.

19          THE COURT:  Before or after the

20   preliminary injunction, if you know?

21          THE WITNESS:  I believe it would be after.

22   Q.  (BY MR. DENNIS WILENCHIK)  You believe it would be after

23   why?

24   A.  Just I had been there for a little while in the unit.

25   Q.  Do you know for a fact, or is that a guess?  I just need to

1    know.

2    A.  I don't know for a fact, no.

3    Q.  Okay.  So it could have been before?

4    A.  Possibly.

5    Q.  Now, in any event, am I right in understanding that at the

6    end of this conversation that you listened to with Sergeant

7    Palmer and the sheriff, that the sheriff ultimately agreed to

8    do what Sergeant Palmer had recommended he thought should be

9    done?  Am I getting that right?

10   A.  I'm not sure if I'd say agreed.  It wasn't a very --

11   Q.  Wait a minute.  When you say you're not sure they agreed,

12   the sheriff is in charge of you and Palmer and the entire

13   office?

14   A.  Correct.

15   Q.  What he says in the office I assume would be the law in the

16   sense -- and I mean it colloquially -- but I mean in the sense

17   that if he ordered somebody to do something, he could do that?

18   A.  He could.  And that's why the conversation stuck out,

19   because Sergeant Palmer wasn't doing what the sheriff wanted

20   him to do.

21   Q.  Which the last time I checked is called insubordination.

22   Would you agree?

23   A.  Correct.

24   Q.  And the sheriff didn't remove him from his position, right?

25   A.  No.

1   Q.  He didn't tell him to get you on the phone so he could tell

2   you what to do, right?

3   A.  No.

4   Q.  He didn't order Palmer to do something against Palmer's

5   will ultimately, did he?

6   A.  No.

7   Q.  In fact, getting back to my question, the sheriff actually

8   ultimately came to -- if you don't like the word agree -- to

9   accede to what Palmer had said he should do.  Isn't that about

10  the size of it?

11  A.  You could put it that way, I guess, yes.

12  Q.  I am putting it that way.

13  A.  Okay.

14  Q.  Do you have any problem with that?

15  A.  No.

16  Q.  So the sheriff listened, had an opinion, expressed it.  If

17  I understand this correctly, Sergeant Palmer, in your presence,

18  disagreed with it, right?

19  A.  Yes.

20  Q.  You probably agreed with Palmer, right?

21  A.  Yes.

22  Q.  And you didn't say anything, but Palmer did the talking?

23  A.  Yes.

24  Q.  And Palmer said:  Sheriff, I don't think that's right.  I

25  disagree with it, and here's why.

1          That's called, in my book, conversation with people

2    that happens every day.  Would you disagree with that

3    characterization that you disagree with people, and you have a

4    conversation and ultimately come to a conclusion?

5    A.  Sure.

6    Q.  And that's what happened, isn't it?  He expressed a

7    disagreement with the sheriff.  Sheriff didn't fire him didn't

8    cite him for it, didn't claim he was insubordinate.  All of

9    that correct so far?

10   A.  Correct.

11   Q.  Didn't send him off with -- to Sousa with some kind of note

12   that he should be reprimanded for it, right?

13   A.  Correct.

14   Q.  Didn't order him to do it against his will, right?

15   A.  No.

16   Q.  And finally said okay, that's fine, you're right, do it.

17   Right?

18   A.  I guess.

19   Q.  And that's how it ended, right?  That was the end of it?

20   A.  Pretty much.

21   Q.  Okay.  And are you trying -- I don't mean this -- Let me

22   rephrase that.

23          You are not trying to suggest to the Court in any way

24   that there's anything wrongful about that action, correct?

25   A.  I'm not sure how the Court views it.

1   Q.  No, no.  You're not trying to suggest to the Court that you

2   feel that there was something wrongful the sheriff was doing as

3   a result of the end of that conversation?

4   A.  No.  I'm just telling you what happened.

5   Q.  Okay.  That's fair.

6        And ultimately what happened is what you and Palmer

7   recommended should happen, right?

8   A.  Correct.

9   Q.  Now, let me be clear on this.

10       You felt that should happen and advised the sheriff,

11  and he agreed and acceded to it, because both of you, when the

12  order came out, assuming this conversation to be after the

13  order, both of you had been at HSU when the order came out.  So

14  far so good?

15  A.  Yes.

16  Q.  And both of you read the order yourselves.  Isn't that also

17  true?

18  A.  Yes.

19  Q.  Now, I apologize, because it's really hard for me to hear

20  back there, some of this, but -- if you went over this, but

21  what is your educational background?

22  A.  I have a bachelor's degree from Arizona State University in

23  criminal justice.

24  Q.  Are you proud of that?

25  A.  Yeah.

1   Q.  Do you think you know how to read things like an order,

2   right?

3   A.  Yeah.

4   Q.  And you didn't rely on anybody else telling you what it

5   meant.  You actually went along with Palmer and read it, right?

6   A.  Yes.

7   Q.  And I would take it that you discussed it with Palmer so

8   that you could discuss it to the HSU folks.  Would that be a

9   fair assumption?

10  A.  It would be.  I don't remember the details, but yes.

11  Q.  Sure.  It's been a long time, right?

12  A.  Yes.

13  Q.  And would it also be fair for me to assume, based on what

14  would be normal protocol, that you would have probably

15  discussed it with Lieutenant Sousa as well in terms of his

16  understanding of it after his reading of it since he was in

17  charge of both of you?  Would that be a fair assumption?

18  A.  Yes.

19  Q.  And you would have discussions not only with him and Palmer

20  but with also the HSU guys themselves about it, right?

21  A.  Occasionally, yes.

22  Q.  And you actually trained your folks on it like Palmer did;

23  is that fair?

24  A.  Yes.  Not in as much detail, I don't think, as Palmer did.

25  Q.  Okay.  Well, is there any reason for that or just that's

1    the way Palmer is?

2    A.   That's just the way Palmer is.

3    Q.   Okay.  You weren't trying to short shrift the order in any

4    way?

5    A.   No.

6    Q.   And where did you get the order to review it?

7    A.   I believe it was sent via e-mail probably a week or so

8    after the order had come out.

9    Q.   And was that an e-mail from Tim Casey citing the order or

10   was it the actual order?

11   A.   I'm not sure.

12   Q.   So in any event somebody -- would it be Sousa? -- sent you

13   guys the -- either the order or the relevant portion of the

14   order for you to read.  Would that be accurate so far?

15        THE COURT:  Well, let's find out which one it was.

16   Did you get the full order?

17        THE WITNESS:  I don't remember, ma'am.

18        THE COURT:  Or -- so you don't recall if you actually

19   got a copy of the judge's order or some summary of it?

20        THE WITNESS:  Yeah.  I'm not sure.

21        THE COURT:  Thank you.

22   Q.   (BY MR. DENNIS WILENCHIK)  Wouldn't it be accurate to say,

23   if you recall, that you actually did at some point read the

24   order itself?

25   A.   Yes.

1    Q.  Okay.  But initially you got one or the other initially,

2    right?

3    A.  Yes.

4    Q.  Because it was told to you that it was important that the

5    HSU folks at least understand this order prior to the holidays

6    and even before the troops got the order, correct, that is, the

7    regular patrols?

8    A.  Yeah.

9    Q.  So when you reviewed that order and discussed it with

10   Palmer and/or Sousa, did you think that there was anything

11   different about what you were already doing that needed to be

12   done at that time?

13   A.  I don't remember those discussions in detail.

14   Q.  Okay.  Well, do you remember if you felt that there was

15   something that needed to be really changed about what you guys

16   were doing at that time at HSU?

17   A.  No, I don't.

18   Q.  Okay.  Now, those discussions weren't with the sheriff,

19   right?

20   A.  No.

21   Q.  In those discussions, there was never any edict that the

22   sheriff said don't read the orders or any summary of them,

23   right?

24   A.  No.

25   Q.  Nothing where he said don't even discuss the order, right?

1   A.  No.

2   Q.  Certainly nothing in which you were led to believe the

3   sheriff had ordered that the order was not to be followed in

4   some way, right?

5   A.  No.

6   Q.  And so you guys who were experienced in this area were

7   actually looking at the order interpreting it as best you guys

8   could, right?

9   A.  Correct.

10  Q.  Do you know if the other guys similarly had college

11  backgrounds, Sousa, Palmer?

12  A.  I do not.

13  Q.  Okay.  But I assume -- and I don't mean this again

14  pejoratively or facetiously or whatever -- you considered

15  yourself reasonably intelligent enough to understand what

16  you're reading?

17  A.  Yes, correct.

18  Q.  And did you think you understood what the order said?

19  A.  Are you asking now or at the time?

20  Q.  No.  Let's be clear on this, because I don't want any

21  misunderstanding.  At the time, at the time, not after May of

22  '13 when the final order came out that may have been a lot more

23  detailed, and people told you what you'd been doing was wrong

24  because of it -- we'll get to that -- but at the time up until

25  that final order, did you guys think that you were doing

1    something that was in violation of this order as you read it

2    and tried to understand it?

3    A.  No.

4    Q.  Was there anything in that order that you remember reading

5    that was very clear to you as to anything you should be doing

6    to change the practices that you just testified about?

7    A.  Not to me that stuck out, no.

8    Q.  Okay.  Or that was specific?

9    A.  No -- Yes.

10   Q.  Okay.  And did you think you were violating anyone's

11   constitutional rights to the extent you understood them?

12   A.  Not at all, no.

13   Q.  Would you want to violate the order or anyone's

14   constitutional rights?

15   A.  No.

16   Q.  No one ever ordered you to do that?

17   A.  No.

18   Q.  So as we started out, you supervised deputies in these

19   interdiction patrols, and as part of your supervisory duties,

20   you told us you would actually help train them.  So my question

21   is:  Do you know if what you told -- Do you know what you told

22   them about what you interpreted the order to mean?

23   A.  No, I do not.

24   Q.  If I were to tell you that you told them that basically

25   your reading of it was that they were not to simply stop people

1  and detain them on the basis of race alone, would that be in

2  your mind a fair understanding of what you felt the order was

3  saying?

4  　　　　MR. KELLER:  Objection.  Assumes facts not in

5  evidence, Your Honor.

6  　　　　THE COURT:  Sustained.

7  　　　　MR. DENNIS WILENCHIK:  I'm at a loss.  I'm trying to

8  comply, Your Honor, and I don't understand.

9  　　　　THE COURT:  Well, your question said, "If I were to

10 tell you that you told them this."

