# EXHIBIT 1



1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega          )
     Melendres, et al.,              )
5                                    )
               Plaintiffs,           )   CV 07-2513-PHX-GMS
6                                    )
               vs.                   )   Phoenix, Arizona
7                                    )   July 24, 2012
     Joseph M. Arpaio, et al.,       )   8:31 a.m.
8                                    )
               Defendants.           )
9    _____)

10

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          BEFORE THE HONORABLE G. MURRAY SNOW

17          (BENCH TRIAL DAY 2 - Pages 278-537)

18

19

20

21

22   Court Reporter:          Gary Moll
                              401 W. Washington Street, SPC #38
23                            Phoenix, Arizona  85003
                              (602) 322-7263
24

25   Proceedings taken by stenographic court reporter
     Transcript prepared by computer-aided transcription

1  Q.  Your program or your policy is to go after illegal

2  immigrants, but not the crime first, is that right?

3  A.  That's not right.  That is not correct.

4  Q.  You had a press conference in 2007 to announce your illegal

5  immigration efforts, correct?                                   09:46:29

6  A.  I may have.

7  Q.  And you said at that time that your program was a pure

8  program to go after the illegals and not the crime first,

9  correct?

10  A.  The context of that was that we had the 287(g) agreement    09:46:45

11  along with our enforcement of state crimes, and we had the

12  authority under the federal policy to arrest those that are in

13  this country illegally.

14          MR. YOUNG:  Your Honor, I would request that we play

15  Exhibit 410D, which is a portion of the sheriff's statements    09:47:08

16  during that press conference.

17          THE COURT:  Any objection?

18          MR. CASEY:  Your Honor, my understanding -- yes, I --

19  I object that there has not -- it's improper impeachment.  As I

20  understand what he's using it for, the witness has just          09:47:29

21  answered his question.

22          THE COURT:  Well, I'm going to overrule the objection.

23  I'm not sure whether it's entered for impeachment only.  It

24  seems to me that it's not hearsay.  So I'm going to allow it to

25  be played.                                                       09:47:38

1    A.  We continue to enforce the laws, and we do it good.

2    Q.  And you're not going to back down even if people take you

3    to court, is that right?

4    A.  I have confidence in the courts, and what happens, we'll

5    have to abide by the decision.                          14:45:55

6    Q.  You gave a speech in Houston in September 2009 to a group

7    called Texans for Immigration Reform and U.S. Border Watch, is

8    that right?

9    A.  I give so many speeches, but I guess that's correct if --

10        What year was it?                                 14:46:13

11   Q.  2009 in September.

12   A.  Yes.

13   Q.  And the crowd that you spoke to that occasion was a large

14   crowd of about 200 people?

15   A.  I believe so.                                       14:46:26

16   Q.  Now, you've become famous in part for making prisoners in

17   your jail wear pink underwear, is that right?

18   A.  I don't know about "famous," but they do wear pink

19   underwear.

20   Q.  And you've gotten some attention for that, is that right?  14:46:42

21   A.  Yes.

22        MR. YOUNG:  All right.  I'm going to -- I'm going to

23   play a section of PX 410, without a letter suffix, starting in

24   about 33 minutes in, and it's the longer section about the pink

25   underwear.                                              14:47:05

1          Again, you mentioned in there that you had the
2     ability -- and that's not in there.  That was a video clip that
3     was played after the federal government, under the current
4     administration, revoked 287(g) field authority in October of
5     2009.                                                              15:40:34
6          With that frame of reference, you were asked by Glenn
7     Beck how you could continue to do certain things, and you told
8     him, We can stop them or take action based on what they look
9     like, like they just came from another country.
10         What were you trying to accomplish with that statement    15:40:52
11    to Mr. Beck?
12    A.  No, I was -- are you talking about after 287(g)?
13    Q.  Yes.
14    A.  Well, we still had the authority, pursuant to a legitimate
15    arrest, to determine that person was here illegally.  And then   15:41:05
16    if there was no state charge to book that person into the jail,
17    we would turn that person over to ICE.
18    Q.  And you have that authority today.  In any of your law
19    enforcement actions can you, if you come across someone
20    unlawful, detain them?                                           15:41:27
21    A.  Yes.
22    Q.  And what do you do with them?
23    A.  We call ICE, and they can pick them up or we deliver the
24    person to their office.
25    Q.  At any -- is ICE currently accepting -- when MCSO happens,   15:41:41

1

2                    C E R T I F I C A T E

3

4

5

6

7          I, GARY MOLL, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17         DATED at Phoenix, Arizona, this 24th day of July,

18   2012.

19

20

21                         _____s/Gary Moll_____

22

23

24

25

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3

4   Manuel de Jesus Ortega              )
    Melendres, et al.,                  )
5                                       )
                   Plaintiffs,          )   CV 07-2513-PHX-GMS
6                                       )
                   vs.                  )   Phoenix, Arizona
7                                       )   April 22, 2015
    Joseph M. Arpaio, et al.,           )   8:36 a.m.
8                                       )
                   Defendants.          )
9   _____    )

10

11

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16        BEFORE THE HONORABLE G. MURRAY SNOW

17     (Evidentiary Hearing Day 2, pages 286-511)

18

19

20

21

22  Court Reporter:            Gary Moll
                               401 W. Washington Street, SPC #38
23                             Phoenix, Arizona  85003
                               (602) 322-7263
24

    Proceedings taken by stenographic court reporter
25  Transcript prepared by computer-aided transcription

 1    examined and testified as follows:

 2                        DIRECT EXAMINATION

 3    BY MR. YOUNG:

 4    Q.  Good afternoon, Sheriff.

 5    A.  Good afternoon.                                          16:09:09

 6    Q.  You ask your officers to go out every day and risk their

 7    lives in order to protect the public and to uphold the law.

 8    A.  Yes.

 9    Q.  It's important, therefore, that you yourself uphold and

10    obey the law, correct?                                       16:09:24

11    A.  Yes.

12    Q.  The oath that you took to enforce the law includes orders

13    of the court that apply to you, correct?

14    A.  Yes.

15    Q.  I'm going to ask that you look at Exhibits 71 and 72, and  16:09:37

16    actually 67.

17            Sheriff, do you have Exhibit 71, which is an expedited

18    motion to vacate hearing and request for entry of judgment that

19    your lawyers filed on your behalf?

20    A.  Yes.                                                     16:10:16

21    Q.  And you approved the filing of that document, correct?

22    A.  Yes.

23    Q.  In that document you acknowledged that you have violated

24    the Court's orders and that there are consequences for those

25    violations?                                                  16:10:32

1    Q.  Exhibit 67, which has been admitted, is the Court's
2    preliminary injunction order.  I'm going to ask that paragraph
3    5 on page 40 be displayed.  It contains the Court's injunction
4    order that is relevant to this proceeding.
5              You became aware of that injunction when it came out,     16:15:34
6    correct?
7    A.  Not necessarily.
8    Q.  Very shortly after it came out you became aware of it, is
9    that right?
10   A.  When you say "shortly," I don't know what the time period,      16:15:52
11   but it was not the -- when it immediately came out I wasn't on
12   a list notifying that it came out on December 23.  On December
13   26 I left town, I was out of state, and didn't come back to the
14   office till January 3rd.
15   Q.  Well, you were deposed in the Department of Justice's case,     16:16:29
16   correct, on April 29, 2014?
17   A.  I may have been.
18   Q.  Okay.  I'm going to ask that page 66, line 23, to page 67,
19   line 9, be displayed.  And at the bottom of page 66 you'll see
20   that -- that paragraph 5 of the order begins to be read, if we     16:17:05
21   could show page 67 as well.  Page 67 of the deposition
22   transcript.
23              And at line 7 of page 67 you were asked:  "Do you
24   recall being aware of this Order when it came out?"
25              And you answered:  "Yes."                                16:17:44

 1              Was that testimony true when you gave it in the

 2   Department of Justice case?

 3   A.  I was -- I believe before I left town that someone told me

 4   that it came out, but that was my only knowledge of that order.

