1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-16-01012-001-PHX-SRB |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| Joseph M. Arpaio, | |
| Defendant. | |

This case arose from a finding of civil contempt by Judge G. Murray Snow in the *Melendres v. Arpaio*, 2:07-cv-02513-GMS case ("*Melendres*"). On August 19, 2016, Judge Snow referred Defendant for an investigation of criminal contempt. (Doc. 1, Aug. 19, 2016 Order.) On October 25, 2016, the Court issued an Order to Show Cause providing Defendant with notice of the charge against him and setting trial for December 6, 2016. (Doc. 36, Oct. 25, 2016 Order.) Following the grant of several trial continuances, a five-day bench trial occurred, commencing on June 26, 2017 and concluding on July 6, 2017. (*See* Docs. 177, 179, 187, 190, and 199.) The Court took the matter under advisement and now makes its findings of facts and conclusions of law.

## I.    FINDINGS OF FACT

The Court finds:

Defendant was the Sheriff of Maricopa County from 1993 through 2016. The Maricopa County Sheriff's Office ("MCSO") once had 287(g) program authority to enforce federal civil immigration law violations but that authority was revoked in

October 2009. (Gov't Ex. 36A.) The parties in *Melendres* moved for summary judgment and on December 23, 2011, Judge Snow issued an order granting in part and denying in part their motions for summary judgment. (Gov't Ex. 1.) In that order, Judge Snow enjoined the *Melendres* defendants "from detaining persons for further investigation without reasonable suspicion that a crime has been or is being committed." (*Id.* at 23-24, 25, 26.) In the "IT IS THEREFORE ORDERED" section, Judge Snow specifies that:

> MCSO and all of its officers are hereby **enjoined** from detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States, because as a matter of law such knowledge does not amount to reasonable belief that the person either violated or conspired to violate the Arizona smuggling statute, or any other state or federal law.

(*Id.* at 40.) That evening, Timothy Casey, MCSO's attorney, called Chief Brian Sands from MCSO to tell him that the order had been filed. (Trial Tr. Day 1-AM 71:15-72:22.) After his phone call, Mr. Casey sent a follow-up email to Brian Sands, John MacIntyre, Jerry Sheridan, and Joseph Sousa and carbon copied Eileen Henry and James Williams. (Gov't Ex. 6.) Mr. Casey's email gave a "quick summary" of the order including a quote from the order's "IT IS THEREFORE ORDERED" section containing the injunction. (*Id.*) Mr. Casey documented in an email to Mr. Williams that he also spoke to Defendant and advised him of the injunction on December 23, 2011. (Trial Tr. Day 1-AM 73:17-23.)

On December 26, 2011, Mr. Casey spoke to Defendant about the order and whether to take an interlocutory appeal. (Trial Tr. Day 1-AM 88:5-12.) During that conversation, Mr. Casey explained to Defendant "the effect of the rulings" giving the advice that "[i]f you just believe or you know that [a person] is in the country unlawfully, you cannot detain him based on that alone. You either are to have an arrest based on state charges or you release. Those are the options." (Trial Tr. Day 1-AM 88:13-23; 89:4-7.) Mr. Casey also told Defendant that he could not turn people over to the federal authorities, and Defendant responded that it would not be an issue because MCSO was

1    not doing it anymore because "Obama" was not taking them at ICE. (Trial Tr. Day 1-AM
2    91:11-24.)

3         During a January 2012 executive staff meeting, Mr. MacIntyre read the injunction
4    twice to Defendant and others who regularly attended the Monday morning executive
5    staff meetings. (Gov't Ex. 5 1878:19-25.) Mr. MacIntyre "wanted to make sure that
6    everyone knew what the order said." (Gov't Ex. 5 1944:9-10.) Mr. MacIntyre testified
7    that no one asked him a question when he finished reading. (Gov't Ex. 5 1879:24-
8    1880:18.) He believed "that the judge's preliminary injunction forbade the arrest,
9    detention, or delay or stoppage of individuals merely based on the belief or suspicion, or
10   reality, that they were here in this country illegally alone" and required a change in
11   MCSO's policy of "stopping, detaining, or delaying individuals based on mere illegal
12   presence in this country alone." (Gov't Ex. 5 1877:10-13; 1944:9-25.) Mr. MacIntyre
13   provided internal legal advice to Defendant and others at MCSO as part of his work
14   responsibilities. (Gov't Ex. 5 1868:4-9; 1870:5-8; Gov't Ex. 3G 142:12-17; Gov't Ex. 3I
15   404:7-12.) Defendant stated that Mr. MacIntyre had always been part of "the inner circle"
16   and knew him to tell the truth, and Mr. Casey called Mr. MacIntyre "a trusted member of
17   the executive staff . . . for the sheriff." (Gov't Ex. 3G 140:16-17; Gov't Ex. 3I 403:16-20;
18   Gov't Ex. 5 1869:10-11.)

