

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810          Facsimile:  602-606-2811

Dennis I. Wilenchik, #005350
John D. Wilenchik, #029353
admin@wb-law.com

GOLDMAN & ZWILLINGER PLLC
ATTORNEYS AT LAW

Mark Goldman, #012156
Vincent R. Mayr, #013954
Jeff S. Surdakowski, #030988
17851 North 85th Street, Suite 175
Scottsdale, AZ 85255
Main: (480) 626-8483
Facsimile: (480) 502-7500
docket@gzlawoffice.com
*Attorneys for Defendant Joseph M. Arpaio*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **United States of America,** | **Case No.: 2:16-cr-01012-SRB-1** |
| **Plaintiff,** | |
| **v.** | **DEFENDANT'S MOTION FOR NEW TRIAL, AND/OR TO VACATE THE JUDGMENT** |
| **Joseph M. Arpaio,** | |
| **Defendant.** | **(Oral Argument Requested)** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Defendant Joseph M. Arpaio ("Defendant") hereby moves for a New Trial, and/or that the verdict be vacated, under Federal Rules of Criminal Procedure, Rule 33 *inter alia*, and on the following grounds.

## I.   Defendant was wrongfully deprived of a trial by jury; and even Judge Snow said that Section 402 applies to this matter.

Defendant moves for a new trial because the Court wrongfully denied Defendant's repeated requests for a trial by jury under 18 U.S.C. §§ 402, 3691, even though the charged contempt would also constitute a crime under 18 U.S.C. § 242 ("Deprivation of rights under color of law"), *inter alia*,[1] as even Judge Snow expressed at a December 4, 2014 hearing in *Melendres*.

During the initial status conference in this case, the Court stated: "I thought we were dealing with situations here, because of Judge Snow eliminating the perjury as a basis for criminal contempt, that the allegations here relate exclusively to criminal contempt not constituting another – a federal crime under the criminal statutes." (Doc. 27, p. 6, lines 8-12.) To which the Government's counsel falsely responded, "that is what I believe is intended by Judge Snow's Order." (*Id.* at lines 13-14.) The Court did not invite comment from Defendant or his counsel on this subject, and it has repeatedly refused Defendant's requests to be heard on the issue of the right to a jury trial under 18 U.S.C. §§ 402, 3691.

In fact, Judge Snow stated at a hearing in *Melendres* on December 4, 2014 that 18 U.S.C. § 402 *does* apply to what became the subject of his criminal referral.[2] At that hearing, Judge Snow first announced that he believed that criminal contempt may have been committed,

---

[1] The charged contempt also constitutes other federal and state criminal offenses, but this one is the most obvious, and it fully encompasses the conduct charged. Other offenses include 18 U.S.C.A. § 241 ("Conspiracy against rights"); A.R.S. § 13-1303 ("Unlawful imprisonment"); 18 U.S.C.A. § 1509 ("Obstruction of court orders"); and A.R.S. § 13-2810(A)(2)("Interference with judicial proceedings").

[2] Defendant's counsel also raised this at page 7, lines 8-10 of its prior request for a jury trial, Doc. 130, which the Court summarily denied.

and he invited the United States Attorney (whom he had specifically asked to attend the hearing) to prosecute the Defendant.[3] Judge Snow displayed a copy of the general criminal contempt statute, 18 U.S.C.A. § 401, on the courtroom monitors, and he identified exactly the same conduct that would later appear in his criminal referral to this Court and in the Order to Show Cause entered in this case: whether Defendant violated the December 23, 2011 preliminary injunction's prohibition on detaining persons "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States," because "Sheriff Arpaio's position was that he could continue to detain immigrants who he didn't have a cause to hold on any state charges and turn them over to ICE."[4] Crucially, Judge Snow then stated, to the Plaintiffs' lawyers:

> …[I]f I initiate a criminal contempt proceeding, that's actually a separate matter tried by the United States Attorney….I thought I would raise to you another statute which I'm not going to put on the monitor. It's **18, United States Code, Section 402** as opposed to 401, and **it basically says that if a crime has been committed against victims of behavior that results from a contempt**, individual assessments[5] of $1,000 can be made to be paid by the contemnor as well as the jail fine, and **because you are representing people who may have been the victims of that crime,** I guess I want your input as to whether or not it's worth **pursuing such a contempt under that statute** if civil contempt doesn't meet it.

