

### ATTORNEYS AT LAW

The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810          Facsimile:  602-606-2811

Dennis I. Wilenchik, #005350
John D. Wilenchik, #029353
admin@wb-law.com



Mark Goldman, #012156
Vincent R. Mayr, #013954
Jeff S. Surdakowski, #030988
17851 North 85th Street, Suite 175
Scottsdale, AZ 85255
Main: (480) 626-8483
Facsimile: (480) 502-7500
docket@gzlawoffice.com
*Attorneys for Defendant Joseph M. Arpaio*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **United States of America,** | **Case No.: 2:16-cr-01012-SRB-1** |
| **Plaintiff,** | |
| **v.** | **DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL** |
| **Joseph M. Arpaio,** | **(Oral Argument Requested)** |
| **Defendant.** | |

      Defendant Joseph M. Arpaio ("Defendant") hereby moves for a Judgment of Acquittal under Rule 29, Federal Rules of Criminal Procedure.

**I.     The Court's conclusion that the Preliminary Injunction was "clear and definite" to the MCSO in 2011 is unsupported by the evidence; and the Court's own cold reading of the Order last month—nearly six years later—is not evidence, much less of any probative value, concerning whether the order was clear to its audience in 2011.**

There was <u>no</u> evidence to support that the Preliminary Injunction was clear and definite, *to its audience* (the Maricopa County Sheriff's Office) *at the time it was issued* (2011), that holding illegal aliens for immediate turnover to federal authorities was enjoined; much less that holding them at the express direction and encouragement of federal authorities was enjoined. This evidence was needed[1] to meet the substantive elements of the crime of criminal contempt, including that there was a "clear and definite order."[2] The only evidence that the Court cited in support of this element was testimony by Defendant's lawyer, Timothy Casey, that Mr. Casey "told Defendant that his [the Defendant's] backup plan of transporting people to Border Patrol was 'likely' a violation of the Order." (Trial Tr. Day 1-PM 148:10-19.) But as the Court knows, the actual quote by Mr. Casey was:

> THE WITNESS: I told the sheriff that in my judgment it was likely,
>
> **not definitively,** but likely a violation.

(Trial Tr. Day 1-PM 148:18-19.)(Emphasis added.)

The Court's deliberate omission of *the next two words* (and/or the preceding two

---

[1] "A court reviewing for sufficiency of the evidence must first view the evidence in the light most favorable to the prosecution and then determine whether this evidence, so viewed, is adequate to allow any rational trier of fact to find **the essential elements** of the crime beyond a reasonable doubt." *United States v. Jenkins*, 633 F.3d 788, 801 (9th Cir. 2011)(emphasis added). "Reversal is warranted when the evidence so construed may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt or is insufficient to establish **every element of the crime**." *Id.* (quotation marks omitted)(emphasis added).

[2] "Criminal contempt is established when there is [1] **a clear and definite order of the court**, [2] the contemnor knows of the order, and [3] the contemnor willfully disobeys the order." *United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980). Also, "[w]here there is ambiguity in the court's direction, it precludes the essential finding in a criminal contempt proceeding of willful and contumacious resistance to the court's authority." *United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974), *citing Traub v. United States*, 232 F.2d 43, 47 (D.C. Cir. 1955).

1

words)—"not definitively"—concisely demonstrates that Defendant did not receive a fair trial from an impartial factfinder, which in turn casts doubt on the legitimacy of its verdict and of its motivations in refusing to grant the Defendant a trial by jury. A reasonable and unbiased trier of fact could not accord this one word of Mr. Casey's testimony credibility, but ignore the rest of the sentence, and in fact the entirety of the rest of Mr. Casey's uncontroverted testimony on this critical element of the case:

- Mr. Casey testified that "we weren't sure what it [the Order] meant" (Day 1, pps. 153-154).

- Mr. Casey testified that the Order did not discuss the issue of turnovers to ICE "anywhere" (Day 1, p. 118).

- Mr. Casey testified that the language in the Order was "unclear" on the issue (*id.*).

- Mr. Casey testified that there was "ambiguity" in the Preliminary Injunction Order (Day 1, p. 158).

- Mr. Casey testified that he "shared with the [Defendant] sheriff that we could make a good faith argument that under Judge Snow's order, there was some language about there needed to be something more, the magic words something more, that perhaps this [cooperating with federal authorities] was the something more, that we can make a good faith argument" (Day 1, pps. 49-50).

