**Exhibit A**

*Arizona Law*

Beginning in September 2012, Arizona law actually *required* that state law enforcement contact ICE or CBP when they encountered an illegal alien during a lawful stop (A.R.S. § 11-1051(B)).[1] A.R.S. § 11-1051(D)[2] explicitly provided at all relevant times (and even today) that a state law enforcement agency may, "notwithstanding any other law," "securely transport an alien who the agency has received verification is unlawfully present in the United States and who is in the agency's custody to a federal facility in this state or to any other point of transfer into federal custody that is outside the jurisdiction of the law enforcement agency." The validity of this subsection has apparently only been challenged twice; and incidentally both times were in this Court, and it was upheld. See *Friendly House v. Whiting*, No. CV 10-1061-PHX-SRB (October 8, 2010); *Sol v. Whiting*, CV-10-01061-PHX-SRB (September 4, 2015). Both cases were facial challenges; and in the former case, this Court stated: "[s]ection 2(D) requires that verification of the person's unlawful presence be obtained and that the person already be in the agency's custody before the transportation occurs. Plaintiffs have not stated a claim that this provision plausibly violates the Fourth Amendment. *See United States v. Means*, 252 Fed.Appx. 830, 834 (9th Cir. 2007) (unpublished) ("[Plaintiff] cites no authority holding the transportation of a lawfully detained individual violates the Fourth Amendment, and we have found none.") In the latter case (*Sol v. Whiting*), and even more germane to the issues herein, the Court stated (in response to the argument that Section 2(D) is preempted): "federal law authorizes

---

[1] Also referred to as Section 2(B) of SB 1070, injunction lifted by this Court on September 18, 2012.

[2] Also referred to as Section 2(D) of SB 1070, enacted on April 23, 2010.

state and local officials to perform immigration enforcement duties under cooperation agreements and in other circumstances, see, e.g., 8 U.S.C. § 1357(g)(1) [citations omitted]. These duties can include transporting detainees.…The verification and transport process the law recognizes is consistent with state officials' enforcement actions taken under cooperation agreements and as authorized under the federal statutes listed above." In a footnote to this paragraph (footnote 16), the Court further stated: "This analysis also applies to Plaintiffs' argument that Section 2(D) authorizes state officials to unilaterally act without federal direction. Because Section 2(D) can be interpreted to cover **situations in which federal officials request state officials' assistance—a situation that does not implicate the constitutional concerns Plaintiffs identify**—the law is not facially preempted" (referring to "the constitutional concerns mentioned in the *Arizona* opinion, including potential violations of Fourth Amendment")(emphasis added).

*Federal Law*

Federal law expressly provided at all relevant times (and provides today) that no person or entity may restrict state law enforcement from contacting and communicating with ICE or CBP with respect to a person's immigration status. 8 U.S. Code § 1373 (a). Federal law also allows for "cooperation" between state law enforcement and ICE or CBP in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). This expressly includes "communicat[ion] with [ICE or CBP] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(A). The United States Supreme Court decision in *Arizona v. United States*—which came down six month *after* the Preliminary Injunction was issued, and essentially halfway through the PIO injunction "period"—underscores just how ambiguous

these issues were at the time and remain, even outside of Judge Snow's permanent injunction. Justice Kennedy, writing for the majority, stated that "[t]here may be some ambiguity as to what constitutes cooperation under the federal law…" *Arizona*, 567 U.S. at 410 (emphasis added). He wrote that "no coherent understanding of the term [cooperation] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.* In support of this, he cited to a 2011 Memorandum by the Department of Homeland Security, which contained "examples of what would constitute cooperation under federal law," and which specifically listed as an example of cooperation, "where state government officials learn in the normal course of state business of possible violations of federal immigration law, referring those possible violations to DHS [BP and ICE] immigration officials on a case-by-case basis."[3] "Paragraph (10) of subsection 1357(g) allows state and local officers to participate in certain aspects of the enforcement of immigration laws outside of a formal written agreement, through formal or informal cooperation with the Secretary…[S]tate and local law enforcement officers render assistance to DHS on a case-by-case basis as immigration matters come to their attention in the performance of their regular duties under state or local law." (Memorandum, page 7.) "Where state and local officers and DHS officers work closely together, often along the U.S. border, state and local officers are responsive to the requests, needs, and guidance of the federal agency"; and "[t]he Federal Government may, at times, take a secondary, supporting role to a state enforcement effort that is primarily aimed at enforcing state law."

---

[3] The Memorandum is available at https://www.dhs.gov/sites/default/files/publications/guidance-state-local-assistance-immigration-enforcement.pdf. The Court may regard the Memorandum as a legal authority, like the Supreme Court did, or otherwise take judicial notice of it. The quoted section is on page 13.

(Memorandum, page 5.) A state law enforcement officer may communicate information about a person's immigration status to the Department of Homeland Security "when the officer learns of information incidentally in the performance of regular police functions." (Memorandum, page 13.) All of this, even according to Justice Kennedy (writing for a majority of United States Supreme Court), constituted "cooperation" with federal authorities within the meaning of the law as of even 2011. In the same decision, Justice Antonin Scalia wrote that it would even be an "assault on logic" to believe that local law enforcement could not, after encountering an illegal alien, "contact federal immigration authorities, and follow their lead on what to do next." *Arizona v. United States*, 567 U.S. 387, 410, 427 (June 25, 2012). "[I]t is an assault on logic to say that identifying a removable alien and holding him for federal determination whether he should be removed" is illegal, because "federal law expressly provides that state officers may cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States, 8 U.S.C. § 1357(g)(10)(B); and cooperation requires neither identical efforts nor prior federal approval. It is consistent…with the cooperative system that Congress has created, for state officials to arrest a removable alien, **contact federal immigration authorities, and follow their lead on what to do next**." *Id.* (internal citations, quotation marks, bracketing omitted; emphasis added). The majority did not disagree on this point, except to say that "unilaterally" holding an illegal alien without contacting ICE or CBP or taking direction from them would raise constitutional concerns. *See Arizona*, 567 U.S. at 410, 413 (Kennedy, J., *supra*). And of course, "contact[ing] federal immigration authorities and follow[ing] their lead on what to do next" is exactly what the MCSO did and is alleged to be criminal here – something that Justice Scalia remarked it would be "an assault on logic" to think was illegal, and that the Preliminary

4

Injunction did not clearly and definitely enjoin. Even when the evidence is viewed in a light most favorable to the Government, it demonstrates that the Order was ambiguous; and because any such ambiguity (and the mere fact of the ambiguity) must be read in favor of the Defendant, the Government's evidence was insufficient to convict.