Locke E. Bowman, admission *pro hac vice* (Illinois Bar # 6184129)
David M. Shapiro, admission *pro hac vice* (Illinois Bar # 6287364)
RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER
Northwestern Pritzker School of Law
375 E. Chicago Avenue
Chicago, IL 60611
312.503.0711
david.shapiro@law.northwestern.edu
locke.bowman@law.northwestern.edu

*Attorneys for Amicus Curiae Roderick and Solange MacArthur Justice Center*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br>　　　　　　Plaintiff,<br><br>　v.<br><br>Joseph M. Arpaio,<br>　　　　　　Defendant. | No. CR-16-01012-001-PHX-SRB<br>**[PROPOSED] AMICUS BRIEF OF RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER IN OPPOSTION TO ARPAIO'S MOTION TO VACATE CONVICTION** |

This Court should deny Joseph Arpaio's motion to vacate his conviction. The pardon is invalid and unconstitutional because it has the purpose and effect of eviscerating the judicial power to enforce constitutional rights. We show in this brief that the adoption of the Bill of Rights and the Reconstruction Amendments altered the original constitutional framework by specifying individual rights to be enforced, in James Madison's words, by "independent tribunals of justice." 1 ANNALS OF CONG. 439 (1789) (Joseph Gales ed., 1834). Judicial enforcement of these rights would provide an essential and "impenetrable bulwark against every assumption of power in the legislative or executive." *Id*. Whatever the limits of the pardon power may have been when the Constitutional Convention finished its work, the adoption of the Bill of Rights and the Fourteenth Amendment makes clear that the executive power, including the pardon power, cannot be exercised to disable the judicial enforcement of constitutional rights.

Yet eviscerating this Court's power to enforce constitutional rights is precisely what the pardon will do if given effect. Such an outcome would not be limited to this Court. It would, by design, diminish the judicial power of every federal court to enforce constitutional rights. The Arpaio pardon is only the President's latest assault on the federal judiciary; a succession of statements by the President show an intent to undermine the constitutional function of the federal courts as a check against fundamental deprivations of liberty.

Finally, even if the Court were to find that the pardon is valid and erases the effects of the conviction, the conviction itself should stand. Shortly before the pardon, the White House asked Arpaio if he would accept a pardon, and he said that he would. Arpaio's lawyer then insisted that the President issue the pardon before sentencing, which the President did. Arpaio now argues that the conviction should be vacated because he has no opportunity to appeal, but he created that scenario by saying he would accept a pardon and by insisting that it occur immediately. A party who voluntarily moots a case is not entitled to vacatur. If this case is moot, it is because of Arpaio's voluntary choices.

## ARGUMENT

**I.   The President Cannot Issue Pardons that Have the Purpose and Effect of Eviscerating the Judicial Power To Enforce the Bill of Rights and the Reconstruction Amendments.**

The debates at the 1787 Constitutional Convention suggest that the Framers intended to grant the President very broad pardon power. *See* William F. Duker, *The President's Power to Pardon: A Constitutional History*, 18 Wm. & Mary L. Rev. 475, 501-06 (1977); John Dinan, *The Pardon Power and the American State Constitutional Tradition*, 35 Polity 394-95, 404-05 (2003). The Framers voted down a proposed limitation on pardons for treason and rejected a requirement that the Senate approve pardons. *See* Duker, *supra*, at 501-506; Dinan, *supra*, at 394-95, 404-05. The Framers did include one textual limitation on the pardon power in Article II: The President may not issue pardons in "cases of impeachment." U.S. Const., Art. II, § 1. The Framers of course had no cause to consider the

precise issue presented here—whether the pardon power extends to a criminal contempt conviction resulting from a government official's refusal to obey a court order enforcing a constitutional right conferred by *later* constitutional amendments.

Assuming for the sake of argument that the *original* constitutional framework would have permitted the Arpaio pardon, structural alterations accomplished through the Bill of Rights and the Fourteenth Amendment prohibit it. The Framers came to view the original constitutional structure as incomplete and therefore changed it by enacting the Bill of Rights. Geoffrey P. Miller, *Liberty and Constitutional Architecture: The Rights-Structured Paradigm*, 16 Harv. J.L. & Pub. Pol'y 87, 90-91 (1993). These alterations established an important limitation on the executive power: The executive power cannot be exercised to eviscerate the judicial power to enforce constitutional rights.