11 　　　　MR. DENNIS WILENCHIK:  Yes.

12 　　　　THE COURT:  There's no evidence that he told them what

13 you just said.  So that assumes facts not in evidence.  You'll

14 have to try to rephrase your question.

15 　　　　MR. DENNIS WILENCHIK:  I just want the record to

16 reflect on cross-examination that is a standard practice, but,

17 anyway, I'll try to comply.

18 　　　　THE COURT:  Not in this Court, Mr. Wilenchik.

19 　　　　MR. DENNIS WILENCHIK:  Well, I get that.

20 Q.  (BY MR. DENNIS WILENCHIK)  Let me rephrase that.  Okay.  I

21 think you said you don't know exactly what you would have told

22 them after this many years, right?

23 A.  Correct.

24 Q.  Have you looked at that order recently?

25 A.  No.

1    Q.  Let me show you Exhibit 1 and the pertinent language in it,

2    if I may.  Can we --

3           Maureen -- I'm sorry -- can you give the witness

4    Exhibit 1.

5           Let's go down to the last page where I think the

6    pertinent order language is.

7           And look at number five.  Okay.  Do you have that in

8    front of you, sir?

9    A.  Yes, sir.

10   Q.  Okay.  Is this basically fairly stated the injunction as

11   you would have read and understood it at the time?

12   A.  Yes.

13   Q.  If you had in fact read the entire order, it would have

14   pretty much come down to this.  Would that be fair?

15          MR. KELLER:  Objection, Your Honor.  Foundation.

16          THE COURT:  Sustained.

17          MR. DENNIS WILENCHIK:  You know, I just don't

18   understand this, Your Honor.  This is cross-examination, and I

19   don't understand your rulings.

20          THE COURT:  Try another question.

21   Q.  (BY MR. DENNIS WILENCHIK)  Did you believe that this

22   basically was the injunction?

23   A.  Are you speaking of just line five or --

24   Q.  Yeah.

25   A.  Pretty much, because I remember that "without more" phrase

1    was kind of something that stuck out.

2    Q.  Is there anything else in the order that you remember

3    reading that you think affected this language in Paragraph 5?

4    A.  No.

5    Q.  Okay.  So looking at Paragraph 5, which appears to be the

6    actual order of injunction in this order, this 40-page order,

7    which was on a motion for summary judgment, MCSO,

8    blah-blah-blah-blah, detaining a person based only on -- Do you

9    see that?

10   A.  Yes.

11   Q.  Did that stick out in your mind too as to what that means,

12   "only on"?

13   A.  A little bit, yes.

14   Q.  Yeah.  What do you think that means?  Do you have any idea?

15   A.  Basically only on the fact that they're illegally in the

16   country without more.

17   Q.  Isn't that what I said earlier?

18   A.  Yes.

19   Q.  So what about the "without more"?  Does that kind of imply

20   the same thing to you?

21   A.  Yes.

22   Q.  And so reading the sum total of that, does that mean to you

23   what I said, which is pretty much that you interpreted this as

24   well as, to your knowledge, the others that you discussed there

25   at HSU that we discussed as being essentially an injunction

1    against stopping people on the basis of race and detaining them

2    on that basis?

3    A.  Yeah.

4    Q.  Or that they're here illegally?

5    A.  Yeah.

6    Q.  Okay.  And it doesn't tell you what you can do with respect

7    to calling H -- excuse me -- Border Patrol or ICE, right?

8    A.  No.

9    Q.  Doesn't tell you that practice is unlawful, right?

10   A.  No.

11   Q.  Doesn't tell that you it's a violation of any law to do

12   that, right?

13   A.  No.

14   Q.  Doesn't say that maybe without more is the other law that

15   applies, right?

16   A.  It does not, no.

17   Q.  Okay.  All right.  So pretty much would that be what we see

18   here and have just discussed what you would have told your

19   people to make sure they weren't doing?

20   A.  Most likely, yes.

21   Q.  Okay.  And is there anything else you can think of as you

22   look back on it now reading this that you would have or could

23   have told them about what you were reading?

24   A.  Not that I remember, no.

25   Q.  Now, were you aware of the fact that Brett Palmer was

1   preparing training scenarios?  Did he ever discuss that with

2   you in order to get to Tim Casey for his review?

3   A.  I don't remember him ever discussing them with me, no.

4   Q.  Okay.  You never saw any training materials that were ever

5   issued to general population of deputies, right?

6   A.  There was a briefing board, I believe, that came out.

7   Q.  I mean -- pardon me -- with respect to the preliminary

8   injunction order.

9   A.  Not that I recall, no.

10  Q.  There was one we know that came out later after the

11  permanent injunction.  But sticking just, if you can -- and I

12  know it's confusing -- to the preliminary injunction order,

13  there never was a briefing board, an eLearn thing, or anything

14  like that, right?

15  A.  Not that I'm aware of, no.

16  Q.  Do you know why?

17  A.  No.

18  Q.  Do you have any reason to know or suspect even in any way

19  that the sheriff had ordered that not to happen?

20  A.  No.

21  Q.  Assuming Brett Palmer was working on that with

22  Lieutenant Sousa, would that be an indication to you based on

23  your experience at HSU that they couldn't have believed that

24  the sheriff didn't want to train people on what the order said?

25          MR. KELLER:  Objection.  Foundation.  Assumes facts

1    not in relevance -- or evidence and compound.

2         THE COURT:  Sustained.

3    Q.  (BY MR. DENNIS WILENCHIK)  Based on your experience at HSU,

4    would you have any reason to know whether or not the training

5    didn't get out based on anything the sheriff did?

6    A.  That's not something I would know, no.

7    Q.  Did you ever in any way hear from your colleagues that they

8    were ordered by anyone to hold up on the training?

9    A.  No.

10   Q.  And you did train your people at HSU?

11   A.  Again, I believe that, like, an e-mail went out with the

12   order or part of the order, at least the pertinent part, and

13   I'm assuming we were told obviously to read it.

14   Q.  Okay.  And my question really was beyond them just reading

15   it, did you have discussions with them?

16   A.  Again, I don't remember in detail.

17   Q.  You could have?

18   A.  Yes.

19   Q.  If they had questions, wouldn't you be the likely person

20   they would go to?

21   A.  Yes.

22   Q.  And if you didn't understand it, who would you go to?

23   A.  Lieutenant Sousa.

24   Q.  Do you ever remember that happening?

25   A.  No.

1   Q.  Okay.  So would it be accurate to say that during the time

2   that you were at HSU, that most of the time the field deputies,

3   when they encountered either a vehicle load or illegal aliens,

4   that they would generally be instructed to contact HSU for any

5   guidance?

6   A.  Yes.

7   Q.  And that's what generally happened, right?

8   A.  Correct.

9   Q.  And that's how you mostly got involved, right?

10  A.  Not typically.  We'd actually interdict the loads ourselves

11  on the freeways.

12  Q.  Okay.  But with respect to the field deputies, that's how

13  you would get involved.  They would contact you for -- and have

14  you come out there and deal with it, right?

15  A.  Occasionally, yes.

16  Q.  Okay.  Were you ever made aware, for example, that there

17  were wholesale things happening out in the field with deputies

18  that you felt, given what we've just discussed your

19  interpretation of the order was, that was in any way a

20  violation of law or something that HSU should get involved in

21  to clarify with them?

22  A.  Not that I'm aware of, no.

23  Q.  Okay.  So if, generally speaking -- can't go into every

24  example -- generally speaking that would happen where a field

25  deputy might have stopped a group of illegal aliens in a

1   traffic stop or in some other situation that involved some

2   criminal activity.  Was it your experience that they would know

3   to either contact your office or Border Patrol?

4   A.  It depends on the location.  But typically, yes, their

5   supervisor would contact either myself or Brett, Sergeant

6   Palmer, and then we would determine if the deputies, if we were

7   going to call them out to go down and deal with it or not.

8           THE COURT:  Excuse me, Mr. Wilenchik.  We're going to

9   take our afternoon break.  We'll reconvene at 3:00.  The Court

10  is in recess.

11      (Proceedings recessed from 2:46 p.m. until 3:05 p.m.)

12          THE COURT:  The record will show the presence of

13  counsel and the defendant.  You may continue your

14  cross-examination, Mr. Wilenchik.

15          MR. DENNIS WILENCHIK:  Thank you, Your Honor.

16  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  I want to come back,

17  before I move on, to this discussion that occurred with

18  Sergeant Palmer that you overheard.  Okay?  First of all, where

19  were you at that time?

20  A.  Where was I in my location?

21  Q.  Physically.

22  A.  In Sergeant Palmer's office.

23  Q.  Isn't it true -- So you were familiar with the

24  circumstances then?

25  A.  As far as what?

1   Q.  What was going on.

2   A.  Yes.

3   Q.  Isn't true that Sergeant Palmer had already ordered these

4   people transported down to Casa Grande already before the

5   sheriff ever contacted him on the cell or he contacted the

6   sheriff?

7   A.  Not to my knowledge, no.

8   Q.  Do you know that for a fact?

9   A.  No.  I believe they were still in the building.

10  Q.  They were still in the building?

11  A.  Yes.

12  Q.  Well, why were they being detained in the building if you

13  guys understood you couldn't detain them, except to send them

14  to Border Patrol?  Is that because Border Patrol directed you

15  to hold them?

16  A.  No.  We were waiting to transport them down there.

17  Q.  Okay.  So you felt that was reasonable?

18          THE COURT:  How did they get in the building, I think

19  is --

20          THE WITNESS:  They were in a human smuggling load

21  vehicle.

22          THE COURT:  So there was a load vehicle.  Some people

23  were arrested.  You couldn't leave the children by the side of

24  the road.

25          THE WITNESS:  Yeah, correct.  So then they were

1    brought in with the adults who were charged with the state

2    crime type stuff.

3    Q.   (BY MR. DENNIS WILENCHIK)   And I take it it took some time

4    to investigate the human smuggling issue, correct?

5    A.   Correct.

6    Q.   And let me ask you:   The sheriff in that conversation

7    didn't order any of the deputies to take over from you and

8    Palmer because of his disagreement initially, correct?

9    A.   To take over how?   What do you mean?

10   Q.   Say, "Stand down.   I'm going to have some guys, if you

11   won't listen to me, to take over from you"?

12   A.   No.

13   Q.   Okay.   Could have done that, right?

14   A.   Could have.

15   Q.   And you also testified, I remembered, on direct -- at least

16   this is what my notes say, so feel free to correct me -- that

17   the PIO, preliminary injunction order, didn't change the

18   sheriff's decision, but in fact you just -- Did I get that

19   right so far?   Are those the words that were used?