 5   Q.  You may have read about the preliminary injunction in The          16:18:07

 6   Arizona Republic, correct?

 7   A.  It's possible.

 8   Q.  You do not recall believing that the injunction was vague

 9   or unclear in any way, correct?

10   A.  Can you repeat that question?                                       16:18:29

11   Q.  You do not recall believing that the injunction was vague

12   or unclear in any way, is that right?

13   A.  I didn't have knowledge of all the facts of that order.

14   Q.  Well, I didn't ask you about that.  I was asking you about

15   whether you thought the injunction was vague or unclear in any         16:18:48

16   way, and you don't recall thinking that at that time, is that

17   right?

18   A.  That's right.

19   Q.  And you don't recall feeling that you needed to have the

20   Court explain or clarify what paragraph 5 of the injunction            16:19:00

21   meant, is that true?

22   A.  What time frame?

23   Q.  At the time that you first learned of it, you do not recall

24   believing or feeling that you needed to have the Court explain

25   or clarify what paragraph 5 meant?                                     16:19:18

1   A.  Let me say this.  I del -- delegated this court order to my

2   subordinates, and also to the counsel that represented me.

3   Q.  Well, I'm going to ask you to look at your March 25, 2015,

4   deposition, at page 42.

5   A.  I have it here.                                              16:20:05

6         THE COURT:  It will be coming up, I think.

7   BY MR. YOUNG:

8   Q.  Would you like a paper copy of your deposition, Sheriff?

9   A.  No, I can read it here.

10  Q.  Okay.  Page 42.  And at line 4 you were asked:             16:20:15

11        "Did you ever feel that you needed to have the Court

12  explain or clarify what it meant by paragraph 5 of the

13  injunction."

14        Your response was:  "I don't recall.  That would be

15  something that the attorneys would look at."                   16:20:34

16        Was that testimony correct?

17  A.  Yes.

18  Q.  Now, you don't remember one way or the other whether you

19  ever obtained any opinions from your attorneys about the

20  meaning of paragraph 5 of the Court's December 23, 2011, order, 16:20:52

21  is that right?

22  A.  Not that I can recall.

23  Q.  Okay.  You appealed that order, correct?

24  A.  My attorneys did, yes.

25  Q.  You were the ultimate decision maker on the decision       16:21:11

1   Q.  Well, you knew, just based on the fact that you no longer

2   had 287(g) authority for traffic stops, outside of your jails,

3   that you did not have the authority that you used to have under

4   287(g) to enforce federal civil immigration law, is that right?

5   A.  Civil and criminal on the 287(g) --                          16:27:07

6   Q.  Right.

7   A.  -- but that would be correct then.

8   Q.  And then the next sentence of that same paragraph states,

9   quote:  "Defendants are therefore enjoined from detaining

10  individuals in order to investigate civil violations of federal  16:27:24

11  immigration law."

12          Do you see that?

13  A.  Yes.

14  Q.  You knew that when you learned of the injunction, right?

15  A.  Well, I don't know which time of that year, but it's        16:27:33

16  possible that that came to my attention.

17  Q.  As of April 2014, which is when your deposition in the

18  Department of Justice case was taken, you could not recall

19  directing that anything be done to make sure that your office

20  was going to comply with the injunction, is that right?        16:28:09

21  A.  Can you repeat that question?

22  Q.  At the time of your Department of Justice deposition in

23  April 2014, you could not recall directing that anything be

24  done to make sure that your office was going to comply with the

25  injunction, is that correct?                                    16:28:29

1    A.  No, it's not correct.  I mentioned previously that this was

2    delegated to my staff and to the -- and the counsel was looking

3    into it.

4    Q.  I'm going to ask that you look at page 67 of that April 29,

5    2014, deposition, starting at line 21.  And you were asked:          16:28:51

6    "As to paragraph 5 on page 40" -- referring to the injunction

7    order -- "did you direct that anything be done to make sure

8    your office was going to comply with that part?"

9              And your response was:  "I don't recall."

10             Was that testimony correct?                                  16:29:16

11   A.  Once again, I mentioned that this order was reviewed by the

12   counsel and it was delegated to my staff to carry it out.

13   Q.  Did you have a chance to review your Department of Justice

14   deposition transcript?

15   A.  Which one are you talking about?                                   16:29:38

16   Q.  The one that we're looking at right now from April 29,

17   2014.

18   A.  I'm not sure whether I reviewed it.

19   Q.  Did you make any changes to it?

20   A.  Did I make changes?                                               16:29:53

21   Q.  Yes.

22   A.  In what form?

23   Q.  Any form.  Do you recall making any changes to it at all?

24   A.  No.

25   Q.  You never asked either Chief Deputy Sheridan or Chief Sands       16:30:05

C E R T I F I C A T E

I, GARY MOLL, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 23rd day of April, 2015.

s/Gary Moll

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega           )
     Melendres, et al.,               )
5                                     )
                    Plaintiffs,       )   CV 07-2513-PHX-GMS
6                                     )
                    vs.               )   Phoenix, Arizona
7                                     )   April 23, 2015
     Joseph M. Arpaio, et al.,        )   8:34 a.m.
8                                     )
                    Defendants.       )
9    _____  )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             BEFORE THE HONORABLE G. MURRAY SNOW

17          (Evidentiary Hearing Day 3, pages 512-817)

18

19

20

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1    BY MR. YOUNG:

2    Q.  Sheriff, Mr. Cavuto asked you a question about possibly

3    going to jail.  Your intention at the time that you spoke to

4    him in June 2012 was to keep doing what you were doing,

5    notwithstanding what he asked you about as a possibility in          09:05:41

6    that regard, correct?

7    A.  I don't know where he came up with that, but that was his

8    comments.

9    Q.  I'm asking about your intention.  Your intention at that

10   time when he asked you that question was to keep doing what you      09:05:56

11   had been doing, correct?

12   A.  Well, I had no intentions of violating the law, so that

13   breezed right by me, his comment.

14   Q.  But you intended to keep doing what you were doing, right?

15   That's what you'd been saying all along and that's what you         09:06:15

16   kept doing?

17   A.  On certain parts of our authority.

18   Q.  You thought that the possibility of violating the law in a

19   way that would send you to jail was just politics?

20   A.  Can you repeat that?                                            09:06:28

21   Q.  Yes.  I'm referring to what you just said to Mr. Cavuto

22   back in June 2012.  You believed that the possibility of

23   violating the law and going to jail for it was just a matter of

24   politics, correct?