19        In a March 1, 2012 Univision interview, Defendant answered "yes" when asked if
20   he was still detaining and arresting illegal immigrants. (Gov't Ex. 37A.) He further stated
21   that he would continue to enforce the laws and "if they don't like what I'm doing, get the
22   laws changed in Washington." (Gov't Ex. 37B.) According to a March 28, 2012 press
23   release following a load vehicle raid, "Arpaio remains adamant about the fact that his
24   office will continue to enforce both state and federal illegal immigration laws as long as
25   the laws are on the books." (Gov't Ex. 36D.) In an April 4, 2012 Fox News interview
26   Defendant stated, "[he] will never give in to control by the federal government." (Gov't
27   Ex. 37D.) On April 5, 2012, in an interview with CBS about his Department of Justice
28   investigation Defendant stated, "Why are they going after this Sheriff? Well we know

why. Because they don't like me enforcing illegal immigration law." (Gov't Ex. 37E.) On April 13, 2012, Defendant did a television interview stating, "I have support across the nation as evidenced by the big bucks I'm raising for my next campaign. They don't give you money unless they believe in you . . . I want everyone to know what I do." (Gov't Ex. 37G.) When asked in an April 24, 2012 PBS Newshour interview what the impact to his operations would be if the Supreme Court struck down S.B. 1070, Defendant replied "[n]one. I'm still going to do what I'm doing. I'm still going to arrest illegal aliens coming into this country." (Gov't Ex. 37H.) In a May 2012 Fox News interview, Defendant stated, "I'm not going to give it up. I'm going to continue to enforce state laws and federal laws." (Gov't Ex. 37C.)

The bench trial in *Melendres* occurred during the summer of 2012. During the *Melendres* trial, Mr. Casey "heard testimony that made [him] concerned" from Sergeant Palmer, Charley Armendariz, and Defendant. (Trial Tr. Day 1-PM 132:10-18.) Soon after that testimony, Mr. Casey told Defendant that the MCSO could not detain people for federal authorities in the absence of state charges. (Trial Tr. Day 1-PM 133:8-20.) Defendant responded that he knew about the order but that he delegates the details to the Human Smuggling Unit, and indicated that he understood that he could not detain. (Trial Tr. Day 1-PM 135:15-22.)

Lieutenant Jakowinicz testified that sometime between July and December 2012, he had a conversation with Defendant about transferring individuals to federal authorities. (Trial Tr. Day 3-AM 582:22-583:8.) Lieutenant Jakowinicz stated that Defendant asked him what he would do if Immigration and Customs Enforcement ("ICE") refused to take people they detained but did not have state charges for and that before he could respond, Defendant told him "[y]ou take them to Border Patrol." (Trial Tr. Day 3-AM 583:14-23.) Sergeant Michael Trowbridge explained that when ICE would not accept people detained without criminal charges from the MCSO, MCSO officers would have to drive the detainees to the Border Patrol in Casa Grande. (Trial Tr. Day 3-PM 705:4-11.) The drive from Phoenix to Casa Grande took an hour and 15 minutes to an hour and 30 minutes.

(Trial Tr. Day 3-PM 705:12-14.)