Doc. 817 in *Melendres*, Case 2:07-cv-02513-GMS, page 21, lines 13-23 (emphasis added).

---

[3] Judge Snow stated: "I have asked the United States Attorney to be here and she is – or the chief assistant is here. And the reason I've asked her to be here…I want you to be aware of what's going on from the beginning and keep you apprised." After describing the Defendant's alleged criminal contempt, Judge Snow put a copy of Fed.R.Crim.P. 42 (regarding the procedure for initiating criminal contempt prosecutions) on the screen, and stated that Rule 42 "gives your office, your own office, an opportunity to evaluate…whether or not you wish to pursue [this]…" Doc. 817, page 29, lines 1-11; page 29, line 23 through page 30, line 3.

[4] Doc. 817, page 17, lines 5-9. Compare this with the criminal referral and O.S.C.: "[t]he MCSO continued to stop and detain persons based on factors including their race, and frequently arrested and delivered such persons to ICE when there were no state charges to bring against them…" Doc. 36 at page 3, lines 7 – 10.

[5] Judge Snow actually misinterpreted the language of 18 U.S.C. § 402 with respect to fines, but it has little bearing on the issue at hand. (Section 402 provides for only one maximum fine of $1,000, not "individual assessments" each in that amount.)

Judge Snow's comments clearly show that even he determined that 18 U.S.C. § 402 applies to the conduct that forms the basis for this case, which contradicts the view that this Court voiced during the initial status conference on this case, and what the Government's counsel wrongfully led this Court to believe. Judge Snow was clearly saying that he believed that the allegedly contemptuous behavior in this case would constitute a crime, and that the plaintiffs would be the "victims" of that crime, if proven. By discussing whether it was "worth pursuing such a contempt under that statute," Judge Snow was clearly expressing that he believed that the statute applied and that the prosecution should have proceeded under Section 402. He also made it clear that he understood the statute to apply only when the "behavior that results from a contempt" is also a crime.

It is not hard to see why Judge Snow believed that the statute applied. When a law enforcement officer willfully holds someone without charges and under color of state law, it is a crime under 18 U.S.C. § 242. "Any state enforcement officer who, under color of state law, willfully, without cause, arrests or imprisons an inhabitant or injures one who is legally free, thereby commits an offense" under 18 U.S.C. § 242.[6] *United States v. Trierweiler*, 52 F. Supp. 4, 6 (E.D. Ill. 1943).[7] Because the Defendant's charged contempt would constitute a crime under this statute *inter alia*, Defendant was and is entitled to a trial by jury under 18 U.S.C. § 402 and 18 U.S.C. § 3691. *See also Clark v. Boynton*, 362 F.2d 992 (5th Cir. 1966)(reversing sheriff's criminal contempt conviction following a bench trial, where the conduct charged would have

---

[6] *Trierweiler* and some of the older caselaw actually cites section 20 of former 18 U.S.C.A. § 52, which is now 18 U.S.C. § 242. The former statute was identical in all relevant respects, except that the word "inhabitant" in Section 52 has been replaced by the word "person" in Section 242.

[7] "This conclusion is amply supported by the announcements of the Supreme Court of the United States in *Ex parte State of Virginia*, 100 U.S. 339, 25 L.Ed. 676; *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; *Home Telephone & Telegraph Co. v. Los Angeles*, 227 U.S. 278 and 286 et seq., 33 S.Ct. 312, 57 L.Ed. 510; *Chambers v. Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716; *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682; *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; *Moore v. Dempsey*, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; and by other courts, such as *Culp v. United States*, 8 Cir., 131 F.2d 93, *Catette v. United States*, 4 Cir., 132 F.2d 209."

constituted a crime under 18 U.S.C. § 242 *inter alia*, such that defendant was entitled to a trial by jury under 18 U.S.C. § 402; and remanding the case for a trial by jury). The law simply does not get any simpler than this, nor does its misapplication get any more obvious or unjust.