As Mr. Casey himself testified, context matters. The Court's verdict cited none of this testimony and apparently ignored it. The Court appears to have accorded *one word* of one sentence by Mr. Casey credibility, but to have entirely disregarded everything else that he said on exactly the same subject, including the rest of even the same sentence. This demonstrates a bias and improper motive on behalf of the Court—namely, to disregard the evidence in order to vindicate the authority of a fellow judge, and to effectuate what the Court perceived to be his intent in making this criminal referral. These are not proper reasons to convict an innocent man;

and in doing so, the Court does even greater damage to the authority, the credibility, the esteem and the legacy of this Court. It also makes a mockery of the concept of being proven guilty beyond "a reasonable doubt," where the Court has to strain to even find even a reasonable basis to support its verdict.

The Court cites only its own cold interpretation of the Order last month, nearly six years after it was issued, for statements such as, "[t]hese detentions, in violation of the Fourth Amendment, were exactly what the preliminary injunction intended to stop" (verdict, page 13, lines 23-24); and the Court relies only on its own "full reading" of the Order in July 2017 to conclude that the Order was "clear and definite." The Court's own reading and interpretation is not evidence in this case; but even if it were, it would be of no probative value as to whether the Order was clear and definite to its audience—the MCSO, its counsel, and Defendant—in 2011. Nor may the Court decide whether the Order was clear and definite as a matter of law: "[t]he reasonableness of the specificity of an order is a *question of fact* and must be evaluated in the *context in which it is entered and the audience to which it is addressed*. For example, it may well be necessary that the specificity of orders directed to laypersons be greater than that of orders to lawyers." *United States v. Turner*, 812 F.2d 1552, 1565 (11th Cir. 1987)(emphasis added). And to "serve as a valid basis for contempt, the court's direction must be clear and unequivocal *at the time it is issued*." *Traub v. United States*, 232 F.2d 43, 47 (D.C. Cir. 1955). The Order was not addressed to the Hon. Susan Bolton sitting in her chambers in July 2017. It was addressed to the Maricopa County Sheriff's Office—and by extension its counsel, the Defendant, and over three thousand other hard-working men and women—in December 2011. Every member of the MCSO and its counsel who testified on this subject said, without *any* controverting evidence, that the Order was not clear and definite to them at the time that illegal aliens could not still be detained for the sole purpose of immediate turnover to federal authorities (and at the express request and encouragement of federal authorities, no less), which was and is a common practice

3

by law enforcement agencies; and this was not clarified until Judge Snow's permanent injunction was issued in 2013.[3] Every witness who testified on the subject said—again without controverting testimony or evidence—that the 2013 permanent injunction *was* a clear order, which provided explicit directions to the MCSO; and that this caused the Sheriff's Office to issue an equally clear directive to stop turnovers to federal authorities. The Court fails to articulate any theory to explain away this inconvenient and uncontroverted fact, i.e. why the Sheriff's Office stopped turnovers immediately after the permanent injunction was issued, and at no time before. The obvious and only inference is that the permanent injunction was clear on this issue, but the preliminary injunction was not. There was absolutely no evidence from which a reasonable trier of fact could conclude, much less beyond a reasonable doubt, that the Order *actually was* clear and definite to the MCSO in 2011 that such turnovers were enjoined. In reality, the Order contained confusing conditions and qualifications that you could drive a Mack truck through—"detaining any person based only on…without more"—and it did not address whether and how the MCSO could or should continue to interact or cooperate with federal authorities *at all*, much less specify any "clear and definite" changes that the MCSO would need to make to its operations in this respect. It is clear that Judge Snow left such ambiguity in the Preliminary Injunction because he did not want his Order to be so restrictive that it would be reversed on appeal, and because he could not and did not foresee at that time how it would actually affect the MCSO's operations. But in doing so, he merely enabled it to be interpreted and enforced arbitrarily, which violates the Due Process Clause in a criminal context, as discussed below. Finally, for the Court to now say—with the benefit of six years' hindsight— that Judge Snow was clearly ordering specific changes to the MCSO's operations to occur, and

---

[3] *See e.g.* testimony of Michael Trowbridge, Day 3 PM, pps. 739:22-740:14; 745:13-21; Brian Jakowinicz on Day 3 AM, pps. 601:17-602:1, 615:18-616:17; testimony of Timothy Casey, Day 2 AM, page 309:15-23.

that Defendant willfully defied such a "clear and definite" directive, lacks any rational basis in fact.