James Madison's address to Congress upon his introduction of the Bill of Rights makes it clear that the purpose of the first ten amendments is not only to guarantee certain individual rights but to guarantee the judicial power to enforce them. In the United States, Madison observed, "the people of many states, have thought it necessary to raise barriers against power in all forms and departments of government." 1 ANNALS OF CONG. 454. "[T]he great object" of these barriers, which many states had incorporated into their constitutions, was "to limit and qualify the powers of Government, by excepting out of the grant of power those cases in which the Government ought not to act, or to act only in a particular mode. They point these exceptions sometimes against the abuse of the executive power, sometimes against the legislative . . . ." *Id.* Madison made it clear that the liberties protected by the Bill of Rights would be secured by the judiciary—"independent tribunals of justice," as he called the courts:

> If [individual rights] are incorporated into the constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights.

*Id* at 457. The argument Madison makes to Congress is "founded on separation of powers. Independent judges would be charged with interpreting and enforcing constitutional rights and thus checking the tendency of the people and the other branches to violate these rights." Douglas Laycock, *Individual Liberty and Constitutional Architecture: The Founders' Prompt Correction of Their Own Mistake,* 16 Harv. J.L. & Pub. Pol'y 75, 82 (1993).

Madison appears to have adopted a view of judicial enforcement that Thomas Jefferson had set forth in previous correspondence. *See* Randolph J. May, *Independent Judicial Review: An Appreciation of Its Origins and Some Contemporary Musings about Its Role Two Hundred Years Later*, 2 Geo. Mason Indep. L. Rev. 195, 203 (1993). Jefferson had written to Madison on March 15, 1789:

> In the arguments in favor of a declaration of rights, you omit one which has great weight with me, the legal check which it puts into the hands of the judiciary. This is a body, which if rendered independent & kept strictly to their own department merits great confidence for their learning & integrity. In fact what degree of confidence would be too much for a body composed of such men as Wythe, Blair & Pendleton? On characters like these the "civium ardor prava jubentium" would make no impression.[1]

Drawing on these sources, constitutional scholars have demonstrated that, while the Bill of Rights did not change the text of Article III, it did alter fundamentally the structure of government and the power of the federal courts in relation to the other branches by providing the federal courts with a concrete set of mandates to enforce against officials of the other branches. Thus, the adoption of the Bill of Rights "increased judicial power," though it did not do so through "an amendment to Article III expressly conferring additional powers" upon the judiciary. Laycock, *supra*, at 83. Rather, "the source of power in the Court came from the addition of rights in the people." *Id.* Similarly, Geoffrey Miller writes:

---

[1] Letter from Thomas Jefferson to James Madison (March 15, 1789), *in* The Works of Thomas Jefferson in Twelve Volumes (Paul Leicester Ford ed, Fed. ed. 1904). The phrase "heat of the populace," written by Jefferson in Latin, is a reference to a Horace verse: "The just man tenacious of purpose is not to be turned aside by the heat of the populace nor the brow of the threatening tyrant." *See* Robert Browning, *Poems of Robert Browning from the Author's Revised Text of 1889* 48 (1896).

3

> [T]he Bill of Rights can be seen as rectifying a structural defect in the original Constitution. The original Constitution established two relatively strong branches of the government, the legislature and the executive. It failed to give equal powers to the judiciary. The Bill of Rights increases the powers of the judiciary, consonant with its position of equal dignity within the constitutional structure.

Miller, *supra*, at 91; *see also* May, *supra*, at 195-96, 205.