20   A.   It seemed like it didn't -- that part didn't matter,

21   correct.

22   Q.   When you say that part didn't matter, is that your

23   conclusion from ultimately him agreeing with you to do what you

24   and Palmer felt was in compliance with the order?

25   A.   Again, I wouldn't say it was in agreement.

1   Q.  Well, when you say it wasn't in agreement, if the sheriff

2   had the ability to order you not to do it, and he stood down

3   and didn't do that and finally allowed you to do what you

4   wanted to do, what the heck would you call that?

5   A.  I'm not sure.

6   Q.  Okay.  I call that an agreement.  Okay?

7   A.  Okay.

8           MR. KELLER:  Objection, Your Honor.  Argumentative.

9           THE COURT:  Sustained.

10  Q.  (BY MR. DENNIS WILENCHIK)  What do you call that?

11  A.  I don't know.

12  Q.  Certainly it wouldn't be a disagreement at that point,

13  right?

14  A.  The conversation sounded like a disagreement, yes.

15  Q.  Until he finally said okay, right?  Did I get that right?

16  A.  I don't think he said okay, but --

17  Q.  Oh, okay.  What did he say?

18  A.  I don't know what he said, but ultimately the kids did go

19  to Border Patrol.

20  Q.  Well, how could that have happened if the sheriff disagreed

21  with it or ordered it not to happen?  I don't understand this

22  communication issue.

23  A.  I'm not sure.

24  Q.  Not sure.  Obviously wouldn't that mean, however you want

25  to characterize it, the sheriff stood down and allowed you and

1    Palmer and/or agreed with you as to your interpretation that it

2    was okay to send people to Border Patrol?

3    A.  Sure.

4    Q.  And if I understand the sum total of your testimony, sir,

5    that is what you believed and Palmer believed at the time that

6    you were telling the sheriff, that it was okay for you then to

7    send these people after the interdiction down to Border Patrol?

8    That was your interpretation of the order that you and he had

9    both read and Sousa, right?

10   A.  Correct.  But in hindsight, that was wrong also.

11   Q.  Well, okay.  You know -- Okay.  Let's talk about that while

12   you're on it.  In hindsight, when you say in hindsight, and you

13   told these attorneys from the government that you believed that

14   the sheriff had done something wrong or something to that

15   effect -- Do you remember that testimony?

16   A.  Yes.

17   Q.  Were you referring to this conversation with Palmer or in

18   general the sheriff's practices?

19   A.  Just that conversation with Palmer.

20   Q.  Okay.  And we've already exhausted that pretty much, right?

21   A.  Yes.

22   Q.  So let's talk now about in hindsight.  Obviously we all

23   know hindsight to be 20/20, but the hindsight that you're

24   talking about has nothing to do with the preliminary injunction

25   order, if I understood you correctly.  And I want this

1   perfectly clear before I sit down.  It has to do with the fact

2   that later you were told by others that what you had been doing

3   was wrong based on Judge Snow clarifying things in the

4   permanent injunction sometime in '13.  Correct?

5   A.  Yes.

6   Q.  That's what you're talking about, right?

7   A.  Yes.

8   Q.  No ifs, ands, buts, or disagreements about that?

9   A.  No, not at all.

10  Q.  Okay.  You didn't think you were doing anything wrong until

11  you were told by others -- and we will come into the detail of

12  that in a minute -- that there was something that was going on

13  wrong in hindsight, right?

14  A.  Yes.

15  Q.  Now, you have no testimony to offer to this Court

16  whatsoever that Sheriff Arpaio ever intentionally intended or

17  did willfully disobey Judge Snow's order based on what he

18  understood the order to be, right?

19          MR. KELLER:  Objection as to foundation, Your Honor.

20          THE COURT:  Overruled.  You may answer.

21          THE WITNESS:  Can you ask that again, sir?

22          MR. DENNIS WILENCHIK:  I'll have the court reporter do

23  it because I'm not as smart as she is to be able to read back.

24      (Requested portion of the record was read by reporter.)

25          THE WITNESS:  Just that conversation -- again, I keep

1    going back to it -- but with Sergeant Palmer.

2    Q.  (BY MR. DENNIS WILENCHIK)  I'm sorry?

3    A.  Just the conversation with Sergeant Palmer.

4    Q.  But I thought we've already resolved, sir -- maybe I missed

5    it -- that in that conversation, the sheriff was actually

6    saying don't take them down to Border Patrol, which, as I

7    understand it, would have been more in line with what Judge

8    Snow said in his '13 order.  Would you understand that to be

9    correct?

10   A.  Somewhat.  But if the people are still in the building and

11   they're detained, then it's incorrect.

12   Q.  Okay.  And you told him that, right?  You told him you

13   thought he was incorrect?

14   A.  Brett did, yes.

15   Q.  Yeah.  And he said nothing to argue with you after that

16   about it.  He didn't insist on detaining them for him to come

17   down there, right?

18   A.  He wanted him held there until the media got there.

19   Q.  But he then relented, and you did take them down to Border

20   Patrol, and he did not stop you, as was his right and power to

21   do so, correct?

22   A.  Correct.

23   Q.  And you weren't cited or anything else for your

24   participation in what might be considered to be insubordination

25   by the sheriff, were you?

1    A.  No, sir.

2    Q.  He didn't later call you in his office and chew you out

3    because you expressed your opinion to him as to how you read

4    the order, right?

5    A.  Sergeant Palmer did, yes.

6           THE COURT:  I'm sorry.  I don't think he said he ever

7    said anything to the sheriff during this conversation.  I think

8    he said he was listening, but Palmer --

9           MR. DENNIS WILENCHIK:  Yeah.  I think he just

10   clarified that.

11          THE COURT:  Right.

12   Q.  (BY MR. DENNIS WILENCHIK)  And my question still remains

13   but a little different, to be clear on it:  Did the sheriff

14   know you were there at the time?

15   A.  Probably not, no.

16   Q.  Okay.  Did you say anything on that phone conversation to

17   express your disagreement?

18   A.  No, I did not.

19   Q.  Why?

20   A.  At that time Sergeant Palmer was the senior sergeant in the

21   unit, so it was something that he was dealing with on the

22   phone.

23   Q.  Okay.

24   A.  And it was his guys that intercepted the load vehicle.  It

25   wasn't mine.

1    Q.  You never heard that Sergeant Palmer was ever reprimanded

2    for that discussion with the sheriff; isn't that true?

3    A.  That is true.

4    Q.  Ultimately what happened was what you and Palmer thought

5    should happen?

6    A.  Yes.

7    Q.  Wouldn't the sheriff as the duly elected sheriff of the

8    county have the right, as far as you were concerned, to come

9    down personally to investigate what was going on and the

10   circumstances of any detention if he wanted to?

11   A.  Yes, he could.

12   Q.  So he could have done that, right?

13   A.  Yes.

14   Q.  But he didn't?

15   A.  No.

16   Q.  Now, in determining how to conduct these operations, you

17   never personally asked the sheriff's permission to pursue what

18   you read and interpreted in the order consistent with Palmer,

19   right?

20   A.  No.

21   Q.  You didn't think you needed the sheriff's permission on any

22   of that, right?

23   A.  Need his permission how?  To do my job?

24   Q.  To do your job and to read the order and to follow it.

25   A.  No.  I would assume that it would come down from the chain

1    of command if there was something new that we needed to know.

2    Q.  Right.  And you guys were adamant, from what I just heard,

3    about how it should be, based on your reading?  No doubt about

4    that, right?

5    A.  Yes.

6    Q.  And nobody at the sheriff's office told you, well, you

7    can't have that understanding based on what you've read and

8    understood, right?

9    A.  No.

10   Q.  Or that frankly they had any difference of opinion of what

11   it said on its face either, right?

12   A.  No.

13   Q.  Did you ever talk to Tim Casey about his interpretation

14   that he has claimed now that he had that was different than

15   yours about the order?

16   A.  No.

17   Q.  Did you ever hear at the time in any way as one of the two

18   sergeants under Lieutenant Sousa that Tim Casey had a

19   difference of opinion as to how you should be operating?

20   A.  No.

21   Q.  Did you ever at any time while you were at HSU, prior to

22   the final order coming out, hear what I just said, that Tim

23   Casey disagreed with what you guys were doing and how you were

24   doing it?

25   A.  No.

1   Q.  Did you ever hear the term arrest or release before '13?

2   A.  No.

3   Q.  Now, while we're on it, let's talk now about this meeting

4   that you testified about, and you said a lot of people were

5   there, including Mr. Casey and Mr. Liddy?

6   A.  Correct.

7   Q.  Who is Mr. Liddy, as you understood it?

8   A.  He was some type of counsel for the sheriff's office at the

9   time.

10  Q.  Did you ever hear from Mr. Liddy that anything going on at

11  HSU was illegal or wrongful or a violation of the order?

12  A.  No.

13  Q.  So now in '13, the final order comes out.  Did you read the

14  final order, sir?

15  A.  Yes.

16  Q.  And when you read it, would you agree with me that it was

17  far more detailed and specific than the preliminary injunction

18  order?

19  A.  Yes.

20  Q.  It was clearer and more definite?

21  A.  Yes, definitely.

22  Q.  And it also contained reference to what the deputies should

23  be told about what the order is?  Is that also accurate or

24  fair?

25  A.  Yes.

1    Q.  I want to be clear now on what this process was once and

2    for all for my purposes.

3            When people were stopped for lawful purposes, not just

4    because they're here illegally, were you on patrols where you

5    would call Border Patrol during the stop and ask them how to

6    proceed?

7    A.  If there was no state statute?  Is that what you're

8    referring to?

9    Q.  Yeah.  If you conclude -- Well, let me back up.

10           THE COURT:  Let's back up.  I assume if you stopped a

11   vehicle and everybody was getting arrested on state charges,

12   there was no contact with federal whatsoever?

13           THE WITNESS:  Correct.

14           THE COURT:  It was only on those situations where you

15   might have been arresting some but not all or arresting nobody?

16           THE WITNESS:  Correct.

17   Q.  (BY MR. DENNIS WILENCHIK)  Right.  And so you couldn't

18   possibly know, if I'm hearing you right, until you decided who

19   you were going to arrest and not arrest to call Border Patrol?

20   Would that sound logical?

21   A.  It was usually ICE, but, yes, same thing.

22   Q.  Well, my understanding was ICE wasn't taking these folks

23   for some time.  Is that accurate?

24   A.  It was for a short time, yeah.

25   Q.  Okay.  And that sort of upset the sheriff, in fact, in that

1    incident you just described, that ICE wouldn't take them, and

2    he didn't like that?