25   A.  I'm just responding to his comment.  He's the one that said     09:06:49

```
 1   it.
 2   Q.  Well, you're the one who said this is all politics, right?
 3   A.  Through the whole illegal immigration program.
 4   Q.  And that comment --
 5   A.  Very complex.                                              09:07:05
 6   Q.  Your response accurately reflected your view at that time,
 7   is that right?
 8   A.  I was speaking for the policies of the United States and
 9   Arizona.  Or their, let me just say their policies, their
10   decisions emanating from Washington.                          09:07:24
11   Q.  Did you take your oath of office so lightly that when you
12   were asked whether you could go to jail for violating the law,
13   you said it was just politics, and that was the way you felt?
14   A.  I don't think I was responding to that question by
15   politics.  I think I said follow the Constitution and the laws, 09:07:44
16   some of these interviews, so I was responding to his question
17   to the best way I could.
18   Q.  Following the law and following the orders of the Court,
19   that's not just politics, right?  Doesn't that rise above the
20   level of politics, or shouldn't it?                           09:08:07
21   A.  Yes, it's very important to follow the Court's decisions
22   and the laws, and --
23   Q.  And court orders, too, right?
24   A.  Yes, court orders.
25           You know, I've been in the -- a top federal official  09:08:25
```

1    for 22 years.  I have a deep respect for the courts, federal

2    courts, and the federal judges.  And I didn't know all the

3    facts of this court order, and it really hurts me to have after

4    55 years, 55 years, to be in this position.

5              So I want to apologize to the judge that I should have       09:08:59

6    known more of his court orders.  It slipped through the cracks.

7    So that's what I'm responding to your oath of office comment.

8    Q.  Well, speaking of politics, Sheriff, you attended the

9    Republican National Convention in August 2012, correct?

10   A.  Yes.                                                               09:09:29

11   Q.  Okay.  I'm going to show you a part of an interview that

12   you did with Fox News Latino.  It's Exhibit 196A.

13             (Video clip played as follows:)

14             INTERVIEWER:  You know, when you talk to the Hispanic

15   community they point to this platform and they pick two names.        09:09:47

16   It's Kansas Secretary of State Kris Kobach and Sheriff Joe

17   Arpaio that are the problem with the immigration tone, and are

18   the reason why the Hispanics aren't voting for Republicans.

19   What's your response to that?

20             SHERIFF ARPAIO:  First of all, what's the problem?  I        09:10:00

21   don't make the laws.  I'm the sheriff.  I enforce the laws and

22   I'm enforcing state laws and federal laws.  I enforce all the

23   laws.  I don't think that's a problem.  Now I'm the poster boy

24   from Washington from the president on down, but is it because

25   I'm just doing my job?                                                 09:10:17

1           (Video clip concluded.)

2    BY MR. YOUNG:

3    Q.  Sheriff, do you think there's something wrong with

4    Lieutenant Jakowinicz's testimony?

5    A.  Well, you know, I don't remember telling my subordinates          09:22:08

6    that I give you orders, so I don't know where that's coming

7    from.  I don't give orders.  I may have a suggestion, but I

8    don't give orders.  I mean, I'm not in the military.

9           So when he talks about orders, I don't -- that's his

10   opinion.  I may have suggested the Border Patrol, but I didn't       09:22:32

11   order.  I let my deputies make their decisions depending on the

12   circumstances.

13   Q.  So you're saying that you didn't order Lieutenant

14   Jakowinicz to take those people to Border Patrol in that

15   situation, you merely suggested that he do that.  Is that what       09:22:46

16   you're saying?

17   A.  That's my recollection.

18   Q.  Do you always merely suggest things to your subordinates

19   within your office?

20   A.  Many occasions.                                                  09:22:59

21   Q.  What you think of as a suggestion some people might

22   perceive as an order.  Would you agree with that?

23   A.  It's possible, but I think they understand who the sheriff

24   is and my management ability.

25   Q.  Since people understand who the sheriff is, you'd agree          09:23:18

```
 1    A.  No.  Which -- let me clarify that.  It was not on an e-mail

 2    that he sent out.

 3    Q.  No, understood.  So you didn't receive it by e-mail,

 4    correct?

 5    A.  I didn't receive the message by e-mail that there was this    10:40:24

 6    order.

 7    Q.  And you -- you don't get e-mails, do you?

 8    A.  No.

 9    Q.  And you didn't receive a phone call on the date that it was

10    issued regarding that order, correct?                            10:40:39

11    A.  I don't recall.

12    Q.  You didn't read this order on the date that it was filed,

13    correct?

14    A.  No.

15    Q.  Do you ever recall reading the order?                        10:40:47

16    A.  May have been many, many months later.

17    Q.  When a court issues orders, not just in this case, but

18    generally, how do you normally get informed of the order?

19    A.  You talking about lawsuits or an order?

20    Q.  Just generally.                                              10:41:18

21    A.  I may have -- people may have mentioned it to me, but --

22    Q.  Sheriff, generally, if an order comes down or lawsuit gets

23    filed, how do you get informed of that?

24    A.  I don't get all of them, but when I do, I just give them to

25    the subordinates.  I don't get involved.  Usually my attorneys   10:41:39
```

1   look into it.

2   Q.  So when you say your attorneys, you're talking about people

3   from the Maricopa County Attorney's Office?

4   A.  Or those that are hired by the County Attorney's Office.

5   Q.  What they call outside attorneys?                    10:41:55

6   A.  Yes.

7   Q.  So you rely on your attorneys to give you information

8   regarding issues in lawsuits, correct?

9          MR. YOUNG:  Objection, leading.

10         THE WITNESS:  Information, or if they need --       10:42:08

11         THE COURT:  Sheriff --

12         THE WITNESS:  I'm sorry.

13         THE COURT:  Sustained.

14  BY MS. IAFRATE:

15  Q.  So my question is:  How is it that you generally get the   10:42:14

16  information regarding what's going on in the lawsuits?

17  A.  It's usually the attorney that will mention it, I guess, at

18  the appropriate time.

19  Q.  Do you recall who told you about the preliminary

20  injunction?                                              10:42:35

21  A.  No.

22  Q.  Do you recall when you were told about the preliminary

23  injunction?

24  A.  As far as being told, and there's a little confusion

25  because I left the state day after Christmas and was not back   10:42:57

 1    A.  Yes.

 2    Q.  Not just about illegal immigration?

 3    A.  No.

 4    Q.  There are video clips and press releases regarding

 5    enforcement of other laws during that time period also,          10:44:54

 6    correct?

 7    A.  Yes.

 8    Q.  Were you just enforcing illegal immigration laws between

 9    2008 and 2013?

10    A.  No.                                                          10:45:05

11    Q.  Let me just show you one of the press releases that was

12    shown to you.  It's Exhibit 75.

13          This is in evidence.  It's dated December 30, 2011,

14    correct?

15    A.  Yes.                                                         10:45:38

16    Q.  Sheriff, do you write the press releases?

17    A.  Usually my public information office does.

18    Q.  Do you ever personally write the press release itself?

19    A.  No.

20    Q.  In this press release it talks about the Human Smuggling     10:45:55

21    Unit, correct?

22    A.  Yes.

23    Q.  And it talks about some enforcement that was done on

24    December 30, 2011, correct?

25    A.  Yes.                                                         10:46:08

1   A.  -- worldwide.

2   Q.  As the sheriff, how many press releases has your office

3   disseminated during the time that you were sheriff?

4   A.  I would say in the thousands.

5   Q.  I'm going to show -- well, you were shown a -- many video          10:49:29

6   clips during your direct examination, correct?