In a June 25, 2012 Fox News interview, Defendant stated, "We are going to try to call ICE to take them off our hands, which they have been doing, great cooperation locally, they have been taking these illegal aliens off our hands when we have no state charge against them, but I predicted this will stop. . . they took away [my 287g authorization] about a few years ago." (Gov't Ex. 37K.) In another interview that day with KNVX and Univision, Defendant stated "we have been doing it anyway, nothing has changed" when asked about how his practice will change following the Supreme Court's ruling on S.B. 1070. (Gov't Ex. 37L; *see also* Gov't Ex. 37N.) In a June 26, 2012 interview with Fox News, Defendant noted that the "worst part" is that the "feds" have a new policy where they only want to pick up felons and that he would have to "work around" the policy to not release the people the feds do not want onto the streets. (Gov't Ex. 37O.) In an August 31, 2012 Fox Latino interview Defendant stated, "I'm just enforcing the law, I took an oath of office and I won't back down and I will continue to do what I've been doing." (Gov't Ex. 37R.)

In September 2012, the Ninth Circuit affirmed Judge Snow's preliminary injunction. Mr. Casey sent an email to Mr. MacIntyre, Mr. Sands, Mr. Sheridan, and Defendant's assistant Amy Lake, stating that the preliminary injunction had been affirmed and that the order was in place, "nothing changes". (Trial Tr. Day 1-PM 140:4-17; Gov't Ex. 24.) On October 9, 2012, MCSO issued a news release wherein Defendant stated, "I continue to enforce the laws but keep running into road blocks . . . My back up [sic] plan is still in place and will continue to take these illegal aliens not accepted by ICE to the Border Patrol." (Gov't Ex. 36G.)

On October 11, 2012, Mr. Casey received a letter from Andre Segura, a *Melendres* plaintiff's attorney, alleging that the MCSO had been detaining and transporting individuals in violation of the preliminary injunction. (Gov't Ex. 25.) The letter specified three occasions where the MCSO detained and transported an individual who did not have state charges to Border Patrol because ICE would not take them. (*Id.*) The incidents

were disseminated by the MCSO to the public via press releases, which Mr. Segura attached to the letter. (*Id.*) Mr. Casey forwarded the letter to various MCSO personnel including Mr. Sheridan, Mr. MacIntyre, and Mr. Sands. (*Id.*) The Sheriff was not on that email chain because he does not have an email address. (Gov't Ex. 3F 2539:14-22 (noting that Amy Lake receives emails for the Sheriff; Trial Tr. Day 1-PM 143:3-10.) Mr. Casey had a conversation with Defendant and told Defendant that transferring people to the Border Patrol when ICE would not take them ("the backup plan") was likely a violation of the preliminary injunction order. (Trial Tr. Day 1-PM 148:10-19.) In one of the press releases dated September 21, 2012, Defendant is quoted saying, "I expected that it would happen eventually, so I had a back up [sic] plan in place which was to take these illegal immigrants not accepted by ICE to the Border Patrol." (*Id.*; Gov't Ex. 36E.) Mr. Casey testified that although he believed that MCSO had violated the preliminary injunction during the three incidents, he was assured by Defendant that it was a mistake and that it would not happen again. (Trial Tr. Day 1-PM 154:12-20, 169:19-22; *see also* Ex. 3F 2542:13-21 (Defendant stating that he may have told Mr. Casey that he would release illegal immigrants that he did not have a state-law basis to charge without taking them to ICE or Border Patrol).) Mr. Casey responded to Segura's letter on October 18, 2012 stating that there had been no violation of the preliminary injunction. (Gov't Ex. 26.)

In a January 17, 2013 news release, Defendant stated "[u]ntil the laws are changed, my deputies will continue to enforce state and federal immigration laws." (Gov't Ex. 36I.) In March 2013, the MCSO released a statement documenting that seven people had been turned over to ICE while four had been arrested on state charges. (Gov't Ex. 36J.) An April 2013 press release documented that seven people had been arrested while two people were turned over to ICE. (Gov't Ex. 36K.) In May 2013, four people were turned over to ICE. (Gov't Ex. 36L.)

On May 24, 2013, Judge Snow issued a permanent injunction enjoining the MCSO from "[d]etaining, holding, or arresting Latino occupants of vehicles in Maricopa Country based on a reasonable belief, without more, that such persons were in the

country without authorization" among other things. (Def. Ex. 100.) On May 28, 2013, the MCSO released a Briefing Board stating, "By order of Sheriff Arpaio, effective immediately, no MCSO personnel shall detain any person for turnover to ICE unless probable cause to arrest or detain exists under Arizona Criminal Law." (Gov't Ex. 46.)