The Court has been a willing and voracious adopter of Judge Snow's views on everything in this case, which has by and large harmed the Defendant; but for the Court to refuse to adopt Judge Snow's views in the one instance when it would actually benefit the Defendant, by granting him a trial by jury, smacks of the worst kind of prejudice. At the initial status conference in this matter, the Court stated that "I feel that I need to inquire myself in order to attempt, as best I can, to effectuate Judge Snow's Order [referring Defendant for criminal contempt]…." (Doc. 27, p. 35, lines 17-22.) During the trial, when confronted with a ruling by Judge Snow regarding attorney-client privilege in the civil case, the Court quickly reversed its prior rulings on the subject and stated, "the Court respects that decision, will assume that that is correct…" (Day 1 AM, p. 86, lines 8-9.) And, with due respect to the Court, it has continued its pattern of deferring to Judge Snow in the form of its verdict, as discussed below, which hews so closely to Judge Snow's findings of fact and his criminal referral, that it even repeats the same mistakes about the evidence. To demonstrate consistency and integrity, this Court must grant a new trial, on the grounds that 18 U.S.C. § 402 clearly warrants a trial by jury in this case, as even the prior Judge determined.

Up until this point, Defendant's interlocutory appeals on this issue have been denied simply because they are interlocutory; but by continuing to ignore this most fundamental issue in the case, the Court invites a certain reversal on direct appeal.

To protect the integrity of the Court, the Court must order a new trial by jury. As Justice Scalia wrote, jury trials are especially appropriate in criminal contempt cases "involving out-of-court disobedience to complex injunctions." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833–34 (1994)(Scalia, J.). "Such contempts do not obstruct the court's

1    ability to adjudicate the proceedings before it, and the risk of erroneous deprivation from the

2    lack of a neutral factfinder may be substantial." *Id.* at 844. Under such circumstances, he wrote,

3    criminal procedural protections like the right to a trial by jury "are both necessary and

4    appropriate to protect the due process rights of parties and prevent the arbitrary exercise of

5    judicial power." *Id.* at 834. "[T]he contempt power also uniquely is liable to abuse. Unlike most

6    areas of law, where a legislature defines both the sanctionable conduct and the penalty to be

7    imposed, civil contempt proceedings leave the offended judge solely responsible for identifying,

8    prosecuting, adjudicating, and sanctioning the contumacious conduct. Contumacy often strikes

9    at the most vulnerable and human qualities of a judge's temperament, and its fusion of

10   legislative, executive, and judicial powers summons forth the prospect of the most tyrannical

11   licentiousness." *Id.* at 830. (internal citations and quotation marks omitted). "Accordingly, in

12   criminal contempt cases an even more compelling argument can be made than in ordinary

13   criminal cases for providing a right to jury trial as a protection against the arbitrary exercise of

14   official power." *Id.*

15        Further, because the "victim" in a contempt of court case is really the Court, trying the

16   case to the Court is about as fair as trying a criminal case to the victim—the Court has an

17   inherent conflict and prejudice, which the Defendant raised before trial both as a basis for

18   granting a trial by jury (Doc. 62, pages 2, line 16 to page 3, line 17) and again in his Motion to

19   Change Venue (Doc. 171, page 3, lines 8-13).[8] Judge Snow and the Court have sat together as

20   two of only around eight active judges on the same court for over nine years. Trying the case to

21   this Court instead of Judge Snow does not cure the inherent conflict or prejudice, any more than

22   it would to try a case for assaulting a police officer to the officer's partner or squadmate.

---

24   [8] From that Motion: "Additionally, venue should be changed due to the risk of the appearance of bias. This
     applies because the case is being tried by a judge for contempt of another judge of the same court. Judge Bolton

25   made some comments in the initial status hearing indicating that she is trying to 'effectuate' Judge Snow's intent,
     or words to that effect, which would indicate to a reasonable third person that Judge Bolton is biased in favor of

26   deferring to Judge Snow's determinations that formed the basis for the Order to Show Cause."

Defendant again raises this issue now, requests that the verdict be vacated, and that a new trial by jury be granted; both to avoid a certain reversal by the appellate courts, and to serve the ends of basic and certain justice in this case.

## II.   The verdict must be vacated because the Court violated the Defendant's constitutional right to be present for the verdict.