Further, there *was* evidence admitted in this case of how three Judges of the Ninth Circuit interpreted the Order in 2013: Judges Clifford Wallace, Susan Graber, and Marsha Berzon (Exhibit 45). Even their interpretation, which was made *at the time* and with more knowledge of the context in which the Order was entered than this Court has, disagreed with this Court's interpretation that the Order was "exactly" intended to stop holding illegal aliens for turnover to federal authorities.[4] In contrast to this Court's conclusion that the Order was intended to stop the MCSO from "delivering [its] detainees to the nearest Border Patrol station," Judge Susan Graber said in 2013: "all [Judge Snow's] enjoined is stopping someone for human trafficking on the sole ground that the person themselves, that people themselves are here unlawfully. So I don't understand what's wrong with that." (Exhibit 45.) Judge Clifford Wallace interpreted the PIO much more narrowly than this Court, to mean that the MCSO was enjoined from only "one process," which was from "stop[ping]" persons for being illegal aliens. (Exhibit 45.) His full statement, which was admitted into evidence in this case (Exhibit 45), was:

> The only thing we really have before us is an Order. We don't have an Opinion, we have an Order. And the Order says that the Sheriff cannot enforce federal civil cases. **That's all it says**. And it says the officers are hereby enjoined from detaining any person based upon knowledge or reasonable belief, without more –**he's put the "without more" in**– that the person is unlawfully present within the United States. And he explains that's a civil not a criminal case **so you can't stop them**. And he said specifically in here he's not enjoining the police officers from going ahead and processing their own cases, their own crimes. You're **only stopped for one process**. Now, assuming that that's right, that there's enough in here that he could enforce this temporary injunction, in two weeks or three weeks **we're going to find out what he really means**.

(Exhibit 45)(emphasis added).

---

[4] Of course, the opinions of Judges Clifford, Graber, and Berzon in 2013 are of limited evidentiary value because the Ninth Circuit was not the audience to whom the Order was directed either; but their opinion still holds greater evidentiary value than the opinion of this Court in 2017, which has none.

Finally, there was copious evidence and testimony introduced that the persons to whom the Order was actually addressed—the MCSO—had various and conflicting interpretations of the Order at the time, even after reading it for themselves. Lieutenant Jakowinicz testified that when he read the order, he interpreted it to mean that "we cannot stop people based on race" (Day 3, page 65); and Sergeant Trowbridge testified that when he read the order, he believed that it was "essentially an injunction against stopping people on the basis of race and detaining them on that basis" "[o]r that they're here illegally." (Day 3, page 130.) Lieutenant Sousa testified that when he read the Order, his interpretation was that "[i]f ICE or Border Patrol says, yeah, we wanted them, then we considered it their detainment....So when I read this, my first thought is hey, we're not in violation of this." (Day 4: p. 874.) Lieutenant Sousa testified that he shared his view of the Order with the Defendant and other executive MCSO staff, as well as with Timothy Casey, and that none of them disagreed or expressed that they understood the Order to clearly and definitely say otherwise. (Day 4, 877:3 - 879:21.) Sergeant Michael Trowbridge also testified that the Order did not appear at the time to require any change in the MCSO's operations. (722:16-18; 723:4-6; **727:4-7**; 755:20 – 25, 756:5-7.)

The Court cites various public statements by Defendant that he would continue to enforce immigration laws, but it is unclear what probative value the Court believes that these statements have, since the Defendant *was* entitled, if not obligated, to enforce immigration laws, including state immigration laws—i.e., the employer sanctions law and the human smuggling law, which even Judge Snow's Order acknowledged were valid and enforceable state immigration laws, *at the time*. While the Court gives weight to Defendant's statements that he would not change anything after the Order, it also fails to identify a single thing that the Order clearly required to be changed. Lieutenant Sousa testified that he believed that no changes were needed because the MCSO was not arresting people just for being in the country illegally,[5] it was stopping them for

---

[5] Testimony by Joseph Sousa, Day 4, p. 874:6-17; 877:3-6.

violations of state law (or other criminal laws), then holding them as directed by and in cooperation with federal authorities, which the Order did not clearly (or even logically) enjoin. Sergeant Michael Trowbridge also testified that based on his own independent reading of the Order at the time, it did not clearly require any changes to the MCSO's practices.[6] In other words, and to quote Judge Graber, because the Order only appeared to enjoin the MCSO from stopping someone for human trafficking (or some other crime) on the sole ground that the person was an illegal alien—something that the MCSO did not have a practice of doing—then the MCSO did not believe that anything needed to change. Nor did the Order give any clear or specific directions to the MCSO to change anything, such as the final permanent injunction did, which is fatal to this case.