After the Civil War, the Fourteenth Amendment further altered the original constitutional structure both by expanding the judicial power and by guaranteeing new rights—including equal protection—against state actors. A draft of Section 1 of the Fourteenth Amendment did not guarantee any individual rights, and merely granted Congress the power to protect them through legislation. CONG. GLOBE, 39th Cong., 1st Sess. 1088 (1866). Senator Giles Hotchkiss criticized this draft sharply because it failed to secure individual rights as the law of the land:

> I understand the amendment as now proposed by its terms to authorize Congress to establish uniform laws throughout the United States upon the subject named, the protection of life, liberty and property. I am unwilling that Congress shall have any such power. . . . The object of a Constitution is not only to confer power upon the majority, but also to restrict the power of the majority and protect the rights of the minority.

CONG. GLOBE, 39th Cong., 1st Sess. 1095 (1866). Hotchkiss therefore proposed a revision—from which the Fourteenth Amendment was "ultimately derived"—that provided a direct guarantee of Fourteenth Amendment rights. William E. Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* 55 (1998); *see also* Maggie McKinley, *Plenary No Longer: How the Fourteenth Amendment Amended Congressional Jurisdiction-Stripping Power*, 63 Stan. L. Rev. 1213, 1229 (2011). Hotchkiss insisted on this change because he "wanted to be certain that the rights would be enforced by the judiciary." Nelson, *supra*, at 55. Thus, the Fourteenth Amendment, as enacted, guaranteed "a neutral federal forum in which to enforce these new rights against state malfeasance." McKinley, *supra*, at 1229. The point that the Fourteenth Amendment expanded the enforcement power of the federal courts was not lost on the Governor of Alabama, who

opposed ratification on states' rights grounds, and observed that the Amendment "would enlarge the judicial powers of the General Government to . . . gigantic dimensions."[2]

In short, even if the original architecture of the Constitution would have allowed the President to defeat the judicial power to enforce constitutional rights by exercising the pardon power, this much is clear: The President may do so no longer. Subsequent changes in the structure of American government prohibit the Chief Executive from abusing the pardon power to nullify the judicial enforcement of constitutional rights.

*Ex Parte Grossman*, 267 U.S 87 (1925), is not to the contrary. In *Grossman*, the district court acted pursuant to a prohibition law and ordered the defendant, a county official, to stop selling liquor from his place of business. *Id.* at 107. The official defied the injunction, the court convicted him of criminal contempt, and the President pardoned him. *Id.* In *Grossman*, there was no constitutional dimension to the order that the defendant defied, and the Supreme Court rejected the claim that the pardon violated the separation of powers or compromised judicial independence. *Id.* at 119-22. This case is different. Arpaio's crime consists of flouting orders issued to enforce constitutional rights, and the fundamental role of the judiciary in the American structure of government is to protect those rights. A pardon that nullifies the punishment for selling alcohol does not defeat the enforcement of constitutional rights. This pardon does so, and is therefore invalid.

## II.   The Arpaio Pardon Has the Purpose and Effect of Eviscerating the Judicial Power To Enforce Constitutional Rights.

The President's pardon eviscerates this Court's enforcement power in the *Melendres* litigation by endorsing Arpaio's refusal to comply with federal court orders. Not only does the pardon purport to eliminate Arpaio's criminal conviction, but it also immunizes him for any future violations of orders entered in *Melendres* (including orders that have not even been entered yet).

---

[2]*Governor's Message*, Mobile Daily Advertiser and Register, Nov. 13, 1866, at 2, *quoted in* Nelson, *supra*, at 105.

The text of the pardon is so broad that it purports to allow Arpaio to run for Sheriff again, resume his violation of orders currently in place in *Melendres*—or future orders in *Melendres* that have not yet been entered—and escape criminal liability for future contempt.[3] This scenario is a very real possibility: Immediately after receiving the pardon, Arpaio refused to rule out the possibility of running for office again.[4] The pardon therefore purports to establish *prospective* immunity for Arpaio against all criminal liability no matter how many times or how blatantly he flouts orders issued in *Melendres*. Such a scenario would eviscerate the power of this Court to discharge its constitutional duty to enforce constitutional protections in the *Melendres* litigation. In fact, the Supreme Court has repeatedly held that the President cannot issue pardons for future conduct. *Grossman*, 45 S.Ct. at 337 ("A pardon can only be granted for a contempt fully completed."); *Ex parte Garland*, 71 U.S. 333, 334 (1866) (stating that the power to pardon an offense may be "exercised at any time *after* its commission") (emphasis added).