3    A.  I guess not.

4    Q.  Right.  And so, anyway, getting back to it, if they were

5    arrested, you'd just take them to jail, right?

6    A.  Well, yes, eventually.  We would take them to the

7    enforcement support building, do a more in-depth interview, and

8    eventually we would transport them down to 4th Avenue Jail.

9    Q.  Sure.  So there's no need at that point to contact ICE

10   because ICE actually is in the jail, right?

11   A.  Correct.

12   Q.  So it would only be in situations where you make a

13   determination that for whatever reasons, which we could go into

14   a myriad of them, you decide not to finally charge them with

15   something, right?

16   A.  Correct.

17   Q.  And then of course at that point, since you're not taking

18   them to jail, that's when you would call ICE, right?

19   A.  Yes.

20   Q.  If the people were then not arrested -- Do you understand

21   arrest to mean detained essentially?

22   A.  Eventually, yeah.

23   Q.  So at that point are you telling the Court that you and

24   Palmer and Sousa and Sands perhaps had decided that you could

25   still arrest them by detaining them in some way, or were they

1   free to go while you were calling ICE and putting them on the

2   phone with ICE?

3   A.  They were still, when ICE was contacted, they were still on

4   the roadside, and they were still detained at that point until

5   it was investigated, and ICE would talk to them on the phone.

6   Q.  Well, let's go into that.  So when you say detained, I want

7   to understand what you mean by that.  So if somebody is a

8   passenger, as the Judge pointed out, you decide you're not

9   going to arrest them, then you're calling ICE?

10  A.  Yes.

11  Q.  So ICE wouldn't be called at any other point in time?

12  A.  If there was minors in the vehicle or, like, there's a

13  language barrier where I know we had one where a girl was

14  Chinese, and nobody could speak to her.

15          THE COURT:  Let's not take the exceptions.  Let's take

16  it's adults, and somebody's not getting arrested and charged

17  with a state charge.

18          THE WITNESS:  So then ICE would be contacted.

19  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  And you would basically

20  say, "I've got ICE on the phone.  They want to talk to you"?

21  A.  One of the detectives would in Spanish, yes, typically in

22  Spanish tell the person, hey, and the ICE agent would start

23  speaking and ask the person some questions.

24  Q.  You witnessed these things happening?

25  A.  Yes.

1    Q.  And in those situations, was the person told you're under

2    arrest, and you're not free to leave?

3    A.  Not that I know of, no.

4    Q.  Okay.  Well, that was what I was trying to find out.  So in

5    that situation, would it be fair to say most if not all of

6    those people voluntarily would talk to ICE, and in fact most of

7    them even admitted they were illegal?

8            MR. KELLER:  Objection, foundation, Your Honor.

9            THE COURT:  Overruled.  You may answer if you can.

10           THE WITNESS:  I'm not a fluent Spanish speaker, so I

11   don't know all the conversation that was going on between them.

12   But usually, yes, they would voluntarily talk to ICE.

13   Q.  (BY MR. DENNIS WILENCHIK)  Yeah.  I mean, you didn't

14   personally, as you witnessed these -- And you were there

15   personally, right?

16   A.  Yes.

17   Q.  You wouldn't have to run after anybody that ran away when

18   you asked them to talk -- somebody asked them to talk to ICE,

19   right?

20   A.  Occasionally load vehicles would just start to pull over,

21   and everybody would bail out, yes.

22   Q.  Oh, sure, at the beginning.  But what I'm talking about is

23   when you're putting them on the phone with ICE, you didn't have

24   a situation -- or maybe you did -- where they ran away?

25   A.  No, not to my knowledge, no.

1    Q.  Right.  So in that scenario, they voluntarily would be

2    talking to ICE.  And was it your experience, talking with the

3    deputy talking to them, that they -- most of them actually --

4            And you can say no if you want.  I'm asking the

5    question.

6            -- voluntarily talked with ICE and told them they were

7    here illegally?

8    A.  When you have --

9            MR. KELLER:  Objection, foundation, Your Honor.

10           THE COURT:  Sustained.

11           There's no foundation to know at the present time what

12   the individual said on the phone to ICE.

13   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Well, did you determine

14   obviously in each of these instances what they did talk to ICE

15   about as part of your duties?

16   A.  Occasionally, yeah, the detention officer would tell me,

17   hey, you know, they're obviously illegally in the country and

18   stuff like that.  And then we would start to transport them

19   down there.

20   Q.  And that was at the direction of ICE or Border Patrol?

21   A.  Correct.

22   Q.  Did you think that it was lawful for you to cooperate with

23   ICE or Border Patrol at that point?

24   A.  Yes.

25   Q.  Did they essentially ask you to detain them for either them

1    to pick them up or you to take them down?

2    A.  Essentially, yes.

3           THE COURT:  The "they" you're referring to is ICE and

4    then later Border Patrol?

5           THE WITNESS:  Yes.

6    Q.  (BY MR. DENNIS WILENCHIK)  Yeah.  Did you see anything, as

7    far as you were concerned, having read the order, that you

8    thought was unlawful about any of that?

9    A.  At the time, no.

10   Q.  Okay.  And, by the way, you said your other deputies that

11   were involved in these interdictions also from your own

12   knowledge read the order too or were given the order?

13   A.  As far as I know, yes.

14          THE COURT:  Well, I'm sorry.  When you say as far as

15   you know, did you give them the order?

16          THE WITNESS:  It's been quite a long time, so I'm not

17   sure.

18          THE COURT:  So you don't know --

19          THE WITNESS:  No.

20          THE COURT:  -- if they received the full order?

21          THE WITNESS:  Or just partial.

22          THE COURT:  Or just parts of it.  Okay.  And if they

23   got them, would it have been from somebody other than you?

24          THE WITNESS:  Possibly Lieutenant Sousa.  It might

25   have been sent out to everybody.

1           THE COURT:  Okay.  Thank you.

2    Q.  (BY MR. DENNIS WILENCHIK)  Yeah, because you actually got

3    the order from Sousa in an e-mail, right?

4    A.  I believe so, yes.

5    Q.  And you weren't the only one who received it?

6    A.  I don't think so, no.

7    Q.  As you sit here today, is it your belief that it was sent

8    out to the HSU unit?

9    A.  I would think so, yes.

10   Q.  Okay.  So -- And when the Judge asked you whether you read

11   the entire order or part of it, I want to be clear on that too.

12          The relevant part of the order, the part that

13   Mr. Casey in fact had highlighted -- Maybe you don't know this.

14   That may be improper.

15          But were you aware that Mr. Casey actually had

16   highlighted a portion of the order to be read?

17   A.  No, I wasn't.

18   Q.  Okay.  So the portion of the order that you might be

19   referring to would be the portion we looked at, the actual

20   injunction order and what it says?

21   A.  Paragraph 5, yes.

22   Q.  Okay.  Now, I was starting to talk about the discussion

23   when the permanent order came out.  Okay?

24          And you said there were a lot of people there, and

25   Casey and Liddy were there.

1          Do you know why Casey and Liddy were there?

2   A.  No, I don't.  I'm assuming to speak about the order.

3   Q.  Okay.  Did you or Sousa or Palmer -- I assume you three

4   were representing HSU?

5   A.  When the second order came out, it would have been

6   Lieutenant Jakowinicz.

7   Q.  I'm sorry.  You're right.

8          Lieutenant Jakowinicz, you, and Palmer were

9   representing HSU?

10  A.  Probably, yes.

11  Q.  Yeah.  And what was the purpose of that meeting?

12  A.  I'm not sure.  I'm assuming to go over the order, whatever

13  their take on it was.

14          THE COURT:  You were directed to go to the meeting,

15  correct?

16          THE WITNESS:  Yes, I was.

17          THE COURT:  Nobody said what the purpose was?

18          THE WITNESS:  No.

19          THE COURT:  But when you got there, it was about the

20  order?

21          THE WITNESS:  Yes, it was.

22  Q.  (BY MR. DENNIS WILENCHIK)  And can you tell me why there

23  would be a meeting about this order if the sheriff was

24  intending to disobey the court's orders?

25          MR. KELLER:  Objection, foundation, Your Honor.

1          THE COURT:  Sustained.

2   Q.  (BY MR. DENNIS WILENCHIK)  Did anyone at that meeting even

3   mention anything about the sheriff wanting to disobey a court

4   order?

5   A.  No, not to my knowledge, no.

6   Q.  Wouldn't you agree that the very purpose of that meeting

7   was to try to follow the Court order at that time?

8          MR. KELLER:  Objection, foundation, Your Honor.

9          THE COURT:  Overruled.  You may answer based on your

10  recollection.

11          THE WITNESS:  And I don't remember, no.

12  Q.  (BY MR. DENNIS WILENCHIK)  Well, what do remember about the

13  meeting?

14  A.  I just remember that that was the general theme of it, but

15  I don't remember the exact discussion.

16          THE COURT:  The general theme of it being?

17          THE WITNESS:  The court order.

18          THE COURT:  The court order of May, 2013?

19          THE WITNESS:  Correct.

20  Q.  (BY MR. DENNIS WILENCHIK)  And, again, prior to that time,

21  had Mr. Casey or Mr. Liddy shared with you or to your knowledge

22  anybody at HSU their opinions or interpretations?

23  A.  No.

24  Q.  So I may have asked you this earlier, and I apologize if I

25  did, but I believe when you testified on direct that somehow

1    the sheriff may have violated the order, again, that was in

2    hindsight you're saying, correct, based on the meeting and the

3    permanent order?

4    A.  Yeah, I will.  Yeah, I guess you could say that, and also,

5    again, that conversation sounded like he didn't want to exactly

6    follow what the judge had laid out on that conversation with

7    Sergeant Palmer.

8    Q.  Because he wanted to come down there?

9    A.  He wanted the media to come down there, yes.

10   Q.  Okay.  Is there anything in the order about that?

11   A.  Not that I'm aware of.

12   Q.  Okay.  But even so -- once again I repeat -- it was

13   explained to him and reminded him of what your interpretation

14   of the order was.  He didn't balk at that?

15   A.  With Sergeant Palmer, no.  That's ultimately what happened,

16   what we discussed earlier.

17   Q.  I couldn't hear the last part.

18   A.  That's ultimately what happened, that the people were

19   transported.

20   Q.  So during your entire time at HSU, you never thought or

21   believed that this practice, policy that you and the other two

22   gentlemen who were directing HSU were following in any way

23   violated the December 23rd, 2011, preliminary injunction, did

24   you?