7   A.  Yes.

8   Q.  Some of them talked about SB 1070, correct?

9   A.  Yes.

10  Q.  And SB 1070 was what some called "show me your papers"            10:49:44

11  provision.  Do you recall that?

12  A.  Yes.

13  Q.  That was one area that was upheld that you could enforce,

14  correct?

15  A.  Yes.                                                              10:49:56

16  Q.  That was one of the areas where when you say that you will

17  continue to enforce the immigration laws, that was a piece

18  where you could continue to enforce, correct?

19  A.  Yes.

20  Q.  You were shown some press release regarding a backup plan.        10:50:10

21       Do you recall that?

22  A.  Yes.

23  Q.  Explain what you mean by a backup plan.

24  A.  Well -- excuse me -- that's when ICE, there was a lot of

25  controversy around the nation about ICE not releasing -- or not       10:50:48

```
 1              MR. YOUNG:  Objection, legal conclusion, Your Honor,
 2    and foundation with this witness.
 3              THE COURT:  I'm going to allow it.
 4              THE WITNESS:  Could you repeat?
 5    BY MS. IAFRATE:                                              10:52:24
 6    Q.  Sure.  We were talking about the telephone call between you
 7    and Sergeant Palmer.  You wanted the individuals held at
 8    Enforcement Support.  You now know that was a violation of the
 9    preliminary injunction, correct?
10    A.  Yes.                                                     10:52:36
11    Q.  Sergeant Palmer testified that he wanted to remove them and
12    transport them to Border Patrol.  Do you recall that?
13    A.  Yes.
14    Q.  Was that in violation of the preliminary injunction?
15    A.  Yes.                                                     10:52:50
16    Q.  Did you know that back when you were talking to
17    Sergeant Palmer?
18    A.  No.
19    Q.  Did anyone tell you that the backup plan was in violation
20    of the preliminary injunction?                              10:53:24
21    A.  No.
22              Are you -- what period are you talking about, Counsel?
23    At that time or what?
24    Q.  At that time.
25    A.  No.                                                      10:53:55
```

1   A.  Yes.

2   Q.  Those employer search warrants regarding identity thefts,

3   that was another area of the law that you could continue to

4   enforce, correct?

5   A.  Yes.                                                      10:57:53

6   Q.  These search warrants, for example, the ID theft raid

7   discussed in this Exhibit 78, that wasn't the result of a

8   traffic stop, correct?

9   A.  No.

10  Q.  Sheriff, when did you become aware that some of your      10:58:37

11  previous actions from MCSO violated the preliminary injunction?

12  A.  I don't have the time frame, but it was, as I say, many,

13  many, many months later.  Could have been before the -- around

14  the time of the -- was it 1913, May 1913?

15  Q.  2013?                                                     10:59:11

16  A.  2013.

17  Q.  When the judge issued its findings of fact and conclusions

18  of law?

19  A.  Yes.  And that's the time I sent a newsletter to all the

20  employees regarding the judge's decision.                    10:59:27

21  Q.  You're saying that you sent out a newsletter.  Are you

22  talking about some sort of Briefing Board?

23  A.  Yes.

24  Q.  And why did you send out a Briefing Board in May 2013?

25  A.  It had to do with detainment and also using race.  Those  10:59:44

 1  are two issues that I wanted to get across to our people.

 2  Q.  Well, explain more.  What were you trying to get across to

 3  your people in May 2013 regarding --

 4  A.  That it should not be done.

 5  Q.  That what should not be done?                              11:00:07

 6  A.  By using race or detaining people illegally.

 7  Q.  You were not familiar with those concepts in the

 8  preliminary injunction until May 2013?

 9  A.  No.

10  Q.  My statement was accurate?                                 11:00:25

11  A.  Yes.

12  Q.  There came a time where a monitor was appointed, correct?

13  A.  Yes.

14  Q.  Did you express what your involvement with the monitor

15  would be to your organization?                                 11:00:54

16  A.  If I recall, I think the monitor came to my office, I

17  believe it was around January 1914 -- 2014.  We had a nice

18  discussion.  He has a law enforcement background, so we had

19  something in common.

20       And I believe he mentioned that he would rather deal      11:01:17

21  with my staff, realizing that I had a large organization to

22  run, and I said, you know, that's a good idea.  Talk to my

23  staff.  And I believe that's what's been going on ever since.

24  Q.  Since the monitor has been appointed have you done anything

25  to block him from doing his job?                               11:01:47

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ARIZONA

 3

 4   Manuel de Jesus Ortega Melendres,    )
     et al.,                             )
 5                                        )
                    Plaintiffs,           )  No. CV 07-2513-PHX-GMS
 6                                        )
                    vs.                   )  Phoenix, Arizona
 7                                        )  October 1, 2015
     Joseph M. Arpaio, et al.,            )  9:01 a.m.
 8                                        )
                    Defendants.           )
 9   _____)

10

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           BEFORE THE HONORABLE G. MURRAY SNOW

16      (Evidentiary Hearing Day 9, Pages 2007-2247)

17

18

19

20

21

22   Court Reporter:           Gary Moll
                               401 W. Washington Street, SPC #38
23                             Phoenix, Arizona  85003
                               (602) 322-7263
24
     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription
</pre>

 1   statements?

 2   A.   Yes.  That's a side issue.  The main issue was to enforce

 3   that program and arrest people with fake identification.  That

 4   was what our mission was.

 5            MR. YOUNG:  Your Honor, I may address this next                    09:12:36

 6   question to Mr. Masterson.  I had an e-mail exchange about a

 7   number of exhibits which I would like to have admitted, which I

 8   can examine the sheriff on, but we could save time if we could

 9   achieve a stipulation.  And they are Exhibits 79, 80, 81, 83,

10   86, and 89.                                                                 09:13:00

11            MR. MASTERSON:  I think we had another e-mail on my

12   way down here, but -- I don't know what you want me to do,

13   Judge.  I can, I guess, try to look through all of them.

14            THE COURT:  You haven't looked at them yet?

15            MR. MASTERSON:  No, sir.                                           09:13:14

16            THE COURT:  All right.  Then proceed, Mr. Young.

17            MR. YOUNG:  Perhaps I'll defer that question until

18   Mr. Masterson has more of a chance.  Would that -- let's do

19   that.