The MCSO's Human Smuggling Unit's shift summaries document that from December 23, 2011 to December 30, 2011, 14 persons not charged with a criminal offense were turned over to ICE. (Gov't Ex. 18.) They further show that from January 4, 2012 to December 31, 2012, 97 persons not charged with a criminal offense were turned over to ICE. (Gov't Ex. 19 (CD).) They also show that from January 2, 2013 to May 22, 2013, 60 persons not charged with a criminal offense were turned over to ICE. (Gov't Ex. 20.) Sergeant Trowbridge explained that persons with state charges were not turned over to ICE because an ICE agent was in the jail, so all persons documented as turned over to ICE on shift summaries did not have criminal charges. (Trial Tr. Day 3-PM 747:4-19.)

## II.   CONCLUSIONS OF LAW

"[C]riminal contempt requires a contemnor to know of an order and willfully disobey it." *United States v. Baker*, 641 F. 2d 1311, 1317 (9th Cir. 1981). "Willfulness and awareness of the order must be shown beyond a reasonable doubt." *Id.*

### A.   Clear and Definite Order

"[B]efore one may be punished for contempt for violating a court order, the terms of such order should be clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed." *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974). "The language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972); *see Haskell v. Kansas Natural Gas Co.*, 224 U.S. 217, 223 (1912). "The mere fact that such an interpretation is necessary does not render the injunction so vague and ambiguous that a party cannot know what is expected of him." *United States v. Greyhound Corp.*, 508 F.2d 529, 537

1   (7th Cir. 1974).

2          Judge Snow enjoined Defendant and the MCSO from "detaining persons for

3   further investigation without reasonable suspicion that a crime has been or is being

4   committed." (Gov't Ex. 1 at 23-24, 25, 26.) Although the parties cited primarily to

5   paragraph five in the "IT IS THEREFORE ORDERED" section of the order as the

6   injunction during trial, a full reading of the December 23, 2011 Order makes clear that

7   the Sheriff did not have "inherent authority" to investigate civil immigration violations.

8   In his discussion of law enforcement officers' obligation to comply with an individual's

9   constitutional right to be free from unreasonable searches and seizures under the Fourth

10  Amendment, Judge Snow said "[l]ocal law enforcement officers may therefore not detain

11  vehicle passengers based upon probable cause, or even actual knowledge, without more,

12  that those passengers are not lawfully in the United States, since such knowledge does

13  not provide officers with reasonable suspicion that the passengers are violating any law

14  that local law enforcement can enforce." (Gov't Ex. 1 at 12-13.) He further said, "[l]ocal

15  law enforcement agencies, such as the MCSO, may not enforce civil immigration law.

16  Defendants are therefore enjoined from detaining individuals in order to investigate civil

17  violations of federal immigration law." (Gov't Ex. 1 at 39.)

18         Judge Snow found that "[a] policy of detaining people pursuant to laws that

19  MCSO has no authority to enforce, or detaining them without reasonable suspicion that

20  they are violating laws it can enforce . . . merits injunctive relief." (*Id.* at 7, 38.) The order

21  states, "MCSO does not have reasonable suspicion that a person is violating or conspiring

22  to violate the state human smuggling law or any other state or federal criminal law

23  because it has knowledge, without more, that the person is in the country without legal

24  authorization." (*Id.* at 38.) In the "IT IS THEREFORE ORDERED" section, Judge Snow

25  specifies that:

26         MCSO and all of its officers are hereby **enjoined** from detaining any
            person based only on knowledge or reasonable belief, without more, that
27         the person is unlawfully present within the United States, because as a
            matter of law such knowledge does not amount to reasonable belief that the
28         person either violated or conspired to violate the Arizona smuggling statute,
            or any other state of federal law.