The Court violated the Defendant's constitutional right to be present for the verdict when it issued its verdict via electronic notice (email) to the lawyers alone, instead of rendering the verdict in his presence, as required by the Sixth Amendment Confrontation Clause and the Fifth Amendment Due Process Clause. Before the verdict, the Court admitted to its awareness that the Defendant does not use email.[9] Defendant had the right to be present at all stages of the trial, including the verdict; and Defendant was entitled to more dignity from this Court than having to be first told about his verdict by the media. The Court's deliberate error affects "the integrity and legitimacy of the entire judicial process" and it is not harmless, as a matter of law. *United States v. Canady*, 126 F.3d 352, 364 (2d Cir. 1997). "The announcement of the decision to convict or acquit is neither of little significance nor trivial; it is the focal point of the entire criminal trial. To exclude the public, the defendant, the prosecution, and defense counsel from such a proceeding—indeed not to have a proceeding at all—affects the integrity and legitimacy of the entire judicial process." *Id.* In *Canady*, the district court mailed out its verdict following a criminal bench trial, instead of calling a hearing to announce it in the presence of the defendant; as the result of which, the defendant first learned about his own conviction "by reading a newspaper." *Canady*, 126 F.3d at 355. The Second Circuit deemed this to be a fundamental structural error, and vacated the verdict. "A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of" the

---

[9] "Q….[W]hy is the sheriff not included on this e-mail?" "THE COURT: I think we all know it's because he didn't have e-mail." (Day 1 PM, page 143, lines 4-7.)

7

defendant. *Lewis v. United States*, 146 U.S. 370, 372 (1892); *see also Rushen v. Spain,* 464 U.S. 114, 117-18 (1983). The defendant's right to be present at every stage of trial is "scarcely less important to the accused than the right of trial itself," *id*. at 455, and it is rooted in both the Sixth Amendment Confrontation Clause and the Fifth Amendment Due Process Clause. *See Illinois v. Allen*, 397 U.S. 337, 338 (1970); *Arizona v. Levato*, 186 Ariz. 441, 924 P.2d 445, 448 (1996)(in banc)(recognizing Sixth Amendment guarantee to be "physically present for the return of jury verdicts" absent exceptional circumstances); *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *Snyder v. Massachusetts*, 291 U.S. 97, 107-108 (1934); *Hopt v. Utah*, 110 U.S. 574, 579 (1884). The Defendant's right to be present extends to all stages of trial, including the verdict. *Rogers v. United States*, 422 U.S. 35, 39 (1975); *see also* Fed.R.Crim.P.43(a)(2). "There is a distinctly useful purpose in ensuring that the pronouncement of the defendant's guilt or innocence by the court is both face-to-face and public. It assures that the trial court is keenly alive to a sense of its responsibility and to the importance of its functions." *Id.* at 361 (quoting *Waller v. Georgia,* 467 U.S. 39, 46 (1984))(internal quotation marks omitted). "In the jury context, several courts, in rejecting the argument that the defendant's presence is useless, have pointed to the fact that the defendant's mere presence exerts a psychological influence upon the jury. This is because the jury in deliberating towards a decision knows that it must tell the defendant directly of its decision in the solemnity of the courtroom. We fail to see how the situation is any different when the fact finder is the district judge." *Id.* at 361-362. And clearly, it is not. The Court's failure to announce the verdict directly to the Defendant in court furthers the perception that this Court does not "own" its own verdict; that the Court is merely copying Judge Snow's findings and giving "his" verdict, as discussed below; that the verdict was irresponsibly pre-judged and disconnected from the actual court proceedings attended by Defendant (i.e. the trial); and that the trial was a "show trial" put on by the federal judiciary, with the Government supplying a token prosecution at its request, and the verdict merely an afterthought. Because the Court

violated the Defendant's right to be present for the verdict, and this is a fundamental structural error, its verdict must be vacated.

### III.   <u>The verdict is tainted with prejudice</u>

The Court's verdict so thoroughly tracks Judge Snow's criminal referral—even making the same mistakes about the evidence—and it so completely ignores the actual testimony at trial (and quotes it so misleadingly, as described in the Defendant's Motion for Judgment of Acquittal), that it is apparent that its verdict was improperly motivated by prejudice—namely the Court's desire to vindicate the authority of a fellow judge of the same court, to the exclusion of the evidence, and of the truth. Further, the Court's refusal to grant a trial by jury, despite all the authority requiring one; the Court's obvious affiliation with Judge Snow, as a fellow judge on the same court with only around eight active members for over nine years; and the prejudice inherent in trying a contempt of court case to the bench, which is effectively the "victim" of the alleged crime; as well as certain other statements made by the Court during the course of this case, demonstrate that the verdict was tainted by prejudice and bias, warranting a new trial before a jury.