Further, the Court's finding that Defendant did not do anything to implement the Order is completely unsupported by the evidence; but it would support only a civil contempt finding (on a negligence standard) at best, not the willfulness that is required for a criminal conviction. The finding is also irrelevant, because the Order did not clearly and definitely specify any changes that needed to be made, much less order that the Defendant himself make them. The evidence in fact showed that the Defendant directed Tim Casey to work with Joe Sousa and the Human Smuggling Unit on training the MCSO on whatever they needed to be trained on under the Order; but that this process effectively broke down at the lower levels, mainly because the Order did not clearly spell out any particular change to the MCSO's practices and did not appear to require any, and because it was a turbid and legalistic order that was open to various interpretations to begin with. Further, the Order did not direct the Defendant to personally implement the Order; in fact, it was addressed to the entire MCSO. For the Court to conclude that the Order created a specific and definite obligation for the Defendant to personally involve himself in following up on its implementation is not supported by any evidence in this case.

---

[6] 727:4-7 *et seq.*

Again, the Court is taking advantage of the vagueness in this Order to enforce it arbitrarily, now by claiming that it created some clear obligation for the Defendant to personally oversee the implementation of changes that it did not even clearly define.

The bottom line is that the Court's conclusion that Judge Snow's order was clear to the MCSO at the time (2011-2013) that the MCSO could not hold illegal aliens for immediate turnover to federal authorities is not supported by any actual evidence in this case. It is supported only by the Court's own gloss of the order in 2017, which is inadmissible, and which was in turn clearly influenced only by its desire to vindicate the authority of Judge Snow. (See e.g. the Court's statements, "[t]he Court concludes that *Judge Snow*'s order was clear and definite," and "the Court finds that *Judge Snow* issued a clear and definite order," rather than merely referring to "the court order" being clear.) But the Court in fact does more harm to the authority and dignity of the Court by issuing a verdict that is completely contrary to the evidence at trial, and to the truth. And the Court plays to the worst weaknesses of judicial temperament, and "summons forth the prospect of the most tyrannical licentiousness," by finding an innocent man guilty of contempt. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833–34 (1994)(Scalia, J.). For all of the foregoing reasons, the verdict must be vacated, and a judgment of acquittal must be entered.

## II. The uncontroverted evidence sustains a defense of reliance on the "good faith" advice of counsel

Reliance on the "good faith" advice of counsel is a defense to criminal contempt. *In re Eskay*, 122 F.2d 819, 822 (3d Cir. 1941). "It is a good defense to an attachment for criminal, but not civil contempt that the contemnor acted in good faith upon advice of counsel." *Id.* The Ninth Circuit distinguishes between "good faith reliance upon counsel's advice that what the defendant did was not a violation of the court's order," which is a valid defense to criminal contempt; and advice by counsel to disobey an "unambiguous" order of which the defendant was aware, which

is not a defense, and "in such a case the attorney is also in contempt." *United States v. Snyder*, 428 F.2d 520, 523 (9th Cir. 1970); *United States v. Armstrong*, 781 F.2d 700, 706 (9th Cir. 1986). The uncontroverted evidence showed that even Mr. Casey – whose understanding of the "context in which [the Order was] entered" clearly surpasses this Court's own inadmissible gloss six years later – did not believe that the Order was clear or definite at the time, and that he advised the Defendant of this and that he could make a good faith argument in support of cooperating with federal authorities. By finding that the Defendant committed criminal contempt in spite of such advice being given, the Court must also be finding that Mr. Casey was in criminal contempt of an "unambiguous" order—in which case, this Court's failure to refer him for prosecution, and the prosecution's failure to charge him, could be viewed as evidence of wrongful selective prosecution, as addressed below. But the reality is that the Order was ambiguous to Mr. Casey, and even more so to the laypeople at the MCSO, including Defendant, when it was issued. Further, the uncontroverted evidence at trial demonstrated that that the MCSO's practice of turning over illegal aliens without state charges was and is a "common practice" by law enforcement agencies across the state, and that it was encouraged and directed by federal authorities.[7] The MCSO would not reasonably believe that Judge Snow was ordering them to undermine the mission of federal law enforcement, or to refuse to cooperate with federal authorities in their mission to enforce federal immigration laws. A reasonable and unbiased trier of fact could not conclude, based on this evidence, that the Order was clear and definite that cooperation with federal authorities was enjoined, where the Order does not even mention the subject, or the subject of holding people for the sole purpose of turning them over to federal law enforcement, at all.