The consequence of the pardon, if it is given effect, will not be limited to the *Melendres* litigation. The President's statements further demonstrate that the pardon is designed to endorse and encourage government officials who flout court orders. The President did not say that Arpaio deserved a pardon because he committed a forgivable transgression by ignoring this Court's repeated orders. Instead, the President said that Arpaio was "doing his job" by thumbing his nose at this Court's orders:

> The most sacred duty of government is to protect the lives of its citizens, and that includes securing our borders, and enforcing our immigration laws.
>
> By the way, I'm just curious. Do the people in this room like Sheriff Joe?
>
> *So, was Sheriff Joe convicted for doing his job?* That's why...

---

[3] The President has furnished Arpaio with a "full and unconditional pardon" not only for his current conviction but "for any other offenses under Chapter 21 … *that might arise*, or be charged, in connection with *Melendres v. Arpaio*." Def.'s Mot. Vacate & Dismiss Ex. A (emphasis added).

[4] Amy B. Wang, *Arpaio, 85, hints at return to politics after pardon from Trump*, Wash. Post (Aug. 26, 2017), https://www.washingtonpost.com/news/post-nation/wp/2017/08/26/arpaio-85-hints-at-return-to-politics-after-pardon-from-trump/?utm_term=.1af0da8de782.

> He should have had a jury, but you know what? I'll make a prediction. I think he's going to be just fine, OK?
>
> But – but I won't do it tonight, because I don't want to cause any controversy. Is that OK? All right?
>
> But Sheriff Joe can feel good. The people of Arizona know the deadly and heartbreaking consequences of illegal immigration, the lost lives, the drugs, the gangs, the cartels, the crisis of smuggling and trafficking. MS-13 – we're throwing them out so fast, they never got thrown out of anything like this. We are liberating towns out on Long Island. We're liberating.[5]

The notion that Arpaio was "doing his job" when he ignored the orders of this Court sends a message that state and local law enforcement officials need not fear federal courts trying to enforce constitutional rights—when government officials ignore the courts, they are "doing their job," and the President will protect them against sanctions. After the pardon, Trump reiterated the message that Arpaio was unfairly prosecuted for doing his job of protecting the border against undocumented immigrants: "Sheriff Joe protected our borders" and was "unfairly treated" by the Obama Administration (presumably because Judge Snow referred the case and the prosecution commenced during that administration).[6]

The President continually reinforces this message—the federal courts have no business enforcing constitutional rights against the government—through his public bullying of federal judges. After the Honorable James L. Robart, United States District Judge for the Western District of Washington, temporarily blocked enforcement of the original executive order banning travel to the U.S. from certain Muslim-majority countries, the President tweeted:

> The opinion of this so-called judge, which essentially takes law-enforcement away from our country, is ridiculous and will be overturned![7]

The next day, he tweeted:

---

[5] *President Trump Ranted For 77 Minutes in Phoenix. Here's What He Said*, TIME, (Aug. 23, 2017), http://time.com/4912055/donald-trump-phoenix-arizona-transcript/.

[6] Remarks by President Trump and President Niinistö of Finland in Joint Press Conference, White House Office of the Press Secretary (Aug. 28, 2017, 4:20 P.M.), https://www.whitehouse.gov/the-press-office/2017/08/28/remarks-president-trump-and-president-niinist%C3%B6-finland-joint-press.

[7] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 5:12 AM), https://twitter.com/realDonaldTrump/status/827867311054974976.