25   A.  No, we did not, or I did not.

1    Q.  And the sheriff never met with you either in the presence

2    of those two or separately to tell you that he had some other

3    interpretation than you did, correct?

4    A.  No, he did not.

5    Q.  You believe that HSU was at all times complying with the

6    PIO, correct?

7    A.  At the time, yes.

8    Q.  When you say at the time, as far as you know, to this day

9    it was, other than the fact that Judge Snow later clarified

10   what he thought he meant to say as far as you're concerned in

11   2011, right?

12          THE COURT:  Well, there is that matter of the court

13   order that also has concluded that there were violations of the

14   preliminary injunction.  That's why we're here.

15          MR. DENNIS WILENCHIK:  Yeah.  The court order --

16          THE COURT:  Judge Snow has --

17          MR. DENNIS WILENCHIK:  -- already had concluded,

18   according to Judge Snow, based on his orders of how he

19   interpreted his orders, yes.

20          THE COURT:  But Judge Snow has concluded in a court

21   order that there were violations of the preliminary injunction.

22          MR. DENNIS WILENCHIK:  He has concluded that.

23          THE COURT:  That's correct.

24          MR. DENNIS WILENCHIK:  Which is not binding on this

25   court and has no relevance to the facts based upon what Judge

1    Snow --

2           THE COURT:  Excuse me, Mr. Wilenchik.  It's relevant

3    to the question that you asked.

4           MR. DENNIS WILENCHIK:  Oh, okay.

5           THE COURT:  As to his understanding that there were

6    violations of the court order.

7    Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Well let me add that

8    then.

9           And Judge Snow -- Were you even aware that Judge Snow

10   later held a civil contempt proceeding, which is I think what

11   the Court's referring to?

12   A.  Yes.  I testified in that.

13   Q.  Yeah.  And at that point was there -- Well, were you

14   present in the courtroom through the hearing or just testified?

15   A.  Just testified.

16   Q.  And were you aware that Judge Snow found, for whatever

17   reasons, and based on whatever was put on, that he found that

18   there was a violation of his order civil violation?

19   A.  Yes, yes.

20   Q.  Okay.  And is that also what you're saying causes you to

21   now say that you feel that notwithstanding at the time you

22   didn't know anything was going on wrong, that you later learned

23   it through Judge Snow saying so?

24   A.  In part, yes.

25   Q.  Okay.  Is there any other part?

1    A.  No.

2    Q.  Okay.  I hope that clarified it.

3            Now, if you expected there was any kind of violation,

4    I think you were asked would you have heard it from the chain

5    of command?  Do you remember that on direct?

6    A.  Yes.

7    Q.  And you never did hear that there was, you told us, right?

8    A.  No.

9    Q.  And do you have any knowledge in particular as to what the

10   chain of command was being told in particular by Mr. Casey or

11   Mr. Liddy about anything they were doing?

12   A.  No.

13   Q.  Did you participate in Mr. Casey doing a -- what he

14   referred to as a thorough investigation in late September,

15   early to mid-October of 2012 about what the plaintiffs in

16   Melendres case, the one you're referring to, claimed was a

17   violation not only of Judge Snow's order but also what

18   Mr. Casey advised the Ninth Circuit Court of Appeals of?  Were

19   you involved in his investigation?

20   A.  No.

21   Q.  Did he ever contact you in regard to that investigation?

22   A.  No.

23   Q.  Did you ever talk to Sergeant Palmer or Lieutenant Sousa

24   about whether they were involved in the investigation?

25   A.  No.

1    Q.  Did they ever volunteer to you that he had contacted them?

2    A.  No.

3            MR. KELLER:  Objection.  Calls for hearsay, Your

4    Honor.

5            MR. DENNIS WILENCHIK:  It's not offered for the

6    truth --

7            THE COURT:  Overruled.  The --

8            MR. DENNIS WILENCHIK:  Thank you.

9            THE COURT:  Mr. Wilenchik, I didn't ask for a

10   response.

11           MR. DENNIS WILENCHIK:  I know.  I just get a little

12   upset, and I apologize.

13           THE COURT:  Overruled.  The answer "no" will stand.

14   Q.  (BY MR. DENNIS WILENCHIK)  Did you ever talk to Chief Sands

15   in regard to what participation, if any, he had in any alleged

16   investigation by Mr. Casey at that time?

17   A.  No.

18   Q.  Chief Sands never told you not to comply with the PIO

19   either, correct?

20   A.  No.

21   Q.  Did you ever have occasion to deal with Lisa Allen at

22   the -- I don't know what to call it -- the media relations

23   portion of the sheriff's office?

24   A.  Occasionally, yes.

25   Q.  And why would you deal with her?

1   A.  She was one of the recipients on the shift summaries that I

2   would send out after interdiction load, and then anytime we

3   were up at Wells Fargo, she would usually be present.

4   Q.  Was it your understanding that she was the one who dealt

5   with writing up the press releases and dealing with them?

6   A.  Yes.

7   Q.  Have you ever been in the sheriff's office?

8   A.  Yes.

9   Q.  Did he have a computer?

10  A.  I don't think so, no.  He has a typewriter.

11  Q.  He had an old Smith Corona typewriter.  Is that fair?

12  A.  Yes.

13  Q.  That's what he used, right?

14  A.  Yes.

15  Q.  And did you ever see what kind of phone he used?

16  A.  A flip phone.

17  Q.  Didn't even have a smartphone, right?

18  A.  Correct.

19  Q.  Did you ever witness the sheriff actually using any kind of

20  computer to revise any media releases?

21  A.  No.

22  Q.  Is it true that at the two meetings that I think you've

23  talked about -- There were actually two meetings, right?

24  A.  Yes.

25  Q.  And this was, again, about the permanent injunction, right?

1    A.  Yes.

2    Q.  At these two meetings, isn't it true that Tim Casey usually

3    did most of the talking?

4    A.  Yes.

5    Q.  And in those meetings, did you ever hear him use the term

6    that he had advised the office arrest or release?

7    A.  No.

8    Q.  The sheriff really didn't say anything at those meetings.

9    Is that accurate?

10   A.  Again, I don't remember the exact discussion, but no, no,

11   not that I remember.

12   Q.  Okay.  Isn't it true that even after Casey spoke at

13   those meetings, you still didn't fully know that cooperating

14   with ICE or Border Patrol could potentially violate the

15   permanent injunction?

16   A.  Correct.

17   Q.  So when did you actually come to learn that things had to

18   change if not at those meetings where Casey spoke?  When did

19   you actually do that?

20   A.  I was actually out of the unit in March of '13, so it was

21   probably after I was already out of the unit.

22   Q.  I see.  So while you're still there, things were going on

23   as usual?

24   A.  Yes.

25   Q.  Notwithstanding the permanent injunction?

1    A.  Yeah.

2            THE COURT:  No, no.  He was out of -- out March, 2013.

3    The permanent injunction was May of 2013.

4    Q.  (BY MR. DENNIS WILENCHIK)  Okay.  So let me get that clear.

5    I thank you for that.  That's a good point.

6            So you went to the meetings, if I understand this

7    correctly, after you had already left the unit?

8    A.  No.  I was still in the unit, so it might have been

9    reference the first order or the injunction.  I was definitely

10   in HSU when I went.

11   Q.  Okay.  And that was in March of '13?

12   A.  The meetings or when I left?

13   Q.  Yes, meetings.

14   A.  The meetings were sometime in that time frame when I was in

15   HSU.  I wouldn't have gone after I was out of the unit.

16           THE COURT:  Okay.  We know the date of the permanent

17   injunction, and it was May of 2013.

18           You were out of the unit then?

19           THE WITNESS:  Correct.

20           THE COURT:  So why would you have been at a meeting

21   about the permanent injunction with Liddy and Casey and the

22   sheriff and --

23           THE WITNESS:  Must have been prior to that.  It must

24   have been reference the September 2011 one or December of '11.

25   Q.  (BY MR. DENNIS WILENCHIK)  Well, why would they be talking

1  about that right before the permanent injunction would be

2  coming out?

3  A.  I'm not sure.

4  Q.  Could they have --

5          THE COURT:  Could you be wrong about when you left

6  HSU?  Could it have been a couple of months later in May?

7          THE WITNESS:  No.  It was in March, the end of

8  February, beginning of March.

9  Q.  (BY MR. DENNIS WILENCHIK)  So let me get that clear, if you

10  give me a little leeway.

11          So did they say that they had argued the issues

12  because the trial had now ended, and they anticipated that the

13  judge was going to rule on the permanent injunction at that

14  point?  Would that be possible?

15          MR. KELLER:  Objection.  Calls for hearsay, Your

16  Honor.

17          THE COURT:  Overruled.  We need to try to figure

18  this -- these dates out.

19          THE WITNESS:  I'm not sure exactly what was discussed.

20  It may be leading up until the -- The meeting may have took

21  place knowing that the order was going to come out.

22  Q.  (BY MR. DENNIS WILENCHIK)  And the reason I say that, if

23  you will, Your Honor, is because it seems to me, based on what

24  your testimony was, that even after that meeting, you continued

25  to do things the way you were doing them until you left?

1    A.  Correct.

2    Q.  That it may -- It appears at least that the permanent

3    injunction could not have then issued, right?

4    A.  Correct.

5    Q.  And they were talking about the fact they anticipated that

6    it might be coming down?

7    A.  Yes.

8    Q.  And therefore nothing changed until it did.  Would that

9    make sense?

10   A.  Yes.

11   Q.  Okay.  I think we've straightened it out, Judge, unless you

12   have any other question on it.

13          So just to close that, coming back to my earlier

14   question, so we're clear now on it, nothing occurred at that

15   meeting by either Mr. Casey or Mr. Liddy to make it clear that

16   any act had to change until the permanent injunction came down?

17   A.  Correct.

18   Q.  Do you believe it was a secret to them what the practices

19   were that we've just gone over here for the latter part of the

20   afternoon --

21          MR. KELLER:  Objection.

22   Q.  (BY MR. DENNIS WILENCHIK)  -- in terms of HSU?

23          MR. KELLER:  Objection, foundation, Your Honor.

24          THE COURT:  Sustained.

25   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Let me ask it a different

TROWBRIDGE - REDIRECT

1  way.  Was that something that you know of one way or the other

2  that they understood the practice that we've been talking

3  about?

4  A.  If Mr. Casey and Mr. Liddy understood, like, the

5  interdiction stuff?

6  Q.  Yeah.

7  A.  I believe they did, yes.

8  Q.  And what do you base it on?

9  A.  They kind of knew the way we did business, and I'm

10  assuming -- He was actually CC'd on the shift summaries also,

11  so he would know.