20            THE COURT:  All right.                                             09:13:24

21   BY MR. YOUNG:

22   Q.   Sheriff, as a result of this Court's December 23, 2011

23   preliminary injunction, you did not tell anyone in your office

24   to change anything about how your office was doing its work, is

25   that correct?                                                              09:13:40

1   A.  No, I -- after this preliminary injunction came out, we did
2   delegate that to Brian Sands, and the lawyer was keeping track
3   of it, so there were, I'm sure, many discussions between those
4   people regarding this order.
5   Q.  But you yourself did not tell anyone to change anything as        09:14:05
6   a result of the injunction, is that correct?
7   A.  Well, I didn't go out to every employee, but that, once
8   again, was delegated to my subordinates to carry that message
9   out.
10  Q.  Sheriff, do you remember having your deposition taken             09:14:24
11  earlier this month on April 15 -- actually, no.  September 18.
12  Actually, last month at this point.
13          Actually, sorry, it is September 17.  You remember
14  having a deposition, correct?
15  A.  Yes.                                                              09:14:52
16  Q.  Okay.  I'm going to direct your attention -- and we can
17  play it on the screen -- to page 358, line 16, to 359, line 1.
18          And I'm going to have Mr. Klein play that video.  It's
19  clip number 6.
20          (Deposition video clip played as follows:)                   09:15:14
21          "Question:  Did you, yourself, ask anyone to change
22  anything in what your office was doing as a result of the
23  injunction?
24          "Answer:  What do you mean by change?
25          "Question:  Do anything different from what your             09:15:31

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3

4    Manuel de Jesus Ortega Melendres,      )
     et al.,                                )
5                                           )
                    Plaintiffs,             )  No. CV 07-2513-PHX-GMS
6                                           )
                    vs.                     )  Phoenix, Arizona
7                                           )  October 8, 2015
     Joseph M. Arpaio, et al.,              )  9:03 a.m.
8                                           )
                    Defendants.             )
9    _____)

10

11

12

13

14
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
               BEFORE THE HONORABLE G. MURRAY SNOW
16
            (Evidentiary Hearing Day 11, Pages 2471-2711)
17

18

19

20

21

22   Court Reporter:           Gary Moll
                               401 W. Washington Street, SPC #38
23                             Phoenix, Arizona  85003
                               (602) 322-7263
24

25   Proceedings taken by stenographic court reporter
     Transcript prepared by computer-aided transcription

1    it.  So I don't know how you would take that.  I took it like

2    it was okay to do because I wanted some advice before I did it.

3          "Question:  Did Casey tell you, 'Yes, you can do that

4    and it complies with the injunction'?

5          "Answer:  I don't recall him either way.  I recall him      09:42:05

6    not having a problem with it.

7          "Question:  Okay."

8          (Deposition video clip concluded.)

9    BY MR. YOUNG:

10   Q.  Sheriff, you now have heard that Mr. Casey wrote a letter     09:42:17

11   back in October 2012 to plaintiffs, responding to questions

12   raised by plaintiffs about whether your backup plan for taking

13   people to the Border Patrol violated the preliminary

14   injunction, correct?

15   A.  Yes.                                                          09:42:36

16   Q.  Okay.  You do not recall ever reading that letter, correct?

17   A.  Well, I read it recently, but I may have read it way back,

18   I'm not sure.

19   Q.  Sheriff, on your September 17, 2015 deposition, I'm going

20   to play for you page 391, lines 12 through 16.                    09:43:02

21         That is clip number 9.

22         (Deposition video clip played as follows:)

23         "Question:  So you never read a letter from Mr. Casey

24   on the issue of whether your office was violating the

25   injunction; is that right?                                        09:43:21

1    A.  I believe that happened two, three days before Christmas.

2    I don't recall being notified.  In fact, I was on an airplane

3    the day after Christmas and got back to the office, I believe,

4    around January 3rd.

5    Q.  What did you do with respect to the preliminary injunction?   10:24:18

6    A.  Well, we delegated that to my subordinates to work with the

7    attorney, Casey.

8    Q.  Did you say your subordinates were to work with the

9    attorney?

10   A.  Casey, and those involved in the human smuggling.   10:24:41

11   Q.  Do you know what they -- do you know what they were

12   supposed to do with Mr. Casey?

13   A.  No.  Coordinate and get his advice, I presume.

14   Q.  Were you personally involved in any of the -- well, you sat

15   here and you heard evidence about the training scenarios that   10:24:59

16   Sergeant Palmer prepared and that Lieutenant Sousa was dealing

17   with back then.  Do you recall that testimony?

18   A.  Yes.

19   Q.  Were you personally involved in that?

20   A.  No.   10:25:11

21   Q.  Did you personally contact Sergeant Palmer or

22   Lieutenant Sousa about the training scenarios that were

23   discussed?

24   A.  I don't recall.  I don't think so.

25   Q.  Did you have any involvement at all in trying to draft up   10:25:22

1    training scenarios in an attempt to comply with the Court's

2    December 23, 2011 order?

3    A.  No.

4    Q.  Did you ever order Sergeant Palmer, Lieutenant Sousa, or

5    anyone else, not to finalize those training scenarios?          10:25:41

6    A.  No.

7    Q.  Now, Mr. Young just this morning asked you some questions

8    and read to you some snippets from your deposition about

9    conversations you had with Mr. Casey about turning people over

10   to the Border Patrol.                                           10:26:15

11          Do you recall those questions just maybe, I don't

12   know, half hour, an hour ago?

13   A.  Yes.

14   Q.  Did you have conversations with Mr. Casey about whether you

15   could turn suspects over to the Border Patrol if you did not    10:26:33

16   have reason to hold them on state criminal charges?

17   A.  As I said, I may have talked to him about that, whether to

18   use the Border Patrol to take those that are here illegally but

19   with no state charge.  And that would have been my alternative,

20   since ICE was refusing to accept, like in the past.  And if I   10:27:03

21   recall, I didn't get a yes or no.

22   Q.  Could you take a look -- Mr. Young just had you look at

23   this so let's look at it again.  On page 644 of your April 2015

24   deposition.

25          Do you have that up there, by chance?  Or maybe not.     10:27:30

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Manuel de Jesus Ortega Melendres,　)
et al.,　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiffs,　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　vs.　　　　　　　　　) No. CV-07-02513-PHX-GMS
　　　　　　　　　　　　　　　　　　　)
Joseph M. Arpaio, et al.,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　　)
_____)


VIDEOTAPED DEPOSITION OF JOSEPH M. ARPAIO


Phoenix, Arizona
March 25, 2015
9:11 a.m.


REPORTED BY:
CATHY J. TAYLOR, RPR
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)



Joseph M. Arpaio      de Jesus Ortega Melendres v. Arpaio      3/25/2015

Page 19

 1    injunction, did you think that you needed to change anything

 2    about how your office was operating as a result of that

 3    injunction?

 4         A.    Any -- what do you mean change?  I'm confused.

 5         Q.    Well, your office prior to the injunction had

 6    engaged in certain activities; right?

 7         A.    Yes.

 8         Q.    Okay.  As a result of the injunction, did you

 9    believe that you needed to change anything about what your

10    office was doing?

11         A.    Yes.

12         Q.    Okay.  And what did you believe your office needed

13    to change in its activities?

14         A.    Once again, I -- I delegated this to my staff.  And

15    the attorneys knew working for us, and I expected them to

16    follow that order.

17         Q.    Yes, but I am entitled to know what you were

18    thinking at the time.  And you can tell me you weren't

19    thinking anything, if that's the case, or you can tell me

20    what you were thinking.  But I'm entitled to know everything

21    about what you were thinking as to what changes were

22    necessary in the activities of your office as a result of

23    this injunction.

24         A.    I was -- I was thinking as to passing this on to my

25    employees.  I wasn't thinking of anything at the time,



Joseph M. Arpaio      de Jesus Ortega Melendres v. Arpaio      3/25/2015

Page 20

1   because I had people that -- legal people that could read

2   the -- read the -- the -- what the judge put in his -- in

3   his -- in his document and see that it would be carried out.

4       Q.    So I'm getting from your answer that you yourself

5   did not have any specific changes in the operation of your

6   office that you believed personally would be necessary as a

7   result of the judge's December 2011 injunction; is that

8   correct?

9                    MS. IAFRATE:  Form.

10                   THE WITNESS:  Once again, I passed that law --

11  that document to my subordinates.