(*Id.* at 40 (emphasis in original).) The Court concludes that Judge Snow's order was clear and definite. This conclusion does not require looking beyond the plain words of the order, but even considering the relief sought by the plaintiffs in *Melendres*, the conduct Defendant and the MCSO had been accused of, and what Judge Snow was seeking to prevent, there is no doubt that the order prohibited the MCSO from conducting detentions in violation of plaintiffs' constitutional rights. The *Melendres* plaintiffs complained that MCSO violated their constitutional rights by detaining them without state charges solely for violating civil immigration law and Judge Snow's order expressly prohibited the MCSO from continuing that conduct.

Defendant argues that he had authority pursuant to Arizona Senate Bill 1070 and Section 287(g)(10) to detain persons in the country illegally in order to cooperate with federal agencies for civil immigration violations. (Trial Tr. Day 5 1050:1-15.) Assuming without deciding that that might have been true before December 23, 2011, Judge Snow's order was clear—Defendant and the MCSO were enjoined from continuing their practice of detaining persons for whom there were no criminal charges. Judge Snow's preliminary injunction spelled out that detaining those persons past the time sufficient to conduct a criminal investigation was a violation of their Fourth Amendment rights and that Defendant had to cease the practice immediately.

### B.    Knowledge of Order

In order to find that a person knew of the order, personal service is not required so long as the person has "knowledge of the order". *Baker*, 641 F. 2d at 1317; *United States v. Rylander*, 714 F.2d 996, 1003 (9th Cir. 1983) ("[A]ctual knowledge of the order is all that is required; neither formal notice nor personal service is necessary to support a conviction for criminal contempt."). It is clear that Defendant had knowledge of the Order. Mr. Casey testified that on December 23, 2011 he made a phone call to Defendant informing him that Judge Snow had issued an order regarding the *Melendres* plaintiffs' motion for summary judgment and that a preliminary injunction had been issued. (Trial Tr. Day 1-PM 184:11-15.) Mr. Casey's billing records show that on December 26, 2011

1    he had another conversation with Defendant about the order wherein they discussed

2    appealing the preliminary injunction. (Gov't Ex. 34; Trial Tr. Day 1-AM 88:5-7, 89:1-8.)

3    During that meeting, Mr. Casey explained to Defendant "the effect of the rulings" giving

4    the advice that "[i]f you just believe or you know that [a person] is in the country

5    unlawfully, you cannot detain him based on that alone. You either are to have an arrest

6    based on state charges or you release. Those are the options." (Trial Tr. Day 1-AM 88:

7    13-23; 89:4-7.) Mr. Casey told Defendant that he could not turn people over to the federal

8    authorities, and Defendant responded that it would not be an issue because MCSO was

9    not doing it anymore because "Obama" was not taking them at ICE. (Trial Tr. Day 1-AM

10   91:11-24.) The evidence also shows that Mr. MacIntyre, an MCSO employee, lawyer and

11   frequent legal advisor to Defendant, read a portion of the preliminary injunction aloud

12   twice to Defendant and others at an MCSO Executive Cabinet meeting in January 2012.

13   (Gov't Ex. 5 1878:19-25, 1879:24-1880:12.)

14          On at least two other occasions between December 2011 and May 24, 2013, Mr.

15   Casey discussed the preliminary injunction with Defendant. During the *Melendres* trial,

16   Mr. Casey told Defendant that the MCSO could not hold people for federal authorities in

17   the absence of state charges after Defendant testified about the LEAR policy. (Trial Tr.

18   Day 1-PM 132:10-18; 133:8-18.) Defendant responded that he knew about the order but

19   that he delegates the details to the Human Smuggling Unit, and indicated that he

20   understood that he could not detain. (Trial Tr. Day 1-PM 135:15-22.) Mr. Casey testified

21   that after he received the Segura letter, he told Defendant that his backup plan of

22   transporting people to Border Patrol was "likely" a violation of the order.[1] (Trial Tr. Day

23   1-PM 148:10-19.) Mr. Casey testified that Defendant told him it was a mistake and that

24   "it was not going to happen again." (Trial Tr. Day 1-PM 154:7-24.) Defendant even

25   admitted that he knew of the order. (Gov't Ex. 2—Ex. B at 7; Gov't Ex. 3A—Rep.'s Tr.