At the initial status conference in this matter, the Court stated that "I feel that I need to inquire myself in order to attempt, as best I can, to effectuate Judge Snow's Order [referring Defendant for criminal contempt], to be satisfied other than on the say-so of four well-respected attorneys and whoever else has been doing the research behind the scenes...I just feel that I have to satisfy myself." (Transcript of October 11, 2016 status conference, page 35, lines 17-22.) The Court's comment demonstrates that it has been pursuing a mistaken policy of trying to "follow" what it believes Judge Snow wanted to be done, regardless of the actual argument or testimony in this case; and of course the Court knew before trial that Judge Snow had already found that Defendant committed willful acts constituting criminal contempt, as part of his "civil contempt" proceeding. The Court clearly read Judge Snow's criminal referral before trial—in fact, the

1  Court copied it when it composed the Order to Show Cause. Both the criminal referral and the

2  Order to Show Cause cite heavily to Judge Snow's civil findings that the Sheriff acted willfully.

3  At a pretrial hearing in this matter, the Court stated that "I agree with the government that the

4  Order [civil contempt findings] of Judge Snow is not evidence in this case" (transcript of 4-12-

5  17 hearing, page 9, lines 23-24); but these words ring hollow, because the Court's verdict

6  nevertheless hews so closely to Judge Snow's criminal referral and civil findings, that it even

7  misreports the same testimony in the same way. For example, Judge Snow wrote in his criminal

8  referral (and this Court's Order to Show Cause also stated) that Defendant "continued to direct

9  his deputies to arrest and deliver" aliens to federal authorities, for which Judge Snow cited

10 paragraph fifty-seven of his civil findings.[10] However, paragraph fifty-seven only referenced

11 testimony by Lieutenant Jakowinicz that Defendant told Mr. Jakowinicz to "call" Border Patrol,

12 not "arrest and deliver" or "take" persons to Border Patrol.[11] This is an important distinction,

13 since there was no dispute that contacting Border Patrol was legal, even under Judge Snow's

14 inexact preliminary injunction. During the trial in this case, Mr. Jakowinicz—whom the

15 Government interviewed at least twice before trial, and once again even during trial[12]— at first

16 testified that the Sheriff told him to "take" persons to Border Patrol, but then he immediately

17 clarified that he could not recall verbatim what the Sheriff told him that day;[13] and when

18 confronted with his prior testimony before Judge Snow that the Sheriff only told him to "call"

19 federal authorities, he admitted that this is what the Sheriff said. (Day 3 AM, 622:10-11, 16-

20 19;[14] 623:1-3.) Nevertheless, the Court again mischaracterizes his testimony in exactly the same

21

22 [10] Doc. 36, p.4, 1-3, citing ¶ 57 of Doc. 1677 in *Melendres,* case no. 2:07-cv-02513-GMS.

   [11] *See* ¶ 57 of Doc. 1677 in *Melendres*, referring to civil trial transcript 371:9-372:9.

23 [12] On January 9, 2017; March 10, 2017; and June 28, 2017.

   [13] Day 3 AM, 583:24-584:3.

24 [14] Q. He didn't say to take anyone down there. He said call them, right?

      A. Yes. I can't tell you one way or the other the exact verbiage.

25    …

      Q. Can we rely then that that is your best recollection at the time what the Sheriff actually said?

26    A. Yes. (Day 3 AM, 622:16-19; 623:1-3.)

way that Judge Snow did: "Lieutenant Jakowinicz stated that…Defendant told him '[y]ou take them to Border Patrol.'" (Verdict, page 4, lines 21 to 24.)