---

[7] *See e.g.* testimony of Christopher Clem, Day 3 PM, p. 775:20-777:10, 784:11-20; testimony of Salvador Hernandez, Day 4 AM, 859:3-15, 862:9-13.

**III.** **The Court's finding that the Order was "clear and definite" does not pass constitutional muster under the Due Process Clause of the Fifth Amendment.**

The Fifth Amendment requires at a minimum that in order to convict a defendant for criminal contempt of a court order, the order must give notice to a person of "ordinary intelligence" that his conduct was "plainly and unmistakably" criminal, and the order must have been definite enough that men of "common intelligence" need not guess at the order's meaning and could not differ as to its application. *United States v. Lanier*, 520 U.S. 259, 266 (1997); *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015); *United States v. Bass*, 404 U.S. 336, 348 (1971). In other words, the Order cannot be unconstitutionally vague as applied to the Defendant's conduct. *See United States v. Trudell*, 563 F.2d 889, 892 (8th Cir. 1977)(analogizing criminal contempt element of "clear and definite" to the constitutional vagueness doctrine). The Court violated the Defendant's Fifth Amendment due process rights by finding him guilty of violating an ambiguous Order that was "hedged about by conditions and qualifications which cannot be performed, or which may be confusing to one of ordinary intelligence." *N.L.R.B. v. Bell Oil & Gas Co.*, 98 F.2d 405, 406 (5th Cir. 1938). The Preliminary Injunction was so inherently vague – providing only that the MCSO could not detain "based solely on" illegal alienage, "without more," and failing to address the obvious question of whether the MCSO could still hold illegal aliens for immediate turnover to federal authorities – that it cannot support any action for criminal contempt at all on this issue. The injunction was clear that the MCSO was enjoined from *stopping* illegal immigrants solely for being illegal immigrants; but it simply did not clearly address whether the MCSO could still detain them in strict cooperation with the federal government. The only testimony at trial on this subject, even when viewed in a light most favorable to the Government, showed that the Defendant believed and was advised by his attorney that there was a "good faith argument" that cooperation with federal authorities was the "something more" required by the Order, especially given that the actual context of the Order was that the MCSO had simply lost its *own* unilateral immigration

enforcement authority, not that the immigration laws themselves were no longer unenforceable, or that it could not otherwise cooperate with federal authorities. If Judge Snow intended to order that the MCSO could not cooperate even with federal authorities in holding or turning over illegal aliens, then he needed to have said that. To hold the Defendant culpable in the absence of such a "plain and unmistakable" direction from the Court is to allow the Court to arbitrarily enforce its own orders criminally. This is violative of the Constitution, which provides that a criminal defendant must be put on fair notice that his conduct is plainly and unmistakably criminal. In the context of this case, it also raises certain *ex post facto* issues, to the extent that the Court issued an ambiguous order which said one thing; it allowed the Defendant to do another; and then after the Court issued its final order (the permanent injunction) that clearly prohibited the defendant's conduct, it prosecuted him for his prior conduct anyway, even though it was not clearly illegal when it occurred.

Further, as a matter of law, federal and state law expressly authorized, and even *required*, the MCSO to cooperate with federal authorities to hold or turn illegal aliens over, which the Preliminary Injunction did not clearly define or address. *See* Appendix of Law, Exhibit "A" hereto and incorporated herein. The Court's interpretation of the Order appears to be that the MCSO simply had to release illegal aliens without cooperating with federal authorities, which would clearly undermine federal immigration enforcement. A person of ordinary intelligence would not conclude that is "exactly what the preliminary injunction intended." Even a person of extraordinary intelligence, like Justice Antonin Scalia, remarked just months after the Preliminary Injunction was entered that it would be an "assault on logic"[8] to say that a known or suspected illegal alien could not be detained at least for the time that it takes to contact immigration authorities for direction; and *this very Court* has ruled, both before and after the

_____

[8] *Arizona v. United States*, 567 U.S. 387, 410, 427 (June 25, 2012)(Scalia, J.)