> Just cannot believe a judge would put our country in such peril. If something happens blame him and court system. People pouring in. Bad![8]

After the Ninth Circuit held argument in the same case, President Trump told a crowd of law enforcement officials:

> I listened to a panel of judges, and I'll comment on that – I will not comment on the statements made by certainly one judge. But I have to be honest that if these judges wanted to, in my opinion, help the court in terms of respect for the court, they'd what they should be doing. I mean, it's so sad.[9]

Trump also excoriated the federal judiciary for enforcing constitutional rights in the "sanctuary cities" litigation. After U.S. District Judge William H. Orrick (N.D. Cal.) ruled against the Administration, President Trump attacked the judiciary on April 25, 2017:

> This San Francisco judge's erroneous ruling is a gift to the criminal gang and cartel element in our country, empowering the worst kind of human trafficking and sex trafficking, and putting thousands of innocent lives at risk . . . This case is yet one more example of egregious overreach by a single, unelected district judge.[10]

Trump again attacked the Ninth Circuit following Judge Orrick's decision, mistaking him for the Ninth Circuit:

> First the Ninth Circuit rules against the ban & now it hits again on sanctuary cities—both ridiculous rulings.[11]

The message from the President's statements is clear: The judiciary should leave law enforcement alone, and allow government officials to achieve "law and order" by violating constitutional rights. The President can say what he chooses, but he must not issue pardons that eviscerate the role of the federal judiciary in our constitutional structure. Viewed together, the breathtaking scope of the pardon, the President's statement that Arpaio was

---

[8] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 5, 2017, 12:39 PM), https://twitter.com/realdonaldtrump/status/828342202174668800?lang=en

[9] Remarks by President Trump at MCCA Winter Conference, White House Office of the Press Secretary (Feb. 08, 2017), https://www.whitehouse.gov/the-press-office/2017/02/08/remarks-president-trump-mcca-winter-conference.

[10] Statement on Sanctuary Cities Ruling, (Apr. 25, 2017), https://www.whitehouse.gov/the-press-office/2017/04/25/statement-sanctuary-cities-ruling.

[11] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 26, 2017, 3:20 AM), https://twitter.com/realdonaldtrump/status/857177434210304001?lang=en.

just "doing his job" by flouting court orders, and the President's repeated attacks on judges who enforce the Constitution make it clear that the purpose and effect of the Arpaio pardon is to neutralize the judiciary's function as "an impenetrable bulwark against every assumption of power in the legislative or executive." 1 ANNALS OF CONG. at 457.

### III. Even If the Court Concludes that the Pardon Is Valid, The Court Should Not Vacate the Conviction Because Arpaio Voluntarily Mooted the Case.

A party is entitled to vacatur of existing orders and judgments only if the party did not moot the case through "voluntary action." *U.S. Bancorp Mortg. Co. v. Bonner Mall Partnership*, 513 U.S. 18, 24 (1994). Vacatur is appropriate only "where a controversy presented for review has 'become moot due to circumstances unattributable to any of the parties.'" *Id.* at 23 (citing *Karcher v. May,* 484 U.S. 72, 82 (1987)). In other words, "a party who seeks review of the merits of an adverse ruling" should not be "frustrated by the vagaries of circumstance." *Id*. at 25.

Arpaio mooted this case voluntarily. The White House called Arpaio shortly before the pardon issued and gave him the opportunity to decline the pardon, but Arpaio accepted it.[12] Arpaio was also adamant about the timing of the pardon—in response to indications that the President might not issue the pardon until after sentencing, Arpaio's counsel wrote to the White House Counsel on August 25 and demanded a pre-sentencing pardon.[13] Thus, he insisted on a timeframe that would eliminate any possibility that his appeals would be exhausted when the pardon issued. Arpaio should not be heard to argue that the very time frame he demanded unfairly denied him the opportunity to challenge the verdict on appeal.

Arpaio relies upon *United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) (en banc), which granted vacatur when a presidential pardon mooted a case with an appeal pending, but this decision is inconsistent with the legal tests established by the Supreme Court. When a convict *makes a request* for a pardon (as Shaffer presumably did, although

---

[12] *A letter from Joseph Arpaio's lawyer to White House Counsel Donald F. McGahn II*, The Washington Post, (https://apps.washingtonpost.com/g/documents/politics/a-letter-from-joseph-arpaios-lawyer-to-white-house-counsel-donald-f-mcgahn-ii/2540/.
[13] *Id.*