12        THE COURT:  Who was CC'd on the shift summaries?

13        THE WITNESS:  Tim Casey.

14        MR. DENNIS WILENCHIK:  May I just have one second,

15  Judge?

16        THE COURT:  You may.

17        MR. DENNIS WILENCHIK:  Nothing further, Your Honor.

18        THE COURT:  Mr. Keller.

19        MR. DENNIS WILENCHIK:  Just give me one second, and

20  then I'll --

21                    REDIRECT EXAMINATION

22  BY MR. KELLER:

23  Q.  Sergeant Trowbridge, if we could go back to the scenario

24  where a vehicle is pulled over on reasonable suspicion or

25  probable cause of a traffic violation or that it's a load

TROWBRIDGE - REDIRECT

1    vehicle, and there's just adults in the vehicle, and you

2    determine that the passengers -- there's no probable cause for

3    a state charge on the passengers.

4            I just want to clear up what I think you testified to

5    on cross.  You're not testifying that those passengers on the

6    roadside after you determined that they had no state charges

7    but you determined that you were going to contact ICE --

8            MR. DENNIS WILENCHIK:  Objection, Your Honor.  That's

9    a leading question.

10           THE COURT:  Once again, he gets to finish his

11   question, and then you get to object.

12           MR. DENNIS WILENCHIK:  I thought he did.  I apologize.

13           THE COURT:  Just like Mr. Salgado had to wait for you

14   when we had this problem with the last witness.

15           MR. DENNIS WILENCHIK:  I thought he had.

16   Q.  (BY MR. KELLER)  Is it your testimony that those people

17   were free to go?

18   A.  No.

19           MR. DENNIS WILENCHIK:  Wait, wait.  I have an

20   objection.  That was a leading question.

21           THE COURT:  Overruled.  You may answer.

22           THE WITNESS:  I was trying to answer that, but

23   something happened where I was unable to.  But what I was going

24   to describe was from their perspective, there's five to six

25   detectives standing there, flashing lights, red and blue

1    lights.  A reasonable person would not think that they're free

2    to leave.

3         THE COURT:  And in fact from your perspective were

4    they free to leave?

5         THE WITNESS:  No.

6    Q.  (BY MR. KELLER)  And certainly --

7         MR. DENNIS WILENCHIK:  Well, wait, wait.  I'm going to

8    object.

9         THE COURT:  To what?

10        MR. DENNIS WILENCHIK:  First of all, he doesn't have

11   any clue what any person would believe other than himself.  And

12   he wasn't asked whether he told them they weren't free to

13   leave.  So his belief is entirely irrelevant and has nothing to

14   do with the sheriff anyway.

15        THE COURT:  That sounded more like an argument than an

16   objection, but it's overruled, and the answer to both

17   Mr. Keller's question and my question stands.

18   Q.  (BY MR. KELLER)  And, Sergeant Trowbridge, certainly when

19   those people were being actually transported to ICE or Border

20   Patrol, they were not free to leave, were they?

21   A.  No.

22        MR. KELLER:  Nothing further, Your Honor.

23        THE COURT:  May this witness be excused?

24        MR. KELLER:  Yes, Your Honor.

25        MR. DENNIS WILENCHIK:  Yes, Your Honor.

TROWBRIDGE - REDIRECT

1          THE COURT:  Is there any objection?

2          Thank you very much, Sergeant.  You may step down, and

3    you are excused as a witness.

4          Other than the outstanding exhibits that have been

5    offered that I have not yet had a chance to review, does the

6    government have any further evidence to present?

7          MR. KELLER:  No, Your Honor.

8          THE COURT:  And, Mr. Wilenchik, do you wish to call

9    your first witness tomorrow morning, or do you want to call

10   somebody this afternoon?

11         MR. DENNIS WILENCHIK:  Your Honor, here's the dilemma

12   I'm in, and I'll be as brief as I can.  I have witnesses here.

13   I don't want them to necessarily come back, or I would like to

14   start.  But I also have a directed verdict motion.  And so

15   would the Court allow me to not be waiving that motion.

16         THE COURT:  Right.  Make it -- Don't -- Just make it

17   for the record without any argument.  I will take it under

18   advisement.

19         The government has not officially rested because I

20   have to resolve these exhibits, but you can make it now because

21   you know what the sum total of all of the evidence is if

22   everything's admitted.

23         MR. DENNIS WILENCHIK:  So I make the directed verdict

24   motion, Your Honor, reasons to follow, and --

25         THE COURT:  The motion is taken under advisement.  So

UNITED STATES DISTRICT COURT

                          CLEM - DIRECT

1    you may call your first witness.

2              MR. DENNIS WILENCHIK:  Okay.  Thank you.

3              Your Honor, I will call the first witness.

4              We'll be calling Chris Clem as our first witness, Your

5    Honor.

6              CHRIS CLEM, DEFENDANT'S WITNESS, SWORN

7              THE CLERK:  Please state your name for the record,

8    spelling your first and last name.

9              THE WITNESS:  Chris Clem, C-h-r-i-s C-l-e-m.

10             THE COURT:  You may proceed, Mr. Wilenchik.

11             MR. DENNIS WILENCHIK:  Thank you, Your Honor.

12                        DIRECT EXAMINATION

13   BY MR. DENNIS WILENCHIK:

14   Q.  Could you state your full name for the record please.

15   A.  Chris Clem.

16   Q.  And from May, 2010, Mr. Clem, through November, 2012, where

17   were you employed?

18   A.  U.S. Border Patrol.  I was the Patrol Agent in charge of

19   the Casa Grande Border Patrol Station.

20   Q.  Is -- Was the Casa Grande Border Patrol Station the primary

21   checkpoint or station for Border Patrol in Arizona?

22   A.  No, sir.

23   Q.  What was?

24   A.  The primary checkpoint?

25   Q.  Well, that's a poor question.  Tell us about how many

                    UNITED STATES DISTRICT COURT

CLEM - DIRECT

1    stations there were in Arizona for Border Patrol.

2    A.  Well, let me start from -- I'll go west to east for Tucson

3    sector because there's two sectors in Arizona.

4         In Tucson sector you had Ajo, Casa Grande.  You had

5    Tucson station, Nogales, Naco, Douglas, Wilcox, and Sonoita.

6    And Yuma sector I believe it was Yuma station, Wellton station,

7    and Blythe, California station.

8    Q.  Was there any station in Maricopa County?

9    A.  Not that I'm aware of.  I believe Casa Grande was in Pinal,

10   and Ajo would have been in Pima, I believe.  It may have

11   been -- I just don't know if Ajo -- which county it was in.

12   Q.  I'm trying to find out what would have been the closest

13   station to Maricopa County?  Would it be -- Would it be

14   accurate to say it would be Casa Grande?

15   A.  Without me looking at the map, I'll say yes.

16   Q.  In your capacity as Patrol Agent in charge there, did you

17   often meet with local law enforcement and talk to them about

18   what the Border Patrol's policies were?

19   A.  That's correct, yes.

20   Q.  And when I say local law enforcement, who would that

21   include in general?

22   A.  For me, during that time I met with all of the agency heads

23   at one point when I first got there.

24   Q.  When you say all the agency heads, I don't mean to

25   interrupt.

CLEM - DIRECT

1    A.   So let's start with Pinal County, the sheriff, Casa Grande

2    Chief of Police, the Eloy Police Department.  I had an

3    appointment with Maricopa County.  This would have been about

4    seven years ago when I first got there.  Meet and greet.

5    Welcome to the neighborhood.

6    Q.   And these meetings that followed or ensued from those

7    initial meet-and-greets, would you come to learn of basically

8    some of their policies with respect to how they're interacting

9    with the entity you work for for the government, the Border

10   Patrol?

11   A.   I may need some clarification on it.  Are you asking me --

12   I was telling them our policies or I was hearing their

13   policies?

14   Q.   Let's start with you hearing some of their policies.  In

15   other words, did you come -- did you become -- I'm sorry.

16        I'm getting tired.

17        Did you become familiar with all of these various law

18   enforcement agency's policies about turning people over to

19   Border Patrol?  Let's start with that.

20   A.   Familiar is a broad word.  Did they talk about

21   relationships?  I mean, this was --

22   Q.   No, no.  Did you talk to them about what they would be

23   doing with people, for example, to be very specific, who were

24   stopped on lawful criminal charges but were -- it was decided

25   they wouldn't be arrested, but they did find them to be illegal

CLEM - DIRECT

1  in contacting the Border Patrol?  Did you come to learn of that

2  being a regular practice by local law enforcement or not?

3          MR. KELLER:  Objection.  Leading and compound.

4          THE COURT:  Sustained.  You'll have to rephrase the

5  question.

6  Q.  (BY MR. DENNIS WILENCHIK)  Did you come to learn of the

7  policies of the various local law enforcement agencies with

8  respect to them turning people over and contacting Border

9  Patrol?

10  A.  In a broad sense, yes.

11  Q.  Did you come to learn at any point in time during the time

12  you were head patrol agent that Maricopa County Sheriff's

13  Office had a policy that varied or differed significantly from

14  any of these other law enforcement agencies in that regard?

15  A.  No, because I didn't have much conversation with leadership

16  at Maricopa.

17          THE COURT:  Why would that be if you tried to be in

18  touch with agency heads?

19          THE WITNESS:  So my -- my position in Casa Grande was

20  border security, getting down, and that was the whole purpose I

21  was there was to make a change to effect border security at the

22  border.  So as my operations and I got involved in making

23  changes, we were compressing things down to the line.

24          The station was 110 miles from the border, so I had to

25  get things stopped where the problem was, and that was at the

CLEM - DIRECT

1    line.  So that was my focus.

2    Q.  (BY MR. DENNIS WILENCHIK)  Regardless of your focus, did

3    you talk with other agencies other than MCSO about their

4    policies at all in contact with the Border Patrol and how they

5    operated?

6           MR. KELLER:  Objection as to relevance, Your Honor,

7    for these other agencies.

8           THE COURT:  Overruled.  You may answer.

9           THE WITNESS:  Policies, not that detailed.  Practices,

10   that would be a little bit more of a conversation of law

11   enforcement talking to law enforcement.

12   Q.  (BY MR. DENNIS WILENCHIK)  Okay.  Sorry.  I don't want to

13   quibble, so I apologize.  Practices.  Did you discuss their

14   practices and how they interacted with Border Patrol?