12  BY MR. YOUNG:

13      Q.    Did you yourself believe that there would be any

14  changes in the operation of your office that would be

15  necessary as a result of the injunction?

16      A.    Once again, I passed that document on and -- and

17  expected the ruling to be enforced.

18      Q.    Okay.  Well, I -- I realize you did that.  As a

19  result of your passing it on, did you believe one way or the

20  other that any changes would be needed in how your office

21  operated?

22      A.    Well, first of all, I didn't read the whole

23  document -- excuse me -- at that time.  And passed it on to

24  the subordinates and -- and expected any necessary action to

25  be taken.



DOJ-001038

Joseph M. Arpaio       de Jesus Ortega Melendres v. Arpaio       3/25/2015

Page 22

```
 1      A.    -- question?
 2      Q.    Well, let's -- let's -- let's put a time frame on
 3   it.
 4            At any time in 2011 or 2012, did you ever come
 5   to believe that the preliminary injunction dated December 23,
 6   2011, required your office to change any aspect of its
 7   operations?
 8                MS. IAFRATE:  Form.
 9                THE WITNESS:  Once again, I'm just going to
10   repeat that I passed this ruling on to my subordinates and
11   expected them to carry it out.
12   BY MR. YOUNG:
13      Q.    When you expected them to carry it out, did you
14   expect them to change anything in how your office operated?
15      A.    Once again, I didn't -- I did not look at every
16   aspect of this.  I was relying on information from Legal that
17   I received and other officials in the office.  My mission was
18   to give them this, like I do every lawsuit, and expect them
19   to carry it out.
20      Q.    Did you care one way or the other whether any
21   changes in your office were necessary as a result of the
22   injunction?
23                MS. IAFRATE:  Form.
24                THE WITNESS:  No, I didn't care whether yes or
25   no.  I expected it to be carried out.
```



DOJ-001040

Joseph M. Arpaio        de Jesus Ortega Melendres v. Arpaio        3/25/2015

Page 24

1            You said do I care or don't care.  Yeah, I do

2       care.

3       BY MR. YOUNG:

4            Q.    Okay.  My question was, did you care whether the

5       order required any changes in your office's operations?

6            A.    That is something I did not know if -- if it --

7       what the changes would be and so on.  I would expect changes

8       would occur --

9            Q.    Okay.

10            A.    -- but I didn't know what they were.

11            Q.    Did you ever try to find out what they were?

12            A.    During what time span?  A year?  Two years?

13            Q.    In 2011 or 2012.

14            A.    Well, I -- I expected that the policies were being

15       followed.

16            Q.    Did you ever try to find out what the policies or

17       changes in policy were resulting from the injunction?

18                 MS. IAFRATE:   Form.

19                 THE WITNESS:   I may have received some verbal

20       comments, but nothing official.

21       BY MR. YOUNG:

22            Q.    From whom did you receive verbal comments?

23            A.    I don't recall.

24            Q.    Did you believe that any changes in the training of

25       your officers would be required as a result of the



DOJ-001042

Joseph M. Arpaio       de Jesus Ortega Melendres v. Arpaio          3/25/2015

Page 25

1    preliminary injunction?

2                    MS. IAFRATE:   Form.

3                    THE WITNESS:   I believe if -- if it was

4    necessary, it should be done, yes.

5    BY MR. YOUNG:

6        Q.    Okay.  Well, did you know one way or the other

7    whether a revised training would be needed as a result of the

8    injunction?

9        A.    If I recall at that time span, I believe there was

10   training.

11       Q.    What training do you have in mind?

12       A.    I -- once again, I'm not sure if it was training

13   having to do with the judge's order or criteria on the

14   illegal immigration problem.  Enforcement.

15       Q.    Are you aware --

16       A.    Enforcement.

17       Q.    Are you aware of any changes in training that were

18   either proposed or implemented as a result of the

19   December 2011 injunction?

20       A.    No.

21       Q.    Are you aware of any training materials that were

22   prepared or proposed as a result of the December 2011

23   injunction?

24       A.    No, I don't recall.

25       Q.    I'm going to hand you what was previously marked in



DOJ-001043

Joseph M. Arpaio        de Jesus Ortega Melendres v. Arpaio        3/25/2015

Page 36

```
 1                    MS. IAFRATE:  Form.
 2                    THE WITNESS:  Not that I can recall.
 3                    (Exhibit 75 marked for identification.)
 4                    THE WITNESS:  Do you want one of these back?
 5     You gave me two.
 6                    MR. YOUNG:  Okay.  Well, thank you very much.
 7                    MR. LIDDY:  Are these for us?
 8                    MR. YOUNG:  Yes.
 9     BY MR. YOUNG:
10         Q.    Exhibit 75 is a press release that your office
11     issued on December 30, 2011; correct?
12         A.    Yes.
13                    (Audio from laptop.)
14                    MR. McDONALD:  Sorry about this.  Stupid
15     thing.  There.
16                    I needed to wake you up.
17     BY MR. YOUNG:
18         Q.    Now, you issued this press release seven days after
19     the preliminary injunction; correct?
20         A.    That's the date, yes.
21         Q.    Okay.  And in it, you said, quote, "I will continue
22     to enforce illegal immigration laws."
23                    Do you see that down toward the bottom?
24         A.    Yes.
25         Q.    What did you mean by that?
```



DOJ-001054

Joseph M. Arpaio      de Jesus Ortega Melendres v. Arpaio      3/25/2015

Page 37

1      A.    Well, first of all, we had the Human Smuggling Unit
2  in operation.   And, according to this press release, we took
3  12 illegal aliens into custody.
4      Q.    Well, I understand that, because that's what had
5  happened.   My question is really when you said, quote, "I
6  will continue to enforce illegal immigration laws," unquote,
7  what did you mean?
8      A.    That I will continue to enforce illegal immigration
9  laws.
10     Q.    Okay.   What illegal immigration laws were you
11 referring to?
12     A.    Well, we -- we had the employer sanction still in
13 operation.   We still had the human smuggling operation, I
14 believe, going.   And, also, we had the jail policy where
15 anyone arrested on state/local violations would be checked
16 for their immigration status.
17     Q.    When you learned about the December 23, 2011,
18 injunction, did you understand that it would affect the way
19 your office could enforce the Human Smuggling Act?
20               MS. IAFRATE:   Form.
21               THE WITNESS:   I didn't have knowledge of the
22 nuts and bolts of that, whether there were certain criteria
23 or not.   But I expected the criteria that the -- the --
24 ruling the judge put out to be followed.
25               (Next page, please.)



DOJ-001055

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Manuel de Jesus Ortega Melendres,  )
et al.,                            )
                                   )
                Plaintiffs,        )
                                   )
          vs.                      ) No. CV-07-02513-PHX-GMS
                                   )
Joseph M. Arpaio, et al.,          )
                                   )
                Defendants.        )
_____)


VIDEOTAPED DEPOSITION OF JOSEPH M. ARPAIO

VOLUME II


Phoenix, Arizona
April 14, 2015
1:20 p.m.


REPORTED BY:
CATHY J. TAYLOR, RPR
Certified Reporter
Certificate No. 50111

PREPARED FOR:
ASCII/CONDENSED

(CERTIFIED COPY)



DOJ-001328

Joseph Arpaio          de Jesus Ortega Melendres v. Arpaio          4/14/2015

                                                            Page  320

 1     a misdemeanor.  So this is a tough one to answer.