26   of Proceedings Before Honorable G. Murray Snow (Evidentiary Hr'g Day 2) 477:5-14,

27

28          [1] Defendant does not dispute that he knew about the order arguing instead that his
     subordinates were charged with implementing it. The Court will address that argument
     below.

18-25, 478:1-4, 483:8:16.) The Court concludes that Defendant knew of Judge Snow's preliminary injunction order.

### C.    Willful Violation of Order

> In a criminal contempt case involving a court order, such as the one before us, on the other hand, the court should consider the entire background behind the order- including the conduct that the order was meant to enjoin or secure, the interests that it was trying to protect, the manner in which it was trying to protect them, and any past violations and warnings- in determining whether the order is sufficiently specific and in determining whether the defendant knew or should have known that his conduct was wrongful.

*Greyhound Corp.*, 508 F.2d at 532. "Willfulness is defined 'as a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful.'" *Baker*, 641 F.2d at 1317 (quoting *Greyhound Corp.*, 508 F.2d at 531-32). "The very issuance of the order puts the party on notice that his past acts have been wrongful. 'No concept of basic fairness is violated by requiring a person in this position to be more than normally careful in his future conduct.'" *Greyhound Corp.*, 508 F.2d at 532–33 (quoting *United States v. Custer Channel Wing Corp.*, 247 F. Supp. 481, 496 (D.Md.1965), *aff'd*, 376 F.2d 675 (4th Cir. 1967), *cert. denied*, 389 U.S. 850).

Defendant argues that he has not willfully violated the preliminary injunction order because he delegated enforcement of the order to his subordinates. (Ex. 3A, 478:23-479:2, 482:22-25; Ex. 3F 2527:5-10.) However, willful ignorance of a court order which a person has knowledge of and a duty to fulfill does not excuse non-compliance therewith. *United States v. Hoffman*, 13 F.2d 269, 277 (N.D. Ill. 1925), *aff'd*, 13 F.2d 278 (7th Cir. 1926), and *aff'd sub nom. Westbrook v. United States*, 13 F.2d 280 (7th Cir. 1926) ("It seems to be assumed by the sheriff that no one is chargeable with more knowledge than he chooses to have; that he is permitted to close his eyes when he pleases upon all sources of information, and then excuse his ignorance by saying that he does not see anything. In criminal as well as civil affairs, every man is presumed to know everything that he can learn upon inquiry, when he has facts in his possession which suggest the inquiry."). In *Hoffman*, the court concluded that "[w]hile there is no evidence

connecting the sheriff with the bribery and corruption in the jail, he is chargeable with the disobedience of the court's writ to the extent that he might have prevented it if he had acted with diligence. He must be charged here with knowledge of that which it was his duty to know. And, so charged, he is convicted of disobedience of the writ by the records of his office." *Id.*

Defendant stated on numerous occasions that he would continue to keep doing what he had been doing. (*See, e.g.*, Gov't Ex. 36D, 36I, 37B, 37C, 37H); *Hoffman*, 13 F.2d at 277 ("He is chargeable with the disobedience of the court's writ to the extent that he might have prevented it if he had acted with diligence."). Defendant stated that he "will continue to enforce illegal immigration laws" just seven days after the issuance of the preliminary injunction." (Ex. 3A 497:1-9.) During a June 2012 interview Defendant stated, "Nothing has changed . . . We've been doing it. And we'll continue to enforce the laws." (Gov't Ex. 3B 526:6-9; *see also* 530:6-8 ("we're going to continue doing what we've been doing the last four or five years.").) In August 2012, Defendant stated that he continued to enforce federal law, despite knowing that he no longer had 287(g) authority to do so. (Ex. 3B 544:21-22; 545:16-20; Gov't Ex. 3G 44:21-24.) He did not tell anyone in his office to change anything about how they did their work. (Gov't Ex. 3D 2021:22-2022:1; 2202:21-2023:3.) In January 2013, Defendant's stance had not changed, as evidence by his statement: "Until the laws are changed, my deputies will continue to enforce state and federal immigration laws." (Ex. B 568:23-569:2.)