As another example, the Court—when confronted during trial with the issue of whether Mr. Casey's testimony was attorney-client privileged—originally ruled that it was privileged; but then when confronted with an Order from Judge Snow in the civil case concluding that it was not privileged (erroneously, as discussed below), the Court quickly reversed course and ruled that it was not attorney-client privileged, stating "the Court respects that decision, will assume that that is correct…"[15] Finally, the Court's verdict sets an unusual emphasis on identifying the judge to whom the Order belongs—that "Judge Snow's order was clear and definite," "Judge Snow's order was clear," "Judge Snow issued a clear and definite order," "the Defendant knew of Judge Snow's preliminary injunction," etc. (instead of "the order," "the preliminary injunction")—suggesting that its conclusion was influenced by something other than an assessment of whether the order was clear to the MCSO in 2011; i.e., the court was influenced because it belonged to a fellow judge of the same court.

The Court clearly received evidence at trial with an eye toward reaffirming what Judge Snow had already found civilly. This is a *de facto* "guilty until proven innocent" standard, and it is unconstitutional. Further, the Court's steadfast refusal to allow a jury—the only constitutionally independent body available in these circumstances—to hear the case, and despite a clear requirement that it do so, shows prejudice. Instead, the Court forced the Defendant to try the case to his alleged victim—i.e. the Court—resulting in a show trial whose verdict was so tainted by prejudice that it cannot be justified by the actual or complete evidence and testimony presented in the case. Defendant must be granted a new trial, before a jury of his peers.

---

[15] Day 1 AM, p. 86, lines 8-9.

## IV.    Attorney-Client Privileged Testimony was Improperly Compelled and Admitted at Trial

The Court improperly compelled and admitted attorney-client privileged testimony by Timothy Casey[16] and related attorney-client privileged exhibits at trial. Neither Maricopa County nor the Defendant has ever waived the privilege; and no party ever claimed that it was waived expressly in this proceeding.[17] (*See* Trial Transcript, Day 1 a.m., at 54:1 – 6.) The Court found that Judge Snow's erroneous order finding of an implied waiver in *Melendres*, which was a civil case brought against the County (i.e., against the Sheriff in his official capacity alone), also allowed for the admission of attorney-client privileged testimony in this case. Even an actual implied waiver of the privilege in one case does not constitute an automatic waiver of the privilege in another case.  *See Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003)(finding that implied waiver of attorney-client privileged materials in a habeas proceeding for ineffective assistance of counsel did not render the materials admissible for purposes of a re-prosecution of the defendant: "the court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it"); *see also generally Transamerica Computer,* 573 F.2d at 651 ("a party does not waive the attorney client privilege for documents which he is compelled to produce"); *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596, 611 (8th Cir. 1977)(holding that disclosure of documents to one third-party does not waive as to other third-parties requesting

---

[16] To the extent that the Court concluded, albeit falsely, that Jack MacIntyre was a legal advisor to the MCSO, then his testimony was also attorney-client privileged and improperly admitted.

[17] Defendant held the privilege. An attorney-client relationship "is proved by showing that the party sought and received advice and assistance from the attorney in matters pertinent to the legal profession." *Matter of Petrie,* 154 Ariz. 295, 299, 742 P.2d 796, 800 (1987). The test is a subjective one, in which "the court looks to the nature of the work performed and to the circumstances under which the confidences were divulged." *Alexander v. Superior Court in and for Maricopa County,* 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984) (citing *Developments of the Law—Conflicts of Interest in the Legal Profession,* 94 Harv.L.Rev. 1244, 1321–22 (1981)). Another important factor is whether the client believed an attorney client relationship existed. *Petrie,* 154 Ariz. at 300, 742 P.2d at 801; *Alexander,* 141 Ariz. at 162, 685 P.2d at 1314. At the trial in this matter, Defendant's lawyer, Timothy Casey, testified that he believed that the Defendant reasonably believed that Mr. Casey was his lawyer and that their conversations were attorney-client privileged.