Preliminary Injunction, that detaining persons pursuant to direction from Border Patrol and holding or transporting them for federal detainment is not illegal. *Friendly House v. Whiting*, No. CV 10-1061-PHX-SRB (October 8, 2010); *Sol v. Whiting*, CV-10-01061-PHX-SRB (September 4, 2015).

Finally, where the order that is the subject of a criminal contempt proceeding contains any ambiguity, such ambiguity must be resolved in favor of the Defendant, following the Rule of Lenity, which is likewise applied to the interpretation of vague criminal statutes. *See e.g. Bass*, 404 U.S. at 348.[9] What the Court did here was the opposite. It chose to resolve all doubts against the Defendant, and to conclude—based on no actual evidence in the case, but only its "own reading" last month—that the Order was clear and definite, beyond a reasonable doubt.

## IV.    The Uncontroverted Evidence Sustained Defendant's Public Authority Defense

Defendant's raised an affirmative defense, the "public authority" defense, which was sustained by the undisputed evidence but entirely overlooked by the Court. "The public authority defense is properly used when the defendant reasonably believed that a government agent authorized her to engage in illegal acts." *United States v. Bear*, 439 F.3d 565, 568 (9th Cir. 2006). The Ninth Circuit Criminal Jury Instruction on the Public Authority defense states that:

> The defendant contends that if he committed the acts charged in the indictment, he did so at the request of a government agent. Government authorization of the defendant's acts legally excuses the crime charged. The defendant must prove by a preponderance of the evidence that he had a reasonable belief that he was acting as an authorized government agent to assist in law enforcement activity at the time of the offense charged in the indictment… If you find that the defendant has proved that he reasonably believed that he was acting as an authorized government agent as provided in this instruction, you must find the defendant not guilty.

Ninth Circuit Manual of Model Criminal Jury Instructions, Instruction 6.11 (2010 Edition, last updated 6/2017)(alternative bracketing omitted, as inapplicable).

---

[9] See also Defendant's Memorandum of Law, section 1 on pages 3-5, incorporated herein by reference.

The Government has of course never claimed that the Defendant himself detained persons in violation of the Order. Rather, its theory—although it has never clearly acknowledged it as such—has been that the Defendant was an "accomplice" to this act, because he allegedly "commanded" or otherwise directed persons to violate the Order, per 18 U.S.C. § 2 ("[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal"). And so the public authority defense should be modified slightly, to reflect that the defendant contends that if his "principals"—i.e., the MCSO—committed the acts charged, then they did so at the request of a government agent, i.e. Border Patrol (or ICE); and that authorization by Border Patrol (or ICE) legally excuses the crime charged. The uncontroverted evidence, and particularly the testimony of the Border Patrol agents who testified at trial, demonstrated by more than preponderance of the evidence that the Defendant and MCSO had a "reasonable belief that [they] were acting as authorized government agent[s] to assist in law enforcement activity at the time of the offense charged." At trial, Agent Hernandez of the Border Patrol testified that CBP would "request" that the MCSO transport (i.e. turn over) illegal aliens to CBP, and that "[i]f we [CBP] are short on manpower and they [MCSO] had bodies and we couldn't respond to that area, I have instructed them to bring them to our checkpoint, yes." (Day 4 AM, 859:3-15; 862:9-13.) The agent in charge of the entire Casa Grande station at all relevant times, Chris Clem, further testified that "it was an expectation of cooperation" that "[i]f you suspected you had an illegal alien, and you were willing to hold them, and we were able to respond," to temporarily detain them in order for CBP to take custody. (Day 3 PM, 784:11-20.) "[I]f they [agencies such as MCSO] catch somebody they think is illegal, if we are available, give us a call. If we could respond, we would. I mean, that's pretty much a common practice that we still do to this day." (Day 3 PM, 775:20-23.) Timothy Casey's letter to the Plaintiffs in *Melendres* (attached to Exhibit 26) also stated this. Because the uncontroverted evidence—even when viewed in a light most favorable to the Government—

demonstrates that the Defendant and MCSO had a "reasonable belief that [they] were acting as authorized government agent[s] to assist in law enforcement activity at the time of the offense charged," the public authority defense also provides a complete defense, as a matter of law.