9

the case does not say either way), the pardon is not "unattributable" to the petitioner, nor is the petitioner "frustrated by the vagaries of circumstance." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 23, 25. The successful pardon petitioner obtains mootness through "voluntary action," *id.* at 24, by initiating a pardon request. But even if *Schaffer* were consistent with Supreme Court precedent, it does not reach the present circumstances. Most pardon petitioners make a request and then relinquish voluntary control over it; they await a decision that will come far in the future and in which they will have little or no involvement. While Arpaio claims he did not request the pardon, he had the opportunity to decline it right before it issued; instead he accepted the pardon, and even obtained it on his preferred schedule. The notion that Arpaio was "frustrated by the vagaries of circumstance," *id.* at 25, is ludicrous.

"Judicial precedents . . . are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." Moreover, moot cases must be disposed of "in the manner 'most consonant to justice.'" *Id.* at 391-392 (citation omitted). It is difficult to imagine a case in which vacatur would be *less* consonant to justice and the public interest than it would be here. The President has pardoned Arpaio in a manner repugnant to our constitutional order, rewarding him for waging war on minority communities and for breaking the law repeatedly and willfully. The least this disgraced lawman should suffer is the stigma of conviction. The nation deserves for his conviction to stand.

## CONCLUSION

*Amicus* requests that the Court hold the pardon invalid and deny the motion to vacate.

Dated:  September 11, 2017

Respectfully Submitted,

By /s/David M. Shapiro
Locke E. Bowman, admission *pro hac vice* (Illinois Bar # 6184129)
David M. Shapiro, admission *pro hac vice* (Illinois Bar # 6287364)
RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER
Northwestern Pritzker School of Law
375 E. Chicago Avenue
Chicago, IL 60611

*Attorneys for Amicus Roderick and Solange MacArthur Justice Center*

11

# CERTIFICATE OF SERVICE

☒   I hereby certify that on September 11, 2017, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

**Dennis Ira Wilenchik**
**John Douglas Wilenchik**
Wilenchik & Bartness PC
2810 N 3rd St., Ste. 103
Phoenix, AZ 85004
602-606-2810
Fax: 602-606-2811
Email: diw@wb-law.com
Email: jackw@wb-law.com
*Represents Defendant Joseph Arpaio*

**John Dixon Keller**
US Dept of Justice Public Integrity Section
10th & Constitution Ave.
Washington, DC 20530
202-514-1412
Email: John.Keller2@usdoj.gov
*Represents Plaintiff USA*

**Joseph John Popolizio**
**Justin Michael Ackerman**
**Linda Kim Tivorsak**
Jones Skelton & Hochuli PLC
40 N Central Ave., Ste. 2700
Phoenix, AZ 85004
602-263-1700
Fax: 602200-7876
Email: jpopolizio@jshfirm.com
Email: jackerman@jshfirm.com
Email: ltivorsak@jshfirm.com
*Represents Defendant Joseph Arpaio*

**Victor R Salgado**
US Dept of Justice - Public Integrity Section,
1400 New York Ave. NW, 12th Fl.
Washington, DC 20005
202-353-4580
Email: victor.salgado@usdoj.gov
*Represents Plaintiff USA*

**Jeffrey Sinclair Surdakowski**
**Mark David Goldman**
**Vincent Rene Mayr**
Goldman & Zwillinger PLLC
17851 N 85th St., Ste. 175
Scottsdale, AZ 85255
480-626-8483
Fax: 480-502-7500
Email: jsurdakowski@gzlawoffice.com
Email: mgoldman@gzlawoffice.com
Email: vmayr@gzlawoffice.com
*Represents Defendant Joseph Arpaio*

**Simon Joseph Cataldo**
US Dept of Justice
1400 New York Ave., 12th Fl.
Washington, DC 20005
202-616-2464
Email: simon.cataldo@usdoj.gov
*Represents Plaintiff USA*

**Karen Ann Clark**
Adams & Clark PC
520 E Portland St., Ste. 200
Phoenix, AZ 85004
602-258-3542
Fax: 602-258-1377
Email: assistant@adamsclark.com
*Represents Movant Timothy Casey*

/s/David M. Shapiro