15   A.  Yes.

16   Q.  And did you find in your time at Border Patrol as head

17   Patrol Agent that anything that MCSO was doing was markedly

18   different in that regard than what these other agencies were

19   doing with Border Patrol?

20   A.  Not, not necessarily, no.

21   Q.  Meaning?

22   A.  I mean, I really didn't know what -- We didn't have those

23   kind of conversations.  Call the Border Patrol if you need

24   assistance.  If we're available, we'd respond.  I mean, as far

25   as --

CLEM - DIRECT

1    Q.  That's my question.  Was that the policy with all of these

2    agencies?

3    A.  Policy?  I don't know if that was the policy.

4    Q.  Look, I'm trying not to quibble with you, but was that the

5    practice?  I apologize.

6    A.  Yes.

7            THE COURT:  In Maricopa County.

8    Q.  (BY MR. DENNIS WILENCHIK)  In all of them?

9            THE COURT:  Well, I'm interested in Maricopa County.

10   Q.  (BY MR. DENNIS WILENCHIK)  Well, I'm interested in all to

11   determine if there's anything different.

12           THE COURT:  Okay.  You can ask him that after I ask

13   him this.

14           MR. DENNIS WILENCHIK:  Okay.  Fine.

15           THE COURT:  Are you familiar with what the practice

16   was in Maricopa County vis-a-vis seeking assistance from Border

17   Patrol?

18           THE WITNESS:  Not -- Not in-depth.  More of, hey, if

19   you've got somebody, give us a call.  If we can help, we will.

20   But I think it was, you know, it was ICE's responsibility in

21   these areas, Immigration Customs Enforcement, to respond to

22   some of this interior actions.  If you encountered somebody you

23   thought was an illegal alien and you needed to get a hold of

24   us, if we could respond, we would.

25           But, I mean, that was just -- It wasn't really

CLEM - DIRECT

1   something I was concerning myself with because my mission was

2   at the border.

3           THE COURT:  All right.  Mr.  Wilenchik.

4   Q.  (BY MR. DENNIS WILENCHIK)  Did you have an interview with

5   the federal government about this matter or this case?

6   A.  Did I have an interview with the federal government?

7   Q.  Yes, FBI.

8   A.  Yes.

9   Q.  Did you talk to them openly and opined to them on these

10  practices, if you want to call them that, to FBI Agent Crocker

11  who's here in court?

12  A.  Did I have a conversation with -- Yes, I did.  We had a

13  conversation, but I'm not -- It was very --

14  Q.  Did you describe to her that it was your understanding that

15  while you were at the Border Patrol, that the practice was that

16  agencies such as MCSO would in fact contact Border Patrol, who

17  would then direct the agency what to do with the individual

18  once determined they were illegal?

19  A.  I don't know of that specific response, but having a

20  conversation would have been, yeah, if they catch somebody they

21  think is illegal, if we are available, give us a call.  If we

22  could respond, we would.  I mean, that's pretty much a common

23  practice that we still do to this day.

24  Q.  And that's been the common practice, right?  That hasn't

25  been something that just changed, right?

CLEM - DIRECT

1   A.  Correct.

2   Q.  It's been the practice for a long time, right?

3   A.  Yes, sir.

4   Q.  Not just with MCSO but with other agencies as well, right?

5   A.  Correct.

6   Q.  And you consider that kind of cooperation to be important

7   for your work at the time, correct?

8           MR. KELLER:  Objection, leading, your Honor.

9           THE COURT:  Sustained.

10  Q.  (BY MR. DENNIS WILENCHIK)  Okay.  I'll rephrase it.

11          Did you consider that to be important?

12  A.  Relationships are important, yes.

13  Q.  Was it important for what reason?

14  A.  Well, we're law enforcement, and we could be backing each

15  other up.  We want to always have that opportunity to support

16  each other.  I mean, in the broad things, we're public safety.

17  At the end of the day, we need to be out on the same page and

18  have a relationship so we can share information that we can

19  work for the greater good.

20  Q.  Did you ever have any impression while you were head of

21  Border Patrol there that MCSO --

22          THE COURT:  Back to the microphone.

23  Q.  (BY MR. DENNIS WILENCHIK)  I understand.

24          -- that MCSO was doing anything for purely political

25  reasons that concerned you that was any different than these

UNITED STATES DISTRICT COURT

CLEM - DIRECT

1   other agencies were doing?

2   A.  If I understood the question was I concerned about what

3   they were doing for political reasons?  I found it interesting,

4   but I wasn't compelled enough to take any actions, you know,

5   that would change my focus on operating on the border.

6   Q.  So the question is did you find that they were doing

7   anything differently, regardless of what motives they may or

8   may not have had, that were different than what other agencies

9   were doing that concerned you?

10  A.  No.

11  Q.  Were you familiar working with ICE?

12  A.  Yes.

13  Q.  Did you work with ICE in the same cooperative manner that

14  you just told us about?

15  A.  Yes.

16  Q.  For the same reasons?

17  A.  Yes.  They're a DHS partner, yes.

18  Q.  And if a deputy, for example, could not contact ICE or ICE

19  would not respond to them, was it your estimation and

20  understanding that ICE had to respond?

21  A.  They were supposed to respond, yes.

22  Q.  But if they didn't, did you come to learn that at times ICE

23  wouldn't respond?

24  A.  Yes.  We know ICE wouldn't respond at times, yes.

25  Q.  And in those situations where ICE would not respond, what

CLEM - DIRECT

1    was BP's position?

A.  If we had the availability, we had the resources, and

3    operations allowed us to, we would respond.

THE COURT:  What do you mean by respond?

THE WITNESS:  If -- If -- Show up to the scene.

THE COURT:  Okay.

THE WITNESS:  Or accept a body or whatever.  Go and

8    interview or make a phone call.  That's how I'm looking at

9    respond.

THE COURT:  So sometimes respond meant you would go to

11   the specific scene where the individuals were with the other

12   law enforcement agency?

THE WITNESS:  Correct.

THE COURT:  Sometimes respond would mean that you

15   would accept a person at Border Patrol?

THE WITNESS:  Sure.  Yes, ma'am.

THE COURT:  And then you might do other cooperative

18   things?

THE WITNESS:  Exactly, phone call, things like that,

20   yes.

THE COURT:  I wanted to clarify, because sometimes

22   respond, when law enforcement talks about responding, they mean

23   responding to a scene.

THE WITNESS:  And that's correct, and I -- It is.  It

25   could be responding, responsive.  Yes, I'm sorry we can't show

CLEM - DIRECT

1    up, or, yes, we can, but it's going to be a few hours, or the

2    answer is, I'm sorry, we responded, but, no, we can't go.

3    Q.  (BY MR. DENNIS WILENCHIK)  During your time at Border

4    Patrol, did Sheriff Arpaio swear in any Border Patrol agents as

5    deputies?

6    A.  I'm not aware.

7            THE COURT:  Are you still with the Border Patrol?

8            THE WITNESS:  Yes.

9            THE COURT:  You're just in a different location now?

10           THE WITNESS:  That's correct.  I left in 2012 and went

11   to Washington, D.C., and New Orleans.  And now I'm back at

12   Tucson but down in Tucson sector, no longer in Casa Grande.

13           THE COURT:  Thank you.

14   Q.  (BY MR. DENNIS WILENCHIK)  Did you think anything Border

15   Patrol was doing in directing such agencies as MCSO to either

16   take people down to Border Patrol, if they were found to be

17   illegal after contacting Border Patrol, or picking them up was

18   in any way somehow illegal at all?

19           MR. KELLER:  Objection, Your Honor.  Assumes facts not

20   in evidence or mischaracterizes the testimony.

21           THE COURT:  Overruled.  You may answer.

22           THE WITNESS:  Could you repeat the question?  Because

23   you said something about Border Patrol directing, and I don't

24   know about a direction.  I'm trying to figure out what you're

25   trying to get.

CLEM - DIRECT

1   Q.  (BY MR. DENNIS WILENCHIK)  You don't know what I mean by

2   direction?

3   A.  Well, I didn't direct anybody.  Direction's a pretty strong

4   word.  But I would say, hey, if you've got somebody to come

5   over, if you can come over here, we'll do it.  Or if you want

6   to bring them to us or call us if you encounter them, that's

7   why I go into the responsiveness.  But directing another agency

8   to do this, I --

9   Q.  Okay.  When I say direct, let me be clear on it for your

10  purposes, given that.  I'm asking if they would contact Border

11  Patrol to find out what to do with this illegal alien.  Would

12  you talk to the people, or would other people at your office

13  talk to them?

14  A.  I would not.  It wasn't me.

15  Q.  So you wouldn't direct anybody to do anything personally?

16  A.  Correct.

17  Q.  Okay.  You don't know what your people did, but would it be

18  typical, based on your working there and being head of the

19  office there, that they would respond to these requests for

20  direction as to what to do, and they would be told you can take

21  them here, or we'll pick them up?

22          MR. KELLER:  Objection, leading.  Your Honor.

23          THE COURT:  Sustained.

24  Q.  (BY MR. DENNIS WILENCHIK)  Were you ever present when

25  conversations occurred by your people with Maricopa County

CLEM - DIRECT

1    deputies?

2    A.  No, sir.

3    Q.  Okay.  Did you ever have conversations with your people to

4    instruct them about what to do, with respect to requests by

5    these deputies, as to what to do with people once they

6    contacted Border Patrol and learned that they were illegal?

7    A.  Yes, yes.

8    Q.  What did you instruct your people to tell them?

9    A.  Okay.  So it wasn't specific to Maricopa.  It was to any of

10   our agencies, whether it was local, state, or other federal, is

11   if they encounter, they need to contact ICE.  If ICE is not

12   available, there was a response unit from ICE ERO.  And if you

13   could -- if no one else would respond, and we could, meaning

14   the supervisor on the shift that night could afford to send

15   somebody to that location, then by all means, if it wasn't

16   going to impact our operations, go ahead and respond.

17   Q.  Respond meaning to tell them that you can bring them down

18   here, or we'll pick them up?

19   A.  Either way, yes.

20   Q.  Okay.  No doubt about that?

21   A.  No.

22   Q.  You weren't aware of situations, I take it, where deputies

23   just showed up unannounced at Border Patrol's offices to dump

24   people off, right?

25   A.  No.

CLEM - DIRECT

1   Q.  And between December, 2011, and May, '13, do you have any

2   reason to believe that that policy had changed that you just

3   described?

4   A.  No.

5           THE COURT:  Sir, would there ever be a circumstance

6   when Border Patrol might refuse to accept someone that another

7   law enforcement agency wanted to bring to you because they had

8   reason to believe they were in the country illegally?