 2          Q.    Under your oath, do you think it's more important

 3     for you to enforce the immigration laws than to enforce the

 4     orders of the Court?

 5          A.    No.

 6                   MS. IAFRATE:  Form.

 7                   THE WITNESS:  It's important to enforce the

 8     orders of the Court.

 9     BY MR. YOUNG:

10          Q.    Okay.  In your view, did your oath include

11     enforcing the immigration laws but not include enforcing the

12     orders of the Court or obeying the orders of the Court?

13                   MS. IAFRATE:  Form.

14                   THE WITNESS:  Don't know.

15     BY MR. YOUNG:

16          Q.    You don't know one way or the other?  Is it -- is

17     it possible that, in your view, enforcing the immigration

18     laws took priority over obeying the orders of the Court?

19          A.    Once again --

20                   MS. IAFRATE:  Form.

21                   THE WITNESS:  -- I believe in obeying the

22     orders of the Court.

23     BY MR. YOUNG:

24          Q.    Okay.  Well, I understand that.  And -- and I'm

25     posing the question to you, though, about whether you thought



DOJ-001380

Page 321

1    enforcing the immigration laws was more important than

2    obeying the orders of the Court.

3                    Was that your view?

4        A.    No.

5                    MS. IAFRATE:  Form.

6                    THE WITNESS:  My view is to abide by the

7    Court's rulings.

8    BY MR. YOUNG:

9        Q.    Okay.  Well, what if that, in your view, comes in

10   conflict with the goal of enforcing the immigration laws?

11                   Now, you've told me that you don't know --

12   that you do know that your oath includes enforcing the

13   immigration laws.  You don't know whether it includes obeying

14   the orders of -- or enforcing the orders of the Court.

15                   My question to you is, given that, if you had

16   a choice between enforcing the immigration laws and obeying

17   the orders of the Court, do you know which direction you

18   would go?

19       A.    If --

20                   MS. IAFRATE:  Form.

21                   THE WITNESS:  If there is a conflict between

22   the immigration laws versus the Court's order, naturally, I

23   would abide by the Court's order.

24   BY MR. YOUNG:

25       Q.    Even though you don't know that your oath includes



DOJ-001381

# In The Matter Of:

*Melendres v*
*Arpaio*

---

*Joseph M. Arpaio*
*Vol. III*
*September 17, 2015*

---

*Griffin & Associates Court Reporters*
*2398 E. Camelback Road, Suite 260  Phoenix, AZ 85016*
*www.arizonacourtreporters.com*
*602.264.2230*

Original File JA091715.txt
**Min-U-Script®**

DOJ-001409

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


Manuel de Jesus Ortega          )
Melendres, et al.,              )
                                )
            Plaintiffs,         )
                                ) No. CV-07-2513-PHX-GMS
vs.                             )
                                )
Joseph M. Arpaio, et al.,       )
                                )
            Defendants.         )
                                )




VIDEOTAPED DEPOSITION OF JOSEPH M. ARPAIO
VOLUME III


Phoenix, Arizona
September 17, 2015
8:09 a.m.




REPORTED BY:
MARISA L. MONTINI, RPR
Certified Reporter
Certificate Number 50176

PREPARED FOR:
ASCII/COPY

(Certified Copy)

1           MR. WALKER:  Join.

2           THE WITNESS:  I don't know about saying that

3    I -- I -- what was it?  That I --

4    BY MR. YOUNG:

5        Q.  Mr. Casey said that you told him, quote, "I'm the

6    sheriff, and I make the decisions around here," end quote.

7    Is it possible that you told him that?

8           MR. MASTERSON:  Form; foundation.

9           THE WITNESS:  It's -- I don't know what

10   context we were talking about where I make decisions.  I

11   was just trying to let him know that I'm the elected

12   sheriff, and sometimes when I -- when I made -- evidently

13   I made a decision about the Border Patrol issue, and he

14   didn't say -- I don't recall him saying you can't use the

15   Border Patrol.  I checked it out before I did it or said I

16   was going to do it.

17   BY MR. YOUNG:

18       Q.  Did you get anything from writing on him on that

19   issue?

20           MR. MASTERSON:  Excuse me.  Could I have

21   that question back, please?

22           MR. YOUNG:  Well, I'll reword it.

23   BY MR. YOUNG:

24       Q.  When you said that you checked out your plan with

25   Mr. Casey about taking people to the Border Patrol, did

1    you get something in writing from him --

2                    MR. McDONALD:  Object to the form.

3    BY MR. YOUNG:

4        Q.    -- telling you that you could do that?

5                    MR. MASTERSON:  Form.

6                    MR. WALKER:  Join.

7                    THE WITNESS:  I don't recall.  I --

8    someone -- and I have no documentation or nothing, but

9    someone, I don't know who, mentioned that he may have

10   written a letter saying it was okay.  It didn't come to

11   me.

12   BY MR. YOUNG:

13       Q.    Well, how about -- you said that you got that

14   okay from him before you put in place your plan to take

15   people to the Border Patrol.  That's what I'm talking

16   about when you -- when you checked with him before you

17   said that -- you were doing that, did you get that in

18   writing?

19                    MR. WALKER:  Form.

20                    MR. MASTERSON:  Join.

21                    THE WITNESS:  When you say I got the okay,

22   what I'm saying when I ran this by him, he didn't say you

23   can't do it.

24   BY MR. YOUNG:

25       Q.    Okay.  Let me --

1      A.    So we were discussing, and I wanted to get some

2  type of opinion of whether it was okay to do this.  It had

3  nothing to do with the Court.  It had to do with ICE not

4  picking these illegal aliens up and leaving them in the

5  desert or they could be suspects in other crimes.  And

6  being an ex-federal guy for 30 years working in Mexico and

7  Texas and Arizona, as a federal guy, I always cooperated

8  with the federal officials.  You come up with some type of

9  federal -- that you perceive as a violation.  You call the

10  agency and work with them.  Border Patrol had the

11  jurisdiction.  So that was my theory about turning these

12  people over to the federal government.

13      Q.    Was that in an oral conversation where you ran it

14  by Mr. Casey?

15              MR. WALKER:  I'm sorry.  Was that?

16              THE WITNESS:  I don't think I ever wrote a

17  letter to Mr. Casey.  I have no documentation, e-mails or

18  anything else.  I didn't write the lawyers any letters

19  that I can recall.

20  BY MR. YOUNG:

21      Q.    When you ran it by Mr. Casey, was that in a

22  meeting face to face or on the phone?

23      A.    No idea.  I didn't have that many meetings with

24  him face to face.

25      Q.    These press releases where you talk about your --

385

1   taking people to the Border Patrol are dated September 21,

2   September 27 and October 9, 2012.  Did you run that issue

3   by Mr. Casey before those press releases?

4                  MR. MASTERSON:  Form.

5                  MR. WALKER:  Join.

6                  THE WITNESS:  I -- I think, if I recall,

7   that he wanted to see these press releases.  I think that

8   they were sent to him by my public relations staff.

9   There's no secret that I was doing this if it's in the

10  media.  I didn't hear anybody come back and tell me, "Hey,

11  stop it.  You're violating something."

12  BY MR. YOUNG:

13      Q.   Did you run the press releases by Mr. Casey

14  before you released them to the public?