Even more, Mr. MacIntyre, who provided internal legal advice to Defendant, understood "that the judge's preliminary injunction forbade the arrest, detention, or delay or stoppage of individuals merely based on the belief or suspicion, or reality, that they were here in this country illegally alone." (Gov't Ex. 5 1868:4-9; 1870:5-8; 1877:10-13.) During a January 2012 executive staff meeting, Mr. MacIntyre read the injunction twice to Defendant and no one asked him a question. (Gov't Ex. 5 1878:19-25, 1879:24-1880:18.) Mr. Casey told Defendant "arrest or release," and Defendant does not deny that Mr. Casey told him that or that Mr. MacIntyre read from the preliminary injunction at the

meeting. (Trial Tr. Day 1-AM 112:7-20; Trial Tr. Day 1-PM 126:13-127:3; Ex. 3F 2540:5-21; Gov't Ex. 3I 406:21-407:24, 408:11-409:10.) Defendant knew of Judge Snow's order and received advice from internal and external counsel on what that order required. *See Hoffman*, 13 F.2d 269, 277 ("He must be charged here with knowledge of that which it was his duty to know."). He did not follow up with any of his subordinates to see if the order was in fact being complied with. (Gov't Ex. 3G 23:6-11, 51:13-17.) Defendant admits that he did not make any effort to find out if his office's application of the human smuggling law needed to change after issuance of the order. (Gov't Ex. 3G 38:18-39:1;) *see Greyhound*, 508 F.2d at 532 (noting that indifference to the order will support a finding of willfulness).

Not only did Defendant abdicate responsibility, he announced to the world and to his subordinates that he was going to continue business as usual no matter who said otherwise. For example, ICE changed its policy to only accept felons who violated civil immigration law, and in response Defendant declared that he created a backup plan. (Ex. 3B 557:6-9; Ex. 3G 63:17-21; Gov't Ex. 36G.) The backup plan directed the Human Smuggling Unit to take illegal immigrants for whom state charges were unavailable to Border Patrol if ICE did not agree to take them. (Gov't Ex. 36E.) In mid to late 2012, Defendant gave Lieutenant Jackowinicz a direct order to take people ICE would not to Border Patrol. (Trial Tr. Day 3-AM 583:14-584:7.) This meant, in effect, that MCSO officers were required by Defendant to detain persons not suspected of any crime for the additional hour and 15 minutes to hour and 30 minutes it took to deliver the detainees to the nearest Border Patrol station, Casa Grande in Pinal County. (Trial Tr. Day 3-PM 705:4-11.) These detentions, in violation of the Fourth Amendment, were exactly what the preliminary injunction intended to stop. (Gov't Ex. 1 at 7-8, 17, 23-24, 38, 40.) When confronted by Mr. Casey about the violations in October 2012, Defendant told him that it was a mistake and that it would not happen again, but there is no evidence that Defendant ever gave his subordinates a contrary instruction. (Trial Tr. Day 1-PM 154:7-24.)

The evidence shows a flagrant disregard for Judge Snow's order. Credible

testimony shows that Defendant knew of the order and what the order meant in regards to the MCSO's policy of detaining persons who did not have state charges for turnover to ICE for civil immigration violations. Despite this knowledge, Defendant broadcast to the world and to his subordinates that he would and they should continue "what he had always been doing." The Court concludes that there is no doubt that Defendant knew or should have known that his conduct violated the preliminary injunction order. *Greyhound*, 508 F.2d at 541. The Court finds Defendant's violation of the order willful.

## III.     CONCLUSION

The evidence at trial proves beyond a reasonable doubt and the Court finds that Judge Snow issued a clear and definite order enjoining Defendant from detaining persons for further investigation without reasonable suspicion that a crime has been or is being committed; that Defendant knew of the order; and that Defendant willfully violated the order by failing to do anything to ensure his subordinates' compliance and by directing them to continue to detain persons for whom no criminal charges could be filed. Because the Court finds that Defendant willfully violated an order of the court, it finds Defendant guilty of criminal contempt.

**IT IS ORDERED** finding Defendant guilty of criminal contempt.

**IT IS FURTHER ORDERED** setting Sentencing for **October 5, 2017 at 10:00 a.m.**

**IT IS FURTHER ORDERED** directing the Probation Department to prepare a presentence investigation report.

Dated this 31st day of July, 2017.

Susan R. Bolton
United States District Judge