same documents). But Judge Snow's finding of an implied waiver in the civil case was also erroneous, as a matter of law. On May 14th, 2015, Judge Snow held that the privilege had been waived in the civil matter, because the Defendant had allegedly asserted an "advice of counsel" defense in that matter. (Doc. 1094 in Case 2:07-cv-02513-GMS.) However, reliance on the advice of counsel is not a defense to civil contempt, and Judge Snow's order was therefore erroneous. *See In re Eskay*, 122 F.2d 819, 822 (3d Cir. 1941)("[i]t is a good defense to an attachment for criminal, **but not civil contempt** that the contemnor acted in good faith upon advice of counsel")(emphasis added); *see also Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc.*, 817 F.2d 1361, 1365 (9th Cir.1987)(civil contempt "need not be willful," and a "good faith exception to the requirement of obedience to a court order has no basis in law" in the civil context); *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir.1983)("[i]ntent is not an issue in civil contempt proceedings"); *In re Dual–Deck Video Cassette Recorder Antitrust Litigation,* 10 F.3d 693, 695 (9th Cir. 1993); *General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.1986). Further, the Defendant, for his part, did not assert any defense at all in the civil proceeding (he conceded liability). Therefore, he clearly did not waive the attorney-client privilege by asserting a "reliance on counsel" defense in that matter; and Judge Snow's order compelling Mr. Casey to testify in that matter, on which this Court's determination was based, was in error.

Further, simply because the attorney-client privilege was illegally breached by Judge Snow in the civil contempt proceeding, does not mean that the privilege is forever waived because it now "out of the bag," or that the privilege cannot preserved for further proceedings. The attorney-client privilege is supposed to be sacred, and in order to fully honor and preserve the privilege—and to discourage potential judicial abuse of it—attorney-client privileged testimony that was compelled in one matter may still be excluded in another, especially where the testimony was wrongfully compelled in the first instance. In such cases, the Court should

apply something akin to the exclusionary rule, and find that the attorney-client privileged material remains privileged and must be excluded from subsequent proceedings. Otherwise, there is no meaningful deterrent to a court that intends to wrongfully abuse the privilege to uncover incriminating evidence; because the court knows that once something has been revealed—no matter how wrongfully—such evidence can and will be used against the defendant in subsequent criminal proceedings.

Up until the Court wrongfully compelled Mr. Casey to testify to attorney-client privileged matters, the Defendant did not assert a reliance on counsel defense; and his counsel made this extremely clear on the record.[18] Only subject to the admission of such testimony, has Defendant argued that a reliance on counsel defense indeed applies, as argued in the Motion for Judgment of Acquittal filed concomitantly herewith.

This error is not harmless, because the only actual evidence that this Court cited in its verdict in support of its finding that the Order was "clear and definite" was testimony (albeit only partially quoted) from Mr. Casey. In fact, the Court's verdict cited Mr. Casey's testimony on all but three pages, for a total of twenty-eight times. *Id.* Because Mr. Casey's testimony was attorney-client privileged and improperly compelled by this Court, a new trial must be ordered.

## V.   <u>Evidentiary Issues – Prior Testimony of John MacIntyre</u>

The Court improperly admitted the testimony of John MacIntyre, in violation of the Defendant's Sixth Amendment rights. The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with witnesses against him," and it guarantees an opportunity for effective cross-examination. *United States v. Owens*, 484 U.S. 554, 559 (1988). With these safeguards in mind, Fed.R.Ev. Rule 804(b)(1) allows the use of a statement by an unavailable witness only if the statement was given by the

---

[18] See Trial Day 1 AM, page 82, lines 13-16; transcript of April 12, 2017 hearing at page 34, lines 22-23; page 35. Line 13.

witness at a trial, hearing, or lawful deposition, and when the statement is offered against a party who had an opportunity and similar motive to develop it by direct, cross-, or redirect examination. The Ninth Circuit has "not developed a bright-line test for determining similarity of motive," as the analysis is "inherently a factual inquiry." *U.S. v. Duenas*, 691, F.3d 1070, 1086-89 (9th Cir. 2012).  In discussing *Duenas*, the Northern District of California has stated "[a]s part of this factual inquiry, the Ninth Circuit looks to whether the 'fundamental objective' of the party against whom the evidence is being offered is the same at both proceedings." *USA v. Shayota*, No. 15-CR-00264-LHK-1, 2016 WL 6093238, at *15 (N.D. Cal. Oct. 19, 2016) (quoting *Duenas*, 691 F.3d at 1089).