## V.    The prosecution of Defendant constitutes impermissible selective prosecution for exercise of political speech

The Government's decision to proceed with charges against only Defendant—even though his case is clearly subject to the same one-year statute of limitations in 18 U.S.C.A. § 3285, on which basis the Government voluntarily dismissed the other defendants in this case—as well as the Government's decision to "announce" that it would charge him just two weeks before his election, and its heavy use of his political speech against him at trial—all reek of unconstitutional selective prosecution in violation of the Defendant's First Amendment rights, warranting the entry of a judgment of acquittal.

Further, there was uncontroverted testimony at trial that the Defendant's lawyer, Timothy Casey, advised him that holding illegal aliens for turnover to federal authorities was "likely, *but not definitively*" a violation of the Order, and that he advised the Defendant could make a "good faith" argument that it was allowed. For the Court to have found the Defendant in contempt despite such advice from his lawyer, the Court must be saying at the minimum that Mr. Casey was also guilty of "willfully" defying an "unambiguous" order. In which case, the Government's decision to charge only Mr. Arpaio constitutes evidence of selective prosecution.[10]

## VI.    This case is barred by the statute of limitations, 18 U.S.C. § 3285

Defendant incorporates herein and re-urges the entirety of his prior Motion for a Judgment of Acquittal regarding the Statute of Limitations (Doc. 188), and his original Motion to Dismiss based on the Statute of Limitations (Doc. 130).

---

[10] In reality, however—and to Mr. Casey's credit—the Order was ambiguous; and the Court's verdict to the contrary is utterly unsupported by the actual evidence in this case.

## VII.    The Trial Violated the Double Jeopardy Clause of the Fifth Amendment

The trial constituted a violation of the Defendant's right not to be tried twice for the same crime, because Judge Snow's alleged "civil" contempt trial and findings—which in fact focused on elements and defenses that are exclusive to a criminal contempt proceeding, such as the defendant's willfulness and alleged reliance on advice of counsel, and which concerned an alleged disobedience which even Judge Snow admitted had ended years before the proceeding began—was a *de facto* criminal contempt trial.

"A court's characterization of its proceedings is but one factor to consider in determining the true character of contempt proceedings….Problems arise when it is unclear what form of contempt proceedings was contemplated by the court or *when the court mislabels the proceedings.*" *United States v. Powers*, 629 F.2d 619, 626 (9th Cir. 1980). "Actions and proceedings need not be wholly civil or wholly criminal and the choice of one label does not prevent application of both forms of contempt punishment." *Id.* at 627. The purpose of civil contempt is remedial, and it is designed to enforce compliance with a court order. *Id.* For that reason, the punishment in a civil contempt matter is conditional and must be lifted if the contemnor obeys the order of the court; in other words, the term of punishment for civil contempt cannot extend beyond compliance with the court's order. *Id.* On the other hand, the penalty for criminal contempt is punitive in nature. It serves to vindicate the authority of the court and does not terminate upon compliance with the court's order. *Id.*

Judge Snow first raised the possibility of a criminal contempt proceeding at a status conference on November 20, 2014,[11] at which he stated, in response to a question from counsel about whether he was contemplating civil or criminal contempt proceedings: "Well, I mean, that is one of the interesting things I'm looking at….There is civil contempt and there is criminal contempt….and it may be that matters are appropriate subjects both of criminal and civil

---

[11] *See* Doc. 803, transcript.