9           THE WITNESS:  I can't think of a situation where we

10  we'd refuse another agency.

11          It would -- Maybe if the person was in a condition

12  medically or mentally where, hey, we can't determine alienage,

13  then we wouldn't take them, but nothing has risen to my level

14  where I was aware of that.

15          I'm sure it has happened, but I cannot think of a

16  situation where if somebody brought somebody to our station

17  that they thought was illegal, we determined that they were

18  undocumented, they were in the country illegally, that we would

19  just say no, we're not taking them, unless it was -- there was

20  an emergent situation.

21          THE COURT:  Thank you.

22  Q.  (BY MR. DENNIS WILENCHIK)  If there were any other policy,

23  i.e., that if the deputy would release these people into the

24  wilds, and then you had to go hunt them down, would that be

25  advancing your mission to enforce immigration laws or contrary

CLEM - DIRECT

1   to it?

2           MR. KELLER:  Objection, Your Honor.  Assumes facts not

3   in evidence.

4           THE COURT:  Sustained.

5   Q.  (BY MR. DENNIS WILENCHIK)  What was the BP's mission with

6   respect to enforcing immigration laws as it relates to working

7   with the local law enforcement units?

8   A.  So our mission was quite simple:  Secure the nation's

9   border.  And border security was our primary objective.  As far

10  as working with other agencies, it was defined, you know,

11  information sharing.  That was one of our pillars, information,

12  integration, rapid response.  And information could be

13  intelligence.  It could be, hey, you know, talk about different

14  leads, things that are impacting the community, and we

15  certainly wanted to share that information.

16          You know, in essence if you could help me connect dots

17  to plug the gaps at the border, that's what I was, you know,

18  that was our mission.  That was our plan in regards to other

19  agencies.

20          THE COURT:  How does your mission differ from the

21  mission of ICE, Immigration and Customs Enforcement?

22          THE WITNESS:  So ours -- There's -- They're an

23  investigative branch.  They're the investigative agency for us

24  in the sense of any criminal actions, we're going to give ICE

25  first opportunity to pursue a prosecution.  It's very --

CLEM - DIRECT

1    There's a lot of things that are similar in the sense that they

2    enforce immigration laws like us, but we don't do a lot of the

3    investigative stuff.  Ours is at the border between the ports

4    of entry.  We'll do -- We'll track the groups from the border.

5    We'll interdict them at the check points and things like that,

6    where ICE is really going to take raw information and begin the

7    investigations or take cases from us and begin the

8    investigation.

9            So that's kind of it in a short nutshell, if that

10   pleases you, ma'am.

11   Q.  (BY MR. DENNIS WILENCHIK)  Did Border Patrol expect the

12   local law enforcement deputies to cooperate by temporarily

13   detaining these individuals who were aliens in order for it to

14   take custody?

15           MR. KELLER:  Objection, leading, Your Honor.

16           THE COURT:  Overruled.  You may answer.

17           THE WITNESS:  I think it was an expectation of

18   cooperation.  If you suspected you had an illegal alien, and

19   you were willing to hold them, and we were able to respond, I

20   think that was -- that's the spirit of cooperation.

21   Q.  (BY MR. DENNIS WILENCHIK)  And the spirit of cooperation,

22   that's embodied in actually the law?

23   A.  I'm not --

24           MR. KELLER:  Objection, foundation, Your Honor.

25           THE COURT:  Overruled.  You may answer if you know.

UNITED STATES DISTRICT COURT

CLEM - DIRECT

1          THE WITNESS:  I don't know a specific law where

2     cooperation is required.  And if there is, I apologize I

3     don't --

4     Q.  (BY MR. DENNIS WILENCHIK)  Have you heard of what's

5     referred to as 287(g)(10)?

6     A.  287(g), that is --

7     Q.  287(g)(10.)?

8     A.  You would have to be a little more specific on what that

9     one says.

10    Q.  It talks specifically about cooperation with the federal

11    immigration authorities by local law enforcement.

12    A.  Gotcha.  That's ICE handles 287(g), not Border Patrol.

13    Q.  Oh, I see.  Okay.  But if it applied to -- the statute

14    applied to both, you wouldn't know that?

15    A.  If the statute applied where 287(g)(10) gave me the

16    authority to have others cooperate with it, then I would act

17    under that authority.  But 287(g) for me is one of my arrest

18    authorities, but I don't have the delegative authority to give

19    287(g) to --

20    Q.  You don't have the authority to give the certification?

21    A.  Correct.

22    Q.  I get that.

23          All right.  What are immigration detainers?

24          MR. KELLER:  Objection, Your Honor, relevance.

25          THE COURT:  Overruled.  You may answer.

CLEM - DIRECT

1          THE WITNESS:  That is where we ask an agency to hold

2     on to a subject that we believe to be illegally in the

3     United States.

4     Q.  (BY MR. DENNIS WILENCHIK)  And how does that come about?

5          Could that come about in the scenarios we were just

6     talking about where a deputy would contact Border Patrol to

7     find out someone's status and then seek guidance on how to

8     proceed?

9     A.  That would be something that my experience with a detainer

10    is we issue the detainer.  The agent or somebody that is, you

11    know, on duty would interview the subject or note that they

12    were taken to a detention center.  And we would issue the

13    detainer, not to have another agency issue the detainer.

14    Q.  Right.  But the question is do you ask other agencies to

15    cooperate with Border Patrol to do that?

16    A.  Well, we would, yes.

17    Q.  And did you ever have any conversations with Sheriff Arpaio

18    in particular during the time you were in Casa Grande that

19    dealt with any of these issues we've been discussing?

20    A.  No, sir.

21    Q.  Did you feel a need to contact him?

22    A.  For these issues, no.

23    Q.  Isn't it true, sir, that an immigration detainer or hold

24    can be where ICE or BP requests a state deputy to continue to

25    detain an alien who has been arrested on state charges for up

CLEM - DIRECT

1    to 48 hours?

2         MR. KELLER:  Objection, leading, Your Honor.

3         THE COURT:  Sustained.

4    Q.  (BY MR. DENNIS WILENCHIK)  I can invoke Rule 607, I

5    believe.

6         THE COURT:  I haven't seen any evidence that would

7    suggest that that could be invoked at this time.

8    Q.  (BY MR. DENNIS WILENCHIK)  No.  Okay.  I'm not going to

9    quibble.

10        Were you ever aware of Judge Murray Snow's order in

11   the Melendres case or did it come to your attention in terms of

12   any preliminary injunction?

13   A.  No.

14   Q.  Did your officers, were they instructed to routinely

15   inquire of deputies contacting BP as to the specific

16   circumstances of the stops?

17   A.  We would ask for probable cause if we were taking somebody

18   into custody and we had to write a report.  So I think it would

19   be a practice where we would ask, hey, why did you stop them,

20   or what was the purpose for the arrest?

21   Q.  And what about if there were not an arrest and the officer

22   was contacting Border Patrol to determine what to do with

23   somebody that they found to be an illegal alien by contacting

24   Border Patrol and having Border Patrol speak with the illegal

25   alien?

1   A.  I believe that practice has happened where they put them on

2   the phone and determine alienage over the phone.  I have not

3   done that, but I've understood that this happened before.

4   Q.  Your people that work for you?

5   A.  I believe so.

6   Q.  Okay.  And you didn't see anything inappropriate or

7   wrongful about that practice?

8   A.  No.

9           MR. DENNIS WILENCHIK:  Okay.  That's all.  Thank you.

10          THE COURT:  Mr. Keller.

11          MR. KELLER:  No questions, Your Honor.

12          THE COURT:  May this witness be excused,

13  Mr. Wilenchik?

14          MR. DENNIS WILENCHIK:  Yes, Your Honor.  Thank you.

15          THE COURT:  Any objection?

16          MR. KELLER:  No, Your Honor.

17          THE COURT:  Thank you, sir.  You may step down, and

18  you are excused as a witness.

19          THE WITNESS:  Thank you.

20          THE COURT:  It's almost 4:15.  If you have someone you

21  want to call, you may, but if you want to adjourn, that's fine

22  as well.

23          MR. DENNIS WILENCHIK:  Well, again, it's not for my

24  convenience, but I think we have somebody up here -- Is he from

25  Casa Grande?  Can he come up tomorrow?  I mean, that's fine

1   with me.

2           MR. JOHN WILENCHIK:  He's already here, Judge.

3           MR. DENNIS WILENCHIK:  He's here, but --

4           THE COURT:  Okay, but we're not going past 4:30.

5           MR. DENNIS WILENCHIK:  Oh, well, then I suggest we

6   unfortunately ask him to come back.

7           THE COURT:  All right.  Then we'll recess for the day.

8   Are there any administrative, housekeeping matters we need to

9   discuss before we adjourn from the government?

10           MR. KELLER:  I guess, Your Honor, just on the pending

11   Rule 29 motion, will we schedule argument for that at some

12   point after the outstanding evidentiary issues are resolved?

13           THE COURT:  Yes, we will, but not until the

14   outstanding evidentiary issues are resolved.

15           MR. KELLER:  Thank you.  And on one of those, Your

16   Honor, I do have excerpts regarding the issue for

17   Mr. MacIntyre's testimony.

18           THE COURT:  Okay.  Great.  You can hand them to

19   Maureen, and I'll take them with me.

20           Is that all, Mr. Keller?

21           MR. KELLER:  I'm sorry, Your Honor?

22           THE COURT:  Is that all?

23           MR. KELLER:  Yes, Your Honor.

24           THE COURT:  Mr. Wilenchik?

25           MR. DENNIS WILENCHIK:  Yes.  Thank you, Judge.  I

1  think we gave you our excerpts already.

2         Do you have them, Maureen?  Yeah.

3         THE COURT:  You gave me some excerpts this morning.

4         MR. DENNIS WILENCHIK:  Yeah.

5         THE COURT:  That's it.  Court is in recess until 9:00

6  tomorrow morning.

7         MR. DENNIS WILENCHIK:  I know you hate to do that and

8  you want more, but that's it.

9      (Proceedings recessed at 4:14 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

**C E R T I F I C A T E**

3        I, LINDA SCHROEDER, do hereby certify that I am duly

4  appointed and qualified to act as Official Court Reporter for

5  the United States District Court for the District of Arizona.

6        I FURTHER CERTIFY that the foregoing pages constitute

7  a full, true, and accurate transcript of all of that portion of

8  the proceedings contained herein, had in the above-entitled

9  cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11        DATED at Phoenix, Arizona, this 29th day of June,

12  2017.

13

14

15                           s/Linda Schroeder
                           Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**