15      A.   I believe my public relations people did.

16      Q.   What's the basis for that belief?

17      A.   The basis?

18      Q.   Yeah.  How do you know that your public relations

19  people ran these press releases?

20      A.   Because they said that they ran it by them.

21      Q.   Who said that they ran it by them?

22      A.   Whether it's Lisa Allen or some other PIOs.  I

23  think Casey said he wanted to see them.

24      Q.   So did you ever talk to Mr. Casey about drafts of

25  these press releases?

1    part of a larger meeting about other issues or was it

2    limited to this particular issue?

3                    MR. MASTERSON:  Form.

4                    THE WITNESS:  I don't recall if we talked

5    about other subjects.

6    BY MR. YOUNG:

7        Q.   Did Mr. Casey tell you that your plan to take

8    people to the Border Patrol likely violated the

9    preliminary injunction?

10       A.   I didn't hear him tell me that.  If he did, I

11   would not have done it.

12       Q.   Well, he says that he did tell you that.  Do you

13   think he's wrong?

14                   MR. MASTERSON:  Foundation.

15                   THE WITNESS:  That he say -- that I -- I

16   would violate the -- no, I -- no.  I asked for his advice,

17   and he had no qualms about me doing it.  He never said you

18   can't do it that I recall.

19   BY MR. YOUNG:

20       Q.   Well, he said that it likely violated the Judge's

21   order.  Do you deny that he said that to you?

22                   MR. MASTERSON:  Form; foundation.

23                   MR. WALKER:  Join.

24                   THE WITNESS:  I don't know if he said

25   likely.  I don't know what that means.

1    response to the letter that's attached to Exhibit 2512?

2                    MR. MASTERSON:  Form.

3                    THE WITNESS:  To send what letter?  This

4    letter?

5    BY MR. YOUNG:

6        Q.   Well, you notice there's a letter from Mr. Segura

7    of the ACLU that starts on MCAO00031.  Did you instruct

8    Mr. Casey to send a letter back denying the allegation

9    that your office was violating the Court's injunction?

10                   MR. MASTERSON:  Form.

11                   MR. WALKER:  Join.

12                   THE WITNESS:  I never saw this letter, and

13   quite frankly, I didn't even know Andre Segura is.  Well,

14   this is a letter from --

15   BY MR. YOUNG:

16       Q.   You're looking at a letter from plaintiffs'

17   counsel.

18       A.   To Casey.

19       Q.   To Casey.

20       A.   Okay.

21       Q.   Right.  Did you instruct Mr. Casey to send the

22   letter back in response to this letter?

23       A.   No.

24       Q.   Did you ever talk to Mr. Casey about his sending

25   a response to this letter?

390

1      A.    I don't even know what -- I've never seen this

2   letter.   I know nothing about these --

3      Q.    Okay.   Well, this is --

4      A.    -- legal letters.

5      Q.    This is a letter dated October 11, 2012, accusing

6   your office of violating the Court's injunction.

7                Did you ever tell Mr. Casey to send a letter

8   back denying that your office was violating the

9   injunction?

10     A.    No --

11                MR. MASTERSON:   Form; foundation.

12                THE WITNESS:   -- because I never knew about

13   the letter.

14   BY MR. YOUNG:

15     Q.    You don't recall talking to Mr. Casey about that

16   issue?

17     A.    No.

18     Q.    You mentioned a few minutes ago another letter

19   that Mr. Casey or some letter that Mr. Casey had written

20   on this issue.   What do you know or recall about that

21   letter?

22                MR. MASTERSON:   Form; foundation.

23                THE WITNESS:   I don't --

24                MR. WALKER:   Join.

25                THE WITNESS:   It just briefly, something

DOJ-001464

Joseph M. Arpaio - Vol. III - September 17, 2015

396

1     A.   Well, it wasn't a letter to me.

2     Q.   Well, who did Mr. Casey write the letter to

3  according to what Chief Sheridan told you yesterday?  What

4  did Chief Sheridan say in that regard?

5     A.   I think he mentioned to the ACLU or something

6  like that.  I -- it was a passing remark.

7     Q.   When Chief Sheridan made the passing remark to

8  you about the letter that Mr. Casey had written to the

9  ACLU, did you think it had anything to do with the Court's

10  injunction?

11     A.   No.

12          MR. MASTERSON:  Form; foundation.

13          MR. WALKER:  Join.

14  BY MR. YOUNG:

15     Q.   At any time, did Mr. Casey tell you that he

16  thought that you would lose if you went to the court,

17  Judge Snow, and argued that your plan to take people to

18  the Border Patrol complied with the Court's injunction?

19     A.   That I would lose?

20     Q.   Yes.  Did Mr. Casey ever tell you that?

21     A.   I don't recall that.  He's the lawyer.  I mean,

22  if he thought I would lose, I would presume he would not

23  have pursued it.  I don't know.  I'm not a legal guy.

24     Q.   Well, my question is whether he told you that he

25  thought you would lose.  Is it possible that he told you

397

1   that he thought you would lose?

2                   MR. MASTERSON:   Form.

3                   THE WITNESS:   In what -- in what respect?

4   Going up to a higher court?   I don't understand what

5   you're talking about.

6   BY MR. YOUNG:

7       Q.   Well --

8       A.   Lose what?

9       Q.   Lose on the issue of whether your plan to take

10  people to the Border Patrol violated the preliminary

11  injunction.   Did Mr. Casey ever tell you that you would

12  probably lose on that issue if it came up in court?

13      A.   Not that I -- I can recall.   He never said you

14  can't take them -- take them to the Border Patrol.

15      Q.   Did you ever tell Mr. Casey that some other

16  lawyer or anyone else was advising you that you could take

17  people to the Border Patrol as described in your press

18  releases?

19      A.   Other lawyers?

20      Q.   Well, let's start with that, other lawyers.   Did

21  he ever -- did you ever say to him that you had some other

22  lawyers who were advising you on that issue?

23      A.   Well, I -- I -- there was a lawyer way back,

24  Kobach, that did training, I believe, for our office

25  briefly.

484

1  STATE OF ARIZONA         )
                           ) ss.
2  COUNTY OF MARICOPA       )

3         BE IT KNOWN that the foregoing proceedings were
   taken before me; that the witness before testifying was
4  duly sworn by me to testify to the whole truth; that the
   foregoing pages are a full, true, and accurate record of
5  the proceedings, all done to the best of my skill and
   ability; that the proceedings were taken down by me in
6  shorthand and thereafter reduced to print under my
   direction.

7

          I CERTIFY that I am in no way related to any of
8  the parties hereto, nor am I in any way interested in the
   outcome hereof.

9

10         [X]  Review and signature was requested.
           [ ]  Review and signature was waived.
11         [ ]  Review and signature not required.

12

          I CERTIFY that I have complied with the ethical
13  obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
    J(1)(g)(1) and (2).
14         Dated at Phoenix, Arizona, this 20th day of
    September, 2015.

15

16

17         _____  _____
                  Marisa L. Montini, RPR
                    Certified Reporter
18                Arizona CR No. 50176

19         *      *      *      *      *

20

21         I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has
    complied with the ethical obligations set forth in
22  ACJA 7-206 (J)(1)(g)(1) through (6).

23

24         _____
                  GRIFFIN & ASSOCIATES, LLC
                  Registered Reporting Firm
25                 Arizona RRF No. R1005