Defendant did not contest liability for civil contempt, and therefore he did not have a similar motive or fundamental objective for developing cross-examination during MacIntyre's prior testimony during the civil contempt matter. Defendant essentially had no motive to cross-examine any witnesses in the civil contempt hearing. Further, even though the Defendant's (former) criminal counsel was present for the civil contempt testimony, the Judge declined to allow him to cross-examine any witnesses, on the grounds that it would "gum up" the hearing.[19]

For the foregoing reasons, the prior testimony of John MacIntyre should have be precluded, as its admission is a clear violation of the Sixth Amendment and Fed.R.Ev.Rule 804(b)(1). The error is not harmless, because the Verdict cited Mr. MacIntyre's testimony as (the only) evidence in support of the Defendant being aware of the actual terms of the Order (i.e. that Mr. MacIntyre allegedly read it to him), *inter alia.* A new trial is therefore warranted.

## VI.    Jury trial under the Constitution.

Under the circumstances of this case, which involved an alleged out-of-court contempt of a complex injunction that was issued to another branch of the government, the Constitution also

---

[19]  *See* transcript of the April 22, 2015 Evidentiary Hearing Day 2 in *Melendres,* at 508:6 – 509:10.

required a trial by jury. Criminal contempt is an "arbitrary" power which is "liable to abuse," *Bloom v. State of Ill.*, 391 U.S. 194, 202 (1968). Because the Court has very broad powers to enjoin potentially any act, then by using its criminal contempt powers, it can turn potentially any act into a crime—no matter how innocent the act would otherwise be, in the absence of an order that clearly and specifically enjoins it. The Court's power to criminalize otherwise innocent behavior by issuing an injunction is comparable to Congress's power to criminalize otherwise innocent behavior by passing a law. But unlike Congress, the Court can exercise its power unilaterally, on uncertain grounds, and without delay; and so the need for proper constitutional safeguards against the criminal enforcement of a court order is even greater. *See e.g. Bloom*, 391 U.S. at 207 (remarking on "the need for effective safeguards" against abuse of the criminal contempt power); Wright and Miller, § 702 Nature of Contempt Power, 3A Fed. Prac. & Proc. Crim. § 702 (4th ed.)("[t]he possibilities of abuse [of the criminal contempt power] have been reduced by procedural protections imposed by the Supreme Court, but they have not vanished"). In this case, the Court unilaterally issued an injunction that was "hedged about by conditions and qualifications which cannot be performed, or which may be confusing to one of ordinary intelligence"[20]; and it would now, *ex post facto*, read that injunction to "clearly" enjoin something that is a "common practice" amongst law enforcement agencies and encouraged by the federal government. The Court ordered that the Defendant be prosecuted for an out-of-court violation of its own order, under its own interpretation of its own Order; and then the Court sat in judgment of its own prosecution for disobedience of its own order under its own interpretation. The framers of the Constitution clearly never contemplated the Court usurping the roles of Congress, the executive, the judiciary, and a jury, all at once. To comport with the basic requirement of fairness in due process and with the separation of powers, the

---

[20] *N.L.R.B. v. Bell Oil & Gas Co.*, 98 F.2d 405, 406 (5th Cir. 1938).

Constitution—which plainly provides for a jury trial in "all" criminal prosecutions—must provide for a trial by jury in all cases of criminal contempt involving alleged out-of-court disobedience to a complex intergovernmental injunction, and where the Court would otherwise solely be responsible for identifying, causing to be prosecuted, adjudicating, and sanctioning the contumacious conduct. *See Bagwell*, 512 U.S. at 833–34, *supra*.

## CONCLUSION

For the foregoing reasons, Defendant moves that the verdict be vacated and for a trial by jury, or for a directed verdict of acquittal in his favor.

**RESPECTFULLY SUBMITTED** August 14, 2017.

**WILENCHIK & BARTNESS, P.C.**          **GOLDMAN & ZWILLINGER PLLC**

*/s/ Dennis and Jack Wilenchik*          */s/ Mark D. Goldman*
Dennis I. Wilenchik, Esq.                Mark D. Goldman, Esq.
John D. Wilenchik, Esq.                  Vincent R. Mayr, Esq.
The Wilenchik & Bartness Building        Jeff S. Surdakowski, Esq.
2810 North Third Street                  17851 North 85th Street, Suite 175
Phoenix, Arizona 85004                   Scottsdale, AZ 85255
admin@wb-law.com                         docket@gzlawoffice.com

*Attorneys for Defendant Joseph M. Arpaio*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2017, I electronically transmitted the foregoing Notice to the Clerk of the Court through the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF registrants for this matter.

*/s/ Christine M. Ferreira*