contempt."[12] At the following hearing[13] on December 4, 2014, Judge Snow then laid out his charges against the Defendant, or in his words, why he felt that criminal contempt was "at issue."[14] At that hearing, Judge Snow displayed a copy of 18 U.S.C.A. § 401 on the courtroom monitors, which concerns criminal contempt proceedings; and he proceeded to identify exactly the same issues that appear in the Order to Show Cause in this matter: whether Defendant violated the December 23, 2011 preliminary injunction's prohibition on detaining persons "based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States," because "Sheriff Arpaio's position was that he could continue to detain immigrants who he didn't have a cause to hold on any state charges and turn them over to ICE."[15] (Compare with the O.S.C. in this case: "[t]he MCSO continued to stop and detain persons based on factors including their race, and frequently arrested and delivered such persons to ICE when there were no state charges to bring against them…"[16]) And even at that hearing, Judge Snow acknowledged that this alleged violation of his Preliminary Injunction had already occurred: "that is a serious violation in direct contradiction to this Court's authority that apparently *lasted* for months and months, more than a year at the minimum, it appears." (Doc. 817 in *Melendres*, page 17 at lines 13-16.) At the hearing, Judge Snow resolved to begin what he labeled as a "civil" contempt proceeding; and around two months later, or on February 12, 2015, Judge Snow entered his Order to Show Cause. In the proceedings leading up the hearing, Judge Snow emphasized to the Defendant that he needed to have "skin in the game"[17]; and even though "[i]ntent is not an issue in civil contempt proceedings,"[18] Judge Snow put the

---

[12] Doc. 803, page 39, lines 12-23.
[13] See Doc. 817, transcript of hearing.
[14] Doc. 817, page 5, lines 5-6.
[15] Doc. 817, page 17, lines 5-9.
[16] Doc. 36 at page 3, lines 7 – 10.
[17] See transcript of May 31, 2016 hearing in *Melendres*.
[18] *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir.1983).

16

Defendant's "state of mind" at the forefront of his "civil" contempt trial, and of his resulting findings in the civil contempt matter. Judge Snow claimed that "[t]he state of mind of Sheriff Arpaio … impacts the Court's ability to craft remedies that are tailored to the particular problems that gave rise to the contemptuous act in the first place." (Doc. 1094 in *Melendres*, at 7:8 – 9.) However, Judge Snow admitted, both before and after[19] the purported civil contempt proceedings began, that the MCSO had already been in compliance with the preliminary injunction for years, since 2013. All of this indicates that Judge Snow conducted the civil contempt hearings for the true purpose of determining whether the Defendant willfully disobeyed his order, and punishing him for it, making his "civil" trial into a *de facto* criminal contempt proceeding. Further, and as described in Defendant's Motion for New Trial, Judge Snow found a waiver of the attorney-client privilege because he claimed that the Defendant had asserted a defense of "reliance on counsel"; but "[i]t is a good defense to an attachment for criminal, [and] not civil contempt that the contemnor acted in good faith upon advice of counsel." *In re Eskay*, 122 F.2d 819, 822 (3d Cir. 1941); *see also Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc.*, 817 F.2d 1361, 1365 (9th Cir.1987)(in a civil contempt proceeding, a "good faith exception to the requirement of obedience to a court order has no basis in law"). In other words, Judge Snow was applying the elements and defenses of a criminal contempt proceeding. Because Judge Snow's civil trial was in fact a criminal proceeding, then the conduct of a second trial in this case, which was substantially the same as the original trial, constituted Double Jeopardy.

## CONCLUSION

For the foregoing reasons, Defendant moves for a directed verdict of acquittal in his favor.

---

[19] *See* May 13, 2016 Finding of Fact, Doc. No. 1677, Case 2:07-cv-02513-GMS at ¶ 10: "The MCSO continued these unconstitutional practices until this Court entered its Findings of Fact and Conclusions of Law in May 2013."

**RESPECTFULLY SUBMITTED** August 14, 2017.

| **WILENCHIK & BARTNESS, P.C.** | **GOLDMAN & ZWILLINGER PLLC** |
|---|---|
| */s/ Dennis and Jack Wilenchik* | */s/ Mark D. Goldman* |
| Dennis I. Wilenchik, Esq. | Mark D. Goldman, Esq. |
| John D. Wilenchik, Esq. | Vincent R. Mayr, Esq. |
| The Wilenchik & Bartness Building | Jeff S. Surdakowski, Esq. |
| 2810 North Third Street | 17851 North 85th Street, Suite 175 |
| Phoenix, Arizona 85004 | Scottsdale, AZ 85255 |
| admin@wb-law.com | docket@gzlawoffice.com |

*Attorneys for Defendant Joseph M. Arpaio*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2017, I electronically transmitted the foregoing Notice to the Clerk of the Court through the CM/ECF system, which will send a Notice of Electronic Filing to all CM/ECF registrants for this matter.

*/s/ Christine M. Ferreira*